Transcript of the Testimony of

# WILLIAM WRIGHT, M.D.
June 7, 2019

<u>Craig Shipp</u>
v
<u>Correct Care Solutions, LLC, et al.</u>

## Sundae A. Stoa, FCRR, RPR

*Sundae A. Stoa, FCRR, RPR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444





Page 1

UNITED STATES DISTRICT COURT
for the
Western District of Arkansas

Civil Action No. 4:18-CV-04017 SOH

---

DEPOSITION OF: WILLIAM WRIGHT, M.D. - June 7, 2019

---

CRAIG SHIPP,

Plaintiff,

v.

CORRECT CARE SOLUTIONS, LLC; DR.
LORENE LOMAX, DR. MIMO LEMDJA, et al.,

Defendants.

---

PURSUANT TO NOTICE AND AGREEMENT, the deposition of William Wright, M.D. was taken on behalf of the Defendants at 101 North Cascade Avenue, Suite 400, Colorado Springs, Colorado, 80903, on June 7, 2019, at 9:56 a.m., before Sundae A. Stoa, Registered Professional Reporter, Federal Certified Realtime Reporter, and Notary Public within Colorado.

Craig Shipp                                            WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                           June 7, 2019

                                                              Page 2

```
 1                    A P P E A R A N C E S
 2
 3     For the Plaintiff:          DEREK S. FRANSEEN, ESQ.
                                   WALSH & FRANSEEN, PLLC
 4                                 200 East 10th Street Plaza
                                   Edmond, OK  73034
 5                                 (405) 843-7600
                                   dfranseen@walshlawok.com
 6
       For the Defendants:         MICHELLE BANKS ODUM, ESQ.
 7                                 HUMPHRIES, ODUM & EUGANKS,
                                   Attorneys at Law
 8                                 1901 Broadway Street
                                   Little Rock, AR  72206
 9                                 (501) 420-1776
                                   michelle@humphrieslaw.net
10
       For the Attorney            ROSALYN MIDDLETON, ESQ.
11     General via telephone       Assistant Attorney General
       conference:                 Office of the Attorney
12                                 General Leslie Rutledge
                                   323 Center Street
13                                 Suite 200
                                   Little Rock, AR  72201
14                                 (501) 682-8122
                                   rosalyn.middleton@arkansasag.
15                                 gov
16
       Also Present:               None
17
18
19
20
21
22
23
24
25
```

Craig Shipp                                           WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                         June 7, 2019

                                                              Page 3

```
 1                        I N D E X

 2                                                           PAGE
     EXAMINATION OF WILLIAM WRIGHT, M.D.:
 3   June 7, 2019

 4   By Ms. Odum:                                              4
     By Mr. Franseen:                                  69, 78, 81
 5   By Ms. Middleton:                                     72, 80

 6                                                          INITIAL
     DEPOSITION EXHIBITS                                   REFERENCE
 7
     Exhibit 1     Curriculum Vitae - Joseph William           7
 8                 Wright, M.D.

 9   Exhibit 2     Joseph William Wright, M.D. -              14
                   Written Report - October 30, 2018
10

11   (Attached to original and copy transcripts.)

12
     PREVIOUSLY MARKED DEPOSITION
13   EXHIBITS:

14   People's Exhibit 35                                      23

15
     INFORMATION REQUESTED:
16
     (None)
17
     QUESTIONS INSTRUCTED NOT TO ANSWER:
18
     (None)
19

20

21

22

23

24

25
```

Craig Shipp                                                WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                              June 7, 2019

Page 4

1           WHEREUPON, the following proceedings were
2     taken pursuant to the Arkansas Rules of Civil
3     Procedure.
4                    WILLIAM WRIGHT, M.D.,
5     having been first duly sworn to state the whole truth,
6     testified as follows:
7                         EXAMINATION
8     BY MS. ODUM:
9          Q.   Good morning, Dr. Wright.
10         A.   Good morning.
11         Q.   We've already met; but, for the record, I'm
12    Michelle Odum, and I represent the medical defendants
13    in the case that's been filed by Craig Shipp.  And
14    we're here today to take your deposition.
15              Have you had your deposition taken before?
16         A.   Yes, ma'am.
17         Q.   Okay.  Very many times?
18         A.   Oh, probably half a dozen.
19         Q.   All right.  Do you remember what the process
20    is?
21              Could you tell me what you remember the
22    process to be?
23         A.   Well, you ask me some questions, and I tell
24    you the answers.
25         Q.   Okay.  Well, there are just some kind of

Craig Shipp                                    WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                  June 7, 2019

Page 53

1       Q.   That's it?
2       A.   Yes.
3       Q.   Okay. And in this inmate request, he talked
4  about -- he said he had a need for special orthotics;
5  is that correct?
6            He had a wound, he needed his orthotics?
7       A.   Yes.
8       Q.   And then, at the bottom, the warden wrote
9  something about he was forwarding to medical -- or,
10 "medical" question mark, something like that?
11           And that's the very bottom of the page.
12      A.   Well, I don't know that that's the warden.
13      Q.   Well, if the warden testified that's him,
14 what did he say?
15      A.   It's the H.S.A.'s signature on there.
16      Q.   Okay. This part: Action taken 12-12-16,
17 "medical" question mark; and that's Warden Arnold's
18 signature?
19      A.   Oh, okay.
20      Q.   And is that something that happens -- the
21 warden may get something, and he forwards it to medical
22 if it's medical?
23      A.   That's usually not the case.
24      Q.   Okay.
25      A.   The warden doesn't usually get involved in

1  this -- in patient care issues.
2           He would have probably -- if it came to his
3  attention through some other route, he would probably
4  notify the H.S.A. about the issue.
5      Q.   Okay.  Well, so this request to Warden Arnold
6  from Craig Shipp, so he really didn't need to send it
7  to medical?
8      A.   No.  I think in the ordinary course, H.S.A.
9  would send the kite to medical.
10     Q.   Okay.  So that was the right thing to do is
11 send it to medical since it was a medical issue?
12     A.   That's correct.
13     Q.   All right.  And then you said that H.S.A.
14 signed it at the bottom.
15          So she reviewed this, and responded on
16 February 15th, 2016; is that right?
17     A.   That's correct.
18     Q.   Okay.  And you testified earlier that you
19 thought that the H.S.A. may have been aware on the
20 16th?
21     A.   Yeah.
22     Q.   But from this, it's actually the 15th?
23     A.   The 15th.
24     Q.   Okay.  And when I refer to a sick call, it
25 was a different form.

Craig Shipp                                           WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                          June 7, 2019

Page 55

1             And I'm going to hand this to you.  There is
2    one dated 2-3-16?
3         A.    Yes, ma'am.
4         Q.    Okay.  And that -- what date was that triaged
5    at the bottom section?
6             When was it received?
7         A.    On the 5th.
8         Q.    Okay.  And then, if I recall, most of our
9    discussion today has been about that February 5th
10   encounter, the sick call encounter with Ms. Smith?
11        A.    Okay.
12        Q.    So from this, he knew how to use the sick
13   call procedure?
14        A.    Yes.
15        Q.    Okay.  Now, in your experience, if he wanted
16   his shoes -- or, if another inmate wants shoes, in your
17   experience, did they submit a sick call about that?
18        A.    Yes.
19        Q.    Okay.  Or, their CPAP machine -- that was a
20   really good example earlier.  If they need their CPAP
21   machine, in your experience, they would send you or
22   send medical a request for it?
23        A.    Yes, ma'am.
24        Q.    Now, if they didn't get it in a couple of
25   days and they are worried, in your experience, did they

Craig Shipp                                      WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                    June 7, 2019

Page 56

1  follow it up with another request?

2       A.   It would just depend on the individual.

3       Q.   Okay.

4       A.   Some of them post daily requests; some would

5  wait a couple of weeks before they mentioned it again.

6       Q.   Okay. Now, the daily requests, are those the

7  people that think I really, really, really, need this?

8       A.   Yes.

9       Q.   Okay. Did the daily requests from back when

10 you did it, did those kind of get -- just because they

11 are present, does that usually get them seen quicker?

12      A.   No.

13      Q.   Okay. Well, but a sick call gets you seen

14 when not submitting a sick call doesn't necessarily get

15 you seen; is that correct?

16      A.   That's correct.

17      Q.   Now, are you aware of Mr. Shipp filing any

18 other sick calls between February 1st and

19 February 16th, 2016?

20      A.   I don't believe so.

21      Q.   Okay. I'm sorry I keep shifting around.

22           And when that request that was sent to the

23 warden was forwarded to medical on the 15th, am I

24 correct he was seen by Dr. Lomax on the 16th?

25      A.   That's right.

1    Q.   Okay.  Do you agree it was quicker for the
2  family to send the shoes in than it would have been to
3  go through the process of sending him out for a
4  orthotic to be made?
5    A.   Yes.
6    Q.   And I know that you've made a distinction
7  between a medical appliance and other property.
8         But regardless, anything needs to go through
9  security just to make sure there is no contraband; is
10 that correct?
11   A.   That's correct.
12   Q.   Okay.
13   A.   Or, that the device itself is not dangerous.
14 For instance, metal implants and a brace.
15   Q.   That's right.  I was going to say some braces
16 have metal in them, and they don't let those in?
17   A.   Right.
18   Q.   Okay.  And the warden testified something
19 about a shoe with a metal brace.
20        Now, if that had been the case, that
21 definitely would have had to have been checked out by
22 security; is that correct?
23   A.   By security, yes.
24   Q.   Okay.  Now, from what I've read from your
25 report and our discussion today with regard to your

1   A.   Well, really anybody that was in contact with
2   him.
3        And the chain of command was very strange.
4   The warden seemed to be wanting to approve things that
5   came in, which would not be the usual thing to do; the
6   warden deals with, you know, administrative matters,
7   and he wouldn't be involved in whether somebody needed
8   a medical device or not.
9   Q.   Okay.  So how does that apply to standard of
10  care?
11       The only standard of care opinion you really
12  gave was with regard to Dr. Lemdja.  Who else -- I
13  mean, what person is responsible for a chain of command
14  issue?
15  A.   The warden is responsible for that.
16  Q.   Okay.  So is anybody in medical responsible
17  for the chain of command issue?
18  A.   They are in the chain of command, yes.
19  Q.   Okay.  Do they create this procedure, do you
20  know?
21  A.   No.  The procedures are for the facility as a
22  whole.
23  Q.   Okay.  Well, I need you to explain how the
24  people are -- the individuals are responsible for a
25  chain of command issue; what authority they have to fix

Craig Shipp                                              WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                              June 7, 2019

Page 69

1                        EXAMINATION
2     BY MS. MIDDLETON:
3          Q.   Dr. Wright, can you hear me okay?
4          A.   Yes, ma'am.
5               Can you hear me all right?
6          Q.   Okay.  Yes, I can.
7               I just kind of want you to explain -- I hear
8     you say something about it's the chain of command.  Is
9     that what I'm hearing you had a problem with?
10         A.   Yeah, I have a problem with that.
11         Q.   Okay.  Is it -- do you have a problem with
12    them involving the warden in this decision?
13              Is that what you're saying?
14         A.   Well, the thing that seemed peculiar was that
15    the warden would be involved in this in any case.
16              He seemed to feel that he needed to have the
17    shoes sent to him, for instance, while that was really
18    not an appropriate thing to do.
19              Certainly, security would be involved in
20    checking the shoes when they got there.  That's not the
21    warden's job, but it seemed like everybody in medical
22    had the impression that they couldn't really do
23    anything until the warden said it was okay.
24         Q.   But then, did I hear you say that if the
25    shoes had something metal on them, that's a possible

Craig Shipp  WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.  June 7, 2019

Page 71

1   is that correct?

2        A.   No, ma'am.

3        Q.   **No?**

4        A.   No, ma'am.  It's the right foot.

5        Q.   **When he was admitted, he had the Charcot foot**

6   **in the left foot or was it in the right?**

7        A.   No.  He had an ulcer on the left foot, and no

8   Charcot deformity on that side.

9        Q.   **Okay.  Again, can you just, in your own**

10  **words, tell me what it is you're saying that Warden**

11  **Arnold did not do right.**

12       A.   I think that Mr. Arnold should have been

13  clear that this was a medical decision, and that he

14  acted that way.

15            He said several times that this is a medical

16  type of problem; and yet, he kept injecting himself

17  into it.  I think everybody in medical is convinced

18  that they had to clear things with the warden before

19  they could do anything.

20            MS. MIDDLETON:  Hold on for just a second

21  here.

22            Okay.  I think that's all I have right now.

23            MS. ODUM:  All right.

24            MR. FRANSEEN:  Okay.  I do have some

25  questions.

Craig Shipp                                           WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                         June 7, 2019

Page 75

1   case, to keep the weight off that foot.

2       Q.    And by failing to offload the foot, was that

3   a violation of the standard of care for Dr. Lemdja?

4       A.    Yes.

5       Q.    Did Dr. Lemdja notify the H.S.A.?

6       A.    No.

7       Q.    In fact, did Dr. Lemdja refuse to document

8   her encounter due to the liability according to an

9   email?

10      A.    That's correct.

11      Q.    C.C.S. should have trained their employees

12  when a medical device is needed for an inmate to notify

13  the H.S.A. or warden?

14      A.    The proper procedure would be to notify the

15  physician or nurse practitioner at first, and not just

16  the nurses. And they would take the issue to the

17  H.S.A. right away.

18      Q.    And that didn't occur in this instance, did

19  it?

20      A.    No.

21      Q.    Same question on the 9th for Dr. Lemdja: Did

22  she notify the H.S.A.?

23      A.    No.

24      Q.    Did she provide any sufficient offloading for

25  Mr. Shipp?

1    A.   No.

2    Q.   The warden testified that he received phone
3  calls from Mr. Shipp's family.

4         Did he provide any testimony that he told the
5  family, Here is the H.S.A. person you need to call,
6  this is their name, this is their number?

7    A.   No.

8    Q.   Would that have been the appropriate step for
9  him if that's what he believed needed to occur on that
10 date?

11   A.   I believe that would be the appropriate
12 thing, yes.

13   Q.   Same question for when Mr. Shipp wrote him on
14 the 1st about the need for his orthotics: Should he
15 have notified the H.S.A. about getting this approved?

16   A.   Yes.

17   Q.   Was there anything preventing the warden or
18 the H.S.A. from contacting a doctor and asking them
19 directly on the 1st, when they knew about this need,
20 should this be approved or not?

21        MS. ODUM:  Object to form.

22   A.   That would typically be a function of the
23 H.S.A.  The H.S.A. has the job of administrating the
24 medical clinic.

25        The warden is involved with administering the

Craig Shipp                                          WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                        June 7, 2019

Page 77

1    entire prison or jail, so the warden could certainly
2    pass it along, but it's really not his job to do that.
3    If he's concerned about something maybe being neglected
4    in his facility, he would certainly notify the H.S.A.
5    right away.
6         Q.   (BY MR. FRANSEEN)  If a request comes to him
7    about a medical device, is it his duty to notify the
8    H.S.A.?
9         A.   Yes.
10        Q.   On the 12th, there was a note that says:
11   Feet were getting worse while he awaits for all the
12   necessary paperwork to be cleared?
13        A.   Yes.
14        Q.   Is that the paperwork that Dr. Lomax was the
15   first person to initiate on the 16th?
16        A.   That's correct.
17        Q.   And that is fifteen days after Mr. Shipp gets
18   into the facility and notifies both medical and the
19   warden that he does not have his orthotics?
20        A.   Yes.
21        Q.   During that time period, he not only develops
22   sores on his left foot, which was evaluated on the 5th,
23   but also develops sores on his right foot?
24        A.   Yes, he had at that time.
25        Q.   Is it your opinion that had the facility

1  either properly offloaded his foot -- feet on the 1st,
2  or provided the appropriate documentation that they
3  required on the 1st, that these sores would not have
4  formed?
5      A.   You certainly can't predict that something is
6  or isn't going to happen medically, but by not doing
7  it, you're pretty much tipping the scales towards him
8  developing an ulcer in a deformed foot and the
9  complications that go along with that.
10     Q.   Within a degree of medical certainty, is that
11 what happened in this case?
12     A.   Yes.
13          MR. FRANSEEN:  I'll pass the witness.
14          MS. ODUM:  Do you have any follow-up?
15          MS. MIDDLETON:  Yeah, I do.
16          MS. ODUM:  Okay.
17                       EXAMINATION
18 BY MS. MIDDLETON:
19     Q.   I heard you say on the 1st that the warden
20 should -- when he received the request from Mr. Shipp
21 that he should have sent it to the H.S.A.
22          Is that correct?
23     A.   On the 1st?  Let me see.
24          Well, I don't know if I have it in here --
25 the intake note.

Craig Shipp                                              WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                           June 7, 2019

Page 79

```
 1              The intake note would have --
 2      Q.   No, it's not an intake, it's in his request.
 3   He sent an inmate request to the warden on February 1st
 4   right when he -- right after intake.
 5              And I thought I heard you say that he should
 6   have sent that to the H.S.A.?
 7      A.   Well, that would be the person to send it to,
 8   but -- let's see.
 9              Is this on the 1st?  Yes.
10              MS. MIDDLETON:  Michelle, do you have a copy
11   of that?  I thought you put that into evidence.
12              MS. ODUM:  I put the -- we referenced the
13   February 12th one.
14              MR. FRANSEEN:  I provided him with a copy of
15   the one on the 1st.
16              MS. MIDDLETON:  Okay.
17      A.   Yes, that's correct.
18      Q.   (BY MS. MIDDLETON)  Okay.  So you say he
19   erred by telling Shipp to go to medical?
20      A.   No, ma'am.  He erred by not doing anything to
21   take care of this.
22      Q.   Well, did he not refer Mr. Shipp that he
23   needed to see medical?
24      A.   I don't know that.
25      Q.   Look at the bottom of that request.  What's
```