## Page 1

```
             UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF ARKANSAS
                   TEXARKANA DIVISION
CRAIG SHIPP                              PLAINTIFF

             CASE NO. 4:18-CV-04017-SOH
v.

KIMBERLY HOFFMAN, et al.                DEFENDANTS


         *******************************************

                    ORAL DEPOSITION
                          OF
                    LENORA PHILSON
                    MARCH 29, 2019
                       VOLUME 1

         *******************************************


     ORAL DEPOSITION OF LENORA PHILSON, produced as a
witness at the instance of the PLAINTIFF, CRAIG SHIPP,
and duly sworn, was taken in the above-styled and
numbered cause on the 29th day of March, 2019, from
12:58 p.m. to 1:59 p.m., before LEICA TURNER, a
Certified Shorthand Reporter in and for the State of
Texas, reported by machine shorthand, at the offices of
Leigh & Associates Court Reporting, 3930 Galleria Oaks
Drive, Suite 159, Texarkana, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.
```

## Page 2

```
                    A P P E A R A N C E S
FOR THE PLAINTIFF CRAIG SHIPP:
    MR. DEREK S. FRANSEEN
        WALSH & FRANSEEN
        200 East 10th Street Plaza
        Edmond, Oklahoma  73034
        Phone:  405.843.7600
        Fax:  405.606.7050
        dfranseen@walshlawok.com
FOR THE MEDICAL DEFENDANTS:
    MS. MICHELLE BANKS ODUM
        HUMPHRIES, ODUM & EUBANKS
        1901 Broadway Street
        Little Rock, Arkansas  72206
        Phone:  501.420.1776
        michelle@humphrieslaw.net

FOR THE ADC DEFENDANTS:

    MS. ROSALYN MIDDLETON
        ASSISTANT ATTORNEY GENERAL
        CIVIL DEPARTMENT
        323 Center Street
        Suite 200
        Little Rock, Arkansas  72201
        Phone:  501.682.8122
        Fax:  501.682.2591
        rosalyn.middleton@arkansasag.gov
```

## Page 3

```
                      I N D E X
WITNESS:  LENORA PHILSON
                                                    PAGE
Appearances .......................................   2
Changes and Signature ............................   46
Reporter's Certificates ..........................   48


Examination by Mr. Franseen ......................   5
Examination by Ms. Odum ..........................  41
Examination by Mr. Franseen ......................  44
```

## Page 4

```
                  E X H I B I T   I N D E X
EXHIBIT                                             PAGE
NO.       DESCRIPTION                              MARKED

 1        ........................................   18
          Email, 2/16/16, from Lenora Turner to
          Stephen Arnold, Subj:  Resident Craig
          Shipp (Bates CCS-Requests Complaints
          Other 0018)

 2        ........................................   18
          Medical Restrictions/Limitations/
          Special Authorization(s)
          (Bates CCS 788)

 3        ........................................   29
          Email between Jeffrey Stieve and Lenora
          Turner and Kim Hofmann Re: Resident
          Craig Ship (Bates CCS-Requests
          Complaints Other 0024 - 0025)

 4        ........................................   32
          Email String between Lenora Turner and
          Stephen Arnold, 2/16/16, Re: Resident
          Craig Shipp (Bates CCS-Requests
          Complaints Other 0019)

 5        ........................................   44
          Request Form (Bates CCS-Requests
          Complaints Other 0026)
```

## Page 21

Q. The warden says refer to Medical and says he sent it to Medical and you received that document. What are you supposed to do with that?

A. Okay. That's a conversation I would have with the warden.

Q. Okay. What kind of conversation would you have?

A. Okay. First of all, I would have to look into the record to see exactly what was going on as far as the shoes and what the doctor had documented. So I know that I would go in first of all and look at the record and see exactly is there a medical necessity, what the doctor had said about the shoes, about the foot, if the documentation is there. And no matter what the documentation says, I'm still going to follow back up with the warden on that request because that's something we did routinely is follow back up. Any time he gives me something, there was always close follow-up.

Q. How would you follow up?

A. It all depends. I mean, sometimes I will talk to him, I'd go to his office quite a bit, I would e-mail, I would call, sometimes he would come to my office.

Q. So you would agree before February 16, 2016, you had not notified Mr. Warden that Mr. Shipp needed

## Page 22

orthotic shoes?

A. I'm not agreeing to that. I just said I can't recall.

Q. You don't have any memory of doing that?

A. I don't recall.

Q. Do you recall looking at Mr. Shipp's records prior to February 16, 2016?

A. Looking at his records?

Q. To see whether he needed orthotic shoes, whether they were approved or not?

A. Prior to February 16th?

Q. Yes.

A. I don't remember, sorry.

Q. On Exhibit 2 there, is that the document that would be filled out by a doctor approving a medical device?

A. It appears to be.

Q. So that would have to be filled out by a doctor in order for a medical device to be approved to come into the facility by Medical and the warden?

A. It looks like that is one form.

Q. And so in order for a resident to get their medical prescribed device, that document had to be filled out, you would have to be notified, and the warden would have to approve it?

## Page 23

A. Sounds pretty accurate.

Q. Is there anything prohibiting a doctor from filling out that type of form prior to an intake physical if they have an encounter with the resident?

A. I can't answer that. That would be up to the physician.

Q. Why is it up to the physician whether they can fill out a form or not?

A. That would be their discretion.

Q. So it's at their discretion so there's nothing prohibiting them from using their discretion in filling out that form approving a device if it's brought to their attention?

A. I wouldn't think so.

Q. You wouldn't want a policy in place that prohibits them from using their discretion, would you?

A. I don't make the policies.

Q. But as an administrator there, you want to have policies in place that are in the best interest of the residents regarding their healthcare?

A. Well, the policies are in place and that's what we do, follow the policy.

Q. So is there a policy that you're aware of that prohibits a doctor from exercising their discretion in filling out that form during an encounter once they're

## Page 24

aware that a resident does not have their medically prescribed device?

A. I'm not aware of any policies.

Q. Do you agree that a nurse can't notify you that a resident needs a outside medical device without a doctor filling out such an order?

A. Can you repeat that question?

Q. Is there anything regarding the policies and procedures that prohibits a nurse from notifying you that a resident needs an outside medically prescribed device without a doctor's order?

A. I don't recall anything in the policy about that.

Q. Do you know whether the nursing staff follows such a policy in February 2016 in that manner?

A. Follows such a policy about what? I'm sorry.

Q. About not notifying the health service administrator until the doctor fills out an order.

A. Your question was is there anything in the policy?

Q. Do you know whether the nursing staff would have followed that policy, that they would wait until a doctor filled out an order before they notified the HSA regarding the need for an outside device to be approved?

```
                                                    33
 1  an e-mail -- oh, gosh.  It looks like an e-mail from
 2  Mr. Kevin Murphy to Mr. Arnold that talks about unless
 3  he has an issue with it, we need to allow his special
 4  shoes to be sent into the unit.  And then the middle
 5  part of it is from Mr. Arnold to, it looks like to
 6  Whitney Walker who was in -- she was the one over the
 7  property, I believe, at that time.  I can't be clear.
 8  But it looks like he's allowing the shoes to be sent
 9  into the unit and then he wanted to be notified when
10  they arrived.
11       Q.   Anything else in there?
12       A.   No, that's about it.
13       Q.   So this is Exhibit 4, CCS Requests Complaints
14  Other 19.  What are you saying "will do" to up there on
15  the e-mail above it?
16       A.   May I?
17       Q.   Is that with regards to him asking for the
18  family to be notified if they could send the shoes in?
19       A.   I can't verify that because this goes from
20  10:33 a.m. to 1:54 p.m.
21       Q.   So your response isn't until 1:54 p.m.?
22       A.   I don't know what I'm saying "will do" to.
23  That was the question.  I don't know what that was in
24  response to.
25       Q.   But you're responding to his e-mail that
```

```
                                                    34
 1  starts with -- what is the first sentence there?
 2       A.   You said to "his."  Will you clarify that?
 3  Are you talking about --
 4       Q.   Yeah, what's the sentence -- what is he saying
 5  to the sentence that you -- in the first sentence of the
 6  e-mail you're responding to?
 7       A.   You mean Mr. Arnold?
 8       Q.   Yeah.
 9       A.   "Please have his family send in special shoes
10  and send to my attention."
11       Q.   And you respond to that "will do"?
12       A.   And then it says, "Please advise when they
13  arrive."
14       Q.   Okay.  So those are the two sentences on that
15  e-mail; is that correct?
16       A.   Yes.
17       Q.   And you said "will do" in response to that?
18       A.   It has "will do" at the top.
19       Q.   In response to that e-mail?
20       A.   I can't say it's in response to that.
21       Q.   What do you think it's in response to if it's
22  not to that e-mail?
23       A.   I can't say what it's in response to.
24       Q.   Okay.  Do you think that if he told you to
25  notify the family to send the shoes in, you would have
```

```
                                                    35
 1  notified them?
 2       A.   You know what, I can't -- I can't speak on
 3  that either.  I can't -- I can't speculate.
 4       Q.   Okay.  Does that seem reasonable that you
 5  would have notified the family, hey, send the shoes in,
 6  they've been approved?
 7       A.   Because when shoes arrive to the unit, they
 8  don't come to Medical.
 9       Q.   They have to be approved by the warden?
10       A.   Right.
11       Q.   Don't you think the family would want to wait
12  until the warden approves to send them in?
13       A.   I can't -- I don't know what the family would
14  want.  I can't speak on what the family would want.
15       Q.   The family has to follow policy and procedures
16  of the facility that their family member is in, right?
17       A.   You said the family would have to follow
18  policy and procedure?
19       Q.   Right.  They have to follow policy and
20  procedure before something can get admitted?
21       A.   That would be a conversation that the warden
22  would have.
23       Q.   Okay.  So it's the warden's duty to contact
24  the family?
25       A.   I haven't spoken with any family.
```

```
                                                    36
 1       Q.   So you didn't -- you didn't ever contact the
 2  Shipps?
 3       A.   I haven't spoken with any family.
 4       Q.   Do you have any recollection of speaking with
 5  the warden prior to this February 16, 2016, email?
 6       A.   Regarding?
 7       Q.   Regarding Mr. Shipp's orthotic shoes?
 8       A.   I don't recall.
 9       Q.   Do you have any recollection of any nurses
10  notifying you prior to February 16, 2016, regarding
11  Mr. Shipp's orthopedic orthotic shoes?
12       A.   Prior to the 16th?
13       Q.   Yes.
14       A.   I don't.  I don't recall.
15       Q.   Same question as with the nurse, do you recall
16  any doctors notifying you prior to the 16th?
17       A.   I don't necessarily remember prior to the
18  16th.  Sorry.
19       Q.   What is Malvern?  What type of facility is
20  that?
21       A.   Malvern has two facilities.  Which one are you
22  referring to?
23       Q.   Well, is there one that has a better medical
24  unit?
25       A.   A better medical unit?
```