IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


CRAIG SHIPP                                                          PLAINTIFF

VS.                              NO. 4:18-CV-0417 SOH

CORRECT CARE SOLUTIONS, LLC,
DR. LORENE LOMAX, DR MIMO LEMDJA,
KIMBERLY HOFMANN, LENORA PHILSON,
KINDALL SMITH, DIANE CUNNINGHAM,
MELISSA STONER, STEVE ARNOLD                                       DEFENDANTS


_____


ORAL DEPOSITION

OF

CRAIG SHIPP

TAKEN NOVEMBER 14, 2018, AT 10:06 A.M.

_____


# Conway Court Reporting

Post Office Box 2188

Conway, Arkansas   72033

www.conwaycourtreporting.com


*"Spoken to written . . . word for word"*


Conway Office: 501.679.1488          Little Rock Office:   501.319.4807


 COPY


EXHIBIT

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

MR. DEREK S. FRANSEEN
WALSH & FRANSEEN
200 EAST 10TH STREET PLAZA
EDMOND, OKLAHOMA 73034

MR. RONALD METCALF
ATTORNEY AT LAW
702 GARRISON AVENUE
FORT SMITH, ARKANSAS 72901

ON BEHALF OF THE DEFENDANTS:

MS. MICHELLE ODUM
HUMPHRIES, ODUM & EUBANKS
1901 BROADWAY STREET
LITTLE ROCK, ARKANSAS 72206

MS. ROSALYN MIDDLETON
ASSISTANT ATTORNEY GENERAL
323 CENTER STREET, SUITE 200
LITTLE ROCK, ARKANSAS 72201

I N D E X

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE . . . . . . . . . . . . . . . . . . 5

WITNESS:  **CRAIG SHIPP**

   Examination by Ms. Odum . . . . . . . . . . . . . 6

   Examination by Ms. Middleton . . . . . . . . . . 89

   Further Examination by Ms. Odum . . . . . . . . . 115

   Examination by Mr. Metcalf . . . . . . . . . . . 120

   Further Examination by Ms. Odum . . . . . . . . . 123

   Examination by Mr. Franseen . . . . . . . . . . . 125

   Deposition Concluded . . . . . . . . . . . . . 126

COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . . 128

E X H I B I T S

EXHIBITS:                                    IDENTIFIED:

1.  Thirteen Page Copy of Grievance Directive . . . . . . 90

2.  One-Page Copy of 2/13/16 Request . . . . . . . . . . 93

3.  One-Page Copy of 2/12/16 Request . . . . . . . . . . 99

4.  One-Page Copy of 2/18/16 Request . . . . . . . . . 102

5.  One-Page Copy of 2/20/16 Complaint . . . . . . . . 103

6.  Three-Page Copy of 3/9/16 Complaint . . . . . . . 104

7.  Eleven-Page Copy of Complaint . . . . . . . . . . 105

8.  One-Page Copy of 3/21/16 Request . . . . . . . . . 109

9.  One-Page Copy of 3/30/29 Request . . . . . . . . . 109

EXHIBITS CONTINUED

10.  One-Page Copy of 2/17/16 Request . . . . . . . . . . . 115

11.  One-Page Copy of 2/1/16 Request  . . . . . . . . . . . 117

1  C A P T I O N

2  ANSWERS AND ORAL DEPOSITION OF **CRAIG SHIPP**, a witness

3  produced at the request of the Defendants, taken in the above-

4  styled and numbered cause on the 14th day of November, 2018, at

5  10:06 a.m., at the law offices of Ronald Metcalf, 702 Garrison

6  Avenue, Fort Smith, Arkansas, pursuant to the Federal Rules of

7  Civil Procedure.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THEREUPON,

**CRAIG SHIPP,**

THE WITNESS HEREINBEFORE NAMED, having

been first duly cautioned and sworn by me

to testify to the truth, the whole truth,

and nothing but the truth, testified on his

oath as follows, to-wit:

EXAMINATION

BY MS. ODUM:

Q    Good morning.  My name is Michelle Odum.  We've actually been sitting here chitchatting, but --

A    Yeah.

Q    -- I forgot to introduce myself.

A    I'm Craig Shipp.

Q    Okay.

A    It's time.

Q    Yes, sir.  I'm here for the medical defendants in this lawsuit.  We're here to take your deposition, which is as I'm sure your lawyer has told you, an opportunity for us to get your side of the story under oath.

A    Yes.

Q    Have you ever had your deposition taken before?

A    No, first time.

Q    Okay.  Have you ever filed any lawsuits before?

1   A    No.

2   Q    Okay.  So no workers' comp?

3   A    No.

4   Q    Okay.  Now, and I believe your attorney told me earlier

5   that you're not seeking lost wages in this case?

6   A    No.

7   Q    Okay.  And at some point you did apply for social security

8   disability; is that correct?

9   A    Yes.

10  Q    When was that?

11  A    That would have been five years ago.

12  Q    Okay.  And why did you do that?

13  A    Because I was told that I probably would not be able to

14  use my foot to do any kind of manual labor.

15  Q    Okay.  And what -- which foot?

16  A    The right.

17  Q    Is that -- and is that the one that had charcot foot?

18  A    Yes.

19  Q    How did the application process go, did you do that

20  yourself, the initial application?

21  A    I was in the hospital, and the lady come in and said, you

22  know, sign this, and they went -- took off and did the rest of

23  it.

24  Q    Okay.  So they submitted your medical records?

25  A    Yeah.

1    A    Yes.

2    Q    Okay. And then they replace -- so it's the orthotic they

3 create that goes into the New Balance?

4    A    Yes.

5    Q    Okay. All right. Have you had -- and you had mentioned

6 your right foot. And you also had some trouble with your left

7 foot as far as the ulcers. Do you have an amputation?

8    A    The toe, yes.

9    Q    Okay. What did they tell you, I mean, what caused the

10 need for the amputation of the toe?

11    A    Infection in the bone.

12    Q    Okay. But you did not have charcot foot on the left?

13    A    No. This foot is still shaped the same as it was, it's

14 just missing a toe.

15    Q    Okay. Did you have any other complications from diabetes

16 besides your feet?

17    A    No.

18    Q    Okay. Do you have any other medical issues besides

19 diabetes and, of course, the issues with your feet?

20    A    High blood pressure.

21    Q    All right.

22    A    And that's all I can think of right now.

23    Q    Okay.

24    A    That's all I take medication for besides high cholesterol.

25    Q    Okay. So you take medication for high cholesterol, high

1    Q    Okay.  And so that would have been '12 or '13 -- '11, '12,

2    '13, somewhere in there?

3    A    No.  Gabapentin --

4    Q    Oh.

5    A    -- they finally put me on that when I was at Texarkana.

6    Q    Okay.  But -- and I'm sorry -- when you started having the

7    nerve pain, it was in '11, '12, or '13?

8    A    Yes.

9    Q    Okay.  Now, you mentioned working for your brother-in-law.

10   Who was that?

11   A    Dewayne Higgins.

12   Q    Okay.  Now, who is he married to?

13   A    Debbie.

14   Q    Okay.  What is his business?

15   A    Dewayne Higgins Trucking.

16   Q    So did you still have your CDL?

17   A    No, not then.

18   Q    Okay.  So you didn't -- you weren't driving?

19   A    No.  I wasn't driving.

20   Q    Okay.  What were you doing for him?

21   A    I was trying to work at his shop.

22   Q    Okay.  Did you do mechanical work, or warehouse work, or?

23   A    It would be basically servicing the trucks, changing the

24   oil, breaking down tires --

25   Q    Okay.

1  A   -- washing them.

2  Q   All right.  And so you have a good relationship with Mr.

3  Higgins?

4  A   Yeah, I used to have.

5  Q   Okay.  All right.  And I apologize if I'm a little

6  repetitive, but just to have it kind of all together.  With

7  your charcot foot, you said was diagnosed 2012 or '13,

8  somewhere in there?

9  A   Yeah.

10  Q   Okay.  And besides the orthotic, have you had any other

11  course of care for that since your diagnosis?

12  A   No.

13  Q   Did they give you any advice as far as what to do to

14  prevent drastic breakdown of the bone?

15  A   Drastic breakdown of the bones and -- no.  They basically

16  said there was nothing they could do.  That's why I originally

17  went to Dr. Thomas to see if, you know, there was anything that

18  she could do because she's a bone and ankle specialist.

19  Q   Right.

20  A   She said with active charcot, she couldn't do anything as

21  long as, you know, it was still moving and breaking down.

22  Q   Okay.  And so what happens when it stops moving and

23  breaking down?

24  A   That's what they -- you know, just keep using your shoes,

25  your orthotics.  The main thing is always check your feet, you

1   with?

2   A      Basically.

3   Q      Okay.  I'm curious.  I've heard of phantom pain when you

4   lose a limb.  Do you still -- do you have that phantom pain?

5   A      Every now and then I can.  I will have an itch on -- you

6   know, a spot on -- I can even feel like the exact spot, you

7   know, like it's in between these toes or something.

8   Q      Uh-huh.

9   A      It's crazy.  I had always heard of that and laughed at

10  people, you know, that had, you know, amputations and I would

11  say, oh, come on.

12  Q      Yeah.

13  A      But it's true.

14  Q      Okay.  That -- I mean, it's interesting.  I mean, not for

15  you, that's terrible for you, but I've always been curious

16  about it.  Okay.

17        Were you given instructions for how to handle your

18  diabetes to maybe keep your foot -- you from having trouble

19  with that right foot that already had the charcot foot?

20  A      Just take the Metformin.  And my diabetes, like your A1C,

21  it runs fairly well.

22  Q      Okay.  All right.  So that's good for your foot care to

23  have your A1C running well?

24  A      Yes.

25  Q      Okay.  Now, how many ulcers did you have on that right

1  foot up to -- you know, before you went into SWACCC?

2  A    Over the years?

3  Q    Yes, sir.

4  A    Maybe two, three.

5  Q    Okay.  And how many had you had on that left foot before

6  -- because I know you've had an amputation?

7  A    Just the one really.

8  Q    Just -- really?  Okay.

9  A    It got the infection in the bone and it come off.

10  Q    Okay.  So am I correct that you had an orthotic for your

11  left foot due to the loss of toe, and you had an orthotic in

12  the right foot due to the charcot foot?

13  A    Yes.

14  Q    Okay.  So that -- I mean, they were for different

15  purposes?

16  A    The left foot is basically they put toe filler for

17  your --

18  Q    Okay.

19  A    -- what they call toe filler for your shoe, but.

20  Q    Does that help with balance?

21  A    No.  It just helps the shoe really --

22  Q    Okay.

23  A    -- basically is what it does.

24  Q    Okay.  I imagine that would probably keep you from tipping

25  forward on your other toes?

1   A    Yes.

2   Q    -- another one?  Okay.  So was it a -- if -- when in 2015

3   was that?

4   A    I don't remember the exact date.

5   Q    Okay.

6   A    It was during the summer.

7   Q    Summer, okay.  So it took six months for you to enter your

8   plea?

9   A    Yeah.

10  Q    When -- you had one night in jail.  When did you go back

11  to jail after you entered your plea?

12  A    February -- I went in February the 1st at SWACCC, so I

13  turned myself in the night before then.

14  Q    Okay.  And how does that work, is that just you report to

15  the jail?

16  A    Report to the jail, surrender yourself.

17  Q    Okay.  Now, so what were you wearing when you reported to

18  the jail?

19  A    I was wearing my shoes.

20  Q    Okay.  And it had the orthotics in them?

21  A    Yes.

22  Q    And was it Crawford County?

23  A    Crawford.

24  Q    Okay.  Did they let you bring your inserts into the jail?

25  A    I wore them in.

1     Q     Okay. And were -- so you were -- were you admitted into

2     Crawford County with them?

3     A     Yes.

4     Q     And did you wear them overnight until they were --

5     A     No.

6     Q     Okay. What happened?

7     A     They take all of your property, you know, wallet if you

8     have it, change, and everything, and give you, you know, the

9     orange jumpsuit and the -- you know, I think they are sandals

10     like the Croc-type things that we were wearing --

11     Q     Okay.

12     A     -- at SWACCC.

13     Q     All right. So what happened -- so you transferred to

14     SWACCC the next day, February 1st?

15     A     Yes.

16     Q     How was that transfer, did they give you your property

17     back?

18     A     No.

19     Q     Okay. What happened to your property at Crawford County?

20     A     They keep it.

21     Q     Did they release it to your family?

22     A     Released it to my sister.

23     Q     Okay. And which sister was that?

24     A     Robbin --

25     Q     Okay. And that --

1    A    -- Styers.

2    Q    Robbin.  So Crawford County gave it all to Robbin.  And do

3    you spell her name with one "B" or two?

4    A    Two.

5    Q    Okay.  And how do you spell her last name?

6    A    S-t-y-e-r-s, Styers.

7    Q    Okay.  So then Crawford County put you in a van, or a

8    patrol car, or something?

9    A    Uh-huh.

10   Q    And drove you down to Texarkana?

11   A    Yes.

12   Q    So what happens once you get to Texarkana?

13   A    You go into Intake.  They take the orange jumpsuit, even

14   the underwear that you are wearing and issue you, you know,

15   their yellow uniforms --

16   Q    Okay.

17   A    -- along with their -- with the Crocs, which would kind of

18   throw us.

19   Q    Okay.  Did your New Balance make it from Crawford County

20   -- without the inserts, make it from Crawford County to SWACCC?

21   A    Yes, with the inserts, though.

22   Q    With the inserts?

23   A    Yes.

24                  MR. FRANSEEN:  On which date?

25                  MS. ODUM:  Yeah?

1      THE WITNESS:  On what date?  Is it on --

2      MS. ODUM:  Yeah, earlier you --

3      MR. FRANSEEN:  It was something about an intake,

4   on intake.

5      THE WITNESS:  Oh, on intake?  Oh.

6      MS. ODUM:  Yes.

7  A    On intake on the second of -- the first, no, the shoes

8  didn't come then.

9  Q    (By Ms. Odum)  Okay.  Because they had -- Crawford County

10  had given them to your sister?

11  A    Yes.

12  Q    Right.

13  A    Yeah.

14  Q    No.  I'm only talking about --

15  A    Okay.

16  Q    -- February first.

17  A    Sorry about that.

18  Q    That's okay.  And what I was asking was, when you

19  transferred from Crawford County to SWACCC, were you wearing

20  the sandals or were you wearing your New Balance that did not

21  have inserts in them?

22  A    I was wearing the sandals.

23  Q    Wearing the sandals, okay.  And what footwear did they

24  give you when you got into SWACCC?

25  A    The orange Crocs-looking like shoes.

1  Q   Okay.  So those, they're kind of rubbery?

2  A   They're rubbery and look like Crocs.  They've got the

3  holes in the top and that was --

4  Q   Right, okay.  Now, I know that you were evaluated by

5  someone in Medical that day?

6  A   Yeah.

7  Q   Tell me about your interaction with her as it pertains to

8  your orthotics?

9  A   I told her that I have to have them, they're prescribed,

10  you know.  And showed her my feet for sure, to make sure, you

11  know, I could get some help getting them, you know, down there

12  to me.

13  Q   Okay.  And what did she tell you?

14  A   She looked and she said I will definitely -- I'm going to

15  -- definitely putting this down and putting it in, I think,

16  notes.

17  Q   Okay.  Did she give you any instructions?

18  A   I don't believe she was the one who told me to file the

19  request for shoes.  I think it was -- I was talking to the

20  Intake person and he told me that.

21  Q   To file the request with whom?

22  A   With SWACCC, a request for the shoes.

23  Q   I mean, was it with Medical or Security?

24  A   I think it was Medical.

25  Q   Okay.  Did anyone in -- at -- tell you to be sure to write

1    the warden?

2    A    No.

3    Q    Okay.

4    A    That I can remember.

5    Q    Okay.  Now, if the -- the lady who did your intake stated

6    that she advised you to write a request to the warden regarding

7    your personal shoes?

8    A    Did she?

9    Q    Yes.

10    A    Not that I recall.

11    Q    Okay.  So you don't recall that, okay.  So did you write a

12    request on February 1st?

13    A    Yes.

14    Q    To whom, do you know?

15    A    I don't remember if it was Medical or if it was the

16    warden, but I think it was the warden.

17    Q    Okay.  Do you know what happened to that request?

18    A    No.  I don't remember.

19    Q    Did anyone come talk to you about it?

20    A    I believe they sent a reply saying you have to send this

21    to Medical.

22    Q    Okay.  What was -- did you speak to anybody -- who did you

23    speak to after that intake?

24    A    After the intake?

25    Q    Yes, sir.

1  progression as you were going through Medical -- you know,

2  going through -- with regard to your medical issues?

3  A     Through February?

4  Q     Yes, sir.

5  A     Well, I went to Medical and I would, you know, show my

6  foot to them and explain to them to, you know, I have to have

7  the shoes.  So they're constantly saying the warden has to

8  approve it, so I would write a request to the warden.  He would

9  send, "You need to take this to Medical."  Medical would turn

10 around and tell me, well, he's the one who needs to approve it.

11 Q     Okay.

12 A     Until, you know, during the month of February the foot

13 eventually -- you know, the toe first -- the right foot gave me

14 problems first.

15             MR. FRANSEEN:  Which foot?

16             THE WITNESS:  The left foot.

17 A     I mean, the left foot --

18 Q     (By Ms. Odum)  Okay.

19 A     -- sorry.

20 Q     Your left foot gave you --

21 A     The left foot gave me problems first, it burst open first.

22 Q     Okay.

23 A     And that was -- I was going to show them my foot then and,

24 you know, I was showing the right and went to kick off the

25 Crocs with my left, and Nurse Kindall says, "Why is there blood

1  shoes.

2  Q    Okay.

3  A    You can -- they could see, you know, I have a valid, you

4  know reason for the shoes to be allowed in.

5  Q    Okay.  Well, did they tell you the steps that they were

6  going to have to take to get you your shoes?

7  A    They said file a request with the warden.

8  Q    Okay.

9  A    And undoubtedly, you know, it would be sent back that

10  Medical has to approve.

11  Q    Okay.  And Medical did approve it; is that right?

12  A    I was never told how it got approved, but how they

13  eventually got in there.  I think so, because they were all,

14  you know, worried that something is going -- you know, the

15  infection will set in and I could eventually lose the foot.

16  Q    Okay.

17  A    I know that it seemed like they were trying, but nothing

18  really was happening --

19  Q    Uh-huh.

20  A    -- as far as, you know, I could tell.

21  Q    All right.  And -- but you don't know anything about the

22  internal processes of -- at Medical?

23  A    No.

24  Q    Just that they were all worried --

25  A    Uh-huh.

1    -- well, she was already seeing the bloody foot, you know, had

2    seen what had happened to that. And the right foot was the

3    one, you know, that was even in worse shape I thought, you

4    know. I already knew it was in worse shape.

5        And basically she was like, "I'm not supposed to, you

6    know, even see you here today." That's why she -- she repeated

7    that, that's why Nurse Kindall got me the elevator pass.

8    Q    Okay. Did she say anything about contacting your family,

9    Dr. Lemdja?

10   A    Not that I remember.

11   Q    Okay. If Ms. Kindall made a note that the doctor made a

12   reference to contacting your family, would you have any reason

13   to dispute that?

14   A    I don't know what they have on my records.

15   Q    Okay. Well, did numerous people in Medical mention

16   contacting the warden or contacting your family?

17   A    It was the warden mostly.

18   Q    The warden?

19   A    Yeah.

20   Q    Okay. Now, let's move on to Dr. Lomax. What is it -- I'm

21   trying to think of your testimony -- so what is it that you

22   think Dr. Lomax did wrong?

23            MR. FRANSEEN: Object to form.

24   A    Basically she could have helped me get the shoes, you

25   know. That's --

1    Q    Okay.  Well, the --

2    A    I mean --

3    Q    The first record that shows that she saw you was February

4    16th?

5    A    Yeah.

6    Q    Okay.  And you -- I think a property record shows you had

7    your shoes on February 19th.  So was it three -- could she have

8    done more?

9    A    Yeah.  I think they all could have done more.

10   Q    Okay.  Well, what -- if that -- that was coming from your

11   family; is that right, those shoes?

12   A    Yes.

13   Q    Okay.  What else do you think she could have done, what do

14   you think she should have done?

15   A    That uh --

16   Q    Could you have gotten your shoes any quicker on February

17   16th when you saw Dr. Lomax?

18   A    I don't know what she -- you know, she helped get me the

19   phone call to the family and the warden, I don't know, but.

20   Q    How did you get your shoes, did someone bring them or did

21   they mail them?

22   A    They FedEx'd them overnight.

23   Q    Okay.  All right.  And so that from February 16th to

24   February 19th, you think was too long?

25            MR. FRANSEEN:  Object to form.

1  A    Yeah.

2  Q    Okay.  Can I get you to also agree that the next step

3  would have been the formal grievance after that, let's look at

4  Section 1B?

5  A    Yeah.

6  Q    Okay.  And if you didn't agree with the decision of a

7  grievance process, would the next step then be the appeal?

8  A    Yes.

9  Q    Okay.  All right.  And you said earlier that you don't

10  remember filing a request with the warden on February 1 during

11  your intake; right?

12           MR. FRANSEEN:  Object to form.

13  A    Yes.  I remember filing that.

14  Q    You said -- you say you did or you didn't with the warden?

15  A    I do, yes.

16  Q    You did file one on February 1st?

17  A    Yes.

18  Q    Okay.

19  A    February 1st.

20  Q    Okay.

21  A    I filed a request.

22  Q    Okay.  On February 1st -- during -- at the --

23  A    Yes.

24  Q    -- intake?

25  A    Yeah.

1   Q    Okay.  Who did you file that with?

2   A    Who did I file it with?

3   Q    Who did you give it to?

4   A    I don't remember.  I think you dropped it in a box -- no,

5   I was in Intake, so I think I give it to the guard.

6   Q    Okay, you gave it to a guard.  Now, did you get a response

7   to your --

8   A    I believe so.

9   Q    Okay.  And what was that response?

10  A    I think it was need to -- how was it like worded -- need

11  to be addressed and -- addressed to Medical or something like

12  that.

13  Q    Okay.  Let's see, you came in to SWCC or SWACCC on the

14  1st.  Now, you submitted a sick call -- do you call them sick

15  calls?

16  A    Yeah.

17  Q    Okay.  And did you submit a sick call around February 3rd,

18  do you remember?

19  A    No.  I can't remember February 3rd.

20  Q    You don't remember?  Okay.  This is going to be Exhibit 2.

21  Now, would you agree that this is titled, "A Health Service

22  Request Form"?

23              (WHEREUPON, Exhibit 2 was marked for

24          identification and is attached hereto.)

25  A    Yes.

1  Q    Okay.  Would you also agree that this is the form that you

2  submitted?

3  A    Yeah.

4  Q    Okay.  What's the date on that form?

5  A    The 2nd and 3rd.

6  Q    Okay.  February 3rd; correct?

7  A    Yes.

8  Q    All right.  Now, in that request you are seeking treatment

9  for what?

10  A    Description of the problem was deformed feet due to

11  charcot joint and also diabetes.

12  Q    All right.  Now, after you submitted that request, were

13  you seen by Medical?

14  A    Yeah.  I would have been seen by them.

15  Q    And would it be about February 5th --

16  A    Yeah.

17  Q    -- would you agree?  Now, who did you see during that sick

18  call, do you remember?

19  A    I do not remember.

20  Q    That's perfectly okay.  Do you recall during that sick

21  call visit being told to notify your family about your shoes?

22  A    No.

23  Q    Do you recall seeing the doctor again on February 12th?

24  A    No.  I don't remember the exact dates.

25  Q    You don't remember the exact date?  I want to record it,

1   so --

2   A    Oh.

3   Q    -- that -- it's fine if you don't remember the exact date

4   A    Yeah.

5   Q    I pulled from your records the exact date.  Your records

6   show that you saw the doctor again on February 12th, and so you

7   don't recall who you saw on the 12th, do you?  It probably

8   would have been, let's say --

9   A    The 12th would have been --

10  Q    It would have been maybe your second visit?  I don't know

11  if you had any visits in between.  I know you had some things

12  with your -- changing your socks.

13  A    I don't know.

14  Q    You don't know who you saw?

15  A    No.

16  Q    Okay.

17          MR. FRANSEEN:  Well, just real briefly, have I

18       been provided these documents?

19          MS. MIDDLETON:  Uh-huh.  Those -- they should be

20       -- it should have been Bates stamped.  It's in the

21       medical.

22          MS. ODUM:  Yeah.

23          MS. MIDDLETON:  Yeah.

24          MR. FRANSEEN:  Well, I've got the CCS 292 and

25       this is a different -- do you know what the -- that

1   Q   Who was she?  What --

2   A   She was a counselor.

3   Q   She was a counselor?

4   A   Yeah.

5   Q   Okay.  So did you pretty much see her everyday?

6   A   No, not everyday.

7   Q   And you don't recall talking to her on the 12th?

8   A   No.

9   Q   No, okay.  Now, according to your Complaint, you state

10  that you filed a -- well, you advised Warden Arnold that you

11  developed an open wound on your foot; is that correct, in your

12  Complaint?

13  A   I would, yes.

14  Q   Okay.  Would this be a resident request?

15  A   I don't remember if it was a resident request or if it was

16  a grievance.

17  Q   Okay.  That will be Exhibit 3. And these are from

18  Michelle's documents.  Take a second and look at that for me,

19  please.

20              (WHEREUPON, Exhibit 3 was marked for

21              identification and is attached hereto.)

22  A   Yeah.  I remember him saying that, yeah, it must be

23  addressed in a sick call.

24  Q   Okay.

25  A   And I was trying to get him to get the shoes in.

1   Q   Okay.  Hold on here.  Let me -- okay, so is this -- this

2   is the resident request you submitted to Warden Arnold?

3   A   Yes.

4   Q   Okay.  And did he respond?

5   A   Yeah.

6   Q   Okay.  What was his response?

7   A   "Must be addressed in a sick call due to it has to be

8   evaluated for medical necessity."

9   Q   Okay.  Now, I heard you earlier say you saw -- well, you

10  received treatment from Dr. Lomax, and you estimated that you

11  saw her for the first time around, what, February 16th?

12  A   The 16th or it could have been earlier.

13  Q   All right.  And you said earlier that you talked to her

14  about your shoes --

15  A   Yes.

16  Q   -- and that this -- okay.  Now, after you saw Dr. Lomax on

17  the 16th, do you recall making a phone call to your family?

18  A   On the 16th?

19  Q   The 17th.

20  A   On the 17th?

21  Q   It would have been the 17th.

22  A   I made a phone call, yes.

23  Q   Okay.  So you did call -- you were allowed to use the

24  phone?

25  A   I was allowed to use the phone.

1  Arnold had some involvement in those and if you have a

2  complaint?

3  A    In the scheduling of appointments?

4  Q    Yes, yes.  The scheduling of your appointments?

5  A    I don't know if he did or didn't.

6  Q    Okay, okay.  Now, after you received your shoes did you

7  have anymore problems with your feet?

8  A    Yes.

9  Q    What type of problems did you have?

10 A    Just the open, oozing ulcer.

11 Q    So after receiving your shoes, I see that you submitted a

12 request to be transferred --

13 A    Yes.

14 Q    -- from the -- why did you --

15 A    I -- no.  It probably was after the shoes.

16 Q    Well, I --

17 A    Go ahead, I'm sorry.

18 Q    I can show you.

19 A    Alright.

20 Q    I can show you.  I've got -- again, you have made me read

21 all of your documents, so I'm going to show you.  These are

22 going to be 7 and 8.  This is going to be resident --

23            COURT REPORTER:  That's 8 and 9.

24            MS. MIDDLETON:  Yeah, 8 and 9.  Sorry.

25 Q    This is 8 and 9.  This is going be a request that Mr.

1    Q    Now, I want to fast forward here, and see if -- you asked

2    to be transferred --

3    A    Uh-huh.

4    Q    -- because you thought you would I guess, what, receive

5    better treatment elsewhere?

6    A    Yes.

7    Q    So now, on May 11th you were admitted to UAMS --

8    A    Yes.

9    Q    -- is that correct?  Why were you admitted?

10    A    Why was I admitted?

11    Q    Uh-huh.  Why were you admitted to UAMS?

12    A    They did a -- I guess you would call it a heavy

13    debridement of the foot that I -- all right, a baboon's rear-

14    end.

15    Q    Okay.  That's fine.

16    A    They cut the meat off of it --

17    Q    Uh-huh.

18    A    -- put it that way.

19    Q    Okay.

20    A    The best way I can describe it.

21    Q    Off your foot?

22    A    It looked that bad.

23    Q    Off your foot?

24    A    Yes.

25    Q    And which foot was that?

1   A    The right foot.

2   Q    The right foot.  And were you hospitalized after --

3   A    I was hospitalized.  That's when they first put me on

4   Vancomycin, and that's the reason they said they could not take

5   me back to SWACCC.

6   Q    Okay.  So you were hospitalized at UAMS how many days, can

7   you recall?

8   A    I think I was there two days.

9   Q    Okay.  And so when you were discharged, you did not return

10  to SWACCC?

11  A    No.

12  Q    Okay.  And you were transferred to?

13  A    Malvern.

14  Q    Malvern.  Now, while you were at -- how long were you at

15  Malvern?

16  A    Until I was released.

17  Q    Until you were released.  Now, did you experience any

18  complications while you were at Malvern?

19  A    Any complications?

20  Q    Yeah, with your foot?

21  A    Yes, I did.

22  Q    What type of complications?

23  A    What do they call it when it, you know, it starts turning

24  red and getting streaks, it's a --

25  Q    An infection?  No?

1    A    No.   So -- but if you hadn't seen them, it may just be my
2    memory there.
3                    MR. FRANSEEN:  But if you remember it, don't --
4              just stick with your memory.
5              THE WITNESS:  Okay.
6              MS. MIDDLETON:  Uh-huh, yeah.
7                    MR. FRANSEEN:  I don't want you just disagreeing
8              with your own memory.
9                    MS. MIDDLETON:  Uh-huh.  Right, right.  If
10             you --
11   Q    (By Ms. Middleton)  What do you think Warden Arnold could
12   have done differently?
13   A    Allowed the shoes in sooner, immediately, you know.
14   Q    When you say immediately, are you talking about when you
15   informed Intake?
16   A    Yes.
17   Q    So without going through the proper channels?
18                   MR. FRANSEEN:  Object to form.
19   A    If you have a medical need for it, I would say so.
20   Q    Okay.
21                   MS. MIDDLETON:  I don't have anything further.
22        Do you need to follow up?
23                   MS. ODUM:  Just because she skipped one.
24                   MS. MIDDLETON:  Okay, I did?
25                   MS. ODUM:  That's because it's still in medical.

1    Q    You mentioned you hadn't spoken to any expert witnesses.

2    Did you talk to Tonya Owen a few weeks ago about your --

3    A    Oh, yes, I did --

4    Q    -- medical condition?

5    A    -- about the medical.  I did not realize that she was an

6    expert witness, sir.

7    Q    All right.  And you were asked about contact or

8    communications you had with the warden about your shoes.  Did

9    you actually have a conversation with him shortly after your

10    arrival --

11    A    I did catch him going through -- as soon as we were on 4

12    South he was walking through, and --

13    Q    But what -- approximately what date would that have been?

14    A    It would have been, I do believe, on the weekend, because

15    he would walk through every Saturday, so the first Saturday I

16    was there.

17    Q    And what day did you get there?

18    A    February 1st.

19    Q    And then so about how many days would that have been after

20    you had been there?

21    A    Was the 1st on a Sunday -- or a Monday, so it would have

22    been about five or six days, I guess.

23    Q    Okay.  All right.  And why did you feel the need to have a

24    conversation with him?

25    A    Because of the condition of my feet.  And I asked him, you

1    know, I need these shoes.

2    Q    Well, just tell me how it came about that you had a

3    conversation with him?

4    A    He would generally walk through on the weekends, come in,

5    you know, sometime after breakfast.  Everyone was up, so he was

6    coming through 4 South, and before I knew who he was, he had

7    already passed.  And one of the inmates who had been there

8    longer said that is, you know, Warden Arnold.

9        So I cut through the barracks through the -- everybody's

10   bunks and met him on the other side and introduced myself and

11   told him, you know, I really need these shoes.  Can you, you

12   know, get them in any sooner, and can you get them in at all

13   really.   And he looks at me and says, "That's something you

14   need to address through Medical."  And he said, "I don't watch

15   -- I don't play a doctor, I'm not a doctor and I don't play one

16   on TV," and walked on.

17   Q    You talked to these various nurses early on in the process

18   after you got there?

19   A    Yes.

20   Q    Did you expect them to talk to their superiors about the

21   need for these shoes?

22   A    Very much so, yes.  I would have thought that they would

23   have went, you know, maybe even to him and said, "You know,

24   he's got to have these, something bad will, you know,

25   eventually happen."

# C E R T I F I C A T E

STATE OF ARKANSAS    )

                             )ss

COUNTY OF FAULKNER    )

    I, DENNIS W. MICKELS, Certified Court Reporter #735, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

    I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

WITNESS MY HAND AND SEAL this 23rd day of November, 2018.



DENNIS W. MICKELS, CCR

Certified Court Reporter #735





EXHIBIT
2
Shipp

PENGAD 800-531-6989

ADC HEALTH SERVICE REQUEST FORM                                    MSF-26

| Name (Last, First, MI): | ADC #: | Date of birth: | Barracks: | Date of Request: |
|---|---|---|---|---|
| Shipp Craig A | 660878 | 11-11-70 | 45 | 2-3-16 |

Job Assignment:

Description of the problem: Deformed feet + toes due to charcot joint. Also Diabetes

I consent to be treated for the above problem. I understand that in accordance with the Department of Correction's policy, I will be charged for healthcare services through deductions of applicable co-payment charges from my resident account, and that if I have insufficient funds to cover the charge, the amount of the co-pay will be set up as an outstanding debt.

INMATE'S SIGNATURE: Craig Shipp                    DATE: 2-3-16

************************************************************************

## FOR MEDICAL USE ONLY

FACILITY NAME: SWACCC

DATE RECEIVED BY MEDICAL DEPT: 2.5.16

PRIORITY 1 :See within 24 hours- emergent need ☐    PRIORITY 3:See within 72 hours- routine request ☒

PRIORITY 2: See within 48 hours- urgent need ☐    PRIORITY 4: Face-to-face visit not needed; respond to request in writing ☐

DATE TRIAGED: 2.5.16    TRIAGED BY: (NAME) J. Hard    (TITLE) U

If the EHR is unavailable, enter nursing sick call notes in this area:

| Vital Signs: BP | Pulse | Temp | Resp | Wt |
|---|---|---|---|---|
| Protocol Used: | | | | |

Subjective:

Objective:

Assessment:

Plan:

Education:

Refer to: [ ] Physician    [ ] Mid-level    [ ] Mental Health    [ ] Dental    [ ] Other (List):

Medical Staff Name:

| Medical Staff Signature: | Title: | Date/time: | Unit: |
|---|---|---|---|

| Inmate Name: Shipp, Craig | ADC #: 660878 | Date of Birth: 11-11-70 |
|---|---|---|

CCS.DOC.000292

EXHIBIT

8

Shipp

PENGAD 800-631-6989

# RESIDENT REQUEST

CENTER: SWACCC          DATE: 3-21-16

TO: _Warden Arnold_          OFFICE:

FROM: _Craig Shipp_          NUMBER: _660898_

JOB:          SUPERVISOR:

WORKING HOURS:          HOUSING UNIT: _5th Floor_

GIVE A DETAILED REASON FOR REQUEST:

Request medical transfer to Malvern med unit.
~~Extension~~ The treatment my feet require such
as De-breeding, casting, x-rays and Una-boot offloading
have to be done at clinic. They have to be approved usually
taking 2 days. Dr. Lamar has told me they are not
equipped to do these things. And are not stopped to do
them. It has been 6 weeks since the wounds
developed and will take months more to heal. I also
have a third wound due to a cast rubbing the skin
off of my right pinky toe. The right foot was cast
Mar. 9 and was removed Mar.14. It had to be approved
first to be removed. Being at the Malvern unit
would be a better place for getting my feet
heal the.

_Craig Shipp_
(RESIDENT'S SIGNATURE)

I spoke with Dr. Lenox on 3/24/16 in response to your
transfer request. She states you are receiving appropriate
medical care at this time and if you are transferred.

ACTION TAKEN:
3-22-16          It may also possibly delay some vital
— medical? tests or services. A transfer is not indicated
          8 Qu /3-22-16 from a medical standpoint
          @ this time. Any decision
          for transfer will be based on the
          Warden's decision.

_Deena Verner HSA 3/25/16_
(RESPONDANT'S SIGNATURE AND DATE)

CCS- Requests Complaints Other 0029



EXHIBIT
9
Shipp

## Arkansas Community Corrections
## Request for Interview
# Resident Request



RECEIVED
APR 0 1 2016

Center: **SWACCC**          Date: **3-30-29**

To: **Mrs. Turner**          Office: **medical**

From: **Craig Shipp**          Number: **660878**
(Resident's Name)

Job Assignment: **Elev Ap**          Supervisor: _____

Working Hours: _____ To: _____          Housing Unit: **5th**

Give a detailed reason for request: _In the reasons listed_
_for not transfering me to the Malvern med unit_
_was the potential for missing doctor's appointment_
_My visit to Wadley I was told by the doctor_
_and his nurse, and so was the officer who took me_
_that I had an appointment with Dr. Keene the_
_next day. Why wasn't I taken to it._

_____
Craig Shipp
(Resident's Signature)

Action Taken:

_Your physician cancelled the appointment_
_& referred you to the Wound clinic instead_
_where you have continued to have ongoing care._

_____
Teneace Turner HSA 4/18/16
(Respondent's Signature/Date)