IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

CRAIG SHIPP                                              **PLAINTIFF**

VS.                    NO. 4:18-CV-0417 SOH

CORRECT CARE SOLUTIONS, LLC,
DR. LORENE LOMAX, DR MIMO LEMDJA,
KIMBERLY HOFMANN, LENORA PHILSON,
KINDALL SMITH, DIANE CUNNINGHAM,
MELISSA STONER, STEVE ARNOLD                            **DEFENDANTS**

---

ORAL DEPOSITION

OF

WARDEN STEPHEN ARNOLD

TAKEN NOVEMBER 15, 2018, AT 10:04 A.M.

---

# *Conway Court Reporting*

*Post Office Box 2188*

*Conway, Arkansas   72033*

*www.conwaycourtreporting.com*

## *"Spoken to written . . . word for word"*

Conway Office: 501.679.1488          Little Rock Office:  501.319.4807




EXHIBIT

4

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

MR. DEREK S. FRANSEEN
WALSH & FRANSEEN
200 EAST 10TH STREET PLAZA
EDMOND, OKLAHOMA  73034

ON BEHALF OF THE DEFENDANTS:

MS. MICHELLE ODUM
HUMPHRIES, ODUM & EUBANKS
1901 BROADWAY STREET
LITTLE ROCK, ARKANSAS  72206

MS. ROSALYN MIDDLETON
ASSISTANT ATTORNEY GENERAL
323 CENTER STREET, SUITE 200
LITTLE ROCK, ARKANSAS  72201

I N D E X

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . .   1

APPEARANCES . . . . . . . . . . . . . . . . . . . . .   2

STIPULATION PAGE . . . . . . . . . . . . . . . . . .   4

WITNESS:  **WARDEN STEPHEN ARNOLD**

    Examination by Mr. Franseen . . . . . . . . . . . .   5

    Examination by Ms. Middleton . . . . . . . . . . .  68

    Examination by Ms. Odum . . . . . . . . . . . . .  72

    Further Examination by Mr. Franseen . . . . . . . .  77

    Further Examination by Ms. Odum . . . . . . . . . .  80

    Further Examination by Mr. Franseen . . . . . . . .  80

    Deposition Concluded  . . . . . . . . . . . . . .  81

COURT REPORTER'S CERTIFICATE  . . . . . . . . . . . .  83

EXHIBITS:                                    IDENTIFIED:

1.  Resident Request, Complaint and Grievance Forms . . .  28

2.  Emails . . . . . . . . . . . . . . . . . . .  48

3.  Inmate Personal Property Record . . . . . . . . . .  53

4.  Personal Property Item . . . . . . . . . . . . . .  56

1    C A P T I O N

2        ANSWERS AND ORAL DEPOSITION OF **WARDEN STEPHEN ARNOLD**, a

3    witness produced at the request of the Plaintiff, taken in the

4    above-styled and numbered cause on the 15th day of November,

5    2018, at 10:04 a.m., at the offices of the Arkansas Attorney

6    General's Office, 323 Center Street, Suite 200, Little Rock,

7    Arkansas, pursuant to the Federal Rules of Civil Procedure.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

THEREUPON,

**WARDEN STEPHEN ARNOLD,**

THE WITNESS HEREINBEFORE NAMED, having been first duly cautioned and sworn by me to testify to the truth, the whole truth, and nothing but the truth, testified on his oath as follows, to-wit:

EXAMINATION

BY MR. FRANSEEN:

Q    Please state your name.

A    My name is Stephen Arnold.

Q    And what is your middle name?

A    Earl.

Q    What is your date of birth?

A    12/27/1957.

Q    And where do you currently reside?

A    Hot Springs, Arkansas.

Q    Are you currently employed?

A    I am.

Q    Who are you employed with?

A    I work security at National Park College in Hot Springs.

Q    How long have you been in that position?

A    I started in September.

Q    And where did you work before that?

1  certificates or training in order to become a warden?

2  A     Well, I have a bachelor's degree from John Brown

3  University in organizational management.  I have an associate's

4  degree in security administration from the Community College of

5  the Air Force.  I had also been through the Arkansas Department

6  of Correction Training Academy, and I pretty much have

7  thousands of hours of training.

8  Q     And how long were you in the position of a warden?

9  A     I was -- a little over two years, and I went back on the

10  active duty tour in March of '99, again, to finish out my

11  retirement, and then I came back and -- it was the end of March

12  of 2000, and that's when I came to Little Rock.  So at that

13  point, about two and a half years-ish, two years.  I don't

14  know.

15  Q     Okay.  And when you come back and you come over to Little

16  Rock, what's your positions there starting in 2000?

17  A     I was the administrator of probation and parole, and that

18  was eventually changed to assistant director.  And I held that

19  position from 2000 until August the 1st of 2013 when I retired.

20  Q     And when it's changed to the assistant director, are you

21  still over the probation and parole, or are you over different

22  departments?

23  A     I'm over probation and parole, the statewide system, yes,

24  sir.

25  Q     So at that point, you are not over seeing any correctional

1    facilities; is that correct?

2    A     Not specifically, no, sir.

3    Q     And then you have your first retirement from, I guess,

4    your civilian jobs?  I guess this technically would be your

5    second retirement at this point?

6    A     (Witness nods head up and down)

7    Q     And what do you do from 2013 until 2015?

8    A     I worked a couple of months for the Department of State at

9    the passport office in Hot Springs, and I went to Washington

10   and did a four-week academy there.  Like I said, I worked there

11   about 14 or 15 months, and I worked for DF&A for a few minutes

12   at Oaklawn and then went back into retirement.

13   Q     And then at some point in 2015, you're asked to come back

14   to the Arkansas?

15   A     Yes, sir.

16   Q     What prompted that conversation or that --

17   A     I'm not sure what prompted that conversation.  I know that

18   I had had some history with Texarkana.  I knew the facility,

19   and I think their search was -- they were looking for somebody

20   that had some history in the area that knew people and asked me

21   if I would consider doing that, and I said yes, and I did that.

22   So that was -- I interviewed for the job and got the job, and

23   that was --

24   Q     Do you know who the warden was before you?

25   A     I think it was Wayne Smith.

1  Q    Is Wayne Smith still within the Arkansas Community of

2  Correction?

3  A    No, sir.  I think he had been out for some time when I got

4  there.

5  Q    Do you know why he left Texarkana?

6  A    I don't have any idea.  I know he was the mayor of

7  Texarkana, Arkansas, when I took the unit over, so I'm

8  presuming he left to become the mayor of Texarkana, Arkansas.

9  Q    I understand.  When you get there in 2015, what was your

10 opinion of how the facility was being run?

11 A    I don't think I had an opinion.  I mean, I think my job

12 was to go in and review the facility, review the policies, and

13 just try to establish a team.  So I guess that was my primary

14 focus, was to establish a team, ensure that we had good solid

15 programs, and we had good relations with the community, and

16 basically just make us a great partner with the local

17 community.

18     So my opinion of how it worked, I don't know that I had an

19 opinion.  I was too busy trying to figure out what I was

20 supposed to be doing.  We were running a modified therapeutic

21 community program, which is a treatment program, and in a

22 prison setting in an old hospital, a seven-story hospital, so

23 there were a lot of dynamics there, so I don't I really -- the

24 long answer, I don't think I really had an opinion.  I just was

25 going to try to make it as good as I could.

1    Q    When you were the warden in '97 to '99, was it a different

2    type of facility?

3    A    It was basically -- it wasn't running on the modified

4    therapeutic community concept.  It was basically running prison

5    programs, like substance abuse, and we did a lot of community

6    work.  We sent a lot of prisoners out in the community to do

7    community work crews, and the concept was different.  That was

8    back in the day when the law was passed in July of 1993 to

9    establish the Department of Community Punishment.  The idea was

10   to put the guys out in the public in yellow uniforms picking up

11   trash and those kind of things so that the community could see

12   that they were changing their ways and they were helping the

13   community, and so the concept was different.

14        And when I came back the next time, it was about

15   treatment.  We still sent out some people to work in the

16   community on a limited basis, but the primary focus was

17   treatment.  So, yes, I would say it was different.

18   Q    In 1997 to 1999, was Correct Care Solutions providing the

19   medical care for your facility?

20   A    No, sir.

21   Q    Was there any third-party medical service provider at that

22   time?

23   A    Yes, sir.

24   Q    Who was that?

25   A    If I recall, it was PHP --

1    Q    Do you know what --

2    A    -- but that's been a long time ago.  I have no -- I think

3    it was like Preferred Healthcare or something, but I don't know

4    for sure.  That was a long time ago.

5    Q    And did you have any issues with PHP, how they handled

6    healthcare?

7    A    I don't recall any issues.

8    Q    Did you have any issues with how Correct Care Solutions

9    handled healthcare at -- during your 2015-to-2017 time period?

10    A    I didn't have any issues with the way they handled

11    healthcare.  My -- the way it was operated was different.

12    Under this contract, they handled everything medical related;

13    okay?  Maybe in the past we had had a say-so on what -- back in

14    the old days we might have had a say-so in what we thought

15    should have happened or didn't happen; but in this case, we

16    functioned pretty much as two operations inside the unit.

17         We provided them space; we provided them whatever.  We

18    worked with them closely, but we didn't really have the input

19    -- like, in the old days, we addressed the grievances, and we

20    addressed other things through administrative function; but

21    under this -- when I came back, basically, it was separate.

22    Q    Does anyone from the Community Correction's care side of

23    the operations oversee the medical staff?

24    A    Oversee.  They had their own regional people.  They had

25    their own administrators, so I don't know that -- I know they

1   medical and a security standpoint?

2   A    If you will give me a specific medical question, I will

3   give you -- I mean, a specific question, I will give you -- I

4   will try to give you a specific answer.

5   Q    What about getting a medical device approved to come into

6   the facility?

7   A    A medical device would be a medical decision.

8   Q    And so there would be no need for Medical to involve the

9   warden in that decision?

10  A    Only to let me know that that device was required and that

11  they wanted it to be sent in.

12  Q    Okay.  And why would they need to notify you that it was

13  required and that it needed to be sent in?

14  A    Because those are not standard things that come in through

15  the mail.  Those are not things that are normally sent in.  So

16  if they were sent through the mail, I would need to know that.

17  If they were sent strictly to the medical department, I

18  wouldn't know but just to say, "This person has a particular

19  device."  That's all I would need to know.

20  Q    So they would need to notify you and for you to approve it

21  for it to come into the facility?

22  A    I don't think to approve it.  I think to acknowledge that

23  they had to -- that it was required and that he needed it

24  there.

25  Q    So you don't even --

1  A    I don't think I would say, "I approve this," or, "I
2  disapprove it." I would say, "Okay. That's based on a medical
3  need. No problem."
4  Q    And so if Medical initiated something to you, you're never
5  going to not approve it?
6  A    I can't imagine why I would.
7  Q    How was that policy and procedure conveyed to the medical
8  staff?
9  A    It was my understanding that that was part of the
10 contract, that if anything -- any type of medical device was
11 required for a resident, that was Medical's obligation to take
12 care of it, that that was part of their contract.
13 Q    And so --
14 A    So the conveyance, to my understanding, was the contract.
15 Q    Well, what -- does that contract say that they have to
16 advise the warden that this device is coming in?
17 A    I don't know.
18 Q    Did you ever review the contract?
19 A    I reviewed the contract, but I don't recall the specifics
20 on what it said. I do know that I consulted with our legal
21 counsel, and our legal counsel said, If something medical is
22 required, Medical will get that for you -- I did get -- just as
23 with a wheelchair or a cane or any other thing.
24 Q    Who did you consult with?
25 A    I consulted with our attorney, Mr. Wade Hodge.

1   A    This particular one on top?

2   Q    Kind of just quickly look through those documents and just

3   kind of give me a general description of what they are.

4   A    Well, the first two were him requesting the orthopedic

5   shoes.  In both cases, I forwarded those to Medical for a

6   response.

7   Q    Okay.

8   A    The third one was a resident request to the administrative

9   review officer, who wanted to complain because -- why it took

10  so long to get his orthopedic shoes.  That appears to be the

11  time that he received the shoes.  If he says he took so long,

12  I'm presuming that was sometime between the 1st and the 18th.

13  Q    I guess, before we go into the detail of each one, let's

14  just generically describe what the forms are and --

15  A    These are requests for an interview.  This is a complaint

16  form.  It's an informal complaint form that's used in the

17  department.  This appears to be a grievance form.  This appears

18  to be a complaint form.  This is another grievance form, a

19  grievance form, basically his response to a grievance form.

20  And that looks like that's it.

21  Q    What are these last two?

22  A    The last two appear to be responses to his grievance from

23  the ARO and the Healthcare Services.

24  Q    The -- were you consulted during the grievance and the

25  appeal process?

1    grievance and appeal going to ever do anything for them?

2    A    I don't know.  I don't think so.  I mean, if they got what

3    they needed, then I don't think so.

4    Q    So if they already have what they need, they don't need to

5    go through the grievance and the appeal process to rectify that

6    situation at that point?

7    A    I don't think I'm able to answer that question.

8    Q    Okay.  And you would agree that if the grievance and

9    appeal is only to correct the situation at hand and that

10   situation has already been corrected, then the grievance and

11   appeal doesn't provide any recourse for the inmate?

12   A    I guess my point would be, if it was rectified before the

13   grievance period would be concluded, then it was rectified.

14   Q    And starting at the first page of that set, can you

15   identify what that document is?

16   A    That's a request for an interview.  The resident request

17   is sent to different staff members to ask for their questions,

18   assistance, or whatever, and they're processed through whoever

19   they should be addressed to, I guess.  In this case, he

20   requested orthopedic shoes, and he was referred to Medical.

21   Q    And who is the "he?"  Who is the resident on that?

22   A    Craig Shipp.

23   Q    Okay.  And who was it provided to?

24   A    It was sent to me, and I referred him to Medical.

25   Q    Okay.  Can you give a full reading of what that

1   description is for the reason for request?

2   A    It says here, Orthopedic diabetic shoes for -- I don't

3   even know what that word is -- Charcot joint.

4   Q    Okay.  Is it "orthopedic," or is it "orthotic"?

5   A    I don't know.  It may be "orthotic."

6   Q    Okay.  When you got that request, did you do any research

7   into what an orthotic is?

8   A    I did not.

9   Q    Did you do any research into what a Charcot joint is?

10  A    I did not.

11  Q    Okay.  Whose signature is at the very bottom?

12  A    Mine.

13  Q    And after that signature is written and dated, does that

14  form go back to the resident then?

15  A    No.  This form was -- there should have been a copy sent

16  to Medical.

17  Q    Oh, okay.  Okay.  So you were responsible for sending that

18  to Medical?

19  A    My -- the people that processed these were, yes.  I make

20  the response, I give them back, and they process them to --

21  there should have been a copy to him that says, "If you need

22  Medical," and there should have been a copy that went to

23  Medical.

24  Q    Okay.  Was that done?

25  A    I can't answer that.

1  A    I referred him to the medical staff, because I'm not a

2  doctor or a practitioner; I'm an administrator.

3  Q    Do you know why Medical was telling him to send requests

4  to you?

5  A    I have no idea why Medical was telling him to send

6  requests to me.   It's clearly a medical condition.

7  Q    It's a serious medical condition, isn't it?

8  A    It's clearly a medical issue, and it was referred to

9  Medical.

10  Q    Is something that can result in an amputation of a foot a

11  serious medical condition?

12  A    I think, obviously, that's true.

13  Q    And so I want to know, who did you speak with in Medical

14  after this request was sent to you?

15  A    I am sure I would have talked to Ms. Turner.

16  Q    Okay.  So you talked to Ms. Turner on February 1st or

17  February 2nd --

18  A    I can't tell you what date I talked to her.  I'm sure I

19  would have talked to Ms. Turner.

20  Q    Well, do you know -- if you're saying you're sure you

21  would have, would you have done it on the 1st, 2nd, or 3rd?

22  A    I can't tell you.

23  Q    Would you have waited a week?

24  A    I wouldn't think so, no.

25  Q    Would you have waited two weeks?

1    A    Of course not.

2    Q    Did you normally communicate with Ms. Turner through

3    emails or in person?

4    A    Sometimes emails; sometimes in person.  Ms. Turner -- we

5    invited Ms. Turner to our management team meetings as a part of

6    that, so we communicated a lot.  Sometimes were about medical

7    issues, and sometimes weren't.  Sometimes we just communicated

8    throughout the facility.  I did a lot of walking when I was at

9    that facility.

10   Q    Did you ever speak with Mr. Shipp?

11   A    I'm sure I did.

12   Q    Do you remember him asking you about your -- about his

13   orthotic shoes?

14   A    I would not be surprised that he did.  I was on those

15   floors every day most days all day.  I would go on those floors

16   at 6:00 in the morning, and I would leave there at 10:00 at

17   night, so I'm sure I would have had a conversation with Mr.

18   Shipp.

19   Q    What would your response have been to him if he asked you

20   about his orthotic shoes?

21   A    I would probably guess that he would have to see Medical,

22   that I wasn't a doctor.

23   Q    And so February 1st, 2016, is Mr. Shipp's first day there.

24   A    Okay.

25   Q    Do you have any -- do you agree with that?

1  Q    And when you say the 12th, is that February of --

2  A    February the 12th of '16.  It shows it was signed by me on

3  the 12th, and I sent it to Medical.

4  Q    Okay.  Describe to me on the detailed reason for request.

5  A    The reason he says, he has an open wound on his left foot,

6  and the specific name, the Charcot joint, on left foot causing

7  bones to break down; needs special orthotics.

8  Q    Okay.  What is your response to him?

9  A    My response was, I sent it to Medical.

10 Q    And you put, "Medical," question mark; is that correct?

11 A    Right.  Right.  And then it was signed off by LeNora

12 Turner on the 15th.  I sent it to Medical because I wanted them

13 to respond.  And she signed it right there, which means she got

14 it.

15 Q    I agree.  So on this form, it's signed by you and it's

16 sent to Medical, and this one has a response by LeNora Turner?

17 A    It just has a signature.  It doesn't have a response; it

18 just has a signature.

19 Q    Well, what's that below his handwriting?

20 A    Where?  Here?

21 Q    Yes.

22 A    "This must be addressed in a sick call due to it has to be

23 evaluated for medical necessity by the doctor."  So I'm

24 guessing that was her response.

25 Q    Okay.  And so that form shows that Medical received it and

1      is on the form.  He asked -- he told me what he did.

2             MS. MIDDLETON:  He told you also that, on the

3      second form, that his signature was on the bottom.

4             MR. FRANSEEN:  I just asked him that, and he --

5             MS. MIDDLETON:  You asked him that earlier, two

6      questions ago, and he answered that.  He answered you

7      when you asked him specifically.

8             MR. FRANSEEN:  So he has already testified that

9      her signature is on the bottom?

10            MS. MIDDLETON:  On the bottom of the February

11            12th form.

12     Q     (By Mr. Franseen)  And those two forms are filled out

13     differently by you?

14     A     Okay.  And on both of them, he was referred to Medical.

15     Q     And you can't sit here today and tell us whether you spoke

16     with someone from Medical on February 1st, 2016?

17     A     No.

18     Q     Did you speak to Ms. Turner in response to the February

19     12th, 2016, one?

20     A     I can't answer that question.  I don't know.

21     Q     How is an inmate supposed to initiate approval for a

22     medical device?

23     A     They go see Medical.

24     Q     Okay.  And what would you expect Medical to do?

25     A     To evaluate him and decide whether he needed something;

1  and if he needed it, provide it.

2  Q    And would you expect that evaluation to occur in a timely

3  manner?

4  A    I would hope so, yes.

5  Q    And if someone needs a medical device on a daily basis,

6  would you expect a quick review by a medical provider?

7  A    I would hope so.

8  Q    What --

9  A    But that's a medical question, and I'm not going to speak

10  for their practices.

11  Q    If someone is starting to show sores on their feet after

12  not having their orthotic shoes, would you expect Medical to

13  make a determination on whether the orthotic shoes could be

14  approved or not?

15  A    I would hope so.

16  Q    And if a medical provider or doctor did not do that, what

17  would your response be?

18  A    Their chain of command was different than ours.  They

19  would have gone through their regional director, and they would

20  have gone about it that way.  That would have been a medical

21  decision.

22  Q    So you would have expected a medical doctor who saw an

23  inmate who needed orthotic shoes who had open sores to start

24  going up the chain of command?

25  A    If that's what it took to get that device approved, yes.

1  Q   What did it take for Mr. Shipp to get his device approved?

2  A   The doctor to say he needed them.

3  Q   Okay.  And when did that occur?

4  A   To the best of my recollection, that was somewhere around

5  the 16th of the month.

6  Q   And how did that occur?

7  A   The doctor wrote a comment somewhere, and I can't tell you

8  where, but said that he needed the shoes.  And they contacted

9  me and said that he needed the ones that come from home because

10  they were 1,200-dollar shoes, and I made another contact to Mr.

11  Murphy and said, "Can we approve this," and he said, "Okay."

12  And we gave them permission to do it at that time.

13  Q   You said you made another contact?

14  A   Yes.

15  Q   So should there be a previous contact between you and Mr.

16  Murphy?

17  A   I don't know.

18  Q   Okay.  Do you recall being reached out by Mr. Shipp's

19  family?

20  A   I think I was reached out a couple of times by Mr. Shipp's

21  family.

22  Q   And was this with regards to his orthotic shoes?

23  A   I think -- later on, I think the initial contacts were

24  that they were concerned because his -- and I -- gosh --

25  Q   Do you have any specific memory about when Mr. Shipp's

1    A     Uh-huh.  Okay, that's me.

2              MS. MIDDLETON:  It's on the next page.

3    Q     And it's kind of in reverse order, so start at the bottom

4    one.  And I think the heading is actually on the first page,

5    but the body of it is on the second page.  Can you say who

6    emailed that to -- or from and to?

7    A     It looks like this was sent to me and Kim Hofmann on

8    February the 16th from LeNora Turner, and it's talking about

9    Resident Shipp.

10   Q     And what's -- it's kind of a long email, but, generically,

11   what's it saying about Resident Shipp?

12   A     The gist of it was, that day, he was called in by Dr.

13   Lomax, and they talked about him needing his shoes to the

14   facility or transferring him to Malvern.  He had written his

15   family and attempted to have them -- the shoes shipped from the

16   manufacturer.  That was on the 7th.  He said that he has a pair

17   of 1,200-dollar shoes at home that he got in November and

18   requested his family send them to the unit.  And she says she

19   submitted a copy of the restriction that was written that

20   morning.

21   Q     And do you know how many times Mr. Shipp had been seen by

22   a doctor or medical staff prior to the 16th?

23   A     I don't.

24   Q     Do you think every time -- do you think any time a

25   resident initiates a request about a medical device, that the

1  in a wheelchair.

2  Q    Okay.  Do you know how to identify what his shoes looked

3  like, orthotic shoes?

4  A    From what they were -- I never saw them -- what they were

5  explaining me to were, they had a metal shoe and they had a

6  leather buckle on them.  That's what I was told.

7  Q    Okay.  So you weren't told that they were inserts for New

8  Balance shoes?

9  A    No.  What I was told was that he had the 1,200-dollar

10  shoes, which were the special metal device with leather on it.

11  And when those were received, he didn't want to wear those; he

12  wanted to wear New Balance shoes that he already had on his

13  person, as I understand.

14  Q    Okay.

15  A    I never heard the "insert" word before.

16  Q    Okay.  So would there have been a personal property

17  showing that -- this metal device that the leather strap came

18  in?

19  A    I couldn't tell you.

20  Q    Did you review --

21  A    I reviewed the documents that showed the New Balance

22  shoes.

23  Q    Okay.  So those are the shoes that came in on the 19th; is

24  that correct?

25  A    I'm not sure.

1     Q    Okay. Do you ever remember seeing the orthotic shoes?

2     A    I don't.

3     Q    Okay. Can you --

4     A    I remember seeing the New Balance shoes.

5     Q    On your response -- take me through kind of the rest of

6 that email.

7     A    I sent -- that day that I got it from Ms. Turner, I got it

8 at 10:14; and at 10:26, I sent it to Mr. Murphy, who was the

9 deputy director, and said, unless he had an issue, I think we

10 needed to go ahead and allow these special shoes to be sent in,

11 and that I would inspect them and make sure that they were

12 good, and he -- and since they had a dollar value, that's why I

13 said I would inspect them and have him do a release of

14 liability for them so that he would be responsible for them.

15     Q    And did you have that form filled out?

16     A    Did I have the form filled out?

17     Q    The release of liability form?

18     A    I did not.

19     Q    Okay. Did you inspect them?

20     A    I did not.

21     Q    Okay. Why not?

22     A    As I understand it, the shoes came in over the weekend,

23 and the shoes went directly up and, I think, Medical got the

24 shoes. And that's the last I recall about it. I know we had

25 -- he sent me an okay to have them sent in, and I sent it to

1    Q    Okay.  Let me see this real quick.  On this page, it

2    doesn't show the last updated information, does it?

3    A    It says, Shoes, keep in possession, as of 2/1/16.

4    Q    Well, we agree that you received his prescription shoes on

5    the 19th?

6    A    That that's what our document showed, yes.

7    Q    Do you know what that document looked like?

8    A    I don't recall.  I remember reviewing that that was the

9    specific date that the shoes were received, which was three

10   days from the date the doctor said that he needed them.

11   Q    Okay.  But that wasn't from three days that he first

12   notified Medical that he needed them?

13   A    I can only refer to what the doctor said, that he needed

14   them, and that's when they got on the way.

15   Q    Well, and you -- but you notified Medical on the 1st;

16   correct?

17   A    That he had requested them.

18   Q    Right, right.  So it wasn't within three days of him

19   notifying them if you did, in fact, notify Medical on the 1st?

20   A    It was within three days of the doctor saying that he

21   needed them --

22   Q    Right.

23   A    -- which would have been my job to refer it to Medical and

24   them to tell us that he needed them.

25   Q    And that occurred 15 days after he notified you?  Am I

1    mistaken on that?

2    A    It was three days -- they were on the unit three days

3    after the doctor prescribed them -- or said that he needed

4    them.

5    Q    Okay.  So we agree they weren't there on the 1st?

6    A    I don't know.  You're telling -- I guess I misunderstood

7    what you were saying.  You were saying that the special shoes

8    were the New Balance shoes.

9                   (WHEREUPON, Exhibit 4 was marked for

10                  identification and is attached hereto.)

11   Q    Okay.  I'm going to hand you what's documented as Exhibit

12   Number 4.

13                  MR. FRANSEEN:  Do you want to review this first?

14                  MS. MIDDLETON:  I've got it.  Go ahead.

15   Q    (By Mr. Franseen)  Is that the one showing the shoes that

16   came in on the 19th?

17   A    That doesn't say anything about any -- 2/1 --

18   Q    You refer to a 2/1 on that form, but what's the last

19   updated and input information date?

20   A    The dates on here show 2/1.  There's inventory date, 2/1;

21   there's 2/1/16 --

22   Q    And then we go -- and there's a little click-down --

23   A    -- 2/19.

24   Q    Right.  And that's the one you're referring to as far as

25   when the shoes came in; correct?

1  continues to be monitored and that you have received treatment

2  from outside providers.  I find the grievance holds no merit."

3  Q    Okay.  And so you would agree that that's the final stage

4  of Mr. Shipp's appeal process?

5  A    I would think so, yes, sir.

6  Q    After February of 2016, were there any changes to the

7  polices and procedures regarding an inmate receiving medical

8  devices?

9  A    Not that I recall.

10  Q    Did you ever have any discussions with medical staff

11  regarding how to respond to an inmate requesting for a medical

12  device?

13  A    Not that I recall.

14  Q    Is there anything in an inmate handbook telling them

15  specifically what to do on getting a medical device approved?

16  A    Not to the best of my recollection.  I think they were

17  told they could have shoes sent in from the manufacturer only

18  for a value of less than $50.  That was on regular athletic

19  shoes.  Again, I've been out for a while, but I think that's

20  correct.

21  Q    And so that wasn't about prescription shoes?

22  A    No, sir, I don't think so.

23              MS. ODUM:  I'm sorry.  I didn't hear what you

24        said.  Can you repeat that about --

25  A    I said that they were told they could have, like, athletic

1  shoes sent in from the manufacturer with a dollar value of less

2  than $50.  Of course that was obvious for security reasons,

3  number one, and for contraband in the shoes; and, number two,

4  the value because of trafficking and trading issues.

5  Q    Okay.  If the medical staff was telling Mr. Shipp to

6  contact the warden regarding getting his medical device

7  approved, did they not understand the approval process?

8  A    I'm guessing, yes.  I mean, I don't know what they

9  understood or didn't.  I mean, it was clearly a medical device,

10  and that would have been a medical decision, so I'm not sure.

11  Q    And you would agree that on February 16th, 2016, when Ms.

12  Turner emailed you, that you -- that was the third time you had

13  been made aware that Mr. Shipp needed his orthotic shoes?

14  A    That was the day that the doctor said that they needed

15  them, and that's the date that we told them they could have

16  them sent in.

17  Q    Okay.  And then that was the third time you were notified

18  about Mr. Shipp's orthotic shoes?

19  A    Based on the documents, that's correct.

20  Q    And then, additionally, there may have been a conversation

21  you had with Mr. Shipp as well?

22  A    Maybe.

23              MR. FRANSEEN:  No further questions.

24              MS. MIDDLETON:  I've got to clarify some things

25         with him too, so -- do you mind?  And then I'll turn

1        him over to you, Michelle.

2                MS. ODUM:  Okay.

3                        EXAMINATION

4    BY MS. MIDDLETON:

5    Q    Now, Mr. Shipp -- oh, God.  It's a long day -- Warden

6    Arnold, I want you to clarify with me, the Texarkana facility,

7    that was a therapeutic --

8    A    Modified therapeutic community, yes, ma'am.

9    Q    So it's considered like a prison or a jail?

10   A    It was a minimum custody offender facility that provided

11   treatment.

12   Q    So --

13   A    It was different from prisons in that it was -- the design

14   criteria was for low-risk offenders to receive treatment.

15   Q    So as a minimum security facility, you still had the same

16   -- did you have security concerns with minimum security

17   facilities?

18   A    Sometimes a lot more.

19   Q    Okay.  What type of security concerns would you have?

20   A    Well, just because an offender had a low-risk offense

21   didn't necessarily mean they were a low-risk offender.  That

22   just means what they came in, number one, so you still had to

23   assess them.  You still had trafficking and trading like you

24   had at other prisons.  You still had activities.

25        And one of the issues we had at Texarkana was, Texarkana's

1   was an old hospital. It was designed to fit into the community

2   so that it didn't have the appearance of being a correctional

3   facility. It looked like it was still a part of the community,

4   and so to look like a part of the community meant you didn't

5   have bars on the windows, you didn't have fences around the

6   building, and so you had those kind of concerns.

7       So you had all kinds of concerns. In a treatment

8   facility, you had movement amongst floors based on levels of

9   the treatment program. So you just had lots of -- again, you

10  had a lot more than just in a regular prison where people had a

11  much more structured environment.

12  Q    Tell me, what is trafficking and trading? You used those

13  terms, and I know those are prison terms, so explain to us,

14  what is trafficking and trading?

15  A    So one person might have something of value, and they

16  trade it to another inmate for something of value or a favor or

17  a phone call or whatever. It's, "You give me something and

18  I'll give you something in return." And the higher the value,

19  the higher the reward.

20  Q    And how many residents did you have in the facility at one

21  time?

22  A    I think we started with 375, and I think at the end, when

23  I left, it was over 500.

24  Q    Let's go back. I want to focus on intake. When a

25  resident is brought in through intake, tell me what happens.

1  A    They go directly to isolation and the administration

2  segregation area.  There's a medical staff there, there's

3  counselors there, there's intake officers there.  They get

4  medically evaluated, they get tested for communicable diseases,

5  they get tested for TB, they get an overview of kind of how

6  things are going to go, evaluate their security risk.  Those

7  are the kind of things that happened.  A minimum of three days

8  to clear for TB or other communicable.  Some guys stay in there

9  longer than that until they're clear.

10 Q    And I heard you say that, on February 1st, Mr. Shipp was

11 already there with him being intake --

12 A    He was already intake -- he was at intake, yes.

13 Q    Intake.  So medical staff was right there at him?  Is

14 that --

15 A    That's correct.

16 Q    -- what you're saying?

17 A    That's correct.

18 Q    So --

19 A    They have a nurses' station in the intake area, and their

20 whole function was to deal with those guys there.

21 Q    Now, can a resident just come in during intake and request

22 medical devices?

23 A    Sure.  They can request anything.  They get intake by the

24 -- their whole medical history is gone over by the medical

25 staff.  Their whole security history and other history is gone

1  over with the security staff, so --

2  Q    Okay.  Would the doctor have to approve that request?  I'm

3  trying to understand here.  Mr. Shipp came in and said, "I have

4  these shoes and I require them."  Do you take the inmate at

5  their word, or is that something Medical had to approve?

6  A    I think, had the shoes come in with Mr. Shipp from the

7  jail, then it would have been an easy call.  They would have

8  been there.  They would have been identified as a medical need,

9  and it would have been done.  But he came in, as I understand

10  it, without the shoes, and they were -- he needed to be

11  evaluated for the shoes, and they needed to decide whether he

12  needed them or not.  And in this case, even though they should

13  have been provided by the medical staff, they were allowed to

14  come in at some point through the family based on the doctor's

15  order, so I hope that makes sense.

16  Q    So you said his family -- what is the normal procedure for

17  -- if Medical said an inmate needed special shoes, what was the

18  normal -- do you know the normal procedure for obtaining those

19  shoes?

20  A    Medical would have to go somewhere and get those shoes.

21  Q    Now, you said that -- let's see here.  So what was the

22  concern about Mr. Shipp's shoes?  Did you have any concerns?

23  Is that why they contacted you, security concerns?

24  A    They were -- I think the concern was they were asking for

25  something to be sent from home, which wasn't a normal practice.

C E R T I F I C A T E

STATE OF ARKANSAS    )

                       )ss

COUNTY OF FAULKNER  )


    I, KRISTY L. ROONEY, Certified Court Reporter #529, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.


    I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

WITNESS MY HAND AND SEAL this 10th day of December, 2018.

_Kristy L. Rooney_

KRISTY L. ROONEY, CCR

Certified Court Reporter #529

## SIGNATURE PAGE

I, <u>STEPHEN ARNOLD</u>, do hereby certify that I have read the foregoing 81 pages of typewritten transcript of my testimony, after necessary translation, given under oath on the 15th day of November, 2018, and that the said transcript and corrections, if any, that appear on the attached errata sheet(s), are true and correct to the best of my memory and belief. Further, that I have signed my name to this signature page and authorize that the same be attached to the original transcript.

_1/7/2019_
DATE

_S. A____ (signature)_
WITNESS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATE OF ARKANSAS          )
COUNTY OF _Garland_        )

SUBSCRIBED AND SWORN to before me, a Notary Public in and for the aforesaid county and state on this the _7th_ day of _January_, 2019.

TONI KAYE KNUPPS
Notary Public
Garland County, Arkansas
Commission # 12693160
Commission Expires January 19, 2026

_Toni Kaye Knupps (signature)_
NOTARY PUBLIC

MY COMMISSION EXPIRES:

_1-19-26_