1

```
 1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF ARKANSAS
 2                  TEXARKANA DIVISION

 3   CRAIG SHIPP                           PLAINTIFF

 4              CASE NO.  4:18-CV-04017-SOH

 5   v.

 6

     KIMBERLY HOFFMAN, et al.              DEFENDANTS
 7

 8

 9   *********************************************

10                   ORAL DEPOSITION
                          OF
11                   LENORA PHILSON
                    MARCH 29, 2019
12                     VOLUME 1

13   *********************************************

14

15       ORAL DEPOSITION OF LENORA PHILSON, produced as a

16   witness at the instance of the PLAINTIFF, CRAIG SHIPP,

17   and duly sworn, was taken in the above-styled and

18   numbered cause on the 29th day of March, 2019, from

19   12:58 p.m. to 1:59 p.m., before LEICA TURNER, a

20   Certified Shorthand Reporter in and for the State of

21   Texas, reported by machine shorthand, at the offices of

22   Leigh & Associates Court Reporting, 3930 Galleria Oaks

23   Drive, Suite 159, Texarkana, Texas, pursuant to the

24   Federal Rules of Civil Procedure and the provisions

25   stated on the record or attached hereto.
```

EXHIBIT

7

PENGAD 800-631-6989

```
 1                    A P P E A R A N C E S
 2    FOR THE PLAINTIFF CRAIG SHIPP:
 3         MR. DEREK S. FRANSEEN
                WALSH & FRANSEEN
 4              200 East 10th Street Plaza
                Edmond, Oklahoma  73034
 5              Phone:  405.843.7600
                Fax:  405.606.7050
 6              dfranseen@walshlawok.com
 7    FOR THE MEDICAL DEFENDANTS:
 8         MS. MICHELLE BANKS ODUM
                HUMPHRIES, ODUM & EUBANKS
 9              1901 Broadway Street
                Little Rock, Arkansas  72206
10              Phone:  501.420.1776
                michelle@humphrieslaw.net
11
      FOR THE ADC DEFENDANTS:
12
           MS. ROSALYN MIDDLETON
13              ASSISTANT ATTORNEY GENERAL
                CIVIL DEPARTMENT
14              323 Center Street
                Suite 200
15              Little Rock, Arkansas  72201
                Phone:  501.682.8122
16              Fax:  501.682.2591
                rosalyn.middleton@arkansasag.gov
17
18
19
20
21
22
23
24
25
```

1                    I N D E X

2     WITNESS:  LENORA PHILSON

3                                              PAGE

4     Appearances ....................................    2

5     Changes and Signature .........................   46

6     Reporter's Certificates .......................   48

7

8     Examination by Mr. Franseen ...................    5

9     Examination by Ms. Odum .......................   41

10    Examination by Mr. Franseen ...................   44

11

12

13

14

15

16

17      '

18

19

20

21

22

23

24

25

E X H I B I T   I N D E X

| EXHIBIT NO. | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | ........................................ Email, 2/16/16, from Lenora Turner to Stephen Arnold, Subj: Resident Craig Shipp (Bates CCS-Requests Complaints Other 0018) | 18 |
| 2 | ........................................ Medical Restrictions/Limitations/ Special Authorization(s) (Bates CCS 788) | 18 |
| 3 | ........................................ Email between Jeffrey Stieve and Lenora Turner and Kim Hofmann Re: Resident Craig Ship (Bates CCS-Requests Complaints Other 0024 - 0025) | 29 |
| 4 | ........................................ Email String between Lenora Turner and Stephen Arnold, 2/16/16, Re: Resident Craig Shipp (Bates CCS-Requests Complaints Other 0019) | 32 |
| 5 | ........................................ Request Form (Bates CCS-Requests Complaints Other 0026) | 44 |

P R O C E E D I N G S

(All parties present have hereby waived the

introductory reading by the

deposition officer as required by Rule 30(b)(5).)

LENORA PHILSON,

having been first duly cautioned and sworn, testified as

follows:

EXAMINATION

BY MR. FRANSEEN:

    Q.    Would you please give your full name?

    A.    Lenora Philson.

    Q.    And what is your -- have you gone by any other

names?

    A.    Lenora Jones and Lenora Turner.

    Q.    Which one is your maiden name?

    A.    Lenora Jones.

    Q.    What year did you become Lenora Turner?

    A.    20 -- oh, my God, excuse me, Lenora Turner

back in 1991.

    Q.    And did you stay Turner until you became

Jones -- or, I mean, Philson?  I'm sorry.

    A.    I'm sorry, could you repeat that?

    Q.    What year did you become Ms. Philson?

    A.    2017.

    Q.    And were you Turner from 1991 until 2017 or

1   your answer.  That's so we're not talking on top of each

2   other.  There's times when you're going to anticipate,

3   kind of normal conversation, and think that's going to

4   shortcut it, but it actually is going to make it longer.

5           So with your RN certification, how many places

6   have you been employed that involved a correctional or

7   jail setting?

8       A.   This would be the first.

9       Q.   "This," are you talking about your employment

10  with CCS, which I understand now is Wellpoint?

11      A.   Wellpath.

12      Q.   Wellpath?

13      A.   Yes.

14      Q.   When did you first start with that entity?

15      A.   CCS?

16      Q.   Yes.

17      A.   October 2015.

18      Q.   What was your job as it started in 2015?

19      A.   Health services administrator.

20      Q.   Prior to that, had you ever served as a health

21  services administrator for any other facility?

22      A.   No.

23      Q.   Had you served in a management position at any

24  facility prior to October 2015?

25      A.   Yes.

1    Q.   Where at?

2    A.   I worked at Encompass Home Health as the

3 branch manager.

4    Q.   What years?

5    A.   I was branch manager from 2013 to just -- I

6 left Encompass and came to CCS from Encompass.

7    Q.   Prior to that, any other management supervisor

8 positions?

9    A.   And while at Encompass, I was the clinical

10 staff supervisor and I was promoted to the branch

11 manager.  And before that, I served as internal medicine

12 supervisor at Wadley Regional Medical Center.

13   Q.   How long were you the internal medicine

14 supervisor at Wadley?

15   A.   I started there in 2001 and left there in

16 2005.

17   Q.   As the health services administrator with CCS,

18 what are your roles?

19   A.   It's primarily the overseeing of the -- of the

20 facility, the policies, the nursing policies and

21 procedures, the nursing staff, just administrative

22 duties as far as the clinical roles.  You know, basic --

23 I guess just the basic nursing duties and tasks just to

24 make sure administratively that they're carried out and

25 just enforcement of the policies and procedures.

1    there any actions that you saw that were not within the

2    policies and procedures that CCS either mandated or

3    followed?

4         A.    Could you repeat the question?

5         Q.    In your review of -- I assume you've reviewed

6    Mr. Shipp's medical record, is that the nursing

7    documents you're talking about?

8         A.    There were parts of it that I reviewed.

9         Q.    Were there any nursing documentation that did

10   not involve Mr. Shipp that you reviewed for this?

11        A.    That did not involve him?

12        Q.    Right.    Other patients or other people.

13        A.    I don't recall.

14        Q.    With regards to the nursing records involving

15   Mr. Shipp, did you notice any documentation or actions

16   that did not fall within the policies and procedures

17   that either CCS followed or implemented?

18        A.    That did not fall within --

19        Q.    Right.    That violated your policies and

20   procedures.

21        A.    I don't recall seeing any violations.

22        Q.    Do you supervise doctors?

23        A.    Well, I'm not a physician so I would say in

24   what way do you mean as far as supervise?  I'm there

25   administratively.  I would not say supervise because

1   they have a medical director for that.

2           Q.   So you're saying with actions regarding a

3   doctor, that's generally left to the medical director?

4           A.   I would say so.

5           Q.   Who is the current medical record?

6           A.   Dr. Stieve, Jeffrey Stieve.

7           Q.   And that's S-t -- is it --

8           A.   I believe it's S-t-i-e-v-e.

9           Q.   Was he the medical director in 2016?

10          A.   I believe so.

11          Q.   Did you review any e-mails?

12          A.   I believe so.

13          Q.   What -- if an inmate in February 2016 has an

14  outside medical device for a medical condition, what is

15  the procedure for them to follow to get that approved?

16          A.   It would -- what type of device would you

17  mean?  It would depend on what type of device it was.

18          Q.   Why would that depend?

19          A.   Because are you're talking about a device that

20  would be like oxygen or are you talking about -- it

21  would just depend on what type of device it was.  Oxygen

22  would be different from, let's say, a cane or something

23  like that.  I mean, it would just -- it would just

24  depend because we would contact the physician if it was

25  something that they brought into the facility.  If it

1   was something like that, we would contact the physician
2   and see if it was something, you know, that they -- if
3   it was something that they brought into the facility
4   that -- to see if they needed to keep or something like
5   that if it was medically necessary.
6       Q.  Okay.  With regards to, let's say, an orthotic
7   shoe for a diabetic, what is the policy and procedure in
8   order for a person in February 2016 to get that approved
9   into the facility?
10      A.  You mean if they brought it with them into the
11  facility?
12      Q.  Whether they have it there or they want it
13  sent there, what do they have to do to get it
14  approved?
15      A.  Well, if it was something that they brought
16  into the facility, then that's something that we could
17  call -- if it was -- was it a prescription?  You mean if
18  it was a prescription?
19      Q.  The orthotic for a diabetic, prescribed
20  orthotic for a diabetic.
21      A.  Okay.  That would be something we could
22  contact the physician and say, okay, they have an
23  orthotic shoe, and to see if it was something that they
24  felt like that they wanted them to keep on them or not
25  if they came into the facility with it.

1       Q.   Okay.

2       A.   If it was not something that they came into

3  the facility with, then it would -- and they needed it

4  or the -- "resident" is what we call them -- resident

5  said they needed it, then it would be something that

6  would be addressed during the physical, during the

7  intake physical.

8       Q.   So you would wait to make that determination

9  until the intake physical; is that correct?

10      A.   The physician.

11      Q.   The physician would make --

12      A.   Yes.

13      Q.   Okay.  Policy and procedure is you don't make

14  any determination or take any actions until the inmate

15  intake physical has occurred?

16      A.   It all depends.

17      Q.   Okay.  What if the -- so if the physician sees

18  them and recognizes a need for an orthotic or is told

19  that they have a prescribed orthotic for a diabetic

20  condition, what is the policy and procedure from that

21  point on?

22      A.   The policy and procedure would be if they're

23  told that they require a orthotic, everything that comes

24  into the facility has to be approved.  Everything -- if

25  it's something that comes into the facility that needs

1   to be sent, in the case of the orthotic shoe, if it's

2   something that needs to be sent in, is that what you're

3   referring to?

4      Q.   I'm asking how does it get approved per the

5   policies and procedures of February 2016.  What is the

6   process?  Just describe it to me.  What do you guys do?

7   What does someone else -- the people in charge to get

8   something approved, who is that and what has to be

9   done?

10      A.   Okay.  I guess I'm not quite understanding the

11   question.

12      Q.   So if someone came to you and says -- or I

13   guess -- so you don't understand what the policies and

14   procedures to approve a diabetic orthotic is as the

15   health service administrator?

16      A.   Sure I do.  I just explained that.

17      Q.   You explained that the doctor at the intake

18   can look into it and see if it's medically necessary.

19      A.   Uh-huh.

20      Q.   Anything after that?

21      A.   If it's medically necessary, then they would

22   go ahead and allow it to be -- for the resident to keep

23   it.  Now, if you're -- are you referring to if it needs

24   to be sent into the facility?

25      Q.   Yes.

1      A.   Okay.   Then that has to go -- that's a

2 security issue.   If it's something that needs to be sent

3 into the facility, then that's going to have to be

4 approved through the warden.

5      Q.   Okay.   How does Medical get that information

6 that something needs to be approved through the

7 warden?

8      A.   Then I -- the physician would then let me know

9 or the nurse would relay the information to me and then

10 I, because I serve as the buffer between the nursing

11 staff and the warden and security, then I would let

12 them, the warden, know that there's a need, that this is

13 what the physician has ordered based on medical

14 necessity.   And then the warden would approve or

15 disapprove for whatever the device to come in.

16      Q.   And how would you generally convey that to the

17 warden?

18      A.   Primarily it's going to be in a verbal

19 conversation, sometimes e-mail, sometimes a phone call.

20      Q.   Would you document if it's a verbal

21 conversation that you notified the warden?

22      A.   Sometimes.

23      Q.   Sometimes you wouldn't?

24      A.   It all depends.

25      Q.   Okay.   If you are emailing the warden about

1   something you've already discussed with him and it's
2   been a delay between your discussion and it getting
3   approved, are you going to document that there was a
4   previous discussion?
5       A.   I really can't say.
6                (Exhibit No. 1 marked)
7       Q.   I'm going to hand you what's been marked as
8   Exhibit 1.   It's Bates stamped as CCS-Requests
9   Complaints Other 0018.
10      A.   Uh-huh.
11      Q.   Do you recognize that document?
12      A.   Yes, I do.
13               (Exhibit No. 2 marked)
14      Q.   I'll also hand you Exhibit 2 which is Bates
15  stamped as CCS 788.   Do you recognize that document?
16      A.   I can't say that I've seen this one.
17      Q.   Okay.   On Exhibit 1, what is that document?
18      A.   This is an e-mail that I sent to the Warden
19  Arnold.
20      Q.   When is the first time that you knew Mr. Shipp
21  needed his orthotic device for his diabetes?
22      A.   I can't recall.
23      Q.   In reading this e-mail, what is the date of
24  it?
25      A.   February 16th.

1      Q.   Does it indicate that you're asking Warden

2 Arnold to approve his orthotic shoe to come into the

3 facility?

4      A.   That's what it looks like, yes.

5      Q.   Do you have any memory of making any request

6 to Warden Arnold prior to this e-mail?

7      A.   I don't recall.

8      Q.   Do you recall Warden Arnold handing you any

9 requests from Mr. Shipp prior to this date regarding the

10 need for an orthotic shoe?

11      A.   Prior to this date?

12      Q.   Yes.

13      A.   I don't necessarily remember.

14      Q.   Do you remember any document where a request

15 had been filled out by Mr. Shipp that Mr. Arnold had

16 referred to you or someone in Medical in order to

17 approve the device?

18      A.   It's so long ago I can't remember.

19      Q.   If such a piece of paper had been handed to

20 you, what would you have done with that request?

21      A.   Can you elaborate on "that request"?

22      Q.   If Mr. Shipp says I need my orthotic shoes for

23 my diabetes, put it on the paper, it's sent to Warden

24 Arnold and he refers it to you or someone in Medical,

25 what should be done with that piece of paper?

1    goes into reducing ulcers, since we're talking about

2    that, or diabetic ulcers. I think diet, you have to

3    take diet into that, you have to take dietary

4    instructions, you have to look at lab values, you have

5    to take offloading. You know, there's several different

6    -- different things that you have to take, different

7    factors.

8        Q.   Did you review any information regarding

9    Mr. Shipp's diet or lab values prior to entry at

10   SWACC?

11       A.   Prior to entry at SWACC?

12       Q.   Yes.

13       A.   I don't -- I can't say that I did.

14       Q.   Okay. Do you have any knowledge that prior to

15   February 16, 2016, Mr. Shipp was noncompliant regarding

16   his medical care?

17       A.   Do I have any knowledge of his noncompliance?

18       Q.   Yes.

19       A.   I don't recall that I do.

20                     (Exhibit No. 4 marked)

21       Q.   I'm going to hand you what's marked as

22   Exhibit 4. I think this is related to the e-mail in

23   Exhibit 1. Can you identify that for me?

24       A.   This looks like -- I'm trying to follow it.

25   It's in three parts. Okay. The first part looks like

1    an e-mail -- oh, gosh.  It looks like an e-mail from
2    Mr. Kevin Murphy to Mr. Arnold that talks about unless
3    he has an issue with it, we need to allow his special
4    shoes to be sent into the unit.  And then the middle
5    part of it is from Mr. Arnold to, it looks like to
6    Whitney Walker who was in -- she was the one over the
7    property, I believe, at that time.  I can't be clear.
8    But it looks like he's allowing the shoes to be sent
9    into the unit and then he wanted to be notified when
10   they arrived.
11        Q.    Anything else in there?
12        A.    No, that's about it.
13        Q.    So this is Exhibit 4, CCS Requests Complaints
14   Other 19.  What are you saying "will do" to up there on
15   the e-mail above it?
16        A.    May I?
17        Q.    Is that with regards to him asking for the
18   family to be notified if they could send the shoes in?
19        A.    I can't verify that because this goes from
20   10:33 a.m. to 1:54 p.m.
21        Q.    So your response isn't until 1:54 p.m.?
22        A.    I don't know what I'm saying "will do" to.
23   That was the question.  I don't know what that was in
24   response to.
25        Q.    But you're responding to his e-mail that

1     I'm not -- I would have to say no.  I'm not critical

2     about any of the care.  I would have to say no to that.

3     I'm not critical of any of it.

4               MR. FRANSEEN:  I'll pass the witness.

5               MS. ODUM:  I just have a couple of

6     questions.

7                         EXAMINATION

8     BY MS. ODUM:

9          Q.   I'm not sure if you understood something he

10    was asking you and I want to make sure we verify it.

11         A.   Okay.

12         Q.   When he was asking you questions about

13    requests that come down, I think he was intending the

14    inmate request form.

15         A.   Okay.

16         Q.   So do you remember receiving any inmate

17    request forms either from Mr. Shipp or from Warden

18    Arnold?

19         A.   Yes.

20         Q.   Or did you see any?

21         A.   Yes, I did.

22         Q.   Okay.  Now, I'm trying to remember his

23    questions.  Do you remember the warden forwarding any

24    requests to you?

25         A.   Yes.

1    Q.    Okay.  Do you remember when the first time was

2  that you received an inmate request from your review of

3  the records?

4    A.    I believe the first date was on 2/12.  I

5  received one that was scratched through from Warden

6  Arnold and it was sent to me.

7    Q.    Okay.  And did you -- is that the one that you

8  received on the 15th?

9    A.    Yes.

10    Q.    Okay.  Now, is it your -- what is your normal

11  routine if you receive an inmate request form that's

12  completed by an inmate?

13    A.    Then I would go ahead and address that.  I go

14  ahead and address whatever the concern is, you know, I

15  just address that, whether it's in the form of -- I

16  mean, if it's something that I can just go ahead and

17  answer, sometimes I'll call the resident up to my office

18  and address it.  If it's -- you know, it just depends on

19  what the concern is and, you know, I'll just go ahead

20  and I'll copy it and then go ahead and send it back to

21  that resident.  And that's what the normal procedure is,

22  you just address it and get it back to them.

23    Q.    So if you receive a request --

24    A.    No, I was just saying -- as far as the policy

25  for resident requests, there's no set amount of time to

```
 1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF ARKANSAS
 2                   TEXARKANA DIVISION
 3    CRAIG SHIPP                           PLAINTIFF
 4               CASE NO. 4:18-CV-04017-SOH
 5    v.
 6
      KIMBERLY HOFFMAN, et al.              DEFENDANTS
 7
 8         *********************************************
 9              REPORTER'S CERTIFICATION
                   ORAL DEPOSITION
10                       OF
                   LENORA PHILSON
11                 MARCH 29, 2019
                     VOLUME 1
12
13         *********************************************
14              I, LEICA TURNER, Certified Shorthand Reporter
15    in and for the State of Texas, do hereby certify to the
16    following:
17              That the witness, LENORA PHILSON, was duly
18    sworn by the officer and that the transcript of the oral
19    deposition is a true record of the testimony given by
20    the witness;
21              I further certify that pursuant to FRCP Rule
22    30(f)(1) that the signature of the deponent:
23              _____X_____ was requested by the deponent or a
24    party before the completion of the deposition and is to
25    be returned within 30 days from the date of receipt of
```

1  the transcript.  If returned, the attached Changes and

2  Signature Page contains any changes and the reasons

3  therefor;

4  _____ was not requested by the deponent

5  or a party before the completion of the deposition.

6  I further certify that I am neither counsel

7  for, related to, nor employed by any of the parties or

8  attorneys to the action in with this proceeding was

9  taken.  Further, I am not a relative or employee of any

10 attorney or record in this cause, nor am I financially

11 or otherwise interested in the outcome of the action.

12 Subscribed and sworn to on this the 16th day

13 of April, 2019.

14

15

16

17

18 LEICA TURNER, Texas CSR #5622
   Expiration Date:  12/31/19

19 Firm Registration No.: 684
   LEIGH & ASSOCIATES

20 COURT REPORTING AND VIDEO
   911 West Loop 281, Suite 211

21 Longview, Texas 75604
   Telephone: (877) 790-3376

22 Facsimile: (877) 790-3377
   www.leighreporting.com

23

24

25