IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

CRAIG SHIPP                                                    PLAINTIFF

VS.                        NO. 4:18-CV-0417 SOH

CORRECT CARE SOLUTIONS, LLC,
DR. LORENE LOMAX, DR MIMO LEMDJA,
KIMBERLY HOFMANN, LENORA PHILSON,
KINDALL SMITH, DIANE CUNNINGHAM,
MELISSA STONER, STEVE ARNOLD                                  DEFENDANTS

---

ORAL DEPOSITION

OF

KIMBERLY HOFMANN

TAKEN NOVEMBER 15, 2018, AT 1:00 P.M.

---

# Conway Court Reporting

*Post Office Box 2188*

*Conway, Arkansas   72033*

*www.conwaycourtreporting.com*

## "Spoken to written . . . word for word"

Conway Office: 501.679.1488          Little Rock Office:  501.319.4807





COPY

EXHIBIT
8

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

MR. DEREK S. FRANSEEN
WALSH & FRANSEEN
200 EAST 10TH STREET PLAZA
EDMOND, OKLAHOMA  73034

ON BEHALF OF THE DEFENDANTS:

MS. MICHELLE ODUM
HUMPHRIES, ODUM & EUBANKS
1901 BROADWAY STREET
LITTLE ROCK, ARKANSAS  72206

MS. ROSALYN MIDDLETON
ASSISTANT ATTORNEY GENERAL
323 CENTER STREET, SUITE 200
LITTLE ROCK, ARKANSAS  72201

I N D E X

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE . . . . . . . . . . . . . . . . . 4

WITNESS: **KIMBERLY HOFMANN**

    Examination by Mr. Franseen . . . . . . . . . . . 5

    Deposition Concluded . . . . . . . . . . . . . 23

COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . 25

EXHIBITS:                                          IDENTIFIED:

1.  Health Services Response to Unit Level Grievance . . . 21

C A P T I O N

1
2      ANSWERS AND ORAL DEPOSITION OF **KIMBERLY HOFMANN**, a witness

3 produced at the request of the Plaintiff, taken in the

4 above-styled and numbered cause on the 15th day of November,

5 2018, at 1:00 p.m., at the offices of the Arkansas Attorney

6 General's Office, 323 Center Street, Suite 200, Little Rock,

7 Arkansas, pursuant to the Federal Rules of Civil Procedure.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

P R O C E E D I N G S

THEREUPON,

**KIMBERLY HOFMANN,**

THE WITNESS HEREINBEFORE NAMED, having
been first duly cautioned and sworn by me
to testify to the truth, the whole truth,
and nothing but the truth, testified on her
oath as follows, to-wit:

EXAMINATION

BY MR. FRANSEEN:

Q    State your name for the record.

A    Kimberly Hofmann.

Q    And where are you currently employed?

A    I am employed with Correct Care Solutions, which has
recently become Wellpath, as a regional manager.

Q    When did that name change occur?

A    I was made aware of it on October 29th.

Q    Do you know if they were bought or just changed their name
or --

A    It was a merger.

Q    Okay.  So they merged with the other company?

A    Two companies merged together to form the new company,
Wellpath.

Q    Oh, okay.  Do you know what the other company was?

A    I do not recall.

1    Q    Okay.  Do you know if it was called Wellpath, or a

2    different name?

3    A    Different name.

4    Q    Do you know if there was a reason why the merger occurred?

5    A    No.

6    Q    What is your current position with Correct -- or with

7    Wellpath, I guess?

8    A    Regional manager.

9    Q    And how long have you been in that position?

10    A    I have been a regional manager with the company since

11    2012.  I have been in Arkansas since 2014.

12    Q    When did you start with Correct Care Solutions?

13    A    September 1st, 2005.

14    Q    What was your position when you first started there?

15    A    I was a medical records clerk.

16    Q    And how long were you in that position?

17    A    Until I became assistant administrator in 2008.

18    Q    How long were you in that position?

19    A    Approximately, two years.

20    Q    And where did you go to after being the assistant

21    administrator?

22    A    The health service administrator.

23    Q    And would that have occurred in around 2010?

24    A    Correct.

25    Q    How long were you in that role?

1  A    Until I promoted to regional manager in July of 2012.

2  Q    And you've been in that position -- you're currently in

3  that position?

4  A    Correct.

5  Q    And so in February of 2016, were you the regional manager?

6  A    Correct.

7  Q    What are you're -- what's your -- in February of 2016,

8  what was your role as far as it related to the Texarkana

9  facility, the Southwest Arkansas Community Correction facility?

10  A    I was the regional manager, so my main position there, or

11  role, is to make sure that we follow policy and procedure to

12  provide adequate medical care to the inmate population by doing

13  so.

14  Q    Do you ever recall being asked any questions about the

15  appropriate policy and procedure for any care or treatment

16  regarding Craig Shipp?

17  A    I recall being asked questions about the individual and

18  his tennis shoes and his foot condition, I guess, yes.

19  Q    His orthotic shoes?

20  A    Yes.

21  Q    Okay.  Do you know whether by the -- do you know what date

22  you were first -- you first became aware of an issue with the

23  orthotic shoes?

24  A    I know that it was sometime in February of 2016.

25  Q    And then you would have been contacted regarding that?

1    A    Yes.

2    Q    Do you know if it was in the first part of February or the

3    later part of February?

4    A    Probably towards the middle of the month.

5    Q    Who contacted you regarding that?

6    A    The health service administrator, Ms. Philson, Ms. Turner

7    at that time.

8    Q    Okay.  Just for the record, Ms. Turner is now married and

9    is Ms. Philson?

10   A    Correct.

11   Q    And do you recall -- how did she communicate with you

12   something about Mr. Shipp's shoes?

13   A    I received an email.  We may have also talked on the phone

14   about it.

15   Q    Do you think you would have talked on the phone the same

16   day you received the email?

17   A    I couldn't say.

18   Q    Do you know whether a doctor had already seen Mr. Shipp by

19   the time you became involved?

20   A    Yes.

21   Q    Had a doctor already approved the orthotics as being

22   medically necessary for Mr. Shipp?

23   A    She documented that they -- that we needed to get him

24   shoes, yes.

25   Q    Do you recall which doctor that was?

1  A    I believe it was Dr. Lomax.

2  Q    Did you receive any communication regarding Ms. Lemdja's

3  care of Mr. Shipp?

4  A    Not that I recall.

5  Q    Did you have any supervisor roles over Dr. Lomax or Dr.

6  Lemdja?

7  A    As far as an operational side, not clinical.

8  Q    Did Warden Arnold ever reach out to you regarding any

9  policies or procedures as they related to Mr. Shipp's orthotic

10  shoes?

11  A    I know that we corresponded with him to get approval to

12  have his shoes submitted -- or sent to the facility.  I don't

13  remember that I've had -- I don't remember having a

14  conversation in regards to the shoes.

15  Q    Would that have been -- the correspondence, would that

16  have been the same correspondence after Ms. Turner contacted

17  you?

18  A    Yes.  I believe my directions to Ms. Turner were to notify

19  Warden Arnold to see if we could get approval from him to have

20  his shoes sent into the facility.

21  Q    What is your understanding as the appropriate policy and

22  procedures when an inmate has outside prescribed medical

23  devices?

24  A    In the past, if they -- if we're made aware that they have

25  something that our providers feel they would benefit from or

1    that they need, we have worked with the warden to see if those

2    can be sent in.  We have been given permission to do that in

3    the past, that's why I instructed her -- or Ms. Philson to

4    correspond with him to see if we could get that same

5    permission.  Otherwise, if we're not allowed to, we would send

6    them through our offsite specialty consult process, which is an

7    ADC policy.

8    Q    So you can either go through the warden or go through the

9    outside process?

10   A    Yes.  I guess so, yes.

11   Q    Have any wardens ever contacted the medical providers if

12   an inmate tells them that they need orthotic shoes, as far as

13   you getting that care coordinated?

14   A    I can't say offhand whether that has happened or not

15   happened.

16   Q    Is it a regular occurrence that an inmate will ask for a

17   personal medical device to be brought into a facility?

18   A    This probably isn't the first time that we've had somebody

19   ask us for something.  Whether or not it's deemed necessary for

20   them to have would be, you know, up to the provider that's

21   seeing them.  I do -- I can't speak to what correspondence

22   inmates have with wardens about asking to have things brought

23   in.

24   Q    Do you have any role in hiring nurses or doctor staff at

25   the Texarkana facility?

1    the performance of a doctor?

2    A    Yes.

3    Q    Does he make any decisions on whether to reprimand them or

4    write them up?

5    A    He can, yes.

6    Q    And are you involved in those decisions or is that

7    relegated to him?

8    A    That's a clinical decision.

9    Q    Yeah.   Did you assist in answering any of the

10   interrogatories or requests for productions on behalf of

11   Correct Care Solutions?

12   A    Yes.

13              MS. ODUM:   Wait.   You said CCS.

14              MR. FRANSEEN:   Yes.

15              MS. ODUM:   I think she's thinking of the ones I

16         just sent her that you sent me.

17              MR. FRANSEEN:   Oh, okay.

18   Q    (By Mr. Franseen)   These other ones were filled out back

19   in August.   Do you think you had any role in filling out those?

20   A    No.

21   Q    Do you know why -- is it CCS -- or in your -- strike that.

22        In your experience, is CCS directed to go through the

23   warden to get outside medical devices at the Texarkana facility

24   approved?

25   A    If our medical providers deem that a product is needed or

1    medically necessary for an inmate, they can go through the

2    warden.  If they believe the person already has the device and

3    that's going to be a quicker turnaround time, they can try to

4    do that.  Otherwise, they would send them through our offsite

5    consult process.

6    Q    And if it is quicker to get the device that they already

7    have in, let's say, a family's possession, is it the policy and

8    procedure to go that route versus delaying it through an

9    outside provider?  .

10   A    We would attempt, but we can't make that determination

11   whether or not it's going to be allowed into the unit for

12   safety and security reasons.  That's why we go through the

13   warden.  If they deem that such device is not something that

14   they want in the facility and they want us to send them out,

15   then that's what we will do.

16   Q    Who is in charge of coordinating with the warden on

17   whether a decision on a medical device is approved or not?

18   A    From a medical standpoint, we would just simply -- the HSA

19   or myself in conjunction would ask the warden.

20   Q    And as far as staff members, what's the policy and

21   procedure -- if a staff member is approached by an inmate

22   regarding a medical device, what does the staff member do to go

23   up the chain of command?

24   A    They should start at their chain of command, which would

25   be Ms. Turner, the HSA.

1    Q    So the day someone becomes aware of someone needing a

2    medical device or asking for a medical device, they should be

3    notifying Ms. Turner?

4    A    Yes.

5    Q    And that would apply to each medical provider each time

6    they become aware that the inmate is asking for this device and

7    has not received it?

8    A    Inmate asking and inmate needing are two different things.

9    If it's been deemed medically necessary by a provider and it's

10   been decided that they need that, then it would be our

11   responsibility to get that item.  If a patient is asking us for

12   something that has not been deemed a medical necessity, then we

13   would not pursue getting that item.

14   Q    And who is the provider you're referring to as far as

15   deeming whether it's necessary or not?

16   A    The provider at the unit.

17   Q    One of the doctors on staff?

18   A    Correct.

19   Q    And is that limited to any doctor on the staff, or can any

20   doctor make that decision?

21   A    Any doctor that has seen the patient at the unit would be

22   able to recommend -- make any recommendations they see fit.

23   Q    Does CCS assign a specific doctor to each inmate?

24   A    No.

25   Q    So you wouldn't expect a doctor to say, "I'm not the one

1    that date?

2    A    They should make a determination.

3    Q    And they should make that determination as quick as

4    possible?

5    A    Ideally, yes.

6    Q    Okay.  They shouldn't pass the buck to someone else,

7    should they?

8    A    I would say no.

9    Q    Can a nurse approve orthotic shoes?

10   A    No.  That must be done by a provider.

11   Q    Okay.  And even if a nurse is told by a provider that

12   these might be necessary, the nurse can't fill out the

13   appropriate paper work to get that approved?

14   A    Correct.  It has to be assessed by a provider.

15   Q    Do you have any medical training or certificates?

16   A    No, I do not.

17   Q    Do you know whether CCS is required to hire nurses that

18   are -- have current licenses, let's say, an LPN?

19   A    Correct.  I mean, if we hire -- if we're interviewing for

20   an LPN position and an LPN applies, they must have a current

21   licenses at that time, and then going forward, they must keep

22   their credentialing.

23   Q    And how do you review whether they have a current licences

24   or not?

25   A    We can pull that from the State Board of Nursing.

1  Q    Okay.  On anything that might relate to a security issue,

2  she would defer to the warden?

3  A    Yes.

4  Q    If the warden forwards Ms. Turner an inmate requesting

5  orthotic shoes, should Ms. Turner do anything as far as

6  coordinating a visit between an inmate and a doctor?

7  A    I think the first step would be to probably review who he

8  has been seen by.  If he hasn't been seen by a provider, then,

9  yes, that would be an option, have him see a nurse first, do a

10  chart review, those types of things.

11  Q    So you would expect her, if that comes across her desk, to

12  do a chart review of the inmate?

13  A    I would take a look at it, definitely.

14  Q    And if she -- if the inmate has already seen medical on

15  several occasions prior to that, should the HSA be looking into

16  that instance further as far as coordinating an appropriate

17  response?

18  A    Yes.  Yeah, I would say so.

19  Q    Should -- would writing a note saying, "Please fill out a

20  medical request," be sufficient to coordinate that response?

21  A    I guess it would depend on what the visits prior to that

22  were in regards to.  That is the policy and procedure that, if

23  they're seeking medical attention, we have sick call policy

24  that they are to follow, and so we try to get people to abide

25  by that policy as much as possible.

1    MR. FRANSEEN:  We're off the record.

2    (WHEREUPON, the proceedings were concluded in

3    the matter at 1:27 p.m.)

4    (WITNESS EXCUSED)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

STATE OF ARKANSAS    )

                        )ss

COUNTY OF FAULKNER   )


     I, KRISTY L. ROONEY, Certified Court Reporter #529, does
hereby certify that the facts stated by me in the caption on
the foregoing proceedings are true; and that the foregoing
proceedings were reported verbatim through the use of the
voice-writing method and thereafter transcribed by me or under
my direct supervision to the best of my ability, taken at the
time and place set out on the caption hereto.


     I FURTHER CERTIFY, that I am not a relative or employee of
any attorney or employed by the parties hereto, nor financially
interested or otherwise, in the outcome of this action, and
that I have no contract with the parties, attorneys, or persons
with an interest in the action that affects or has a
substantial tendency to affect impartiality, that requires me
to relinquish control of an original deposition transcript or
copies of the transcript before it is certified and delivered
to the custodial attorney, or that requires me to provide any
service not made available to all parties to the action.

WITNESS MY HAND AND SEAL this 5th day of December, 2018.


KRISTY L. ROONEY, CCR

Certified Court Reporter #529