1              UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF ARKANSAS
2               TEXARKANA DIVISION

3  CRAIG SHIPP                         PLAINTIFF

4         CASE NO. 4:18-CV-04017-SOH

5  v.

6

KIMBERLY HOFFMAN, et al.        DEFENDANTS

7

8

9      ***********************************************

10                 ORAL DEPOSITION
                      OF

KINDALL SMITH
11               MARCH 29, 2019
                 VOLUME 1

12      ***********************************************

13

14

15      ORAL DEPOSITION OF KINDALL SMITH, produced as a

16  witness at the instance of the PLAINTIFF, CRAIG SHIPP,

17  and duly sworn, was taken in the above-styled and

18  numbered cause on the 29th day of March, 2019, from 9:16

19  a.m. to 10:47 a.m., before LEICA TURNER, a Certified

20  Shorthand Reporter in and for the State of Texas,

21  reported by machine shorthand, at the offices of Leigh &

22  Associates Court Reporting, 3930 Galleria Oaks Drive,

23  Suite 159, Texarkana, Texas, pursuant to the Federal

24  Rules of Civil Procedure and the provisions stated on

25  the record or attached hereto.

EXHIBIT
10
PENGAD 800-631-6989

```
 1                    A P P E A R A N C E S
 2    FOR THE PLAINTIFF CRAIG SHIPP:
 3         MR. DEREK S. FRANSEEN
                WALSH & FRANSEEN
 4              200 East 10th Street Plaza
                Edmond, Oklahoma  73034
 5              Phone:  405.843.7600
                Fax:  405.606.7050
 6              dfranseen@walshlawok.com
 7    FOR THE MEDICAL DEFENDANTS:
 8         MS. MICHELLE BANKS ODUM
                HUMPHRIES, ODUM & EUBANKS
 9              1901 Broadway Street
                Little Rock, Arkansas  72206
10              Phone:  501.420.1776
                michelle@humphrieslaw.net
11
      FOR THE ADC DEFENDANTS:
12
           MS. ROSALYN MIDDLETON
13              ASSISTANT ATTORNEY GENERAL
                CIVIL DEPARTMENT
14              323 Center Street
                Suite 200
15              Little Rock, Arkansas  72201
                Phone:  501.682.8122
16              Fax:  501.682.2591
                rosalyn.middleton@arkansasag.gov
17
18
19    ALSO PRESENT:
20    Ms. Melissa Stoner
      Ms. Diane Cunningham
21
22
23
24
25
```

I N D E X

WITNESS:  KINDALL SMITH

                                                                PAGE

Appearances ....................................     2


Changes and Signature .........................    68
Reporter's Certificates .......................    70


Examination by Mr. Franseen ...................     4
Examination by Mr. Odum .......................    58
Examination by Mr. Franseen ...................    60
Examination by Mr. Odum .......................    66

E X H I B I T   I N D E X

EXHIBIT                                          PAGE
NO.        DESCRIPTION                           MARKED

1          ....................................    25
           Medical Records
           (Bates CCS 536 - CCS 590)

2          ....................................    26
           Arkansas Department of Correction
           Medical Restrictions/Limitations/
           Special Authorization(s)
           (Bates CCS 792)

```
1                    P R O C E E D I N G S
2            (All parties present have hereby waived the
3                    introductory reading by the
4         deposition officer as required by Rule 30(b)(5).)
5                        KINDALL SMITH,
6   having been first duly cautioned and sworn, testified as
7   follows:
8                          EXAMINATION
9   BY MR. FRANSEEN:
10        Q.   Please state your full name.
11        A.   Kindall Nicole Smith.
12        Q.   Have you gone by any other names?
13        A.   Kindall Nicole Hammonds.
14        Q.   How do you spell Hammonds?
15        A.   H-a-m-m-o-n-d-s.
16        Q.   And when did you switch from Hammonds to
17  Smith?
18        A.   2006.
19        Q.   Were you practicing as a nurse under
20  Hammonds?
21        A.   Yes.
22        Q.   When did you -- just kind of briefly give me
23  your educational background.
24        A.   I graduated high school in 1996; started LVN
25  school in February of 2003 -- no, excuse me, August; and
```

1   A. And, let's see, in June of 2007, I went to New

2 Boston Nexion Healthcare.

3   Q. Is that Nexion?

4   A. Nexion.

5   Q. Is that with an X?

6   A. N-e-x-i-o-n, Nexion, which was a nursing home.

7   Q. What was your role there?

8   A. A charge nurse.

9   Q. And how long were you there?

10   A. I was there until April of 2011.

11   Q. And why did you leave that employment?

12   A. I had a grandmother that passed away there and

13 I didn't go back.

14   Q. Were you a charge nurse during that entire

15 period?

16   A. Yes.

17   Q. What was your next place of employment?

18   A. It's my current job.  Of course it was CMS at

19 the time and that was May of 2011 to present.

20   Q. What is your role -- is that now CCS?

21   A. Wellpath.

22   Q. Okay.

23   A. Yes, CCS now.  Wellpath, really, but, yes,

24 CCS.  Just LVN.

25     MS. ODUM:  It's like AT & T

1      A.   Explain that.

2      Q.   I assume that CCS -- and I'm going to refer to

3  that -- those three entities as CCS for purposes of

4  today.  I assume if you have any issues with either

5  substandard care or if they're critical of any care that

6  you provide to a patient, they will write you up or give

7  you some sort of reprimand, verbal or written; is that

8  correct?

9      A.   So are you saying like harm?

10     Q.   It doesn't necessarily have to be harm, just

11  something where they're critical of your job performance

12  as related to a patient.

13     A.   No.

14     Q.   Have you ever been written up for any other

15  reason at CCS?

16     A.   Attendance.

17     Q.   Anything else?

18     A.   Not that I can recall.

19     Q.   What all correctional facilities have you

20  worked for with CCS?

21     A.   Just Southwest Arkansas Community Corrections.

22     Q.   And sometimes is that also referred to as

23  SWACC?

24     A.   Yes.

25     Q.   What did you review in preparation of this

1  deposition?

2        A.   The records.

3        Q.   Are you referring --

4        A.   Medical records.

5        Q.   Are you referring to Mr. Shipp's records?

6        A.   Yes.

7        Q.   I am going to hand you a set of records.

8  They're Bates stamped as CCS 536 through CCS 590.  Do

9  you recognize these records?

10       A.   Yes.

11       Q.   What are they?

12       A.   They are his medical records.

13       Q.   Looking at CCS 536, can you identify what this

14  encounter note is?

15       A.   This was his sick call that I seen him on

16  February 5th.

17       Q.   Of which year?

18       A.   2016.

19       Q.   And would a sick call be the same as a medical

20  request?

21       A.   No.

22       Q.   What's the different procedure for having a

23  sick call versus a medical request?

24       A.   A medical request is where they are requesting

25  a blood pressure check, something that would not pertain

1     A.   Not if it is something that has to be seen as

2  a sick call protocol.

3     Q.   If you are wanting to notify Medical of an

4  issue while at sick call as far as needing some sort of

5  medical device, is it appropriate for them to verbally

6  communicate that to the medical staff?

7     A.   If it's pertaining to their sick call, yes,

8  they can make the request at that time.

9     Q.   Let's just go through this encounter note.

10  There are different sections here; is that correct?

11     A.   Yes.

12     Q.   What is the -- what is the first section?

13     A.   It's subjective.  It's what they fill out for

14  their sick call.

15     Q.   What was his subjective complaint?

16     A.   His deformed feet and toes due to his Charcot

17  joint and also diabetes.

18     Q.   What is the next section?

19     A.   It's your objective.

20     Q.   Let's go through this sentence by sentence.

21  Let's have you read the first sentence.

22     A.   It says, "'Upon resident taking his shoes off,

23  his left sock noted to be covered in blood."

24     Q.   Is that something you observed?

25     A.   Yes.

1       Q.   Is that an issue with someone with diabetes?

2       A.   Yes.

3       Q.   What's the next sentence?

4       A.   "Bilateral feet have deformities noted."

5       Q.   What were the deformities noted?

6       A.   He had the knots from the Charcot foot.

7       Q.   Those were something you observed?

8       A.   Yes.

9       Q.   Next sentence?

10      A.   "Left foot has an open area about the size of

11 a silver dollar with skin only attached by the corner."

12      Q.   When you describe open area, what are you

13 describing?

14      A.   Where the skin is loose, open.

15      Q.   Is it a sore?

16      A.   Yes.

17      Q.   With someone with diabetes, what are the

18 concerns with someone developing a sore on their feet?

19      A.   Infection, not healing.

20      Q.   Do you know what diabetics generally do in

21 order to -- if they have a Charcot joint -- to prevent

22 sores from forming?

23      A.   It would be offloading the pressure of the

24 joint or the -- the deformity.

25      Q.   And what's one of the -- one of the ways they

1    can offload the pressure?

2         A.    His shoes that he said he had; a wheelchair.

3         Q.    The shoes he said he had, what are you talking

4    about?

5         A.    The shoes that he said he was prescribed in

6    the free world for his issue.

7         Q.    The shoes that his family had in their

8    possession at this time?

9         A.    I don't know whose possession they were in at

10   that time.

11        Q.    Read the next sentence, please.

12        A.    "Resident has already had his left great toe

13   removed four to five years ago from infection that went

14   to the bone."

15        Q.    Was that observable by you?

16        A.    Yes.

17        Q.    Next sentence?

18        A.    "Unit MD here.  Skin was removed by MD."

19        Q.    Who was the unit MD?

20        A.    It was Dr. Lomax -- Dr. Lemdja that day.

21        Q.    Why did Dr. Lemdja get involved in this?

22        A.    Because he was a diabetic, his foot was

23   bleeding, and he had an open sore.

24        Q.    Did you notify Dr. Lemdja?

25        A.    Yes.

1       Q.   Were you concerned for Mr. Shipp's foot upon
2   seeing it?

3       A.   Yes.

4       Q.   Did you believe that a doctor should have done
5   an appropriate evaluation and treatment for that foot at
6   that time?

7       A.   I can't answer for her.

8       Q.   Read the next sentence there for me.

9       A.   "The area was cleaned with wound cleanser,
10  TAO," triple antibiotic ointment, "applied, and then
11  covered with 2x2s and roll Kerlix."

12      Q.   Was that performed by you or Dr. Lemdja?

13      A.   By me.

14      Q.   Next sentence?

15      A.   "Resident will return to Medical daily for a
16  PM treatment -- or PM treatment after showers to have
17  dressing changed (sic)."

18      Q.   And did someone prescribe that or is that
19  something you recommended?

20      A.   That was Dr. Lemdja.

21      Q.   Next sentence?

22      A.   "The unit MD gave orders for antibiotics
23  Clindamycin 300 QID times 14 days.  The unit" -- oh.

24      Q.   You can go to the next sentence.

25      A.   "The Unit MD also instructed resident to

1    notify his family of ordering him a pair of shoes to be

2    sent in from the manufactory (sic)."

3          Q.    And next sentence.

4          A.    "His right foot was assessed.  There was no

5    open areas at that time."

6          Q.    Do you know whether the family can send in

7    orthotic shoes without approval?

8          A.    No.

9          Q.    Is that, no, they can't or no --

10         A.    No, they had to be approved.

11         Q.    How are orthotic shoes approved by CCS or the

12    facility here?

13         A.    The doctor sees a need for them.  She can

14    request that.  If he has them, it is requested and it

15    has to go through the warden and he has to approve for

16    any outside items to be brought into the facility.

17         Q.    Is that your understanding as far as the

18    appropriate protocol in February of 2016?

19         A.    Through Medical?

20         Q.    Whatever the -- whatever the resident has to

21    do or the patient has to do at that time in order to

22    receive their prescribed orthotics.

23         A.    It would be facility policy.

24         Q.    How was the warden notified?

25         A.    When the nurse would get the order, she would

1 notify the HSA and she would coordinate with the warden.

2     Q.   Did the doctor give the order to notify the

3 HSA?

4     A.   She told the resident he needed to notify his

5 family.

6     Q.   You told me the procedure is for it to be

7 approved and for the nurse to notify the HSA who

8 notifies the warden, correct?

9     A.   If she approves, if she writes on there that

10 he needs his medical shoes.

11     Q.   At this visit, are you aware whether

12 Dr. Lemdja wrote on there that he needs his medical

13 device?

14     A.   I'm not aware of her note.

15     Q.   As we sit here today, you're not aware of her

16 filling out a note --

17     A.   No.

18     Q.   -- stating that he needs a medical device?

19     A.   No.

20     Q.   So did you notify the HSA on February 5, 2016,

21 regarding Mr. Shipp needing his medical device?

22     A.   No.

23     Q.   Who was the HSA at that time?

24     A.   It's Lenora Philson.

25     Q.   And she at that time went by Turner; is that

1     A.    Should there be policies and procedures to

2  prevent her from, is that what you're asking?

3     Q.    Okay.  So you're saying there's no policies

4  and procedures preventing her from filling out that

5  form?

6     A.    Not if she chooses to.

7     Q.    So it's within her discretion whether she

8  wants to appropriately document and place in the

9  appropriate restrictions for an inmate upon seeing them

10  for their physical health?

11     A.    Yes.

12     Q.    And if she chooses not to, she's choosing to

13  do that willfully?

14     A.    Yes.

15     Q.    Let's go to CCS 537.  Do you have any

16  encounters on this date?

17     A.    On 2/7/16.

18     Q.    What is filled out for that encounter?

19     A.    It was for a treatment call in the area to the

20  bottom left foot.  The left foot was treated.  The area

21  continued to be opened at the same size of a silver

22  dollar.  The center open area was meaty, red and meaty,

23  the surrounding skin is white and loose.  There's no

24  drainage noted and there was no signs and symptoms of

25  infection.  The resident was instructed to keep his

1    to provide required medical devices to inmates during

2    the year 2016." And you answered, "In my opinion, it is

3    ordered and recommended by the unit M.D. that a resident

4    have the medical device but then it has to be approved

5    by the warden to be accepted into the facility due to

6    security." Is that your understanding?

7        A.   Yes.

8        Q.   Do you know whether that procedure has changed

9    since 2016?

10       A.   No, I don't know.

11       Q.   Prior to February 2016, were there inmates

12   that came in during that time period that needed medical

13   devices?

14       A.   I don't know.

15       Q.   Do you recall any other conversations that we

16   haven't discussed about Mr. Shipp not using his

17   wheelchair that you recall?

18       A.   Myself, no.

19       Q.   Do you have any specific memory yourself that

20   you were told by any other staff members that Mr. Shipp

21   was not using his wheelchair?

22       A.   There was multiple encounters that he was not

23   being compliant with his wheelchair.

24       Q.   Is that something you reviewed in the records

25   or is that something you were told about and had an

1     A.   No.

2     Q.   Is your LVN license currently active?

3     A.   Yes.

4     Q.   How many times has it been renewed?

5     A.   I would estimate probably seven.  It's every

6 two years.

7     Q.   Has it ever lapsed?

8     A.   Never.

9     Q.   Is there anything regarding Mr. Shipp that you

10 feel is important to tell me concerning any care or

11 treatment at SWACC?

12    A.   No.  I feel that we gave him the best

13 treatment that was appropriate.

14            MR. FRANSEEN:  No further questions.

15            MS. ODUM:  I just have a couple.

16            THE WITNESS:  Okay.

17                   EXAMINATION

18 BY MS. ODUM:

19    Q.   Now, back when you first saw Mr. Shipp on the

20 5th of February, 2016, you were asked questions about

21 you ordering the device or you contacting HSA about a

22 device.  As an LVN, did you have authority to order such

23 a device?

24    A.   No.

25            MR. FRANSEEN:  Object to form.

1     Q.   As LVN, was that your job?

2     A.   No.

3     Q.   Did you have permission to ask the HSA to get

4 an orthotic device in the unit?

5     A.   Not without a doctor's orders.

6     Q.   So that was really beyond the scope of your

7 job?

8     A.   Yes.

9     Q.   Was there any medical device at the unit to

10 give him on that day --

11    A.   No.

12    Q.   -- for his feet?

13    A.   No.

14    Q.   Okay.  In other words, his orthotic wasn't

15 there?

16    A.   No.

17    Q.   Okay.  And with regard to seeing him on March

18 16th when he was not in his wheelchair -- and you

19 mentioned the shoulder, now, you review -- did you

20 review records prior to today?

21    A.   Yes.

22    Q.   And in the records, did you remember seeing

23 something about his complaint was his shoulder?

24    A.   Yes.

25    Q.   And was there any reference to his shoulder in

1   order the orthotics, the fact that the word "order"

2   there, does that kind of hinge on whether that's part of

3   your job?

4      A.   That is not part of my job to order a medical

5   device.  That has to be ordered by a physician.

6      Q.   As an LVN and as your training with SWACC, did

7   you think Mr. Shipp on February 5th needed his orthotic

8   ordered?

9      A.   He and Dr. Lemdja had discussed that and she

10  told him to contact his family to receive his shoes.

11     Q.   But you know the policy for him to receive

12  those is it has to be ordered by Dr. Lemdja and approved

13  by the warden?

14     A.   So he would have had to have wrote his family

15  to see if they would send them and then have it approved

16  by the warden.

17     Q.   But Dr. Lemdja or some doctor there has to

18  order it for it to be approved, correct?

19     A.   Yes.

20     Q.   And on February 5th, it could have been

21  ordered and approved by Dr. Lemdja?

22     A.   Yes.

23     Q.   Did you have any conversation with her

24  regarding whether the orthotic needed to be ordered and

25  documented as being approved?

1  had the device there in order to approve and order it?

2       A.   What date was that she seen him?

3       Q.   February 16th.

4       A.   And your question is?

5       Q.   You're telling me that the policy and

6  procedures is device has to be there before it can be

7  approved by a doctor, is that your understanding?

8       A.   The doctor has to write an order for it.

9       Q.   Right.  So notifying --

10      A.   And then I'm assuming him and Dr. Lomax had

11  talked about them.  I don't know what the conversation

12  was.  And he was told to contact his family and that is

13  what I documented.  That was between him and Dr. Lemdja.

14      Q.   Dr. Lemdja on the 5th?

15      A.   Uh-huh.

16      Q.   Is that a "yes"?

17      A.   Yes.

18      Q.   And do you believe Dr. Lemdja knew that for a

19  medical device to be approved, she has to order it?

20      A.   Yes.

21      Q.   And she did not order it on that date?

22      A.   There's no order, no.

23      Q.   And you knew on that date that in order for

24  those shoes to get approved and come into the facility,

25  a doctor had to order it for you to notify the HSA?

1  just asking her, you know --

2      A.   No.

3      Q.   -- hey, should we do it this way?

4      A.   No.  I went to her and asked her to look at

5  his feet and she took care of it.

6      Q.   But she didn't order the orthotic and didn't

7  approve it?

8      A.   No.

9      Q.   And you didn't have a discussion with her

10  about whether she should order it or approve it?

11      A.   No.

12          MR. FRANSEEN:  No further questions.

13          MS. ODUM:  I just have -- to see if you

14  know.

15                      EXAMINATION

16  BY MS. ODUM:

17      Q.   So Dr. Lemdja told him to call his family?

18      A.   Uh-huh.

19      Q.   If the shoes had arrived at the warden's

20  office, do you know what would have happened?

21          MR. FRANSEEN:  Object to form.

22      A.   They would have been sent back.

23      Q.   If the warden testified that he would have

24  asked Medical, has that ever happened where he's asked

25  Medical if this is something that's needed?

1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF ARKANSAS
2               TEXARKANA DIVISION

3     CRAIG SHIPP                          PLAINTIFF

4          CASE NO. 4:18-CV-04017-SOH

5     v.

6

7     KIMBERLY HOFFMAN, et al.            DEFENDANTS

8     ***********************************************

9               REPORTER'S CERTIFICATION
                    ORAL DEPOSITION
10                       OF
                    KINDALL SMITH
11                 MARCH 29, 2019
                      VOLUME 1
12

13    ***********************************************

14          I, LEICA TURNER, Certified Shorthand Reporter

15    in and for the State of Texas, do hereby certify to the

16    following:

17          That the witness, KINDALL SMITH, was duly

18    sworn by the officer and that the transcript of the oral

19    deposition is a true record of the testimony given by

20    the witness;

21          I further certify that pursuant to FRCP Rule

22    30(f)(1) that the signature of the deponent:

23          _____X_____ was requested by the deponent or a

24    party before the completion of the deposition and is to

25    be returned within 30 days from the date of receipt of

1    the transcript.  If returned, the attached Changes and

2    Signature Page contains any changes and the reasons

3    therefor;

4                _____ was not requested by the deponent

5    or a party before the completion of the deposition.

6                I further certify that I am neither counsel

7    for, related to, nor employed by any of the parties or

8    attorneys to the action in with this proceeding was

9    taken.  Further, I am not a relative or employee of any

10   attorney or record in this cause, nor am I financially

11   or otherwise interested in the outcome of the action.

12             Subscribed and sworn to on this the 15th day

13   of April, 2019.

14

15

16

17

18             LEICA TURNER, Texas CSR #5622
                     Expiration Date:  12/31/19

19             Firm Registration No.: 684
                     LEIGH & ASSOCIATES

20             COURT REPORTING AND VIDEO
                     911 West Loop 281, Suite 211

21             Longview, Texas 75604
                     Telephone: (877) 790-3376

22             Facsimile: (877) 790-3377
                     www.leighreporting.com

23

24

25