

Transcript of the Testimony of
**MIMO LEMDJA, M.D.**

**Date: NOVEMBER 16, 2018**

**Re: SHIPP VS. CORRECT CARE SOLUTIONS, LLC, ET AL**

CONWAY COURT REPORTING, LLC
Phone:501-679-1488
Email:scheduling@conwaycourtreporting.com



EXHIBIT

11

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


CRAIG SHIPP                                              PLAINTIFF

VS.              NO. 4:18-CV-0417 SOH

CORRECT CARE SOLUTIONS, LLC,
DR. LORENE LOMAX, DR MIMO LEMDJA,
KIMBERLY HOFMANN, LENORA PHILSON,
KINDALL SMITH, DIANE CUNNINGHAM,
MELISSA STONER, STEVE ARNOLD                            DEFENDANTS



ORAL DEPOSITION

OF

MIMO LEMDJA, M.D.

TAKEN NOVEMBER 16, 2018, AT 8:59 A.M.




Conway Court Reporting

Post Office Box 2188

Conway, Arkansas  72033

www.conwaycourtreporting.com


"Spoken to written . . . word for word"


Conway Office: 501.679.1488   Little Rock Office:  501.319.4807

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

MR. DEREK S. FRANSEEN
WALSH & FRANSEEN
200 EAST 10TH STREET PLAZA
EDMOND, OKLAHOMA  73034

**ON BEHALF OF THE DEFENDANTS:**

MS. MICHELLE ODUM
HUMPHRIES, ODUM & EUBANKS
1901 BROADWAY STREET
LITTLE ROCK, ARKANSAS  72206

MS. ROSALYN MIDDLETON
ASSISTANT ATTORNEY GENERAL
323 CENTER STREET, SUITE 200
LITTLE ROCK, ARKANSAS  72201

I N D E X

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . 1

APPEARANCES  . . . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE . . . . . . . . . . . . . . . . . . . 4

**WITNESS:**  MIMO LEMDJA, M.D.

Examination by Mr. Franseen . . . . . . . . . . . . . 5

Examination by Ms. Odum . . . . . . . . . . . . . . 42

Further Examination by Mr. Franseen . . . . . . . . 45

Deposition Concluded  . . . . . . . . . . . . . . . 47

COURT REPORTER'S CERTIFICATE  . . . . . . . . . . . . . 49

**EXHIBITS:**                                          IDENTIFIED:

1.  Answers to Interrogatories . . . . . . . . . . . . 17

2.  Encounter Notes dated 02/09/16 labeled CCS 538 . . . . 20

3.  Initial Report of Physical Examination dated 02/09/16  21

4.  Encounter Notes dated 02/05/16 labeled CCS 536 . . . . 32

5.  Emails . . . . . . . . . . . . . . . . . . . . . . 32

6.  Medical Restrictions/Limitations/Special
    Authorization(s) . . . . . . . . . . . . . . . . . 40

7.  Medical Restrictions/Limitations/Special
    Authorization(s) labeled CCS 9 . . . . . . . . . . . 40

1                    C A P T I O N

2          ANSWERS AND ORAL DEPOSITION OF MIMO LEMDJA, M.D., a

3     witness produced at the request of the Plaintiff, taken in the

4     above-styled and numbered cause on the 16th day of November,

5     2018, at 8:59 a.m., at the law offices of Humphries, Odum &

6     Eubanks, 1901 Broadway Street, Little Rock, Arkansas, pursuant

7     to the Federal Rules of Civil Procedure.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       P R O C E E D I N G S

2          THEREUPON,

3                       MIMO LEMDJA, M.D.,

4                  THE WITNESS HEREINBEFORE NAMED, having

5               been first duly cautioned and sworn by me

6               to testify to the truth, the whole truth,

7               and nothing but the truth, testified on her

8               oath as follows, to-wit:

9                            EXAMINATION

10   BY MR. FRANSEEN:

11   Q     Please state your name for the record.

12   A     Mimo Lemdja.

13   Q     And, Dr. Lemdja, do you understand you are here on the

14   matter of Craig Shipp vs. Correct Care Solutions, Warden

15   Stephen Arnold, yourself, Dr. Lomax, Nurse Hofmann -- or, yes,

16   Ms. Hofmann, Ms. Philson, Nurse Smith, Nurse Cunningham and

17   Nurse Stoner?

18   A     Yes.

19   Q     And what did you do to review for this deposition today?

20   A     Talked to my lawyer.

21   Q     And just to be clear, I don't want to know any

22   conversations between you and your attorney.  Did you review

23   any medical records or documents?

24   A     Yes.

25   Q     What all did you review?

1 with Washington Valley Family Clinic.  I started with UAMS in

2 January of 2017.

3 **Q** **And I understand, during this time period, that you are at**

4 **UAMS South, Magnolia, and Washington Valley.  Are you also at**

5 **the Southwest Arkansas Community Correction Center?**

6 A Yes.

7 **Q** **When did you start working there?**

8 A 2015.

9 **Q** **Do you remember which month?**

10 A June -- let me make sure.  June -- I'm not for sure.  I

11 know it was in June.  I know it was summer of 2015.

12 **Q** **What was the process as far as getting hired there at**

13 **SWACCC?**

14 A Application, screening -- drug screening, review of

15 diplomas, certificates, reference check.

16 **Q** **Did you go through any interviews?**

17 A Any interviews?

18 **Q** **Who did you interview with?**

19 A Dr. Stieve , the regional medical director.

20 **Q** **Is Dr. Stieve the regional medical director, or is there**

21 **someone different?**

22 A At that time, he was the regional.  I don't know what he

23 is now.  And Kaufman (sic) -- what's her first --

24 **Q** **Hofmann?**

25 A Hofmann, yes.

Page 10

1    Q    Kim Hofmann?

2    A    Yes, Kimberly Hofmann.

3    Q    So you interviewed with her?

4    A    I interviewed with her.

5    Q    On your interview with Ms. Hofmann, what did that entail?

6    What kind of subject matters was she talking about?

7    A    My job description.

8    Q    What was your job description at SWACCC?

9    A    See patients at the Texarkana location.

10   Q    Did you cover any other locations?

11   A    No.

12   Q    Is there anything about the Texarkana location that

13   requires specialized knowledge for a doctor in performing their

14   abilities?

15   A    Family medicine.  That's all you needed to be, and -- yes.

16   Q    Are there any specific limitations that you can think of

17   that would differentiate the Texarkana facility versus a

18   facility in another state?

19   A    They just told me the rules and regulations.

20   Q    There's nothing about it that requires you to practice

21   differently than you would in a different location?

22   A    I just practiced good medicine.  That's all I was asked to

23   do.

24   Q    Okay.  What were your hours there at SWACCC?

25   A    Variable.  Initially, it was twice a week, but very

1   A    Depending on my schedule.

2   **Q    And would you be there on the same days as Dr. Lomax, or**

3   **would you guys have different days?**

4   A    I think on one or two occasions, we were there at the same

5   time.

6   **Q    Were there any restrictions that you guys were supposed to**

7   **cover different days, or was it just -- it kind of just**

8   **happened out that way?**

9   A    It just happened.

10   **Q    Are doctors there assigned specific patients?**

11   A    What -- I don't understand "specific." What does that

12   mean in terms of your question? How do you want me to answer

13   that?

14   **Q    Out of the inmates that are being seen by doctors there,**

15   **are they divided up between you and Dr. Lomax or any other**

16   **doctors there?**

17   A    Yes.

18   **Q    How is that process done?**

19   A    I will see inmates just for the initial physical

20   examination, history and physical, and she could see patients

21   for the same reason, or for a different reason, maybe for

22   chronic condition management.

23   **Q    Were there any other doctors there during your time**

24   **period?**

25   A    Yes.

1    Q    Who else was there?

2    A    Dr. Floss, F-l -- I'm not sure.  It sounds like "Floss."

3    Q    I understand.  And --

4    A    And Doctor -- no, Dr. Floss.  I think that's it.

5    Q    Are you still employed with SWACCC?

6    A    Yes.

7    Q    Do you still work the same two days a week?

8    A    No.

9    Q    When do you work now?

10   A    As needed.

11   Q    How does that occur?

12   A    Once a month, twice a month, only when I can.  We don't

13   have any set schedule.

14   Q    What other doctors are there currently other than

15   yourself?

16   A    I don't remember their names.

17   Q    Do you know how many other doctors are there?

18   A    There's one nurse practitioner and another doctor.

19   Q    In February of 2016, do you remember the doctors who were

20   employed by SWACCC?

21   A    Dr. Lomax and me.

22   Q    Were there any nurse practitioners there?

23   A    I'm -- I can't recall that.

24   Q    And the way you are describing the doctor-patient

25   interactions, any doctor could treat any resident there if they

1   A    These are questions and answers from me with my lawyer for

2   the deposition.

3   Q    And so did you assist in providing answers for these

4   interrogatories?

5   A    Yes, sir.

6   Q    I want you to look at Interrogatory Number 1.  It's asking

7   to state any and all dates that you provided care and/or

8   treatment to Craig Shipp while he was at SWACCC; is that

9   correct?

10  A    Yes.

11  Q    Okay.  What are the dates you identified as dates that you

12  provided treatment to Mr. Shipp?

13  A    February 9th, March 1st, March 15th, 2016, April 12th,

14  19th, 26th, 2016, May 3rd, 2016.

15  Q    Any other dates?

16  A    February 5th, 2016, as well.

17  Q    Okay.  Did you write notes on all those encounters?

18              MS. ODUM:  Object to form.

19  A    I cannot recall.  I can't tell you unless I review the

20  chart and see if I did.  I cannot really tell you, because I

21  don't know what these dates -- what was my involvement with the

22  patient on these dates.

23  Q    Oh, okay.

24  A    Because I could just look at the patient and just say hi

25  on these dates, so these -- an encounter, I could sit in front

1　of him and have a conversation without me treating him, so I

2　don't -- I can't really tell you for sure, you know, whether a

3　note was done or not, because I don't know what was the details

4　of my involvement with him or her with this -- with the

5　defendant on this date.

6　**Q　　Okay.　So you can't even tell from your interrogatories**

7　**whether you wrote a note on every encounter?**

8　A　　I cannot tell you unless we go into detail on, you know,

9　what I did on these particular dates.

10　**Q　　Well, did you review any of the medical records before**

11　**today?**

12　A　　I did review February 9th, yes, sir.

13　**Q　　Okay.　What did you do about February 9th?**

14　A　　I saw Mr. Craig Shipp for a history and physical, intake

15　physical.

16　**Q　　Okay.　During that, are you clearing them for whether they**

17　**can perform activities in the program or not?**

18　A　　Usually, that's what I do.　I just make sure that they --

19　you know, we treat what medical problem they have, and then --

20　if they need, yes.

21　**Q　　Okay.　So you would have done a full history and physical**

22　**during this intake?**

23　A　　Yes.

24　**Q　　And you would have written out a note?**

25　A　　I write a note, yes.

1  A    For him to follow up with chronic care.

2  **Q**    **And, again, that means to follow up with a doctor who is**

3  **-- you are one of those doctors?**

4  A    But I wasn't doing chronic care; I was doing intake.  That

5  was my intake day.

6  **Q**    **Okay.  So you scheduled another visit with him?**

7  A    Yes, sir.

8  **Q**    **So when did you see him next regarding your follow-up for**

9  **chronic care?**

10  A    I didn't see him after that, because we have other

11  physicians onsite, so the management takes care of scheduling

12  the next appointment.

13  **Q**    **Okay.  So what record did you make that scheduled him for**

14  **another visit?**

15  A    Meaning -- what record, meaning?

16  **Q**    **How did you communicate that to the staff that's supposed**

17  **to coordinate that?**

18  A    They read my note and then they follow through.  Follow-up

19  chronic care, that means you make sure he sees a doctor for his

20  -- for the management of his chronic conditions.

21  **Q**    **Okay.  So you don't know who -- if someone followed up**

22  **with that note?**

23  A    I don't check it.  My job is to tell the nurse to set him

24  up for chronic care, and this is the protocol.  That's how we

25  do it.

1    any sources that would have caused this wound?

2    A    Unless he hurt himself.  I don't -- I cannot tell you for

3    sure.

4    Q    When you took your history and physical, did you ask him

5    whether he hurt himself or not?

6    A    If it's not written, then it isn't an issue.

7    Q    Okay.  So if you didn't write down that Mr. Shipp caused

8    this wound himself, you don't think that that is what occurred?

9    A    If I didn't write it down, probably.  I didn't write it

10   down.

11   Q    Did you do a differential diagnosis for the sore on his

12   left foot?

13   A    He was on antibiotics for the wounds, so it was already

14   addressed.  I was doing an physical examination, and I just

15   made a note of it.

16   Q    And that wasn't the first time you saw Mr. Shipp, was it?

17   A    I saw him briefly for this prior to that.

18   Q    On February 5th?

19   A    February 5th, yes, sir.

20   Q    Okay.  I'm going to hand you -- well, actually, let's go

21   back to your interrogatory.  In your interrogatory, you say you

22   snipped hanging tissue of dead skin off of his left foot.

23   A    Where are you right now?  I can't --

24   Q    Interrogatory Number 1 on the first page.

25   A    Number 1?

1  encounter?

2  A    I told the nurse -- because the nurse was seeing the

3  patient, so I told the nurse to go ahead and call in the

4  antibiotics.  Because we put orders in.  We can tell the nurses

5  what you want, and I told him to -- I told her to start

6  antibiotics.  I saw the piece of tissue hanging, and I just

7  literally took the scissors and just cut it.  No big deal.  We

8  do that all the time.  And I told her to -- because at that

9  time, she had mentioned that he's a diabetic --

10 Q    Right.

11 A    -- and the patient told me, "I don't have my diabetic

12 shoes," and I told him, "Okay.  Well, get it from your family

13 -- go ahead and get it from your family."  So the nurse wrote

14 it down because she was the one doing the assessment, and I was

15 just going to order the antibiotics.

16 Q    Do you know whether the facility allows nurses to approve

17 medical devices?

18 A    They don't approve it; I approve it.

19 Q    Oh, okay.  So you approved it on February 5th?

20 A    I told the nurse to -- I told the patient to tell the

21 family to bring his -- if he doesn't have it, yeah.

22 Q    Right.  Right.  But a doctor has to approve an outside

23 medical device for it to come in to SWACCC; correct?

24 A    The doctor has to order -- yeah, has to approve.

25 Q    Right.  And so you documented your approval on February

1    5th when you were informed by Mr. Shipp that he needed his

2    orthotic shoes?

3    A    I told the nurse to write down that he needs his shoes,

4    yes, sir.

5    Q    Can nurses write prescriptions at SWACCC?

6    A    It's not a prescription.

7    Q    Okay.  Can nurses write approvals for medical devices?

8    A    Doctors do it.

9    Q    Right, correct.  So you did not write the approval for a

10   medical device on February 5th; correct?

11   A    I told the patient to get his shoes if he has them.  I

12   told him personally.

13   Q    And that's all you did?

14   A    That's all I did, and the nurse documented.

15   Q    Did you write any other -- or did you communicate this

16   with anyone else other than the nurse?

17   A    The nurse was present, and the patient was present, so the

18   three of us.

19   Q    Okay.  Did you communicate it with anyone else?

20   A    No.

21   Q    Was there any other reason, in your mind, that you didn't

22   want to document this encounter?

23   A    It was documented.

24   Q    Okay.  By the nurse?

25   A    By the nurse.  They usually say, "The doctor orders," so

1  that's telling in the record that the doctor gave me permission

2  to -- well, the doctor told the patient to bring this or that,

3  so that if the warden has a question, they will approve of it

4  -- well, they will look at it, "Well, the doctor ordered for

5  the patient to wear those shoes or this device."

6  Q    So CCS staff, based off your instruction to the nurse,

7  should have coordinated the approval of the shoes?

8  A    Well, in this particular case, the patient has to call and

9  get it shipped to the unit.

10  Q    Right.

11  A    Yes.

12  Q    And do you know if CCS staff is telling the patient that

13  he has to get approval to do this?

14  A    No.  I told the patient, not CCS.  I told the patient in

15  front of the nurse to get his shoes shipped to the facility --

16  Q    Right.

17  A    -- so he could wear them.

18  Q    Right.  But you didn't write a note saying that?

19  A    I don't have to write a note, sir.  I told him to.  So

20  what he does, he will get it, and he'll bring it, and then the

21  warden will have to go through the protocol to let him have it.

22  Q    Okay.  So how does this information get to the warden?

23  A    The patient will order; and once the shoes arrive, then

24  the warden will call the floor and ask, "Did you guys okay

25  this?"  "Yes."  That's how it goes.  And then he will have the

1　permission to wear his device.

2　Q　Okay.  And that's your understanding of the policy and

3　procedure there?

4　A　That's -- yes, sir.

5　　　　　　　　　(WHEREUPON, Exhibit 4 was marked for

6　　　　　　　　　identification and is attached hereto.)

7　Q　Okay.  And here is Exhibit 4.

8　A　Okay.

9　Q　Is that the encounter you were discussing?

10　A　Yes, sir.

11　Q　What did you discuss with Mr. Shipp on the 9th about his

12　shoes?

13　A　We didn't discuss about the shoes on the 9th.

14　Q　Do you know Ms. Turner or Ms. Philson?

15　A　Yes, sir.

16　Q　And they're the same person; correct?

17　A　Yes, sir.

18　Q　Do you have any opinions on Ms. Turner?

19　A　No, sir.

20　Q　Have you ever been written up or reprimanded at SWACCC?

21　A　No.

22　Q　Do you believe Ms. Turner is an honest person?

23　A　Yes, she is.

24　　　　　　　　　(WHEREUPON, Exhibit 5 was marked for

25　　　　　　　　　identification and is attached hereto.)

1   instructions regarding medical treatment, and he verbalized

2   understanding."  So she did everything that I --

3   Q    (By Mr. Franseen)   And does it --

4   A    -- I asked her to.

5   Q    -- does it mention bed rest in that note?

6   A    Not specifically.

7   Q    And does it mention any prescription for any wheelchair or

8   crutches?

9   A    I don't see any.  I didn't order a wheelchair.

10  Q    So that's a no?

11  A    No.

12  Q    If the SWACCC facility was continuing to maintain that he

13  follow through with his program as far as having to stand at

14  the meetings, walk to various places, would that be against

15  your bed rest orders?

16  A    It would be, yeah.

17  Q    And if Mr. Shipp was not advised of your bed rest orders,

18  not provided that document, would that be improper?

19  A    I can't really speculate on this one.

20  Q    Okay.  Other than Nurse Smith, did you speak with anyone

21  else on February 5th about Mr. Shipp's care?

22  A    Not to my knowledge.

23              MR. FRANSEEN:  I will pass the witness.

24                            EXAMINATION

25  BY MS. ODUM:

C E R T I F I C A T E

STATE OF ARKANSAS    )

                     )ss

COUNTY OF FAULKNER   )


   I, KRISTY L. ROONEY, Certified Court Reporter #529, does

hereby certify that the facts stated by me in the caption on

the foregoing proceedings are true; and that the foregoing

proceedings were reported verbatim through the use of the

voice-writing method and thereafter transcribed by me or under

my direct supervision to the best of my ability, taken at the

time and place set out on the caption hereto.


   I FURTHER CERTIFY, that I am not a relative or employee of

any attorney or employed by the parties hereto, nor financially

interested or otherwise, in the outcome of this action, and

that I have no contract with the parties, attorneys, or persons

with an interest in the action that affects or has a

substantial tendency to affect impartiality, that requires me

to relinquish control of an original deposition transcript or

copies of the transcript before it is certified and delivered

to the custodial attorney, or that requires me to provide any

service not made available to all parties to the action.


           CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807
                      www.conwaycourtreporting.com

WITNESS MY HAND AND SEAL this 4th day of December, 2018.

_____

KRISTY L. ROONEY, CCR

Certified Court Reporter #529

CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807

www.conwaycourtreporting.com