

# ConwayCourt Reporting

# Transcript of the Testimony of
# LORENE LOMAX, M.D.

## Date: NOVEMBER 16, 2018

Re: SHIPP VS. CORRECT CARE SOLUTIONS, LLC, ET AL

CONWAY COURT REPORTING, LLC
Phone: 501-679-1488
Email: scheduling@conwaycourtreporting.com



EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


CRAIG SHIPP                                                                       PLAINTIFF

VS.                         NO. 4:18-CV-0417 SOH

CORRECT CARE SOLUTIONS, LLC,
DR. LORENE LOMAX, DR MIMO LEMDJA,
KIMBERLY HOFMANN, LENORA PHILSON,
KINDALL SMITH, DIANE CUNNINGHAM,
MELISSA STONER, STEVE ARNOLD                                                      DEFENDANTS


ORAL DEPOSITION

OF

LORENE LOMAX, M.D.

TAKEN NOVEMBER 16, 2018, AT 10:11 A.M.



Conway Court Reporting

Post Office Box 2188

Conway, Arkansas   72033

www.conwaycourtreporting.com


"Spoken to written . . . word for word"


Conway Office: 501.679.1488    Little Rock Office:  501.319.4807

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

MR. DEREK S. FRANSEEN
WALSH & FRANSEEN
200 EAST 10TH STREET PLAZA
EDMOND, OKLAHOMA  73034

**ON BEHALF OF THE DEFENDANTS:**

MS. MICHELLE ODUM
HUMPHRIES, ODUM & EUBANKS
1901 BROADWAY STREET
LITTLE ROCK, ARKANSAS  72206

MS. ROSALYN MIDDLETON
ASSISTANT ATTORNEY GENERAL
323 CENTER STREET, SUITE 200
LITTLE ROCK, ARKANSAS  72201

I N D E X

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE . . . . . . . . . . . . . . . . . . . . . . . 4

**WITNESS:** LORENE LOMAX, M.D.

    Examination by Mr. Franseen . . . . . . . . . . . . . . . 5

    Examination by Ms. Odum . . . . . . . . . . . . . . . . . 28

    Further Examination by Mr. Franseen . . . . . . . . . . 36

    Further Examination by Ms. Odum . . . . . . . . . . . . 38

    Further Examination by Mr. Franseen . . . . . . . . . . 38

    Deposition Concluded . . . . . . . . . . . . . . . . 40

COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . . . . 42

**EXHIBITS:**　　　　　　　　　　　　　　　　　　　　　　IDENTIFIED:

1.   Encounter Notes CCS 542 - CCS 544 . . . . . . . . . . . 9

2.   Medical Restrictions/Limitations/Special
    Authorization(s) labeled CCS 8 - CCS 9 . . . . . . . . . 21

CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807

www.conwaycourtreporting.com

1                    C A P T I O N

2       ANSWERS AND ORAL DEPOSITION OF LORENE LOMAX, M.D., a

3   witness produced at the request of the Plaintiff, taken in the

4   above-styled and numbered cause on the 16th day of November,

5   2018, at 10:11 a.m., at the law offices of Humphries, Odum &

6   Eubanks, 1901 Broadway Street, Little Rock, Arkansas, pursuant

7   to the Federal Rules of Civil Procedure.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       P R O C E E D I N G S

2        THEREUPON,

3                     LORENE LOMAX, M.D.,

4            THE WITNESS HEREINBEFORE NAMED, having

5            been first duly cautioned and sworn by me

6            to testify to the truth, the whole truth,

7            and nothing but the truth, testified on her

8            oath as follows, to-wit:

9                          EXAMINATION

10   BY MR. FRANSEEN:

11   Q    Please state your name.

12   A    Lorene Lomax.

13   Q    And, Dr. Lomax, I believe we met briefly before this.  Can

14   you tell me where you're currently employed?

15   A    I am currently retired as of February of 2017.

16   Q    And prior to retiring, you were a medical doctor; correct?

17   A    Correct.

18   Q    Where did you go to medical school?

19   A    Michigan State College of Human Medicine.  And that's

20   designated so because that's the M.D. school.  They also have a

21   College of Osteopathic Medicine on the same campus.

22   Q    That would be a D.O. program?

23   A    Yeah.  The osteopathic is D.O., and my program was M.D.

24   Q    And where did you have your residency?

25   A    I actually had two residencies.  I initially was training

1  working down at Texarkana. I initially was working at Omega in
2  Malvern.
3  Q    And it's my understanding, is Malvern kind of the
4  designated medical unit within --
5  A    No. No. You're thinking of the prison across the road.
6  That's ORCU. That's the dedicated medical wing. I did a
7  couple of shifts over there filling in. I worked at various
8  facilities that -- generally, that's -- when you're a CCS
9  employee, if they are short a particular day, they might ask if
10 you can fill in at a different facility.
11 Q    Okay. But at some point, you started working at the
12 Texarkana SWACCC facility?
13 A    I did. I did. I think I probably -- I worked down there
14 about 18 months off and on, I believe.
15 Q    Have you ever given a deposition?
16 A    A long time ago about 2004.
17 Q    What was that in regards to?
18 A    That was in regards to a lawsuit that I was a party to.
19 Q    Was it with regards to a medical treatment you provided or
20 something --
21 A    Yes, it was.
22 Q    And you were here -- you were present for Dr. Lemdja's
23 deposition?
24 A    Yes.
25 Q    Did you hear the ground rules I kind of told her as far

1   as, you know, some recommendations for getting through a
2   deposition?
3   A    Yes.
4   Q    Okay. And one thing, it's best -- we're kind of doing --
5   we're kind of talking a little bit over each other. Just for
6   the court reporter, I would just remind you that if you can
7   allow me to get my full question out -- you kind of can
8   anticipate where I'm going with it, but it's easier if you kind
9   of let me finish up before you start your question -- or start
10  your answer, and I'll do the same before I start my next
11  question.
12  A    Okay.
13  Q    What was the 2004 lawsuit regarding?
14  A    That was regarding a patient who was in a rehab facility
15  who died from urosepsis, and the allegation was delay of
16  diagnosis. And the case ultimately went to trial, and it was
17  decided in my favor.
18  Q    In February of 2016, were you working at the Texarkana
19  facility for CCS?
20  A    Yes, I was.
21  Q    Do you recall the resident, Craig Shipp?
22  A    I recall vaguely. And then I have since reviewed medical
23  records involving me and Mr Shipp's care, and that triggered
24  more full recall.
25  Q    Do you recall the first date that you had an encounter

1   with Mr. Shipp?

2   A    I believe it was February the 16th.

3   Q    Had you been provided any other information prior to

4   February 16 with regards to Mr. Shipp?

5   A    No.

6   Q    Did Dr. Lemdja, prior to February 16th, speak with you

7   regarding Mr. Shipp?

8   A    No.

9   Q    Did Dr. Lemdja ever speak with you regarding the care that

10  needed to be provided for Mr. Shipp?

11  A    No.

12  Q    I'm going to hand you Exhibit 1.  They are CCS 542 through

13  544.  Can you identify what Exhibit 1 is?

14              (WHEREUPON, Exhibit 1 was marked for

15              identification and is attached hereto.)

16  A    It's a printed-out copy of the computer record for Mr.

17  Craig Shipp for a chronic care doctor visit provided by me on

18  2/16/2016 at SWACCC.

19  Q    And what was your kind of findings and general plan for

20  Mr. Shipp on that date?

21  A    The findings was diabetes, with severe peripheral

22  neuropathy right foot Charcot deformity, left foot status post

23  great toe amputation, now with pressure blisters on both feet;

24  good control of hypertension; chronic kidney disease, stage II,

25  creatinine 1.36 milligrams per deciliter; anemia with no

1    history of ulcers or blood loss; and dyslipidemia.

2    Q    **What did you ultimately recommend for his care?**

3    A    My focus was offloading the pressure points on his feet,
4    because of his abnormal weight-bearing to prevent worsening of
5    his foot lesions.

6    Q    **And at that point, he had lesions on both feet?**

7    A    He did. He had -- it was not -- the one on his right foot
8    wasn't open yet, but you could see where he was developing one.

9    Q    **With someone in his condition, is it critical to offload**
10   **the pressure on their feet?**

11   A    Yes. By offloading, it can mean non-weight-bearing, but
12   it can also mean bandage, padding so that the pressure
13   equalization doesn't impact the part that's hitting the ground
14   like on a Charcot joint. And that's the reason that you do
15   custom orthotics, is to transfer the weight.

16   Q    **So on the Charcot joint on his right foot, he needed the**
17   **orthotics in order to basically redistribute --**

18   A    Redistribute the weight.

19   Q    **And then that's critical as far as preventing, I assume,**
20   **probably both further breakdown and from preventing ulcers or**
21   **sores from forming at that location?**

22   A    That's true, in my medical opinion.

23   Q    **Is there anything in your note indicating that you**
24   **believed he was on bed rest at this point?**

25   A    I don't see anything in my note, and I wasn't aware that

1  he was. He ambulated to the appointment.

2  Q   You would agree that if he was ordered bed rest, that you
3  would have probably noticed that and made a note of it in your
4  February 16th, 2016, note?

5  A   Generally speaking, if he was on bed rest, he would have
6  arrived to the unit in a wheelchair.

7  Q   And so is it safe to assume that if he didn't arrive in a
8  wheelchair, that he was not on bed rest?

9  A   I don't know.

10 Q   And you made a note in there that it's critical that he
11 needs his custom shoes and inserts based on your observations
12 on February 16th, 2016?

13 A   Yes.

14 Q   Does he need those orthotic shoes and inserts regardless
15 of whether a sore has formed on the Charcot joint on the right
16 foot or not?

17 A   Yes.

18 Q   Does he need those on the left foot after an ulcer has
19 formed as well?

20 A   Yes.

21 Q   Is a Charcot joint something you can observe visually even
22 during a quick encounter as a physician?

23 A   You can observe the foot deformity that is secondary to a
24 Charcot joint. A Charcot joint, technically, it's more
25 observed radiographically. You can see the abnormal position

1  of the ankle bones and the breakdown of the foot ankle

2  interfaced joint.

3  Q    And -- but after that breakdown occurs, you can start to

4  observe the deformity?

5  A    When you palpate the foot, you can feel weird bumps where

6  normal people don't have weird bumps on the bottom of their

7  feet.

8  Q    Okay.  Do you agree with Dr. Lemdja's statements that you

9  don't always document encounters with patients?

10 A    If I see a patient, I generally try to document it.

11 Q    And is that what you're trained to do?

12 A    Yes.

13 Q    After putting together this plan, did you pass this up

14 along to the chain of command there at CCS?

15 A    I alerted LeNora Turner -- at that time, she was the HSA

16 -- that we needed to really get going with getting these shoes

17 in for him.

18 Q    And as the appropriate procedure to do as a physician,

19 once you recognize a need for a medical device, you have to

20 notify the HSA?

21 A    Yes.  I mean, the HSA is our interface with the security

22 and the warden's office.

23 Q    So it's critical to notify the HSA in order to get the

24 orders approved and submitted through the proper protocols?

25 A    I wouldn't say it's always critical to do so.  I would

1  notify Ms. Turner in person, which I did on this date, when I
2  needed something to happen very, you know, quickly, you know,
3  "Let's get it done right now." Sometimes I wouldn't
4  specifically notify. And during the course of her work, she
5  has to go through all the restrictions anyway, and so if it's
6  just like a standard one, I wouldn't necessarily get up and let
7  her know about that. But in something like this, yes.
8  **Q    And you -- if you observed and ordered a restriction,**
9  **would you document that yourself personally?**
10 A    Not always, because sometimes if it was, like, for a
11 telephone, the nurses could have an intake. And, for example,
12 if the person -- the patient wasn't scheduled to have their
13 intake physical for several days, the nurses see them on the
14 date of the admission and they might call and they say, "I've
15 got a guy here that he's having trouble getting around. Can I
16 give him a temporary elevator pass," and I would say, "Sure."
17 And they -- but, generally, when the nurses write those things,
18 they're time-limited.
19 **Q    Right.**
20 A    In order for something to be a permanent restriction, then
21 the physician has to get involved.
22 **Q    Okay. If you're there onsite, and you put in a**
23 **restriction, would you document it yourself personally?**
24 A    Again, the intake part of the facility is some distance
25 away from where the office -- where the physician's work is,

LORENE LOMAX, M.D.                              SHIPP VS. CORRECT CARE SOLUTIONS, LLC, ET AL

Page 31

1  Q    Okay.  February 9th?

2  A    I think that was the date.

3  Q    And then on February 9th, she does have the plan,

4  follow-up chronic care?

5  A    Yes.

6  Q    And was that -- does that mean with the doctor?

7  A    Yes.  The chronic care visit is when we enroll the people

8  that have diabetes or hypertension or other medical problems

9  that are going to need chronic follow-up while they're here --

10 while they're there.

11 Q    And he did follow up with a chronic care visit?

12 A    He did, a week later.

13 Q    A week later.  Now, you mentioned in your note -- or when

14 you testified, you said he could offload with orthotics or with

15 padding?

16 A    Well, orthotics, generally, they have some degree --

17 orthotics are manufactured in various types.  Some of them have

18 like a -- they usually have a hard plastic surface, and then

19 the bottom could be like compressible foam in areas.  Some of

20 them, if a person really uses a lot of foot support, they might

21 have like a metal piece that has then foam and stuff to support

22 it.  So -- and the reason for using the orthotics is to

23 redistribute pressure and then have the point -- in the case of

24 a Charcot foot, those weird bumps from his collapsed bones that

25 were sticking out, you want to, like, lift up so that those

C E R T I F I C A T E

STATE OF ARKANSAS    )
                     )ss
COUNTY OF FAULKNER   )

    I, KRISTY L. ROONEY, Certified Court Reporter #529, does hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

    I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

WITNESS MY HAND AND SEAL this 5th day of December, 2018.

_____

KRISTY L. ROONEY, CCR

Certified Court Reporter #529