# Transcript of the Testimony of
# **Jeffrey Stieve**

**Date:** June 10, 2019

**Case:** Shipp v. Murphy, et al.



ConwayCourt
—Reporting—



EXHIBIT
14

Conway Court Reporting
Phone: 5013194807
Email: lydia@conwaycourtreporting.com

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF ARKANSAS

TEXARKANA DIVISION

CRAIG SHIPP　　　　　　　　　　　　　　　　　　　　PLAINTIFF

VS.　　　　　　　　NO. 4:18-CV-04017-SOH

KEVIN MURPHY, et al　　　　　　　　　　　　　　　DEFENDANTS


ORAL DEPOSITION

OF

JEFFREY STIEVE, M.D.

TAKEN JUNE 10, 2019, AT 8:55 A.M.


Conway Court Reporting

Post Office Box 2188

Conway, Arkansas   72033


www.conwaycourtreporting.com


"Spoken to written . . . word for word"


Conway Office: 501.679.1488　　Little Rock Office:  501.319.4807

1                    A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4
5    MR. DEREK S. FRANSEEN
6    ATTORNEY AT LAW
7    200 EAST 10TH STREET PLAZA
8    EDMOND, OKLAHOMA 73034
9
10   ON BEHALF OF THE DEFENDANTS:
11   MS. MICHELLE ODUM
12   HUMPHRIES, ODUM & EUBANKS
13   1901 BROADWAY STREET
14   LITTLE ROCK, ARKANSAS 72206
15
16   MS. ROSALYN MIDDLETON
17   ARKANSAS ATTORNEY GENERAL'S OFFICE
18   323 CENTER STREET, SUITE 200
19   LITTLE ROCK, ARKANSAS 72201
20
21
22
23
24         CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807
25                     www.conwaycourtreporting.com

1                        I N D E X

2

3    STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . 1

4    APPEARANCES  . . . . . . . . . . . . . . . . . . . . . 2

5    STIPULATION PAGE . . . . . . . . . . . . . . . . . . . 4

6    WITNESS: JEFFREY STIEVE, M.D.

7         Examination by Mr. Franseen . . . . . . . . . . . 5

8         Examination by Ms. Odum . . . . . . . . . . . . . 55

9         Further Examination by Mr. Franseen . . . . . . . 59

10        Further Examination by Ms. Odum . . . . . . . . . 60

11        Further Examination by Mr. Franseen . . . . . . . 62

12        Deposition Concluded   . . . . . . . . . . . . . . 63

13   COURT REPORTER'S CERTIFICATE   . . . . . . . . . . . . 64

14

15   EXHIBITS:                                     IDENTIFIED:

16

17   1.   Health Services Encounter . . . . . . . . . . . . 14

18

19

20

21

22

23

24

25

```
 1                        C A P T I O N
 2      ANSWERS AND ORAL DEPOSITION OF JEFFREY STIEVE, M.D., a
 3   witness produced at the request of the Plaintiff, taken in the
 4   above-styled and numbered cause on the 10th day of June, 2019,
 5   at 8:55 a.m., at Humphries, Odum & Eubanks, 1901 Broadway
 6   Street, Little Rock, Arkansas, pursuant to the Federal Rules of
 7   Civil Procedure.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    P R O C E E D I N G S
2        THEREUPON,
3                    JEFFREY STIEVE, M.D.,
4        THE WITNESS HEREINBEFORE NAMED, having
5        been first duly cautioned and sworn by me
6        to testify to the truth, the whole truth,
7        and nothing but the truth, testified on his
8        oath as follows, to-wit:
9                         EXAMINATION
10   BY MR. FRANSEEN:
11   Q    Could you please state your full name for the record.
12   A    Jeffrey Charles Stieve.
13   Q    And where are you currently employed?
14   A    At Wellpath.
15   Q    It is my understanding that Wellpath is the new name for
16   Correct Care Solutions?
17   A    That's correct.
18   Q    So if I refer to Correct Care Solutions or CCS as far as
19   your current employment and former employment, I am referring
20   to the same entity?
21   A    Correct.
22   Q    How did you become -- what is your position at Wellpath?
23   A    My position is called a regional medical director.
24   Q    And how long have you been in that position?
25   A    It will be five years on July 28th.

1  briefly for a left foot problem.
2  Q    As a doctor, if you're finding a sore on the left foot,
3  would you tend to have at least a quick conversation with that
4  person?
5  A    You may.
6  Q    Would you ask them, Hey, do you have sores on your feet?
7  A    I don't know what Dr. Lemdja's standard process is with
8  patients.
9  Q    Records indicated, though, that Dr. Lemdja did have a
10 discussion about his orthotic shoes?
11 A    I believe that's correct.
12 Q    And so she would be on some sort of alert that he has
13 issues with his feet?
14 A    Correct.
15 Q    And the records indicate that the nursing staff, at the
16 very least, knew about the charcot deformity?
17 A    Well, this was with an LPN.  I believe that it's beyond
18 the scope of an LPN's practice to make an assessment.  For
19 example, to label something as charcot foot or something like
20 that.  This nurse's role, to the best of my knowledge, was a
21 triage visit for a rather new inmate.  According to the records
22 that I've reviewed, the sole reason that she involved Dr.
23 Lemdja in this case is that she felt it was in the patient's
24 best interest to have a flap of skin that was loose on the left
25 foot removed.  She went to Dr. Lemdja and explained her

1  patient, should you go ahead and try to flush out that portion
2  of that patient's issues?
3  A    I think with a drive by when there is a nurse scheduled
4  triage, because of the busyness of the clinic, the providers
5  tend to trust the judgement of the nurse doing the triage.  If
6  they say there is a particular instance that they think an
7  intervention is necessary, I think it's not unusual that the
8  focus of that drive by done by the provider would just be on
9  that sole topic.
10 Q    The topic on that date was?
11 A    It was for the left foot specifically, I believe.
12 Q    And during that drive by, she was informed about the need
13 for orthotics?
14 A    Correct.
15 Q    And she knows that that is a prescribed medical device?
16 A    She does.  She also knows that if she would have -- I
17 believe it came to her attention that the inmate had orthotic
18 shoes at the jail, but they didn't appear to have made the trip
19 with the inmate.  If she would have started that process de
20 novo, it would have taken 30 t0 60 days, by policy, to get the
21 patient in to see someone at the foot clinic.  I don't know how
22 complicated the orthotics are, but it would have taken a little
23 bit of time after that visit to generate a new orthotic.  I
24 think Dr. Lemdja did what was in the patient's best interest
25 and said, If you have bad feet and you have previous orthotics,

1   A   Sure.

2   Q   Who's job at SWAC was it to approve a medical device?

3   A   To approve?  Well, medical devices can only be ordered by

4   providers.  That is done in conjunction with custody, because

5   there are some devices that are dangerous in a prison setting.

6   Assuming that we knew that a device was acceptable in the

7   prison setting, an order from a provider would be necessary for

8   the device, and then custody would approve it, and then it

9   would be given to the inmate.

10  Q   Is there a written policy regarding that?

11  A   I don't know.

12  Q   Have you come across any other policies about that?

13  A   If I would have, I would have seen it by now.

14  Q   You agree that regardless of whether the Arkansas -- what

15  is their acronym?  ACC?  Does ACC have policies and procedures

16  regarding medical care that CCS follows?

17  A   We are supposed to not supercede any of their policies.

18  In many instances, we have policies that go above and beyond

19  what the ACC policy might be.

20  Q   And with the ACC policies and CCS policies, there is no

21  written procedure regarding approving medical devices?

22  A   Approving one?  Well, there is two steps to that.  First,

23  the provider needs to say that it's necessary.

24  Q   My question is, is there a written policy?

25  A   I am trying to explain that.  If it's something standard,

Jeffrey Stieve                              Shipp v. Murphy, et al.

Page 36

1  like a New Balance tennis shoe, it is well known that those are
2  an approved appliance. If it happens to be an orthotic limb or
3  anything else, my understanding is that the custody staff at
4  the site either give that a thumbs up or thumbs down as to
5  safety. I think what happens is that the health service
6  administrator, HSA, if they get an unusual device in, that
7  would either be screened before it came to medical or the
8  health service administrator would ask custody to evaluate the
9  appropriateness of any given device. I don't know if that's a
10 written policy or not.
11 Q    Is there any way, in your capacity as medical director,
12 that you've ever seen a written policy on that?
13 A    I have not.
14 Q    Do you know what the practiced custody policy was at SWAC
15 in February 2016 regarding approving a medical device?
16 A    I do not.
17 Q    Do you know whether the warden knew what the practiced
18 custody policy was regarding approving a medical device?
19 A    I believe that the warden is the final arbitrary and he or
20 she could approve or disapprove of anything based on their
21 custody knowledge.
22 Q    In review of your documents, are you aware that the warden
23 knew about the orthotic device on February 1st?
24 A    On February 1st? No, I don't recall that he did.
25 Q    Do you know -- have you -- strike that.

1  standard of care in order to provide the care needed for the
2  inmates in the correctional setting?
3
4              MS. ODUM: Object to form.
5  A   Can you repeat your question?
6  Q   CCS has a duty to provide appropriate medical care to the
7  inmates in the correctional facility?
8  A   They have a duty to provide necessary care for serious
9  medical disorders. We've already agreed that charcot foot is a
10 serious medical disorder. While there might not be a specific
11 policy for dealing with charcot's deformity in an inmate, the
12 CCS providers have a duty to address that serious medical need
13 and sometimes in a step rise fashion until they have all the
14 information or tools to address it.
15 Q   And even in the mean time, even in a step rise fashion,
16 you have to take the appropriate steps to -- put a BAND-AID on
17 it and do what's necessary to kind of help the situation until
18 that full issue can be addressed?
19 A   Yes. To bring us back to the patient here, charcot's
20 deformity is a progressive problem that can go 10 or 20 years.
21 Offloading the foot for charcot's -- for ulcers may well be
22 indicated with severe problems or if not offloading results in
23 detrimental changes to the inmate. I don't think that just
24 having charcot's foot means that patient can't walk. I think
25 that that's a negotiation between the patient and the providers

1  because she didn't do a complete physical exam, and she should
2  have documented what she actually did.
3  Q    And with Dr. Lemdja, if your testimony is that she may
4  have been worried about the orthotics taking 30 to 60 days, she
5  then should have offloaded as well, regardless of whether he
6  had existing orthotics or not?
7  A    Let me be clear here.  If Dr. Lemdja had entered a consult
8  for the inmate to go out and be evaluated for orthotics, that
9  process can take up to 60 days, I think, by policy, and then
10 whatever it took to generate the actual orthotic.  I think that
11 if Dr. Lemdja counseled the inmate that he should call his
12 family about the orthotics, I would have guessed that Dr.
13 Lemdja thought that would be a much quicker procedure.  I must
14 at also that when we hire these providers, I am very clear that
15 we can't ask them to treat things that they are not comfortable
16 treating.  My read of the chart is that Dr. Lemdja wasn't
17 comfortable dealing with the charcot foot deformity.
18 Therefore, she referred this patient to Dr. Lomax, who had more
19 experience or at least that's my assumption.  Both of these
20 providers, generally speaking, are very conscientious and
21 document very well.  I think that -- my guess is that Dr.
22 Lemdja wasn't comfortable as to what the next step was, and so
23 deferred to Dr. Lomax to get a treatment plan that was more
24 specific than she was comfortable generating.
25 Q    What facts do you rely upon in making that assumption?

1  have been dismissed.

2  Q    Okay.  And you've never had to go to court, except for one
3  time?

4  A    One time with you.  I think I was an expert witness or
5  giving my opinion.  I wasn't being sued.

6  Q    That was the one where the Court called the hearing about
7  the water; is that correct?

8  A    That's the one that I recall.

9  Q    Okay.  And that was a post judgement hearing?

10 A    Yeah.  I remember they made a judgment and the judge
11 wanted to talk about it again.

12 Q    Okay.  And you also stated earlier that staff was trained
13 to recognize charcot foot.  Earlier you said that LPNs, it's
14 not their job to make such assessments; is that correct?

15 A    That is correct.  LPNs, I believe, in Arkansas, are
16 prohibited from making assessments and labeling this with a
17 diagnosis.  I think that's a provider issue.  I think that an
18 RN would probably not label it charcot's foot and would assess
19 it as a foot deformity or something.

20 Q    Okay.  And there were times where it was CCS policy -- am
21 I correct that CCS follows ADC or ACC policies?

22 A    Right.  We can't not follow those policies.

23 Q    So all of the time when you were referring to policies,
24 that's what you were referring to?

25 A    Correct.

1                    C E R T I F I C A T E
2    STATE OF ARKANSAS    )
3                         )ss
4    COUNTY OF FAULKNER   )
5

6        I, NICOLE HARTWICK, Certified Court Reporter #739, does
7    hereby certify that the facts stated by me in the caption on
8    the foregoing proceedings are true; and that the foregoing
9    proceedings were reported verbatim through the use of the
10   voice-writing method and thereafter transcribed by me or under
11   my direct supervision to the best of my ability, taken at the
12   time and place set out on the caption hereto.
13

14       I FURTHER CERTIFY, that I am not a relative or employee of
15   any attorney or employed by the parties hereto, nor financially
16   interested or otherwise, in the outcome of this action, and
17   that I have no contract with the parties, attorneys, or persons
18   with an interest in the action that affects or has a
19   substantial tendency to affect impartiality, that requires me
20   to relinquish control of an original deposition transcript or
21   copies of the transcript before it is certified and delivered
22   to the custodial attorney, or that requires me to provide any
23   service not made available to all parties to the action.
24
25

1      WITNESS MY HAND AND SEAL this 2nd day of July, 2019.

2

3

4      _____

5      NICOLE HARTWICK, CCR

6      Certified Court Reporter #739

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807

25                    www.conwaycourtreporting.com