**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**TEXARKANA DIVISION**

CRAIG SHIPP                                                                                    PLAINTIFF

v.                                      **NO. 4:18-CV-04017 SOH**

CORRECT CARE SOLUTIONS, LLC, DR.
MIMO LEMDJA, LENORA PHILSON,
KINDALL SMITH, et al.                                                              DEFENDANTS

## STATEMENT OF FACTS

Defendants Dr. Mimo Lemdja (Dr. Lemdja), Lenora Philson[1] (Ms. Philson), Kindall Smith

(Ms. Smith), and Correct Care Solutions, LLC (CCS) (collectively, "medical defendants"), by and

through their attorneys, Humphries, Odum and Eubanks, pursuant to Local Rule 56.1, state as

follows:

### INDEX OF EXHIBITS

| | | |
|---|---|---|
| Ex. A | - | Relevant Medical Records |
| Ex. B | - | Dr. Wright Deposition Excerpts and Report |
| Ex. C | - | Dr. Smith Deposition Excerpts and Report |
| Ex. D | - | Telephone Log 2-16-16 |
| Ex. E | - | Plaintiff Deposition Excerpts |
| Ex. F | - | Dr. Stieve Deposition Excerpts and Report |
| Ex. G | - | Dr. Lemdja Deposition Excerpts |
| Ex. H | - | Dr. Lomax Deposition Excerpts |
| Ex. I | - | Plaintiff's 3-14-16 Letter to his Sister |
| Ex. J | - | Resident Request 2-12-16 |
| Ex. K | - | Nurse Stoner Deposition Excerpts |
| Ex. L | - | Ms. Philson Declaration Regarding a Sick Call Requests |
| Ex. M | - | Plaintiff's 2-9-16 Letter to his Mom |

---

[1] Ms. Philson was sued as "Turner" which is no longer her legal name.

1.     Plaintiff filed a 42 U.S.C. § 1983 complaint alleging defendants were deliberately indifferent to his medical need for an objective medical condition (diabetes/Charcot foot) and visible developing wounds, the symptoms of which "were clearly indicative of the condition that caused him to ultimately lose his **right foot** due to amputation. Document (Doc.) 42 at ¶¶ 1, 2, 13, 16.

2.     Plaintiff stated that a wound developed on his right foot after an orthotic shoe was not timely approved. Plaintiff complained that he ultimately had his right foot amputated, as the wound never healed. See Doc. 1; Doc. 42 at ¶ 26.

3.     Plaintiff alleged that Ms. Philson and Ms. Smith were employed by and/or contracted with CCS. Doc. 42 at ¶ 1.

4.     Plaintiff alleged that Dr. Lemdja was an employee and/or contract physician for the State of Arkansas at the Southwest Arkansas Community Correction Center (SWACCC). Doc. 42 at ¶¶ 1, 21.

5.     Plaintiff alleged CCS was the medical contractor at SWACCC and "is liable for the acts of negligence and/or deliberate indifference of its employees during the care of [plaintiff] under *respondeat superior* and upon those acts that are related to the policies, procedures and protocols implemented by the entity." Doc. 42 at ¶¶ 1, 30, 41.

6.     Plaintiff complained that he was admitted to the Southwest Arkansas Community Correction Center (SWACCC) on February 1, 2016, when he advised intake personnel that he was diabetic and needed orthotic shoes. He was told he would need approval to have the shoes. Doc. 1; Doc. 42 at ¶ 13.

7.     Plaintiff complained that on February 12, 2016, he informed Warden Arnold by written request that he had a wound on his left foot and Charcot joint on the right and needed special

orthotics. Plaintiff claimed that this request was forwarded to Ms. Philson, who failed to timely respond and failed to timely ensure he was provided with his orthotic. Doc. 1; Doc. 42 at ¶ 16.

8.      Plaintiff alleged that he was seen by Nurse Smith and Dr. Lemdja on February 16, 2016, for wound care. He claimed they did not document and stage his wounds, nor did they do anything to ensure he received his orthotic shoes. **This is plaintiff's only specific allegation against Dr. Lemdja and the only continuing allegation against Ms. Smith[2].** Doc. 42 at ¶ 20.

9.      Both of plaintiff's medical experts, Dr. William Wright and Dr. Shawn Smith, opined that plaintiff received appropriate wound care for his right foot ulcer. Dr. Wright stated that "he received appropriate care conforming to community standards for his symptoms of diabetic foot ulcers." Thus, plaintiff's claim is limited to the time period from February 1 (intake) to February 16, 2016 (start of right foot wound care). Ex. B at 20 and Ex. C at 26.

10.     Plaintiff alleged Ms. Philson promulgated unconstitutional policies, procedures, and customs to refuse diabetic inmates orthotic shoes despite known risks of ulcers and of limb loss. Doc. 42 at ¶ 17.

11.     Plaintiff alleged it took defendants over 3 weeks to provide him with his orthotic shoes which would have prevented sores and ulcers from forming. Doc. 42 at ¶ 25.

12.     Plaintiff's First Cause of Action is entitled "Denial of Due Process Right to Adequate Medical Care" under the "substantive due process clause of the Eighth Amendment". Doc. 42 at 9.

13.     Plaintiff's Second Cause of Action is entitled "Cruel and Unusual Punishment and set forth an Eighth Amendment claim alleging deliberate indifference to serious medical needs. Doc.

---

[2]Plaintiff originally made an allegation against Ms. Smith relating to a wound care cast placed on plaintiff in March of 2016; however, plaintiff's expert opinions relating to appropriate wound care render this allegation moot. See Doc. 42 at ¶ 23 and Statement 9 herein.

42 at ¶¶ 36-40.

14.     Plaintiff's Third Cause of Action is for Negligence. Plaintiff alleged CCS and "employees named" which includes Dr. Lemdja, Ms. Philson, and Ms. Smith. Doc. 42 at ¶¶ 41-44

## FACTS

15.     Plaintiff went through intake at SWACCC on February 1, 2016. He was noted to have two large knots on his right foot and a left foot with the great toe amputated due to diabetes. It was noted that the county would not allow him to bring a shoe prescribed to him by a doctor, and the nurse instructed him to write a request to the warden requesting his personal shoes. Ex. A at 1.

16.     Plaintiff's health history form indicated that he had Charcot joint and bone deformity at the right foot arch and bottom of feet, with his left foot great toe amputated. It was noted that he was diagnosed with diabetes 6 years prior. Ex. A at 2-3.

17.     Plaintiff testified that he was told that his foot prognosis was that his foot would continually get worse. Ex. E at 2 (T. 25).

18.     Plaintiff testified that, because of his neuropathy, he could not feel foot ulcers. Ex. E at 2 (T. 25).

19.     Plaintiff testified that his neuropathy caused him to lose feeling in his feet. The nerve pain from neuropathy that he experienced was separate from ulcers and Charcot foot. Ex. E at 2-4 (Transcript pages (T.) 25-27).

20.     Plaintiff had neuropathy, a degeneration of the nerves which causes numbness or weakness. He also had Charcot neuropathic osteoarthropathy, commonly referred to as Charcot foot. His level of Charcot foot included bone destruction, subluxation, and deformity. The hallmark deformity associated with Charcot foot is midfoot collapse, which he had. Ulcers are a known complication for a diabetic with Charcot foot. He had prior amputation of the left great toe, where

he had no Charcot foot. He was insensate in his feet. Ex. F at 19.

21.     Plaintiff's hemoglobin A1c at intake was 7.3, above high normal. Ex. A at 5.

22.     Hemoglobin A1c is a measure of average blood sugars over an approximately three-month time. Ex. F at 12 (T. 52).

23.     Hemoglobin A1c is a general standard for following diabetics from month-to-month and year-to-year to see whether the control is better, staying the same, or worse. Ex. A at 13 (T. 58).

24.     Plaintiff testified that his foot care instructions included handling his diabetes well and keeping his A1c running well. Ex. E at 4 (T. 24).

25.     Plaintiff testified that he has had a few ulcers on his right foot over the years, and that he had an orthotic for each foot – the left due to an amputated toe and the right due to Charcot foot. Ex. E at 5 (T. 28).

26.     Plaintiff submitted a Health Service Request Form (sick call request) on February 3, 2016, and described his problem as "Deformed Feet and toes due to Charcot joint. Also Diabetes". The sick call was triaged on February 5, 2016. Ex. A at 7.

27.     Plaintiff was seen by Ms. Kindall Smith, defendant herein, at a sick call encounter on February 5, 2016. He had a wound on his **left** foot. Her objective note stated:

> Upon resident taking his shoes off left sock noted to be covered in blood. Bilateral feet have deformities noted. Left foot has a open area about the size of a silver dollar with skin only attached by the corner. Resident has already had his left great toe removed 4 or 5 years ago from infection that went to the bone. Unit MD here skin was removed by MD. Area was cleaned with wound cleanser, TAO applied, and then covered with 2x2's and roll Kerlix. Resident will return to medical daily in the PM after showers to have dressing changed. Unit MD gave orders for ABT Clindamycin 300 mg QID x 14 days. Unit MD also instructed resident to notify his family of ordering him a pair of shoes to be sent in from the manufactory. Right foot assessed no open areas noted at this time.

The plan was antibiotics, Naprosyn, daily dressing changes, and a temporary elevator pass. The

verbal orders were noted to have been read back to the unit MD. Ex. A at 6.

28.     Dr. Lemdja was the MD who plaintiff saw regarding his left foot during the February 5 encounter with Ms. Smith. Ex. E at 7 (T. 45).

29.     When asked what steps medical took to get the orthotic shoes, Plaintiff testified, "I know that it seemed like they were trying, but nothing was really happening. . . as far as, you know, I could tell. Ex. E at 8 (T. 47).

30.     Plaintiff testified that he had an elevator pass from the time he saw Ms. Kindall Smith forward. Ex. E at 9 (T. 48).

31.     Plaintiff received daily treatment call for the wound on his left foot. Ex. A at 8, 9, 12, 13, 14.

32.     Plaintiff was seen by Dr. Lemdja for a physical exam on February 9, 2016. She noted an elevated hemoglobin A1c as well as a past medical history of diabetes, hypertension, obesity, peripheral neuropathy, and a diabetic foot ulcer. She also noted a prior toe amputation. Dr. Lemdja ordered lab work, the continuation of current therapy, and for the plaintiff to follow-up with the chronic care physician. Ex. A at 9.

33.     Dr. Lemdja's February 9 physical examination report indicates that plaintiff had a left foot ulcer with dressing and a clean wound with granulation tissue. Dr. Lemdja also noted that his right foot was deformed. Ex. A at 10.

34.     Dr. Lomax confirmed that Dr. Lemdja entered her plan on February 9 for plaintiff to follow up with chronic care, which occurred the following week. Ex. H at 4 (T. 31).

35.     Plaintiff wrote his mother a letter on February 8/9 asking her to send his shoes. Ex. M.

36.     The elevator pass was renewed on February 12, 2016. Ex. A at 13.

37.     On Friday, February 12, 2016, plaintiff submitted a request to the warden stating "Open wound on left foot and charcot joint on left foot causing bones to break down. Need special orthoics." The warden responded by redirecting the request to medical. Ex. J.

38.     On February 14, 2016, during treatment call, plaintiff showed the nurse a new blister that had formed on the bottom of his right foot that was measured at 1.5" x 2". It was noted to be soft and blood-filled with no drainage. A protective dressing was placed on the blister and a referral was made to the MD. Ex. A at 14.

39.     On Monday, February 15, 2016, Ms. Philson responded to the February 12 request for orthotics by instructing plaintiff to submit a sick call. Ex. J.

40.     Dr. Lomax saw plaintiff at chronic care clinic on February 16, 2016. Dr. Lomax noted that he had a pressure spot on the bottom of his right midfoot in the area of his Charcot joint. Dr. Lomax noted he had been prescribed custom insoles and shoes to offload his foot deformities to try to prevent recurrent ulcers as he had a history of prior ulcers. She noted he had not had his shoes and had developed blisters over the pressure points on its feet. She noted a very thorough exam including a description of his feet, diabetes with severe peripheral neuropathy, right foot Charcot deformity, left foot status post great toe amputation, with pressure blisters on both feet. She ordered various medications, foot soaks, medical restrictions to include no assignments requiring walking, standing, running, jumping, etc., a renewed elevator pass, and an authorization for him to have his own custom shoes. Dr. Lomax recorded that it was critical that plaintiff offload the pressure points of his feet. Ex. A at 15-17.

41.     Plaintiff called his family to request his orthotic shoes on February 16 or 17, 2016. Ex. D; Ex. E at 11 (T. 101).

42.     Plaintiff received his orthotic shoes around February 18 or 19, 2016. Ex. E at 11 (T.

43.     On February 24, 2016, plaintiff was issued a wheelchair and advised to keep his foot up as much as possible. Ex. A at 21.

44.     On March 10, 2016, Dr. Lomax noted that plaintiff had a cast put on his right lower leg and foot for wound care. Plaintiff reported that the side of the cast was cutting into his right little toe. Dr. Lomax noted a related problem was his diabetic neuropathy, that plaintiff was walking with "'post op" type of velcro strap shoes... and a fiberglass knee high cast on the right" and that the cast was putting pressure on his toe. She gave him a no duty restriction and instructed him to use the wheelchair to offload his foot completely. She also entered an urgent consultation for him to return to the clinic for cast removal. Ex. A at 22.

45.     On March 11, 2016, plaintiff was noted to be waiting for an elevator without his prescribed wheelchair, and when questioned about his lack of wheelchair, he complained it made his left shoulder sore. Ex. A at 23.

46.     Plaintiff was noted to have "walked into medical" at 9:40 PM on March 11 although he had already had his daily dressing change. Ex. A at 24.

47.     On March 12, 2016, plaintiff again reported to medical without his wheelchair. The nurses note stated as follows:

> Resident came to medical for treatment to the right toe. Resident walked up here and when asked where his wheelchair was Resident stated "It is making my left shoulder hurt to bad to use it. I only want to hurt in one place so I figured my foot was a good place to hurt. I am not going to use that wheelchair." Treatment done per protocol. Resident encouraged to use wheelchair per Dr. Lomax's orders.

Ex. A at 24.

48.     On March 13, 2016, plaintiff went to pill call without his wheelchair. The nurse noted

as follows:

> Resident came to pill window without his wheelchair. When asked why he stated that it hurts his shoulder, Nurse stated that the wheel chair was more important d/t the condition of his right foot and he stated he wasn't going to use his w/c.

Ex. A at 24.

49. Nurse Stoner recalled seeing plaintiff several times without his wheelchair. She remembers him shrugging his shoulders or telling her that his shoulder hurt, but she explained to him the importance of using the wheelchair, "and I would tell him would you rather lose your foot or have a little shoulder pain, you know. It was his decision." Ex. K at 2-3 (T. 15-16).

50. Ms. Stoner explained her documenting plaintiff's noncompliance with wheelchair use, with her explaining "that the wheelchair was more important due to the condition of his right foot and he stated he wasn't going to use his wheelchair." Ex. K at 4 (T. 29).

51. Ms. Stoner testified that if plaintiff had shoulder pain, it was his responsibility to submit a sick call if he needed treatment. She did not recall him ever submitting a sick call for shoulder pain. Ex. K at 3 (T. 16).

52. On March 14, 2016, at 5:04 a.m., plaintiff again was noted to be walking on his ulcerated and casted foot without his wheelchair:

> Resident here at pill window again with out his W/C. Resident states that it makes his shoulder hurt and he cannot tolerate pain in his shoulder and in his foot. I asked resident why had told this nurse he had "no feeling at all in his feet" and he replied "I don't have any feeling in my feet". Nurse then explained to resident that if he could not feel the cast on his foot, it would be in his best interest to use the wheelchair to prevent anymore damage/injury to his foot. Resident stated "you have a point", but still amb with out wheelchair.

Ex. A at 25.

53. Ms. Stoner testified about her March 14 note, reading the record:

> Nurse then explained to resident that if he could not feel the cast on his foot, it would be in his best interest to use the wheelchair to prevent any more damage/injury to his foot. Resident stated you have a point, but still ambulates without wheelchair."

Ms. Stoner explained that plaintiff seemed to have been agreeing with her. Ex. K at 5 (T. 30).

54. On March 14, 2016, the plaintiff had his cast removed. Despite the well-padded cast, he was noted to have skin loss at the base of the second toe as well. The wound clinic physician noted that his plantar ulcer under the cast "had improved just in the 5 days he had the cast on." He was instructed to stay in the wheelchair until he was told he could walk "for fear of further damage to his feet." Ex. A at 26-27.

55. Plaintiff wrote his sister on March 14, 2016, complaining that he hoped to get phone service before he "explode[s] on one of these cocksuckers. Nurses are logging me every time I'm not in the wheelchair." Ex. I.

56. At noon on March 16, 2016, plaintiff once again was recorded to be walking into medical without a wheelchair. After he him returned from wound care at 3:57 that afternoon, he was again instructed to remain off his feet as much as possible. Ex. A at 28.

57. On the evening of March 16, 2016, plaintiff was recorded as walking in the medical with no wheelchair. On March 22, 2016, commissary staff informed medical that plaintiff was using his wheelchair as a grocery cart for his bags of commissary:

> Katy from commissary contacted this nurse to report that resident went to pick up his commissary. Ms. Katy reported that resident picked up two bags of commissary, placed them in the w/c and pushed the w/c back up the ramp in front of the commissary window and got on the elevator to go back to his assigned floor.

Ex. A at 29, 29, 67-68.

58. Plaintiff only submitted three sick call requests between February 1, 2016, and March

16, 2016, and none complained of any issue with a shoulder. Ex. L; Ex. A at 7, 18, 20.

59.     Plaintiff did not disclose any shoulder issue at intake. Ex. A at 2.

60.     Dr. Lomax recalled having to counsel plaintiff to be compliant with offloading because he did not seem like he was trying his hardest to comply with offloading due to his reported refusal to use a wheelchair. Ex. H at 3 (T. 16).

61.     Compliance is important because, as Dr. Lomax explained, diabetics have a higher likelihood of slow progression of healing of an ulcer because high blood sugars and neuropathy can complicate it. Ex. H at 2 (T. 14).

62.     On May 11, 2016, plaintiff was admitted to UAMS on May 11, 2016 and discharged May 17, 2016, for inpatient wound care. Ex. A at 30-31.

63.     Plaintiff transferred to the ADC's Ouachita River Unit hospital on May 18, 2016. Ex. A at 32-33.

64.     Plaintiff continued to receive weekly wound care at UAMS. Ex. A at 34-42.

65.     On June 16, 2016, plaintiff's hemoglobin A1c was 6.8, above high normal. Ex. A at 30.

66.     Plaintiff was received inpatient care at UAMS July 29-August 5, 2016. Ex. A at 43-45.

67.     Plaintiff was released to go home on August 10, 2016. Ex. A at 46-48.

68.     Plaintiff continued to receive regular wound care after his release from the ADC. Ex. A at 49-63.

69.     Plaintiff was noted to have a slowly healing diabetic ulcer, improving with casting, on September 7, 2016. Ex. A at 49

70.     Plaintiff was noted to have developed a new ulceration on his left foot on September

19, 2016, while wearing a diabetic shoe. Ex. A at 50.

71.     Plaintiff went to UAMS on September 28, 2016, for a one-week follow-up on his diabetic ulcers. Dr. Ruth Thomas noted the week prior that plaintiff elected to try no cast and be non-weightbearing; however, Dr. Thomas noted "Despite this plan he arrived today in SHOES both feet." Ex. A at 51 (emphasis in original).

72.     On October 5, 2016, a UAMS physician noted that they had placed a cast on the left "since he had been noncompliant with non-weight-bearing status at previous visit." The doctor also noted that she encouraged him to continue with non-weightbearing on the right side "as it was not as severe as the left." Ex. A at 52.

73.     After plaintiff decided to transfer his wound care to Fort Smith, he began going to Mercy Wound Clinic and River Valley Clinic. The Mercy Wound Clinic did lab work and its records from February 12-13, 2017, reveal that his hemoglobin A1c was "significantly higher" 12.8. It was also noted that he reported having used crutches to help offloading, but was no longer using them. Ex. A at 53-55.

74.     The provider at nursing wound clinic noted that plaintiff was not checking his blood sugars and that he was to have a follow-up with his Primary Care Provider (PCP) on February 17, 2017. Ex. A at 55.

75.     Plaintiff saw his PCP doctor at River Valley on February 17, 2017. The provider noted that the results from his hemoglobin A1c lab work taken in-house was 6.8 in August 2016; however, the results from his A1c lab work taken at the wound clinic the week prior was 12.8. The provider noted this was "a dramatic increase." Ex. A at 56-57.

76.     On February 17, 2017, the River Valley PCP again performed in-house lab work to measure plaintiff's hemoglobin A1c. The lab value that day was 13.0 and PCP Dr. Kelli Rippy noted

that his A1c was "way above goal, confirms that his sugars are not running normal. He may even need insulin." She recommended that he begin logging his blood sugars each morning before breakfast and after supper. Ex. A at 56-57.

77.     On March 2, 2017, plaintiff was informed at wound care clinic that offloading was a must and the walking boot was recommended; however, plaintiff refused. Ex. A at 59.

78.     On March 5, 2017, plaintiff was advised at wound care clinic to keep off his foot more, and crutches were recommended, but he again refused. Ex. A at 60.

79.     On May 19, 2017, plaintiff was again counseled at wound care clinic to stay off his foot is much as possible, but he was noted to again refuse crutches. Ex. A at 61.

80.     On May 26, 2017, plaintiff's wound care clinic provider noted that his healing was "complicated by hyperglycemia, wound drainage, and Charcot deformity. . . . He was instructed to stay off the foot as much as he can, however, this is an area of noncompliance." Ex. A at 62.

81.     On June 21, 2017, plaintiff underwent a bone biopsy and, after the procedure, noticed worsening swelling and increasing an erythema. He reported to the emergency room on June 18 for an infection. He was admitted for IV treatment and was discharged June 21. Ex. A is 63.

82.     Plaintiff went to UAMS to see Dr. Thomas on June 27, 2017. Dr. Thomas noted plaintiff's subjective history that he received a bone biopsy directly through the present ulcer, but that it did not show osteomyelitis. This biopsy "was followed by a huge infection". It was also reported that another doctor stated that he could reconstruct the foot and eliminate the deformity and prevent re-ulceration. Dr. Thomas noted that pictures "show a very significant infection of the foot." At that time, plaintiff agreed to proceed with a below the knee amputation. Ex. A at 64.

83.     Plaintiff underwent a right below the knee amputation on July 31, 2017. He was discharged home in good condition on August 4, 2017. Ex. A at 66.

### PLAINTIFF'S EXPERT OPINION AS TO MS. SMITH

84.     Plaintiff proffered Dr. William Wright as a correctional and medical expert. Ex. B at 16-22.

85.     Dr. Wright did not identify Ms. Smith in his expert report, nor did he opine in his report that she specifically did anything wrong. Ex. B at 16-22.

86.     Dr. Wright discussed Ms. Smith's February 5, 2016, encounter with plaintiff during his deposition. His issue was Dr. Lemdja's failure to note her contact with plaintiff regarding her snipping dead skin off of a left foot blister; however, although it is not a complaint allegation (and he did not purport to be a nursing expert), Dr. Wright opined that Ms. Smith acted properly on February 5, 2016. Ex. B at 8 (T. 62).

### PLAINTIFF'S EXPERT OPINION AS TO MS. PHILSON

87.     Dr. Wright did not identify Ms. Philson in his report, nor did he opine in his report that she specifically did anything wrong. Ex. B at 16-22.

88.     Dr. Wright recognized that it was not Ms. Philson's fault that she was not notified until late that there was a problem with plaintiff's foot. Ex. B at 9 (T. 63).

### PLAINTIFF'S EXPERT OPINION AS TO CORRECT CARE SOLUTIONS

89.     Dr. Wright did not identify CCS in his report, nor did he opine in his report that CCS specifically did anything wrong. Ex. B at 16-22.

90.     Dr. Wright testified that he had no opinion that the company did anything wrong. Ex. B at 10 (T. 68).

91.     Dr. Wright testified that he was not asked to evaluate the conduct of CCS. Ex. B at 10 (T. 68).

92.     Plaintiff's only complaint allegation against Dr. Lemdja is that on February 16, 2016, when she saw him for wound care, she did not document and stage his wounds, nor did she do anything to ensure he received his orthotic shoes. She was broadly included in both the deliberate indifference and negligence causes of action. Doc. 42 at ¶¶ 20, 36-44.

93.     Dr. Wright produced a report which outlined a time line of events from February 1, 2016, when plaintiff went through intake, to February 19, 2016, when it is estimated plaintiff received his orthotic shoes from home. Ex. B at 18-20.

94.     In his report, Dr. Wright expressed concern over a February 5, 2016, nursing note. Dr. Wright summarized that a nurse noted a left foot ulcer, but no ulcer on the right; that antibiotics were started; and that the patient was instructed to call his family for orthotic shoes. His issue was the fact that Dr. Lemdja removed some dead skin from the left foot on that date, but she did not record her own note about the event. Ex. B at 18-19.

95.     The only opinion Dr. Wright expressed in his expert report is that "Dr. Lemdja should have appreciated the need for his orthotics on 2/5/18 (sic) and should have documented the need in the medical record." He stated that she should have charted it separately for medical continuity of care. Ex. B at 21.

96.     There is no complaint allegation regarding any medical encounter on February 5, regarding anything to do with Dr. Lemdja's care of his left foot, or of Dr. Lemdja failing to chart her debridement (snipping a piece of hanging dead skin) of his left foot on that date. Doc. 42; Ex. A at 6; Ex. G at 2 (T. 29).

97.     Dr. Wright testified that the February 5 nurses note that recorded the unit MD, Dr. Lemdja, instructing the inmate to call his family about the orthotic shoes was her "okay" for him to

have orthotic shoes sent to the unit. Ex. B at 5-7 (T. 27, 30-31); Ex. G at 3 (T. 30).

98.     Dr. Wright stated in his report that an intake history and physical was performed (by Dr. Lemdja on February 9) when "the Charcot deformity was noted and he was authorized to have his own custom shoes and inserts." Ex. B at 19.

99.     Dr. Wright stated in his report that "there was delay by the medical staff in the evaluation of plaintiff's foot problems until 2/9/16 and after that another 10 days until his orthotics were received." He did not attribute that delay to Dr. Lemdja. Ex. B at 21.

100.    Dr. Wright did not opine in his report that Dr. Lemdja specifically violated any particular standard of care. Ex. B at 16-22.

101.    The expert disclosure deadline in this case was March 26, 2019. Doc. 63.

102.    On June 7, 2019, Dr. Wright, after the conclusion of his initial testimony and while being questioned by plaintiff's counsel, testified to a new, previously undisclosed opinion during his deposition that was not expressed in his written report – that Dr. Lemdja's *failure to offload* plaintiff's foot during her physical exam of him on February 9 was a violation of the standard of care. Ex. B at 11-12 (T. 75-76).

103.    Dr. Wright testified that plaintiff developed sores on his right foot thereafter, and that while "you certainly can't predict that something is or isn't going to happen medically" not offloading the foot tips the scales toward him developing an ulcer. Ex. B at 13-14 (T. 77-78).

104.    Because this previously unknown opinion was not in Dr. Wright's disclosed report, defendants were prohibited from consulting with their disclosed experts on this new opinion or consulting with/retaining a rebuttal expert prior to the rebuttal disclosure deadline. Doc. 63.

105.    Dr. Stieve agreed that although Dr. Lemdja informed plaintiff to have his family send his orthotic shoes in, standard of care would have been that she should have offloaded the foot on

February 9 when she performed her health and physical. Ex. F at 4-8 (T. 23, 26-30).

106.     Dr. Stieve opined that there was no evidence of deliberate indifference, however, because Dr. Lemdja only looked at plaintiff's left foot on February 5, properly gave verbal orders for treatment, informed him to call his family for the shoes, and properly referred him to Chronic Care on February 9, which ensured he would see another doctor soon for his chronic conditions. Ex. F at 2, 8-11 (T. 21, 30, 32, 41, 43).

## CAUSATION

107.     Plaintiff retained Dr. Shawn Smith, a Physical Medicine and Rehabilitation physician, as a causation expert in this case. In his practice, Dr. Smith testified that he sees "maybe a couple" of patients a year with Charcot foot, "perhaps after treatment for ulcers or amputations." Ex. C at Ex. C at 30-31; Ex. C at 2-3 (T. 8-9)

108.     Dr. Smith presented a 1.5 page summary report. The substance of the report and opinion is contained on the second page in one paragraph, although the initial four sentences broadly misstate the actual facts of the case.[3] Ex. C at 30-31.

109.     Dr. Smith opined in his report as follows:

> Despite appropriate wound care and studies confirming good circulation, the pressure ulcers (sic) on the right foot that developed due to lack of appropriate support and protection with prescription orthotics and shoe wear never healed and was the proximate cause for his subsequent below the knee amputation on 7/31/17. Had Mr. Shipp been provided use of his prescription shoes, it is my opinion that he would not have developed blisters that ultimately led to the loss of his right leg to amputation.

---

[3] Plaintiff did not turn himself in to SWACCC; he turned himself into Crawford County, where his orthotics were taken from him. Crawford County transported plaintiff to SWACCC without his orthotic shoes. Plaintiff did not request to *continue* use of them, he asked for them to be obtained so he could wear them. Finally, his request *was* honored as Dr. Lemdja instructed him February 5 to contact his family, he wrote his mother on February 9 asking her to send the shoes, and he called his family on February 16/17. His shoes were then FedEx'd and he received them February 18 or 19. See Ex. A at 1, 6; Ex. M; Ex. D; Ex. E at 10-11 (T. 74, 101);

Ex. C at 31.

110. When Dr. Smith was asked whether he had sufficient records to form opinions, and whether he needed any additional records with regard to those opinions, he testified as follows:

3       Q   Have you done all the work that you think
4   has been necessary to form your opinions today?
5       A   Yes.
6       Q   All right.  Did you ask for any additional
7   medical records or information on Mr. Shipp in order
8   to be able to render your opinions?
9       A   I did not.
10      Q   Were you told you would get some additional
11  records?
12      A   No, I was told if I needed anything, they'd
13  try to get it, but I was not told there are additional
14  records forthcoming.
15      Q   All right.  And does this letter represent
16  your full report to date?
17      A   This represents my full documented report
18  today.
19      Q   Okay.  And do you know -- and -- the foot
20  that we're talking about today?
21      A   The right foot.

Ex. C at 4 (T. 19).

111. Dr. Smith testified that outside factors which may have contributed to plaintiff's ulcer not healing included diabetes and Charcot foot. Ex. C at 5-6 (T. 22-23).

112. Dr. Smith testified that despite a defense expert citing to records about the plaintiff repeatedly not using his wheelchair (March 11, 12, 13, 14, 15, 16, 22), "I looked through thousands

of pages to try to find those specific instances and I couldn't find those in there, so…". Ex. C at 6-7 (T. 23-24).

113.    Dr. Smith testified that he did see were plaintiff was instructed to stay in his wheelchair to offload his foot completely on March 10. Ex. C at 7 (T. 24); Ex. A at 22.

114.    The wheelchair medical records that Dr. Smith testified he "couldn't find" were in consecutive SWACCC medical records immediately following the March 10 record where plaintiff was instructed to stay in his wheelchair to offload his foot completely. Ex. A at 22-29.

115.    Importantly, Dr. Smith admitted that a patient who had the ability to offload and not weightbear, but who **did not** do that, would "**definitely have an effect on healing.**" Ex. C at 8-9 (T. 25-26)

116.    Specifically, Dr. Smith testified as follows:

20 **Q** Okay. So if a -- if a patient that was

21 recently diagnosed with diabetic foot ulcers is not

22 following instructions to be non-weightbearing, does

23 that have any bearing on whether the ulcer heals?

24 **A** Well, **I think if a patient has the**

25 **opportunity to offload and not weightbear and have**

1 **full control of their abilities and they didn't do it,**

2 **that would definitely have an affect on healing.**

3 **Q** Okay.

4 **A** Last time I checked, **you know, most people**

5 **who were incarcerated aren't in there because they**

6 **follow the rules or because they follow through with**

Ex. C at 8-9 (T. 25-26) (emphasis added).

117.    Dr. Smith testified that a patient has a responsibility to assist with his care. Ex. C at 8 (T. 29).

118.    Dr. Smith admitted that he could not state whether or not the new foot ulcer would have healed if the cast placed on plaintiff in March 2016 had remained on. Ex. C at 23 (T. 53).

119.    Dr. Smith reviewed UAMS physician Dr. Thomas' note from September 2016 when she recorded that plaintiff was supposed to be non-weightbearing, but he showed up at his appointment wearing shoes on both feet, with her capitalizing "SHOES". He admitted plaintiff was noncompliant that day. Ex. C at 12, 14, 15 (T. 32, 37, 38).

120.    Dr. Smith admitted that there was no way to know whether plaintiff was compliant with medical instructions when he was at home and not physically in the medical setting. Dr. Smith does not know what plaintiff did any other day. Ex. C at 12, 14, 45 (T. 32, 37, 38).

121.    Dr. Smith does not know how plaintiff personally cared for his foot when he was outside of medical a medical setting from August 2016 through July 2017. Ex. C at 24 (T. 54).

122.    Dr. Smith testified that, after plaintiff went home, he did not know whether plaintiff was asked to use a wheelchair at home or whether he was offered crutches. Dr. Smith testified, "I don't really know what orders they gave him to do." Ex. C at 14 (T. 37).

123.    Dr. Smith admitted that plaintiff's A1c level at release was 6.8, and that his A1c level was recorded to be 13 six months later when he had been on his own. Ex. C at 16 (T. 39).

124.    Dr. Smith testified that he did not see blood sugars so he could not correlate an A1c of 13. He testified that River Valley had been checking plaintiff's blood sugars, but he did not recall a notation that plaintiff was not paying attention to his blood sugars. Ex. C at 17 (T. 40).

125. Dr. Smith testified that plaintiff's hemoglobin A1c and his blood sugars were pretty good while he was incarcerated; however, Dr. Smith saw at least two times where records said plaintiff was not checking his blood sugars post-incarceration. Ex. C at 17-18 (T. 40-41).

126. When asked whether plaintiff's A1c of 12.8 or 13 would negatively affect the healing of his diabetic foot ulcers, Dr. Smith did not simply answer the question, but rather decided to deny the accuracy of those two lab value numbers. He testified as follows:

16 **Q** Okay. Well, if a person's not checking his

17 blood sugars and he's trying to heal, does that affect

18 diabetic foot ulcers?

19 **A** If his sugars are good, no.

20 **Q** But what if his A1c is 13 or 12.8?

21 **A** Well, that's what I'm -- that's what I'm

22 saying. If his sugars -- if his hemoglobin A1c was

23 really that high then we would have seen sugars all

24 through that course of care in the 300-plus range and

25 he would have been in the hospital with that kind of

[42]

1 blood sugar.

2 **Q** Okay. Well --

3 **A** And I didn't see anything in there because I

4 specifically went back to look after Dr. Peeples

5 mentioned that **because obviously that would affect**

6 **things if -- if your blood was 380 all the time**, but I

7 couldn't find anything in there to correlate with that

8 number.

9 **Q** Okay. Did you --

10 **A** So **I don't know if that's a real number** or

11 not.

12 **Q Did you find one where it was 12.8**?

13 **A** The hemoglobin A1c --

14 **Q** Yes, sir.

15 **A** -- is that what you're saying?

16 **Q** Yes, sir.

17 **A Yeah**, but I didn't see any sugars to

18 correlate with that, and without a blood sugar to

19 correlate with that, **you don't know if that's his**

20 **hemoglobin A1c or somebody else's**.

21 **Q** The record says it's his; is that correct?

22 **A The record documents that number**, but they

23 don't document anything else that correlates with

24 that, so --

25 **Q** Okay.

[43]

1 **A** -- in my experience in documentation

2 records, if I'm going to believe that number, I'm

3 going to want to see the data that goes along with

4 that, and I just didn't see it, so I...

5 **Q** Did you --

6 **A** From my experience, I would say that that's

7 not necessarily his hemoglobin A1c.

8 **Q** Did you see a record from January that

9 showed an A1c of 12.8?

10 **A** There was one in January, yes.

11 **Q** Okay. So we have January that says 12.8 and

12 we have **February that says 13**, **so are you saying they**

13 **made two mistakes**?

14 **A** I'm just saying I don't have any blood

15 sugars to go along with that, and without a blood

16 sugar to go along with that and otherwise

17 documentation of being compliant with his wound care,

18 it's **hard for me to say that that pushed him over the**

19 **edge one way or the other**.

20 **Q** So **would you want more records**, then, so you

21 can figure out if he was -- what his blood sugars were

22 if he was compliant?

23 **A I don't think there are any more records**,

24 otherwise I would have probably seen them by now,

25 so...

[44]

1 **Q** You don't think there are any more?

2 **A** Do you have any records that you want to

3 show me that tells me one way or the other about that?

4 **Q** Well, **I was curious if you've asked for any**

5 **other records because, you know, you're giving your**

6 **opinions**, so I just want to know if that rang a bell

7 for you that **maybe you needed to verify that there**

8 **weren't any more others** --

9 **A** I looked through all the records I had to

10 try to verify that number as being accurate, and I

11 don't have anything in the records to support that,

12 so --

13 **Q** Okay.

14 **A** -- **right now I don't have any data to**

15 **support those numbers**.

16 **Q** Okay. **And you don't have any evidence that**

17 **they're wrong**?

18 **A I do not**.

19 **Q** Okay. **If that is, in fact, correct, is**

20 that -- **would that reflect a compliant patient**?

21 **A** With regards to diabetes? **No**.

Ex. C at 18-21 (T. 41-44) (emphasis added).

127.    Dr. Smith twice testified that **if plaintiff's A1c was 12.8 or 13, he should have been**

**hospitalized**. Ex. C at 16, 18 (T. 39, 41).

128.  Dr. Smith admitted that having high blood sugars will negatively affect the ability of an ulcer to heal. Ex. C at 22 (T. 46).

129.  Dr. Smith admitted that a patient's noncompliance could contribute to a non-healing ulcer. Ex. C at 26 (T. 58).

130.  When questioned about his assertion that plaintiff would not have developed blisters which led to his amputation if he had been given his prescription shoes, Dr. Smith admitted that he actually does not know what would have happened during that time period. He admitted that anything could have happened. Ex. C at 26-28 (T. 58-60).

131.  Dr. Stieve testified that he saw much evidence that offloading was provided, but plaintiff demonstrated noncompliance with his cast and wheelchair, when the cast was actually resulting in great improvement. Ex. F at 41.

132.  Dr. Stieve testified that plaintiff never requested offloading, that he was noncompliant when offloading was provided, and that there is no evidence that offering offloading would have changed anything in the three-week period that plaintiff did not have his orthotic shoes. Ex. F. at 41.

Respectfully submitted,

*Michelle B. Odum*

Michelle Banks Odum, #94135
HUMPHRIES, ODUM & EUBANKS
Attorneys for Medical Defendants
1901 Broadway Street
Little Rock, AR 72206
Telephone: (501) 420-1776
Email: michelle@humphrieslaw.net

## CERTIFICATE OF SERVICE

I, Michelle Banks Odum, hereby certify that on February 10, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification to anyone registered in this case to receive such filings, including counsel of record.

*Michelle B. Odum*

Michelle Banks Odum