Page 1

UNITED STATES DISTRICT COURT
for the
Western District of Arkansas

Civil Action No. 4:18-CV-04017 SOH

─────────────────────────────────────────────

DEPOSITION OF:  WILLIAM WRIGHT, M.D. - June 7, 2019

─────────────────────────────────────────────

CRAIG SHIPP,

Plaintiff,

v.

CORRECT CARE SOLUTIONS, LLC; DR.
LORENE LOMAX, DR. MIMO LEMDJA, et al.,

Defendants.

─────────────────────────────────────────────


        PURSUANT TO NOTICE AND AGREEMENT, the

deposition of William Wright, M.D. was taken on behalf

of the Defendants at 101 North Cascade Avenue, Suite

400, Colorado Springs, Colorado, 80903, on

June 7, 2019, at 9:56 a.m., before Sundae A. Stoa,

Registered Professional Reporter, Federal Certified

Realtime Reporter, and Notary Public within Colorado.



Craig Shipp                                    WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                      June 7, 2019

Page 13

 1     Q.   You said you had given some expert reports
 2   orally, some written?
 3     A.   Oh.
 4     Q.   Is that correct?
 5     A.   When an attorney contacts me and outlines the
 6   case, they frequently will say, Well, I just want an
 7   oral report.
 8     Q.   Okay.
 9     A.   And sometimes they will say, Well, I want an
10   oral report and then a written report to follow it.
11     Q.   Okay.
12     A.   So I've done both.
13     Q.   Okay.  And then today is the first time
14   you've testified?
15     A.   Yes.
16     Q.   Okay.  Now, were all of those cases related
17   to standard of care?
18     A.   Deliberate indifference or wrongful death is
19   probably the most common.
20     Q.   Okay.  Oh, with any of those cases -- maybe a
21   dozen cases where you were named as a party, did you
22   prevail?
23     A.   Yes.
24     Q.   Okay.  Now, if we can -- now, I would like to
25   just go over your report.

1           MS. ODUM:  We'll mark that as Exhibit 2.

2           (Deposition Exhibit 2 was marked.)

3       Q.   (BY MS. ODUM)  And you can use your notes for

4   some of my questions, as well, since you don't have the

5   records to look at --

6       A.   Okay.

7       Q.   -- just because I was want to go over -- I

8   want to go over your assessment of the records as you

9   were reviewing them and what your thought processes

10  were.

11      A.   Yes, ma'am.

12      Q.   All right.  I guess, before we get started,

13  just some preliminaries about your report:  Are you

14  prepared to give your final opinions today?

15      A.   Yes.

16      Q.   All right.  And are they to a reasonable

17  degree of medical certainty?

18      A.   Yes, ma'am.

19      Q.   All right.  And have you gone over all of the

20  records necessary to be able to render your opinion?

21      A.   Yes, ma'am.

22      Q.   Okay.  Have you been told you're -- you're to

23  expect any additional records?

24      A.   No.

25      Q.   Have you asked for any additional records?

```
 1      A.   No.
 2      Q.   All right.  And this document represents your
 3 full report?
 4      A.   Yes, ma'am.
 5      Q.   Okay.  And prior to your deposition, did you
 6 discuss your report with Mr. Franseen?
 7      A.   Yes.
 8      Q.   Did he help you prepare for this?
 9      A.   No.
10      Q.   Okay.  Did you look at your records to, kind
11 of, refresh your memory before you came today?
12      A.   Yes, ma'am.
13      Q.   Okay.  Do you need those records to be able
14 to testify?
15      A.   I don't have the raw data -- the chart
16 records in front of me; I have my notes about the chart
17 records.
18      Q.   Okay.  Well, I'll try to -- some of my
19 records have notes, but I was wanting you to have those
20 today so you could flip through if you needed.
21           All right.  Have you been compensated for
22 your work as an expert witness?
23      A.   Yes, ma'am.
24      Q.   Do you know how much -- excluding today's
25 deposition, how much you've been compensated?
```

1   **February 5th, that's not a small note, is it?**

2       A.    I'm sorry.  The small note?

3       **Q.    Well, you said nurses may not document it?**

4       A.    Oh, they can certainly document it, but they

5   may not be correct.

6       **Q.    Okay.  All right.**

7       A.    They weren't the ones doing the procedure.

8       **Q.    But snipping the skin is not a serious**

9   **debridement as she described it?**

10      A.    As she described it?  No.

11      **Q.    Okay.  And if Mr. Shipp described it a**

12  **similar way --**

13      A.    Yes.

14      **Q.    -- it wouldn't be?  Okay.**

15            Now, looking at Ms. Smith's note, the last

16  **three sentences:  Unit M.D. gave order for ABT**

17  **Clindamycin -- that sentence?**

18      A.    Uh-huh.

19      **Q.    Okay.  So she ordered antibiotics?**

20      A.    Well, the nurse would not order it.

21      **Q.    Well, it says "M.D. gave order"?**

22      A.    Yeah, right.

23      **Q.    Okay.  Unit M.D. also instructed resident to**

24  **notify his family of ordering him a pair of shoes to be**

25  **sent to the -- I can't read it.**

1    pair of orthotics from the manufacturer.

2         Q.   **Right, but the unit M.D. instructed the**

3    **resident to contact his family for that?**

4              **Is that what the note says?**

5         A.   Yes, that's what it says there.

6         Q.   **Okay.  All right.  And the next part of your**

7    **report, on February 9th, you discuss the health and**

8    **physical?**

9              **It's on Page 4 of your report.**

10        A.   Okay, yeah.

11        Q.   **It says:  The Charcot deformity was noted and**

12   **he was authorized to have his own custom shoes and**

13   **inserts.**

14             **Again, do you remember where you read that?**

15        A.   Again, that was in the -- what I would assume

16   was a nursing intake physical --

17        Q.   **Okay.**

18        A.   -- a screening physical that they did.

19        Q.   **All right.**

20        A.   The nurses, of course, couldn't authorize

21   durable medical equipment.

22        Q.   **You said nurses can't authorize?**

23        A.   Yeah.

24        Q.   **Right.**

25             **Now, if Dr. Lemdja told him to call his**

1    family to get shoes from the manufacturer, would that

2    indicate that she is saying that it's fine for him

3    to -- good for him to get his shoes -- orthotics?

4              MR. FRANSEEN:  Object to form.

5         Q.   (BY MS. ODUM)  You're giving expert opinion

6    and you're using suppositions from the note in your

7    opinion.

8              Did her note okay him having orthotic shoes

9    sent to the unit?

10        A.   Yes.

11        Q.   Okay.  And then a new ulcer had developed on

12   the right foot at this time?

13        A.   Yes.

14        Q.   Okay.  And that's the first time we've had an

15   issue with his right foot; is that correct?

16        A.   That's right.

17        Q.   All right.  So when he saw Dr. Lemdja the two

18   prior times, there was not an issue with an ulcer on

19   his right foot?

20        A.   No ulcer.

21        Q.   Right.

22             She didn't even look at his right foot, did

23   she, other than to note a deformity on the --

24        A.   Made a note that there was an ulcer on it.

25        Q.   Right, okay.

```
 1    get the M.D. to walk over to the patient; is that

 2    correct?

 3         A.   Let me see what she did there.

 4         Q.   This is the day that the unit M.D. came over

 5    and snipped the skin.

 6         A.   Yeah.

 7         Q.   And the unit M.D. gave orders for left foot

 8    care -- foot care of the left foot.

 9              And the unit M.D. advised to notify his

10    family; it doesn't say call.

11         A.   Well --

12         Q.   So what did the nurse do wrong that day when

13    she gets the doctor to come over?

14         A.   No.  Once she's brought this to the attention

15    of the M.D., then that would be sufficient.

16         Q.   Okay.  So Nurse Smith acted properly on

17    February 5th in your opinion?

18         A.   Yes.  Yes, ma'am.

19         Q.   Okay.  Now, what about at intake that

20    Ms. Brown -- when he told her that my shoes didn't come

21    with me, should Ms. Brown have done something else?

22         A.   Can I see the note for that?

23         Q.   Sure.

24              You know, strike that.  She's not a party, I

25    won't even worry about it.
```

1        A.    Okay.

2        Q.    All right.  I'm trying to think -- let's see.

3              What about Ms. Lomax -- sorry, not Lomax.

4              Philson -- Ms. Philson used to be Ms. Turner;

5    she is the Health Services Administrator?

6        A.    Yes, ma'am.

7        Q.    She didn't treat him medically, so there

8    wouldn't be a standard of care complaint against her;

9    is that right?

10       A.    The standard of care was that she was not

11   notified until late that there was a problem.

12       Q.    Okay.  Now, that's not her fault that someone

13   didn't notify me; is that correct?

14       A.    That's correct.

15       Q.    Okay.  Now, on February 5th they noted that

16   they put the dressing on it and then wrapped it.

17             And I think one of the nurses -- someone

18   testified that padding was what they could do at the

19   time that would help -- maybe it was Dr. Lomax --

20   padding helps with offloading?

21       A.    I don't believe that Dr. Lomax saw him at

22   that time.

23       Q.    No.  No, it was just a question asked about

24   the padding they put on the foot.

25       A.    Yeah.

1    Q.   Right, but he said he wrote a letter to his

2    family requesting shoes?

3    A.   Okay.

4    Q.   And so, would that be something that she

5    could rely on that he stated that he did that -- or,

6    anyone in medical, I guess?

7    A.   Well, that he had written a letter?  I

8    suppose you have to take his word for it.

9    Q.   Okay.  All right.  Back to that question I

10   was asking you earlier -- well, no.

11          What do you find that Correct Care

12   Solutions -- they are the company that contracts to

13   provide the medical care -- in your opinion, what did

14   the company, you know, what did they do wrong?

15   A.   From a corporate standpoint, I don't know.

16   Q.   Or, were they -- were you asked to even

17   evaluate?

18   A.   No.

19   Q.   Okay.

20          MS. ODUM:  That's all I have.

21          MR. FRANSEEN:  Rosalyn?

22          MS. ODUM:  Rosalyn, do you have --

23          MS. MIDDLETON:  Yeah, this is Rosalyn.

24          Michelle, you asked pretty much what I wanted

25   to know, but I just have a couple of follow-ups.

Page 75

1    case, to keep the weight off that foot.

2         Q.   **And by failing to offload the foot, was that**

3    **a violation of the standard of care for Dr. Lemdja?**

4         A.   Yes.

5         Q.   **Did Dr. Lemdja notify the H.S.A.?**

6         A.   No.

7         Q.   **In fact, did Dr. Lemdja refuse to document**

8    **her encounter due to the liability according to an**

9    **email?**

10        A.   That's correct.

11        Q.   **C.C.S. should have trained their employees**

12   **when a medical device is needed for an inmate to notify**

13   **the H.S.A. or warden?**

14        A.   The proper procedure would be to notify the

15   physician or nurse practitioner at first, and not just

16   the nurses.  And they would take the issue to the

17   H.S.A. right away.

18        Q.   **And that didn't occur in this instance, did**

19   **it?**

20        A.   No.

21        Q.   **Same question on the 9th for Dr. Lemdja:  Did**

22   **she notify the H.S.A.?**

23        A.   No.

24        Q.   **Did she provide any sufficient offloading for**

25   **Mr. Shipp?**

Craig Shipp                                    WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                June 7, 2019

Page 76

1      A.   No.

2      Q.   **The warden testified that he received phone**

3   **calls from Mr. Shipp's family.**

4           **Did he provide any testimony that he told the**

5   **family, Here is the H.S.A. person you need to call,**

6   **this is their name, this is their number?**

7      A.   No.

8      Q.   **Would that have been the appropriate step for**

9   **him if that's what he believed needed to occur on that**

10  **date?**

11     A.   I believe that would be the appropriate

12  thing, yes.

13     Q.   **Same question for when Mr. Shipp wrote him on**

14  **the 1st about the need for his orthotics:  Should he**

15  **have notified the H.S.A. about getting this approved?**

16     A.   Yes.

17     Q.   **Was there anything preventing the warden or**

18  **the H.S.A. from contacting a doctor and asking them**

19  **directly on the 1st, when they knew about this need,**

20  **should this be approved or not?**

21          MS. ODUM:  Object to form.

22     A.   That would typically be a function of the

23  H.S.A.  The H.S.A. has the job of administrating the

24  medical clinic.

25          The warden is involved with administering the

Craig Shipp                                    WILLIAM WRIGHT, M.D.
Correct Care Solutions, LLC, et al.                  June 7, 2019

                                                      Page 77

1    entire prison or jail, so the warden could certainly

2    pass it along, but it's really not his job to do that.

3    If he's concerned about something maybe being neglected

4    in his facility, he would certainly notify the H.S.A.

5    right away.

6         Q.   (BY MR. FRANSEEN)  If a request comes to him

7    about a medical device, is it his duty to notify the

8    H.S.A.?

9         A.   Yes.

10        Q.   On the 12th, there was a note that says:

11   Feet were getting worse while he awaits for all the

12   necessary paperwork to be cleared?

13        A.   Yes.

14        Q.   Is that the paperwork that Dr. Lomax was the

15   first person to initiate on the 16th?

16        A.   That's correct.

17        Q.   And that is fifteen days after Mr. Shipp gets

18   into the facility and notifies both medical and the

19   warden that he does not have his orthotics?

20        A.   Yes.

21        Q.   During that time period, he not only develops

22   sores on his left foot, which was evaluated on the 5th,

23   but also develops sores on his right foot?

24        A.   Yes, he had at that time.

25        Q.   Is it your opinion that had the facility

1   **either properly offloaded his foot -- feet on the 1st,**
2   **or provided the appropriate documentation that they**
3   **required on the 1st, that these sores would not have**
4   **formed?**
5       A.   You certainly can't predict that something is
6   or isn't going to happen medically, but by not doing
7   it, you're pretty much tipping the scales towards him
8   developing an ulcer in a deformed foot and the
9   complications that go along with that.
10      Q.   **Within a degree of medical certainty, is that**
11  **what happened in this case?**
12      A.   Yes.
13           MR. FRANSEEN:  I'll pass the witness.
14           MS. ODUM:  Do you have any follow-up?
15           MS. MIDDLETON:  Yeah, I do.
16           MS. ODUM:  Okay.
17                        EXAMINATION
18  BY MS. MIDDLETON:
19      Q.   **I heard you say on the 1st that the warden**
20  **should -- when he received the request from Mr. Shipp**
21  **that he should have sent it to the H.S.A.**
22           **Is that correct?**
23      A.   On the 1st?  Let me see.
24           Well, I don't know if I have it in here --
25  the intake note.

```
 1                   REPORTER'S CERTIFICATE
 2    STATE OF COLORADO       )
                              )     ss.
 3    COUNTY OF EL PASO       )
 4              I, SUNDAE A. STOA, Registered Professional
 5    Reporter, Federal Certified Realtime Reporter, and
 6    Notary Public, State of Colorado, do hereby certify
 7    that previous to the commencement of the examination,
 8    the said WILLIAM WRIGHT, M.D. was duly sworn by me to
 9    testify to the truth in relation to the matters in
10    controversy between the parties hereto; that the said
11    deposition was taken in machine shorthand by me at the
12    time and place aforesaid and was thereafter reduced to
13    typewritten form, consisting of 84 pages herein; that
14    the foregoing is a true transcript of the questions
15    asked, testimony given, and proceedings had.
16              I further certify that I am not employed by,
17    related to, nor of counsel for any of the parties
18    herein, nor otherwise interested in the outcome of this
19    litigation.
20              IN WITNESS WHEREOF, I have affixed my
21    signature and seal this 14th day of June, 2019.
22              My commission expires January 11, 2022.
23
24              Sundae A. Stoa, RPR, FCRR
                Commission No. 20024000470
25
```

# Joseph William Wright, M.D.

2206 Lockhaven Drive, Colorado Springs, CO 80909
719-494-7073 (cell)
bwright@mollieplummer.com

---

### Regarding:

Craig Shipp
V
Kevin Murphy, et. al.

### Prepared for:

Mr. Derek S. Franseen, Esquire
Attorney at Law
Walsh & Walsh
200 E. 10th Street Plaza
Edmond, OK 74045

### Prepared by:

Joseph William Wright, M.D.
2206 Lockhaven Drive
Colorado Springs, CO 80909

OCTOBER 30, 2018

1

DEPOSITION
EXHIBIT
2
Wright 6-7-19
HANSEN & COMPANY

October 30, 2018

Mr. Derek S. Franseen, Esquire
Attorney at Law
Walsh & Walsh
200 E. 10th Street Plaza
Edmond, OK 74045

Re: Craig Shipp
v
Kevin Murphy, et. al.


Dear Mr. Franseen:

I, Joseph William Wright, M.D., am a licensed physician Board Certified in Otolaryngology – Head and Neck Surgery. For the past eleven years I have practiced in the field of correctional medicine and am certified by the National Commission on Correctional Health Care as a Certified Correctional Healthcare Professional - Physician (CCHP-P).

The CCHP–Physician credential is designed to recognize expertise among physicians practicing in the specialized field of correctional health care.

I have never had my opinions disqualified by any court.

As the previous medical director of the El Paso County Criminal Justice Center in Colorado Springs, Colorado, I am familiar with the standard care for medical practices that currently relate to issues of care and treatment of patients such as Mr. Craig Shipp.

I can fairly evaluate the quality of care that was afforded Mr. Shipp.  Attached is a copy of my current curriculum vitae.

I have reviewed the medical records of Craig Shipp supplied by your office. These include the following:

1. Medical chart (1-887)
2. Medication records St. Michael (1-144)
3. Wadley Wound Care medical records (1-68)
4. Defendant Arnold's discovery responses (1-11)
5. Defendant Dr. Lemdja's discovery responses (1-6)
6. Dr. Landja's CV (1-2)
7. Records of grievance and kites (1-41)
8. Contract between ADC and CCS (1-41)
9. CME records for CCS (1-268)

2

10. Employment records CCS (1-1))
11. Staff Roster (1-2)
12. Employee Records Kindall Smith (1-43)
13. Certifications of Dr. Lamdja (1-26)
14. Dr. Lomax CV (1-1)
15. Dr Lomax employment records (1-44)
16. Nursing Protocols (1-42)
17. Employment records Lenora Philson (1-23)
18. CCS Interrogatory responses (1-12)
19. Lomax interrogatory responses (1-6)
20. Kindall Smith interrogatory responses (1-6)
21. Kindall Smith CV (1-2)
22. Deposition of Steven Arnold (1-23)
23. Deposition of Kimberly Hofmann (1-8)
24. Deposition of Mimo Lamdja (1-14)
25. Deposition of Lorene Lomax (1-43)
26. Deposition of Craig Shipp (1-128)
27. Deposition Exhibits of Craig Shipp (1-34)
28. Also I have reviewed current literature related to Mr. Shipp's condition (see Notes section)

It is true to some extent all patient interactions are unique, however there are specific medical practices that a treating physician would be expected to provide to meet the applicable standard of care. I have specifically reviewed these records to determine whether within a reasonable degree of medical certainly that the standard of care was met. The above records disclose the following facts in summary:

## Timeline of Events

**2/1/16**
Patient was admitted to Southwest Arkansas Community Correction Center (ACC) from Crawford County Jail. He was noted to have diabetes with severe peripheral neuropathy. He had orthotics for a Charcot deformity of the right foot, but these were apparently "returned with the officer", presumably to Crawford County Jail and thence to Mr. Shipp's family.

A personal property inventory taken by intake personnel shows "shoes" and two "others" in his possession. Note was made of a pair of "New Balance 9 ½ shoes."  He was issued CROC-style shoes, and the New Balance shoes placed in property for holding.

**2/5/16**
An intake nursing physical assessment was performed which showed a left foot ulcer and no ulcers on the right foot. Debridement of the left foot was done by the "unit MD" and

3

clindamycin was started. The patient was instructed to notify his family to order him a pair of orthotic shoes to be sent in from a manufacturer.

Per Dr. Lemdja's response to plaintiff's interrogatories she states that she debrided some dead skin from Mr. Shipp's left foot on 2/5/16, but that this did not constitute an "official medical encounter." She failed to enter a note in the medical record, and she does not recall when she first became aware that Mr. Shipp did not have his required orthotic shoes nor does she recall any efforts to obtain the shoes.

A nursing note on 2/5/16 states the patient was instructed to notify his family to order a pair of orthotic shoes to be sent directly from a manufacturer. It is not stated who made this recommendation. This is the first mention of the need for orthotics. Orthotics need to be custom fitted to a patient and cannot be obtained in this manner.

**2/9/16**
An intake history and physical was performed. The Charcot deformity was noted and he was authorized to have his own custom shoes and inserts.

**2/12/16**
Mr. Shipp sent a kite requesting special orthotics due to increasing ulcer on the left foot and breakdown of bone in the right foot from Charcot. The kite was answered by instructing him to address the problem in a sick call appointment.

A mental health note on this date states that Mr. Shipp was increasingly concerned that his "feet were getting worse while he waits for all the necessary paperwork to be cleared."

**2/15/16**
A new ulcer was noted on the bottom of the right foot in the nursing notes.

**2/16/16**
A chronic care visit with Dr. Lomax reported diabetes for the past 5-6 years with severe peripheral neuropathy. There had been amputation of the left big toe for osteomyelitis and recurrent ulcer. Charcot deformity of the right foot was noted as was a pressure spot on the bottom of the right foot.

A strong recommendation was made that he use his own custom shoes for the foot deformity and a statement was made that is was "absolutely critical for him to off-load the pressure point on his feet" and that it was "limb threatening for him". "If he gets a severe infection again, he is at high risk for amputation".

There is a statement that he has not had appropriate shoes for three weeks and has developed blisters over pressure points in both feet.

An email was sent to Warden Arnold by Health Services Administrator Turner regarding his medical condition and a request that his orthotic shoes be shipped from his home.

4

**2/17/16**
The warden responded with a request that Mr. Shipp's family send the "special" shoes to his attention and that he would personally inspect them.

**2/19/16**
On or about this date Mr. Shipp received the orthotic shoes from home. No mention is made of an inspection by the warden.

**2/19/16 – 8/10/16**
Events following this date until the date of his parole consisted of multiple visits to the hospital, specialty wound care clinic and local wound care at ACC.

## Conclusions

I have made changes to some of the conclusions in this section based on additional information from the later depositions.

There is confusion in the medical record involving shoes that Mr. Shipp had on admission to ACC on 2/1/16. Upon further review it seems there were two pairs of shoes involved. The first shoes were a pair of New Balance shoes with orthotics that he had worn in Crawford County. These were not allowed in the ACC facility and were returned through Crawford County to the patient's family.

The second dispatch is or CROC-style shoes that were issued to Mr. Shipp by ACC to wear in the facility.

Mr. Shipp received his orthotic shoes after an approximate three-week delay. After that he received appropriate care conforming to community standards for his symptoms of diabetic foot ulcers.

There was no medical or security reason to not allow the orthotics to be admitted on 2/1/16 for Mr. Shipp's use. As documented in the medical record, his clinical condition deteriorated rapidly when denied the orthotics.

Warden Arnold stated in his answer to plaintiff's interrogatories that "Per policy, all decisions regarding medical needs, including prescription items, were to be made by the medical contractor.". Yet the sequence of events indicates that the warden's input was sought as a matter of course.

In his interrogatory responses Warden Arnold also states the he "forwarded Mr. Shipp's request for orthotics to the medical provider since it involved prescription orthotics. I requested permission to allow Mr. Shipp to have the shoes and that was granted…" From the records it

5

seems clear that the medical staff requested the shoes on 2/9/16, but they were not delivered. Again, it seems that the warden's permission was needed. It is not stated whose "permission" Warden Arnold sought.

It is unusual to have the warden of a correctional facility involved in the approval of medical devices. A more usual sequence of events is to have the intake security personnel notify medical staff of the device and, if approved by security, to immediately furnish the device to the patient. Perhaps medical staff would want to first see the patient to determine needs, but other than that short delay, an approval that the device poses no security threat to the facility is all the administrative input required.

There was error on the part of the intake staff in not allowing his orthotics to be admitted to the facility on 2/1/16. Likewise, there is no mention of informing the medical unit that the orthotics had accompanied the patient from Crawford County.

Dr. Lemdja should have appreciated the need for his orthotics on 2/5/18 and should have documented the need in the medical record. There was delay by the medical staff in the evaluation of Mr. Shipp's foot problems until 2/9/16 and after that another ten days until the orthotics were received.

In her deposition Dr Lemdja stated that you should not write something in the medical record without doing all the steps of a formal SOAP evaluation. This is incorrect. Any information of medical significance should be noted in the chart. She indicated that the debridement of a wound was a"pretty big procedure", and it is certainly pertinent medical information that should have been recorded in the medical chart.

Her intentional omission of this event would have the effect of masking the seriousness of the situation from her colleagues who depend on the medical record for continuity of care.

There was confusion as to who was responsible for obtaining the orthotics. The warden stated in interrogatories that the medical contractor was responsible while also requesting that the shoes be sent to him. The medical staff felt that they needed the warden's permission to get the orthotics. This breakdown in the chain of command led to more delay.

It is my professional opinion based on a reasonable degree of medical certainly that Mr. Shipp's medical condition significantly deteriorated as a proximate result of being denied the use of his orthotic shoes in a timely fashion.

Sincerely yours,

6

Joseph William Wright, M.D.

7