```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF ARKANSAS
2

     CRAIG SHIPP,
3

4
             Plaintiff,
5
     vs.                         No. 4:18-CV-04017-SOH
6
     CORRECT CARE SOLUTIONS, LLC;
7    DR. LORENE LOMAX; DR. MIMO
     LEMDJA, et al.
8
9            Defendants.
10

             DEPOSITION OF SHAWN SMITH, M.D.
11           TAKEN ON BEHALF OF THE DEFENDANTS
              ON JUNE 13, 2019 AT 1:30 P.M.
12              IN OKLAHOMA CITY, OKLAHOMA
13
14                    APPEARANCES
15   On behalf of the PLAINTIFF:
     Derek Franseen
16   WALSH & FRANSEEN
     200 East 10th Plaza
17   Edmond, Oklahoma  73034
     405.843.7600
18   dranseen@walshlawok.com
19

     On behalf of the DEFENDANT:
20   Michelle Odum
     HUMPHRIES, ODUM & EUBANKS
21   1901 Broadway Street
     Little Rock, Arkansas  72206
22   501.420.1776
     michelle@humphrieslaw.net
23
24   (Appearances continued on the following page)
25   REPORTED BY:  Abby Rhodes, CSR, RPR
```



1   office usually in the afternoons.

2       **Q**     And what type of patients do you treat here?

3       **A**     If you look at all-comers for rehab, I see a

4   lot of people on follow-up from the hospital, so

5   that's going to be patients with strokes, spinal cord

6   injuries, amputations, head injuries.  I do diagnostic

7   EMG studies.  I see -- I evaluate patients for

8   workers' comp and so I'll be treating some of the

9   multi-trauma patients and see them and follow up in

10  the office.

11          I do some chronic pain management still and

12  then I do a lot of just evaluations, whether it's, you

13  know, insurance company for disability or evaluation

14  for medical legal cases like this.

15      **Q**     Okay.  And physiatry, is that your current

16  area of practice?

17      **A**     Yes.

18      **Q**     Okay.  Have you ever practiced orthopedics?

19      **A**     Well, part of physiatry includes some

20  training in orthopedics, not so much in the cutting

21  and screwing and drilling but more of the after care.

22      **Q**     The postoperative care.

23      **A**     So I take care of a lot of people before and

24  sort of tee those patients up, especially, like

25  spine-type patients, or I take care of a lot of the

1    orthopedic patients afterwards in terms of fractures,

2    amputations, multi-trauma.  So even though I'm not

3    board certified in orthopedics, I've had quite a bit

4    of experience and training in taking care of those

5    types of patients.

6        **Q**    Okay.  Since you probably see most

7    patients -- well, do you see very many patients with

8    charcot foot?

9        **A**    I see, you know, maybe a couple a year in

10   the course of treatment, whether they're in the office

11   or, you know, perhaps after treatment for ulcers or

12   amputations.

13       **Q**    Okay.  And the majority that you see, are

14   they post amputation or...

15       **A**    I've seen some -- some of both.  I mean,

16   they don't come to my office specifically with a

17   charcot joint per se, so I'll have some -- I see a

18   diabetic -- I see diabetics every day in my practice,

19   so I'll run across people who have had charcot joints

20   in the course of just rehabilitating them for other

21   things or I'll see them after an amputation.

22       **Q**    Okay.

23       **A**    Or a surgery.

24       **Q**    All right.  Do you consider yourself an

25   expert in the care of a diabetic foot?

1  of medical certainty?

2      **A**    Yes.

3      **Q**    Have you done all the work that you think

4  has been necessary to form your opinions today?

5      **A**    Yes.

6      **Q**    All right.  Did you ask for any additional

7  medical records or information on Mr. Shipp in order

8  to be able to render your opinions?

9      **A**    I did not.

10     **Q**    Were you told you would get some additional

11 records?

12     **A**    No, I was told if I needed anything, they'd

13 try to get it, but I was not told there are additional

14 records forthcoming.

15     **Q**    All right.  And does this letter represent

16 your full report to date?

17     **A**    This represents my full documented report

18 today.

19     **Q**    Okay.  And do you know -- and -- the foot

20 that we're talking about today?

21     **A**    The right foot.

22     **Q**    Right.  Okay.

23     **A**    Correct.

24     **Q**    Now, when I was looking at your letter, you

25 kind of -- you noted all of the records, the providers

1   recognized that by around week three or so he did

2   get --

3        **Q**    Okay.

4        **A**    -- some form of orthotic.

5        **Q**    Right.

6        **A**    It was just a little confusing because down

7   in other records when he was at the other medical unit

8   it said he hadn't gotten them yet, so...

9        **Q**    Okay.  All right.

10            If you skip down a few sentences, you state

11  "The pressure ulcers on the right foot that developed

12  due to lack of appropriate support and protection with

13  prescription orthotics and shoe wear never healed and

14  was the proximate cause for his subsequent

15  below-the-knee amputation on July 31, 2017."

16            Is that correct?

17       **A**    Yes.

18       **Q**    Okay.

19       **A**    That's what it says.

20       **Q**    Do you consider other outside factors that

21  may have contributed to his ulcer not healing when you

22  made that opinion?

23       **A**    Do you mean were there other things that

24  affected his inability to heal?

25       **Q**    Yes, sir.

1      **A**     Yes.

2      **Q**     Okay.  Can you tell me what those are.

3      **A**     Diabetes, charcot foot, and just the

4  severity of the wound as it developed.

5      **Q**     Okay.  Now, that's a year and a half of

6  time.

7           Do you know how the patient handled his foot

8  care or his diabetic condition during that year and a

9  half?

10     **A**     Well, I know what was documented in the

11  records I reviewed, but I couldn't tell you what he

12  did every day about it.

13     **Q**     Okay.  Do you recall reviewing records where

14  he was repeatedly not using the wheelchair that he had

15  been told to use?

16          MR. FRANSEEN:  Object to form.

17          THE WITNESS:  Do you mean the records that

18  Dr. Peeples was alluding to in his report?

19     **Q**     (By Ms. Odum) The -- yeah, the --

20     **A**     Because I saw several documents like that.

21  I looked through thousands of pages trying to find

22  those specific instances and I couldn't find those in

23  there, so...

24     **Q**     Okay.  Let's see.  I'm going to hand you

25  Peeples 102.  The plan is "wheelchair for now to

1    offload his foot completely."  That's March 10.

2        **A**    So is there something in here saying he

3    didn't do that?

4        **Q**    Yes, sir.  Oh, man.  I think this is when

5    the photo copier had a problem.

6        **A**    Okay.  I'm confused.  What's the question

7    about this?

8        **Q**    I wanted to know if you read the numerous

9    references by nursing staff that the resident was

10   walking into the infirmary without his wheelchair from

11   the 11th, the 12th, the 13th, the 14th, the 15th, the

12   16th, March 22.

13       **A**    Does that say that on here?  Because I'm...

14       **Q**    No, sir, that's the first record.

15       **A**    Yeah, well, that's what why I was asking

16   what you were having me look at this for.

17       **Q**    That he was instructed to stay in the

18   wheelchair.

19       **A**    I did see this, this specific page where it

20   said "wheelchair for now to offload his foot

21   completely," yes, I did see that.

22       **Q**    And we may have to go off the record.  I

23   gave Staples things to photocopy and I'm missing

24   several pages.  Okay.  Well, here's one.

25       **A**    Okay.  I do see the document in here that he

1    walked in medical without a wheelchair, yes.

2         **Q**    Okay.

3         **A**    That's on --

4         **Q**    And I'm just going to hand you a few --

5         **A**    That's on March 16.

6         **Q**    Yes, sir.

7         **A**    And this is the same day, it documents the

8    same thing.  And then this is, let's see, a week later

9    and this documents that he picked up bags and put it

10   in his wheelchair and pushed the wheelchair.  So I did

11   see references from Dr. Peeples about that, but I

12   didn't see that exact report.

13        **Q**    Okay.  And there are several others.

14             MR. FRANSEEN:  Object to the form.

15        **Q**    (By Ms. Odum) We can go off the record for

16   me to get the notebook if you'd like to review them.

17        **A**    Well, if they're the same references that

18   Dr. Peeples made, I mean, I don't doubt that he has

19   gotten through there and found those.

20        **Q**    Okay.  So if a -- if a patient that was

21   recently diagnosed with diabetic foot ulcers is not

22   following instructions to be non-weightbearing, does

23   that have any bearing on whether the ulcer heals?

24        **A**    Well, I think if a patient has the

25   opportunity to offload and not weightbear and have

1  full control of their abilities and they didn't do it,

2  that would definitely have an affect on healing.

3       **Q**   Okay.

4       **A**   Last time I checked, you know, most people

5  who were incarcerated aren't in there because they

6  follow the rules or because they follow through with

7  what they're supposed to do, so, and, you know, my

8  understanding of the people I saw during training

9  from -- from prisons is usually that there's specific

10  rules they have to follow that are outside of what you

11  and I would consider the independent things we can do

12  daily.

13       **Q**   Okay.  But if he had access to a wheelchair

14  and was told to remain weightbearing or

15  non-weightbearing, would you expect the patient to

16  follow that rule, that instruction?

17       **A**   I'd expect him to follow it most of the

18  time, but I wouldn't expect him to do it all the time.

19       **Q**   Okay.  What about if it's a fresh ulcer like

20  in this case?

21       **A**   Well, I mean, you can walk without putting

22  weight on that ulcer as well, and I don't know by that

23  documentation what he was actually doing other than

24  pushing a wheelchair, so I don't know how he was

25  protecting his foot.

1    **Q**    Okay.  So the patient doesn't have
2    responsibility to try to assist in his care?
3    **A**    Oh, he does without a doubt.
4    **Q**    Okay.  Now, if he is -- should he be
5    purchasing junk food on commissary if he's trying to
6    have a diabetic ulcer heal?
7    **A**    Well, I don't know what his blood sugars
8    were during that time period.
9    **Q**    Okay.
10   **A**    If his blood sugars were what they -- what I
11   saw during the documented follow-up visits, they were
12   running between, anywhere from 100 to 180.  So if his
13   sugars were generally 100 so 180, then I wouldn't have
14   a problem with him eating those types of food from the
15   commissary.
16   **Q**    Okay.  Yeah, we're going to have to take a
17   break in a minute because -- did you read the column
18   and carry note when they removed his cast in March of
19   2016 after he was walking around on the foot and had
20   to have his cast removed?
21   **A**    Are you talking about where the cast was
22   rubbing on his toe?
23   **Q**    Yes.
24   **A**    I did read about the cast rubbing on his
25   toe.

1   **Q**    Out of prison.

2   **A**    Out of prison, you know, I believe my

3   patients are, at least at this point in my life, are

4   all grown-ups, so it's my job to educate them on

5   what's the best way of caring for themselves, and I

6   hope that they follow those rules, but, you know,

7   that's not my job to be their mama or their daddy.

8   **Q**    Okay.  I'm going to hand you Peeples 402.

9   This was from September 2016, some weeks after his

10  release.

11          Do you see Mr. Thomas' note?  I don't know,

12  they put it on weird paper.  I'm sorry.

13  **A**    No, that's fine.

14  **Q**    When he comes in for that particular visit?

15  **A**    Are you talking about the part under --

16  **Q**    Yes, sir.

17  **A**    -- physical exam?

18  **Q**    Yes, sir.

19  **A**    Yes, the chief complaint.

20  **Q**    Okay.

21  **A**    I do.

22  **Q**    Do you see her notation there?

23  **A**    I do.

24  **Q**    Okay.  She actually capitalized the word

25  "shoes."

1    **A**    She did.

2    **Q**    Does that demonstrate that he is being
3    noncompliant with her directions?

4    **A**    Well, let me read this and see what it says.

5    **Q**    Sure.

6    **A**    So it says "The treatment includes zero
7    casting, IV antibiotics, and weekly trimming.  Last
8    week he elected to try no cast to be
9    non-weightbearing.  Despite this plan, he arrived to
10   today in shoes on both feet."

11        So that would tell me that she recommended
12   he be non-weightbearing without a cast from the
13   previous week and that day he was not compliant.

14   **Q**    Okay.  And there's no way to know whether he
15   was compliant or not when he was not physically in the
16   medical setting; is that correct?

17   **A**    Not that I'm aware of, no.

18   **Q**    Okay.  Now, you mentioned -- did you know
19   his history of alcoholism before he went into the
20   prison?

21   **A**    Did I know about it?

22   **Q**    Yes, sir.

23   **A**    Was I aware of it, yes.

24   **Q**    Okay.  And did you know that's why he was in
25   prison?

1    **Q**     Okay.

2    **A**     Certainly would mean they'd need to have

3    supervision with whatever they're doing wherever

4    they're at.

5    **Q**     Okay.  And so would Mr. Shipp, if he had a

6    guardianship, would that mean he needed some

7    supervision once he was out of prison?

8    **A**     In and out of prison, he'd need supervision.

9    **Q**     Okay.  And if he demonstrated his -- a

10   failure to follow simple orders such as staying in a

11   wheelchair while he's in prison, in your experience as

12   a doctor handling these type of patients, would he be

13   expected to be responsible and follow doctors'

14   directions when he's out of prison?

15   **A**     I'm not sure I understand your question.

16   Can you -- can you clarify that for me?

17   **Q**     If he's noted several times to not use a

18   wheelchair that he was told to use because of the

19   serious nature of his foot and he -- the record

20   demonstrates he did not, and his letter to his sister

21   demonstrates that he did not, would you expect that

22   person when he has no supervision to follow the rules

23   set out by the doctor?

24   **A**     Well, it depends on what the rules are.  I

25   mean, in the records that I reviewed, one of the

1   reasons he wasn't using the wheelchair is because it

2   was hurting his shoulders.  I don't know if he was

3   asked to use the wheelchair at home or not or whether

4   he was offered the crutches that he had asked for when

5   he was in the prison.

6          So that's why I'm a little confused about

7   your question because I don't know which specific

8   doctor order we're talking about, something that

9   happened while he was there or something afterwards.

10  And you're talking about something afterwards, and I

11  don't really know what orders they gave him to do.

12      **Q**   Okay.  Well, Dr. Thomas wanted him to be

13  non-weightbearing and he came in a week later wearing

14  shoes.

15      **A**   That's what she documented, yes.

16      **Q**   Okay.  And that would indicate a

17  non-compliant patient?

18      **A**   On that day, yes.

19      **Q**   And you have no idea how compliant he was

20  from that point.

21      **A**   Nor do you.

22      **Q**   Right.  So we would have to speculate

23  whether he was compliant or not.

24      **A**   Well, we'd have to use the information at

25  hand, and the information at hand shows that when he

1   was supervised, his blood sugars were under reasonable

2   control, he got better in some instances, but the size

3   of the one particular wound never healed.  He healed

4   his left wound and he was compliant with coming for

5   his treatments, whether it was whittling on his feet

6   or hyperbarics or wound care.

7        So he did show some efforts in terms of

8   wanting to save his foot and being compliant with

9   treatment; it just so happens he didn't use the

10  wheelchair the day he saw the doctor.

11       **Q**    Well --

12       **A**    And you're right, I don't know what he did

13  on any other day.

14       **Q**    Okay.  And you said while he was supervised?

15       **A**    Yes, I did say that.

16       **Q**    Okay.  What about when he -- did you see

17  what his A1c level was when he was released from

18  prison?

19       **A**    Are you talking about in August or...

20       **Q**    Yes, sir, in August of 2016.

21       **A**    I don't recall a specific one in August.  I

22  know that the -- between May and July, his sugars ran

23  between 100 and 150 which would be consistent with a

24  hemoglobin A1c right around 7 to 7.2 range, which I

25  think is the one I saw in there, but I don't know if

1    it was right when he left or not.

2        **Q**    Okay.  I'm going to hand you Peeples 360

3    which is a record from River Valley.  There's an

4    August 16, 2016 record and a February 17, 2007.

5        **A**    This was when he was in the medical

6    incarceration facility?

7        **Q**    He was released August -- in August, I think

8    August 10.

9        **A**    Okay.  So this is like the week after?

10        **Q**    The week after, and then the next one is six

11    months later.

12        **A**    Yes.

13        **Q**    Do you see what his A1c levels are when he

14    was released right after he was released?

15        **A**    6.8.

16        **Q**    Okay.  And what was it six months later when

17    he's on his own?

18        **A**    What's recorded in here is 13, but when I

19    tried to look back in those records to correlate a

20    blood sugar, because, I mean, if your hemoglobin is

21    A1c 13, your blood sugar should be 375 or higher,

22    which means he should have been hospitalized, and I

23    looked through all those medical records during that

24    time period and there wasn't one blood sugar that

25    documented anything in that range.

1    And the only thing I saw about blood sugars
2 was his had been in the same range it had been for a
3 while, so I don't know what to make of that particular
4 number because certainly you'd want to correlate it
5 with actual blood sugars.
6    **Q**    Did you see any records from that time
7 period from River Valley where he said that he really
8 wasn't paying attention to his blood sugars?
9    **A**    During the River Valley time?
10    **Q**    Yes, sir.
11    **A**    I know he reported that before he was
12 incarcerated he wasn't, but they were checking his
13 blood sugars routinely there.
14    **Q**    Okay.  You don't recall him saying that he
15 wasn't paying close attention to his blood sugar
16 during that time period after his release?
17    **A**    I don't recall that, but if you look at his
18 sugars during that time period, they did pretty good.
19 This hemoglobin A1c is something that most diabetics
20 would want.
21    **Q**    The 6.8 right after his incarceration?
22    **A**    Yeah.  That was right during that time
23 period that he supposedly wasn't worried about his
24 diabetes.
25    Is that what you're asking?

1    **Q**    No, I'm asking about after he's released

2    from prison six months later.

3    **A**    Oh, okay.  No, all I saw when there was

4    questions about the diabetes was he said he was eating

5    the same thing he normally does.

6    **Q**    Okay.  So you did see that?

7    **A**    That one sentence, yeah.

8    **Q**    Okay.  In the records that you have, did you

9    see where he admitted that he was not keeping up with

10   his blood sugars?

11   **A**    That he wasn't checking them?

12   **Q**    Correct.

13   **A**    Oh, I'm sure I saw at least two times where

14   it said that, but I couldn't tell you exactly when

15   that was.

16   **Q**    Okay.  Well, if a person's not checking his

17   blood sugars and he's trying to heal, does that affect

18   diabetic foot ulcers?

19   **A**    If his sugars are good, no.

20   **Q**    But what if his A1c is 13 or 12.8?

21   **A**    Well, that's what I'm -- that's what I'm

22   saying.  If his sugars -- if his hemoglobin A1c was

23   really that high then we would have seen sugars all

24   through that course of care in the 300-plus range and

25   he would have been in the hospital with that kind of

blood sugar.

    **Q**    Okay.  Well --

    **A**    And I didn't see anything in there because I specifically went back to look after Dr. Peeples mentioned that because obviously that would affect things if -- if your blood was 380 all the time, but I couldn't find anything in there to correlate with that number.

    **Q**    Okay.  Did you --

    **A**    So I don't know if that's a real number or not.

    **Q**    Did you find one where it was 12.8?

    **A**    The hemoglobin A1c --

    **Q**    Yes, sir.

    **A**    -- is that what you're saying?

    **Q**    Yes, sir.

    **A**    Yeah, but I didn't see any sugars to correlate with that, and without a blood sugar to correlate with that, you don't know if that's his hemoglobin A1c or somebody else's.

    **Q**    The record says it's his; is that correct?

    **A**    The record documents that number, but they don't document anything else that correlates with that, so --

    **Q**    Okay.

1    **A**    -- in my experience in documentation

2   records, if I'm going to believe that number, I'm

3   going to want to see the data that goes along with

4   that, and I just didn't see it, so I...

5    **Q**    Did you --

6    **A**    From my experience, I would say that that's

7   not necessarily his hemoglobin A1c.

8    **Q**    Did you see a record from January that

9   showed an A1c of 12.8?

10   **A**    There was one in January, yes.

11   **Q**    Okay.  So we have January that says 12.8 and

12  we have February that says 13, so are you saying they

13  made two mistakes?

14   **A**    I'm just saying I don't have any blood

15  sugars to go along with that, and without a blood

16  sugar to go along with that and otherwise

17  documentation of being compliant with his wound care,

18  it's hard for me to say that that pushed him over the

19  edge one way or the other.

20   **Q**    So would you want more records, then, so you

21  can figure out if he was -- what his blood sugars were

22  if he was compliant?

23   **A**    I don't think there are any more records,

24  otherwise I would have probably seen them by now,

25  so...

1    **Q**    You don't think there are any more?

2    **A**    Do you have any records that you want to

3    show me that tells me one way or the other about that?

4    **Q**    Well, I was curious if you've asked for any

5    other records because, you know, you're giving your

6    opinions, so I just want to know if that rang a bell

7    for you that maybe you needed to verify that there

8    weren't any more others --

9    **A**    I looked through all the records I had to

10    try to verify that number as being accurate, and I

11    don't have anything in the records to support that,

12    so --

13    **Q**    Okay.

14    **A**    -- right now I don't have any data to

15    support those numbers.

16    **Q**    Okay.  And you don't have any evidence that

17    they're wrong?

18    **A**    I do not.

19    **Q**    Okay.  If that is, in fact, correct, is

20    that -- would that reflect a compliant patient?

21    **A**    With regards to diabetes?  No.

22    **Q**    Yes, sir.

23         And if you have a diabetic that his blood

24    sugars jump that drastically from 6.8 to 12.8 and 13,

25    is that -- would that negatively affect a diabetic

1      **A**    Over time, every diabetic has to worry about
2   renal disease.
3      **Q**    Okay.  But high blood sugars over time for a
4   couple of months would negatively affect the healing
5   of a diabetic foot ulcer; correct?
6      **A**    High blood sugars will affect ability to
7   heal, yes.
8      **Q**    Okay.  Did you read Dr. Seiter's records
9   about a bone -- his decision to do a bone biopsy in
10  June of 2017?
11     **A**    Do you have a specific record for me to look
12  at?  Because I don't remember it that way.
13     **Q**    Okay.  I'm going to hand you Peeples 55 --
14  455, 462 -- sorry, 463, 66, and 6 -- 75.
15     **A**    So is there something about a bone -- a bone
16  biopsy in here?
17     **Q**    Yes, sir, starting on that first page, that
18  little bit to the right when he reports to the ER.
19  Probably where your thumb is.
20     **A**    No, I see what you're talking about; I was
21  just looking at the date.
22     **Q**    Oh, sorry.
23     **A**    Okay.  So I see that there was -- he had a
24  bone biopsy done on a Monday, and I don't know if this
25  date was a Monday or after the Monday, but then he

1    requested amputations because of the pain and

2    disability associated with a deformed limb, but

3    usually that's related to trauma and not so much

4    diabetes.

5        **Q**    Right.  Okay.  Do you remember recalling any

6    of the records from when he was still incarcerated

7    where he would remove his dressings and the staff

8    would tell him to stop doing that, leave it on

9    until -- let us handle it?

10       **A**    I saw that at least once or twice, yes.

11       **Q**    Okay.  Can you say whether or not if that

12   cast in March of '16 had remained on if -- if his

13   wound would have healed?

14       **A**    Are you talking about the wound in the

15   bottom of his foot?

16       **Q**    Yes.

17       **A**    No.

18       **Q**    No?

19       **A**    No, I couldn't say one way or the other.

20       **Q**    Okay.  Did the biopsy of his foot negatively

21   impact his foot?

22       **A**    Do you mean the one that didn't show an

23   infection?

24       **Q**    Did you read the biopsy results?

25       **A**    Are you talking about the one you just

1   showed me?

2       **Q**   Yes, sir.

3       **A**   I didn't read the actual result.  I read

4   what the doctor said and it said it didn't show any

5   osteomyelitis.

6       **Q**   Okay.  But did the biopsy -- he got a

7   resulting infection from the biopsy; is that correct?

8       **A**   He got cellulitis from an open wound after a

9   biopsy, yes.

10      **Q**   Okay.  And, again, do you have any idea what

11  Mr. Shipp was doing when he was on his own not in

12  prison with regard to --

13      **A**   Before or after?

14      **Q**   After his incarceration.

15      **A**   I know what he was doing before.

16      **Q**   Yeah.  Yeah.  Yes, we do.

17          No, after he's released and he's on his own,

18  so from August through July of 2017, do we know how he

19  was personally caring for his foot when he was outside

20  the medical?

21      **A**   I do not.

22      **Q**   Okay.  When we were talking about the

23  wheelchair instances, you referred to Dr. Peeples'

24  report.

25          When did you look at that?

1      **A**     In the last month, but I couldn't tell you
2  what day.  Let's see, it looks like it got sent to me
3  April 25.
4      **Q**     Okay.
5      **A**     So probably shortly after that.
6      **Q**     And is that what made you kind of look
7  through records again to see if you could find what he
8  was referring to?
9      **A**     Yes.
10      **Q**     Okay.  And were you also provided with a
11  copy of his records?
12      **A**     No.
13      **Q**     Okay.  Do you know what the status of his
14  charcot foot was back in 2012?
15      **A**     No, I do not.
16      **Q**     Okay.  And then I know I mentioned '13
17  either -- earlier, but have you reviewed records from
18  2013?
19      **A**     Not that I recall, no.
20      **Q**     Okay.  2014?
21      **A**     No.
22      **Q**     Okay.
23      **A**     I just know that the foot was intact when he
24  went into the -- to the prison.
25      **Q**     Okay.  Do you know how his blood flow was at

1   yes.

2      **Q**   Okay.  During your review of the records,

3   other than what I've asked you about, did you see any

4   other moments of noncompliance that was demonstrated

5   by Mr. Shipp?

6      **A**   I mean, I looked at the records.  I saw

7   reports that you pointed out that Dr. Peeples pointed

8   out.  I saw also, you know, reports that they said he

9   was taking care of himself and doing well on some

10  pages too, so I -- I can't recall of anything specific

11  that said he was grossly not taking care of himself

12  after that time period.

13     **Q**   Okay.  Would you consider a patient's

14  noncompliance to contribute to a non-healing ulcer?

15     **A**   Depending on what the noncompliance was,

16  it's certainly possible, yes.

17     **Q**   Okay.  Now, in your report, you -- the next

18  sentence, as I read one earlier, the last sentence of

19  that first paragraph on page two, "Had Mr. Shipp been

20  provided use of his prescription shoes, it is my

21  opinion that he would not have developed blisters that

22  ultimately led to the loss of his right leg to

23  amputation."

24          Now, how can you say that?

25     **A**   Well, because he came into the facility

1    without them when he used his -- his orthopedic

2    orthotics and shoes, and when he didn't have them was

3    put in Crocs that are known to rub your feet and had

4    abnormalities that he was a -- set up to get

5    broken-down feet.

6        **Q**    I guess my question is:  How do you know

7    nothing else would have happened in that year and a

8    half?

9        **A**    I don't know what would happen.  I'm just

10   looking at, you know, a guy that you're saying is

11   non-compliant, doesn't care about his diabetes, but he

12   asked to wear his orthotics and protect his feet and

13   doesn't get them for three weeks and then has a hole

14   and you wonder why he's mad about it.

15            So, I mean, that's what I'm saying in that

16   sentence is that if he had been given those orthotics,

17   then he wouldn't have gotten than sore that led to

18   that year and a half of care before he had his leg cut

19   off.

20       **Q**    Okay.  Well, it said he would have not

21   developed blisters.

22            I mean, he could have developed blisters

23   anytime in that next year and a half; is that correct?

24       **A**    I was talking about that time where he was

25   incarcerated and had no control of his situation.  If

1   you're asking me if a guy can get a blister anytime

2   when he's a diabetic, sure.  But we're talking about

3   this time where he had no control of his situation.

4   He was in a prison, he had to follow the rules and do

5   what they said and had no independent control of

6   protecting his feet other than staying off of them.

7       **Q**    Do you know why he didn't get his shoes?

8       **A**    I know that he was supposed to request it

9   and then it -- there was a delay.  That's all I know.

10      **Q**    Okay.

11      **A**    You-guys would probably know a lot more

12  about that than I would.

13      **Q**    Okay.  I was just curious.

14           But anything could have happened in that

15  next year and a half where he might have ended up

16  getting an amputation?

17           MR. FRANSEEN:  Object to form.

18      **Q**    (By Ms. Odum) Is that correct?

19      **A**    Anything can happen any day of the week.

20      **Q**    Right.

21      **A**    So to answer that question, I think anything

22  can happen any day, any time, any place.

23      **Q**    Okay.  Do you want me to -- you read

24  Dr. Peeples' assessment of the missing wheelchair

25  records that I think I still have tabbed.

```
 1                      CERTIFICATE

 2    STATE OF OKLAHOMA        )

 3                            ) SS:

 4    COUNTY OF OKLAHOMA       )

 5

 6              I, Abby Rhodes, CSR, RPR, do hereby certify

 7    that on June 13, 2019 at the offices of Shawn Smith,

 8    M.D., Oklahoma City, Oklahoma, there came before me

 9    SHAWN SMITH, M.D. who was duly sworn to testify the

10    truth, the whole truth, and nothing but the truth; and

11    that the foregoing pages constitute a full, true, and

12    correct transcript of the deposition of said witness

13    on the date as indicated.

14              I do further certify that I am not counsel,

15    attorney, or relative of either party, or otherwise

16    interested in the event of this suit. IN WHEREOF, I

17    have hereunto set my hand and affixed my seal at

18    my office in Oklahoma City Oklahoma County, Oklahoma,

19    this 20th day of June, 2019.

20

21

22

23    _____,

24          Abby Rhodes, CSR, RPR

25          CSR No. 1939.
```



**SHAWN SMITH, M.D., P.C.**
*PHYSICAL MEDICINE & REHABILITATION*

5100 N. BROOKLINE
SUITE 500
OKLAHOMA CITY, OK 73112
OFFICE 405.605 8780
FAX 405 605 8782

11/15/18

Derek Franseen
Walsh & Franseen
200 East 10th Street Plaza
Edmond, OK 73034

RE: Craig Shipp

Dear Sir:

As you are aware, I have been requested to give my medical opinion regarding the cause of Mr. Craig Shipp's below the knee amputation. As my attached curriculum demonstrates and which is incorporated into this report by reference, I am a medical doctor current licensed to practice in the state of Oklahoma and in the state of Texas. I currently serve as Medical Director of Brain Injury at Jim Thorpe Rehabilitation Hospital. I have served as an Associate Medical Director for the past 23 years at Jim Thorpe Rehabilitation Hospital in Oklahoma City, Oklahoma. I have been board certified in Physical Medicine & Rehabilitation since 1993. By virtue of my education, training, and direct experience, I am qualified to render opinions that apply in this case.

Craig Shipp was presented by teleconference on 11/15/18 for an independent medical evaluation regarding injuries sustained during incarceration at Southwest Arkansas Community Correction Center in Texarkana, Arkansas. I have received copies of multiple medical records including Correct Care Solutions, Department of Corrections, Dr. DeHaan, Saint Michael's Hospital, UAMS (need to find the abbreviation), Wadley Wound Care, CCS, Dr. Jeffrey DeHaan, Wadley Regional Medical Center, Christus Saint Michael Rehabilitation Hospital, Wound Care Hyperbaric Center, Hanger Prosthetics and Orthotics, Mercy Clinical Hospital Fort Smith and River Valley, Mercy Hyperbaric and Wound Care, Ouachita River Correctional Unit and UAMS Medical Center.

In summary, Mr. Craig Shipp is a 40-year-old type II diabetic since 2010 that had a prior history of a right lower extremity Charcot joint and diabetic peripheral neuropathy which resulted in recurrent diabetic foot ulcers. Mr. Shipp was prescribed custom diabetic shoes and insoles to prevent development of additional foot ulcers from his Charcot joint and diabetic peripheral neuropathy.

EXHIBIT # 2
DATE
DEPONENT
PROFESSIONAL REPORTERS (800) 376-1006

Mr. Shipp was incarcerated after turning himself in on 02/01/2016 at Southwest Arkansas Correctional Center in Texarkana. Mr. Shipp requested the continued use of his prescription diabetic shoes to protect his feet from skin breakdown. Mr. Shipp's request was never honored. As a result, he developed blisters on his left foot on 02/08/2016 and blisters on his right foot in the areas of the Charcot joint on 02/12-02/14/2016. Despite appropriate wound care and studies confirming good circulation, the pressure ulcers on the right foot that developed due to lack of appropriate support and protection with prescription orthotics and shoe wear never healed and was the proximate cause for his subsequent below the knee amputation on 7/31/17. Had Mr. Shipp been provided use of his prescription shoes, it is my opinion that he would not have developed blisters that ultimately led to the loss of his right leg to amputation.

A full report of future needs associated with his right lower extremity amputation and his functional changes associated with the loss will be produced in the future.

The opinions above are based upon a reasonable degree of medical certainty. I reserve the right to amend my opinions and provide additional opinions in the event that additional medical records are provided for my review or a change in his medical condition occurs.


Regards,

Shawn Smith, M.D.