IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


CRAIG SHIPP                                          PLAINTIFF

VS.                       NO. 4:18-CV-04017-SOH

KEVIN MURPHY, et al                                 DEFENDANTS

---

ORAL DEPOSITION

OF

JEFFREY STIEVE, M.D.

TAKEN JUNE 10, 2019, AT 8:55 A.M.

---

# Conway Court Reporting

### Post Office Box 2188

### Conway, Arkansas   72033

### www.conwaycourtreporting.com

## "Spoken to written . . . word for word"

Conway Office: 501.679.1488          Little Rock Office:  501.319.4807



1 Q    Well, you told me that it is the duty of the doctor to

2 either give verbal or written orders regarding the medical

3 restrictions and it's the duty of the nurse to document it?

4 A    Correct.

5 Q    That's within their standard of care?

6 A    Correct.

7 Q    And so if the restrictions were medically appropriate on

8 February 5th, for a person with diabetes and charcot deformity

9 on the left foot, should those restrictions have been entered

10 by either the doctor or the nurse?

11 A    Let me just tell you, I am having difficulty answering

12 that question.  To the best of my knowledge, on 2/05/16, the

13 visit was a nursing visit, and it was not a visit with Dr.

14 Lemdja.  I can't speak towards why the nurse would have entered

15 a restriction form in the chart.  My review of the chart, to

16 the best of my memory, is that Dr. Lemdja was called in.  She

17 was busy seeing patients.  She was asked to come in and see

18 this patient.  Let me see if I can get this right.  The patient

19 had a sore on one foot and a charcot deformity on the other.

20 Was it the right foot that had the charcot deformity?

21 Q    Correct.

22 A    To the best of my knowledge, it appears that Dr. Lemdja

23 only saw the left foot.  Therefore, since she's the one that

24 would have generated this, I don't know how she would generate

25 the restriction for the right foot having just seen a patient

1 briefly for a left foot problem.

2 Q    As a doctor, if you're finding a sore on the left foot,

3 would you tend to have at least a quick conversation with that

4 person?

5 A    You may.

6 Q    Would you ask them, Hey, do you have sores on your feet?

7 A    I don't know what Dr. Lemdja's standard process is with

8 patients.

9 Q    Records indicated, though, that Dr. Lemdja did have a

10 discussion about his orthotic shoes?

11 A    I believe that's correct.

12 Q    And so she would be on some sort of alert that he has

13 issues with his feet?

14 A    Correct.

15 Q    And the records indicate that the nursing staff, at the

16 very least, knew about the charcot deformity?

17 A    Well, this was with an LPN.  I believe that it's beyond

18 the scope of an LPN's practice to make an assessment.  For

19 example, to label something as charcot foot or something like

20 that.  This nurse's role, to the best of my knowledge, was a

21 triage visit for a rather new inmate.  According to the records

22 that I've reviewed, the sole reason that she involved Dr.

23 Lemdja in this case is that she felt it was in the patient's

24 best interest to have a flap of skin that was loose on the left

25 foot removed.  She went to Dr. Lemdja and explained her

1   concern.  Apparently Dr. Lemdja agreed, because she came in and

2   saw the patient's left foot and took steps to remove the flap

3   of skin.  To the best of my review of the medical record, that

4   was her only involvement with the patient.

5   Q    And she had the discussion about his orthotic shoes?

6   A    I don't recall that.  If you could show me the note, I

7   would be glad to review that.

8   Q    Well, it says the doctor informed the patient to call the

9   family to have his shoes sent in.  Would that indicate to you

10  that she was aware?

11  A    Yes.  If that is what the record says, then she obviously

12  did that.

13  Q    At that point, she knew that he needed some sort of

14  offloading of his feet?

15  A    Correct.

16  Q    At that point, there is nothing in the record indicating

17  that she provided any restrictions to assist with offloading

18  his feet prior to the orthotic shoes coming in?

19  A    Correct.

20  Q    Should she have?

21  A    The patient, based on my review, had both orthotic shoes

22  and tennis shoes at the jail.

23  Q    On February 5th?

24  A    At the jail.  When the patient came to the prison, the

25  jail -- somebody at the jail made the decision not to send

1  2012 that this had been a problem. He had an acute problem
2  with a piece of skin hanging from his left foot that Dr. Lemdja
3  addressed. Beyond that, I can't say what his physical
4  condition was.
5  Q    And charcot deformity isn't a sore?
6  A    It's not.
7  Q    It can lead to sores?
8  A    It can.
9  Q    It can lead to sores pretty quickly?
10  A    Charcot foot is a progressive disorder that generally
11  doesn't have a good outcome.
12  Q    It's a serious medical condition?
13  A    It is.
14  Q    Is it something that the CCS staff is trained to
15  recognize?
16  A    It is.
17  Q    What does the intake staff do when a charcot foot
18  deformity comes through the door?
19  A    It depends on how long it's been present and so forth.
20  Generally, they set up a meeting with a provider that can
21  evaluate the problem and address it to the best of their
22  ability.
23  Q    Did anyone, on February 1st, set up that meeting?
24  A    Not that I know of.
25  Q    Should they have?

1  Q    Is that a sufficient request for sick call?

2  A    I think the policy states that there is supposed to be one

3  issue.  I would argue that deformed feet, charcot joint, and

4  diabetes are all related.  So, yes, it is.

5  Q    That was enough to put CCS on notice to evaluate the

6  charcot foot deformity in accordance with their policies and

7  procedures?

8  A    Correct.  I am looking for a note from Dr. Lemdja.  I'm

9  used to looking on the computer here.  I believe that -- I am

10  having trouble seeing the date.  On 2/09/16, Dr. Lemdja did a

11  physical exam.  Her assessment was that it was an intake

12  physical and that the patient had Type 2 diabetes, high blood

13  pressure, high cholesterol, and diabetes with a foot ulcer.

14  The physical exam documents a left foot ulcer with dressing,

15  the wound was cleaned with granulation tissue, and there was a

16  deformity of the right foot.  That's it.

17  Q    What medical restrictions were ordered on that date?

18  A    I didn't see any that were ordered.

19  Q    Okay.  So on this date, Dr. Lemdja has a clear duty to

20  evaluate the charcot foot deformity?

21  A    I believe, to the best of my memory, that Dr. Lemdja did

22  do that.

23  Q    And what restrictions were ordered to offload his feet

24  during this time period?

25  A    It doesn't appear that she placed any.

1   Q   Should she have?

2   A   Well, what she did instead --

3   Q   Tell me whether she should have offloaded the feet at that

4   time?

5   A   She should have done something.

6   Q   Okay. What did she do?

7   A   It appears that she rescheduled the patient to see Dr.

8   Lomax for his charcot foot.

9   Q   Is there anything in Dr. Lemdja's experience that

10   prevented her from ordering any restrictions or providing him

11   with a wheelchair to offload his feet at that time?

12   A   No, there's not.

13   Q   She was trained and qualified in order to provide that

14   type of restriction in order to immediately offload his feet on

15   the 9th?

16   A   I think that physician's have various backgrounds and when

17   somebody knows that something is wrong, but they're not sure

18   what the next step is, we seek help. I think that Dr. Lemdja

19   sought help with Dr. Lomax to evaluate this person's foot

20   deformity. In retrospect, I would have felt that, in defense

21   of Dr. Lemdja, it would have been a much stronger case to say

22   that she put the patient on bed rest and so forth. I did

23   notice earlier that the patient was coming down for treatment

24   for his left foot and was asked to elevate that as much as

25   possible. That fell short of offloading both feet.

1   Q    Without you knowing her background, she is a medical

2   doctor.  She violated the standard of care by not offloading

3   his feet and writing those restrictions?

4   A    Yes.

5   Q    She had that same knowledge on the 5th; correct?

6   A    She did.

7   Q    And she should have ordered the offloading on that date as

8   well?

9   A    That one I won't agree to, because it was not her patient

10  visit.  While I encourage all the providers when they see a

11  patient -- there are two kinds of drive bys.  The nurse will

12  come in and say, I need an antibiotic for a boil for example,

13  and the doctor usually asks if they have any allergies, how big

14  is the boil, give them this treatment.  They generally don't

15  write a note, because the nurse is going to incorporate that

16  discussion in their note.  When they see a patient, and

17  especially when they do a procedure, as limited as it could be,

18  my understanding is that Dr. Lemdja was worried because she was

19  not scheduled for a full evaluation of this patient and she

20  would be putting herself in some sort of medical legal risk to

21  write a partial note as to what she did.  I disagree with that,

22  and think that a note should have been written that said, I was

23  called to see this patient for this skin thing.  I saw the skin

24  flap, and this is what I did.

25  Q    So you document your procedures?

1  patient, should you go ahead and try to flush out that portion
2  of that patient's issues?
3  A   I think with a drive by when there is a nurse scheduled
4  triage, because of the busyness of the clinic, the providers
5  tend to trust the judgement of the nurse doing the triage.  If
6  they say there is a particular instance that they think an
7  intervention is necessary, I think it's not unusual that the
8  focus of that drive by done by the provider would just be on
9  that sole topic.
10 Q   The topic on that date was?
11 A   It was for the left foot specifically, I believe.
12 Q   And during that drive by, she was informed about the need
13 for orthotics?
14 A   Correct.
15 Q   And she knows that that is a prescribed medical device?
16 A   She does.  She also knows that if she would have -- I
17 believe it came to her attention that the inmate had orthotic
18 shoes at the jail, but they didn't appear to have made the trip
19 with the inmate.  If she would have started that process de
20 novo, it would have taken 30 t0 60 days, by policy, to get the
21 patient in to see someone at the foot clinic.  I don't know how
22 complicated the orthotics are, but it would have taken a little
23 bit of time after that visit to generate a new orthotic.  I
24 think Dr. Lemdja did what was in the patient's best interest
25 and said, If you have bad feet and you have previous orthotics,

1  in healthcare.  I think I saw lots of evidence that even though
2  offloading later was provided, this inmate's noncompliance with
3  both the wheelchair and his cast -- the cast resulted in great
4  improvement but the inmate actually told his family that, a
5  term that I won't repeat here, the medical staff was looking
6  out for his best interest and documenting when he wasn't
7  following the directions and using the wheelchair.  It's
8  complicated.  It's a negotiation.  Sometimes you want to start
9  insulin on somebody and they're not ready, so you go with what
10 they accept at the time.  I have no evidence here that this
11 inmate had requested offloading.  I have no evidence that
12 offloading would have changed anything in this three week time
13 period or less than three week time period.  Sometimes we have
14 the obligation to offer things like offloading and other times
15 it is a medical judgement that with the shoes coming soon, it's
16 okay for him to continue to walk.  I wasn't there.  I didn't
17 examine him.
18 Q    You don't know what medical judgement Dr. Lemdja did,
19 because you didn't read her testimony?
20 A    I did not.
21 Q    So you can't provide a standard of care opinion on whether
22 she had that negotiation with the patient?
23 A    The only opinion I can offer on Dr. Lemdja is that I would
24 counsel her that in the future, if she is just taking a skin
25 flap off, that doesn't preclude her from writing a note,

1  A    The fact that she didn't order the offloading and

2  wheelchair in her early visit, which I think Dr. Lomax might

3  have done.

4  Q    So the fact that she violated the standard of care, you

5  believe that she was uncomfortable with that situation?

6  A    Well, the standard of care is that when there is a serious

7  medical disorder, we need to not be deliberately indifferent to

8  that.  I would argue that deliberate indifference would have

9  been, Goodbye.  See ya.  Instead, a follow up was scheduled

10  with Dr. Lomax.  That was an action.  Although it wasn't a

11  definitive action, it wasn't doing nothing and it wasn't

12  deliberately indifferent.

13  Q    Are you making all of your evaluations today based off of

14  deliberate indifference?

15  A    No.

16  Q    Okay.  She did say, Goodbye.  See ya.  Someone will see

17  you in the next seven days?

18  A    I don't know what the policy is for that.  I don't recall

19  seeing anything that said that this patient needs to be seen

20  tomorrow or within three days or seven days.  It was just that

21  she saw the patient, I believe, on the 9th, and Dr. Lomax saw

22  the patient on the 17th.  Is that right?

23  Q    So Dr. Lemdja had no idea when the next time the doctor

24  would see this patient?

25  A    I don't know, because I haven't seen how that follow up

1    Q    As we sit here today, you don't know if that is what her

2    decision was?

3    A    Correct.

4    Q    Are you providing any opinions on when this amputation

5    should have occurred?

6    A    Regarding the amputation?

7    Q    Yes.

8    A    All I can say is that I reviewed the record of when the

9    biopsy was done and that it precipitated in an amputation after

10    discharge. That's all I know.

11    Q    Would you agree that an A1C of 6.8 in August of 2016

12    indicates that the purchases from commissary were not

13    significantly affecting his blood sugar levels?

14    A    No. An A1C is a measure of the average of blood sugars

15    over approximately a three-month period. Certainly, we know

16    that acute elevations of blood sugar due to high carbohydrate

17    in foods can cause problems, including circulation problems,

18    even though the average might be within normal limits.

19    Q    You can't use the A1C to base an evaluation off of whether

20    it is controlled or uncontrolled diabetes?

21    A    Most people would think that 6.8 is certainly better than

22    13, but it's not normalized. It's not non diabetic control,

23    which would be optimal.

24    Q    And 7.3, what does that tell you?

25    A    Generally speaking, for somebody like this patient, we

1  Q    Okay.  So the opinions you gave in your report were from

2  your actual review of the records?

3  A    Yes, page after page.

4  Q    And when you were being questioned today, you actually

5  have the records in front of you?

6  A    I do.

7  Q    So you could review the records now to refresh your memory

8  if necessary?

9  A    I've been in depositions before and usually what happened

10  in those depositions was that specific documents were given to

11  me and I was allowed to review those and refresh my memory and

12  then discuss them.  I was not prepared today to page through

13  these hundreds of pages, nor was I able to, from memory, to

14  recall real specifics from any given record.

15  Q    So you don't have them memorized?

16  A    Sorry to say, no, I don't.

17  Q    And last question.  When you're talking about A1C, it is a

18  measure to evaluate blood sugar control over a period of time?

19  A    It's a general standard for following diabetics from month

20  to month and year to year to see whether the control is better,

21  staying the same, or worse.

22  Q    If an A1C drops from -- goes from 7 to four months later

23  being 13, what does that tell you?

24              MR. FRANSEEN: Object to form.

25  A    If an A1C goes from 7 to 13, generally speaking, the blood

1  depositions, I was given specific dates, documents, and asked,

2  Do you recognize this, and then I was asked questions about it

3  after I reviewed it.  I wasn't prepared today to page through

4  this 177 pages based on specific questions as to whether there

5  was an email or whatever, so I felt a little bit unprepared for

6  this.

7  Q    And you marked on that?

8  A    I actually didn't mark this.  Someone else marked on it.

9  I don't know who.

10  Q    I asked you if you reviewed any emails and you said you

11  didn't.

12  A    I don't recall reviewing any emails.

13  Q    If I'm not -- are you critical of me not allowing you to

14  review any documents that would help assist you in your

15  testimony today?

16  A    Not at all.

17  Q    Okay.  Just wanted to make sure.

18                    MR. FRANSEEN: I'm done.

19                    FURTHER EXAMINATION

20  BY MS. ODUM:

21  Q    Read the subjective note of March 11, 2016, record review.

22  A    "At approximately 10:30, I was going downstairs to pass

23  medications in seg.  When I got to the elevator, this resident

24  was standing there waiting to get on the elevator without the

25  wheelchair that was given to him so that he could stay off his

1  feet. I asked resident where it was, and he said, 'I can't use
2  that. It makes my left shoulder sore.'"
3  Q    Okay. So when you were asked about his shoulder earlier,
4  you could have referred to this note to refresh your memory?
5  A    I could have.
6  Q    Turn the page. Look at the March 12th note. Just read
7  that. What does 'I' mean? Is that interview?
8  A    I'm not sure. It says, "Resident came to medical for
9  treatment to the right toe. Resident walked up here. When
10 asked where his wheelchair was, resident stated, 'It is making
11 my left shoulder hurt too bad to use it. I only want to hurt
12 in one place, so I figure my foot was a good place to hurt.
13 I'm not going to use that wheelchair. Treatment done per
14 protocol. Resident encouraged to use wheelchair per Dr.
15 Lomax's orders."
16 Q    And this record reflects his shoulder?
17 A    Correct.
18 Q    And the next one, on 3/13, that record also references
19 complaining about his shoulder; is that correct?
20 A    Yes, ma'am.
21 Q    The nurse stated that the wheelchair was more important
22 due to the condition of his right foot and he stated that he
23 wasn't going to use his wheelchair?
24 A    Correct.
25 Q    So the records were available for you to review?

C E R T I F I C A T E

STATE OF ARKANSAS )

                 )ss

COUNTY OF FAULKNER )

I, NICOLE HARTWICK, Certified Court Reporter #739, does hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

WITNESS MY HAND AND SEAL this 2nd day of July, 2019.

_____

NICOLE HARTWICK, CCR

Certified Court Reporter #739



# Dr. Jeffery Stieve

Fed. R. Civ. P. 26(a)(2)(C) Non-retained Employee Witness Disclosure

## QUALIFICATIONS OF EMPLOYEE EXPERT WITNESS:

Dr. Stieve is the Arkansas Regional Medical Director for Wellpath (formerly Correct Care Solutions (CCS)). A CV detailing Dr. Stieve's qualifications is attached.

## CLAIM AS UNDERSTOOD BY DR. STIEVE:

Mr. Craig Shipp, ACC # 066878, claims that he developed a diabetic foot ulcer on his right foot due to defendants not providing him with his custom orthotics and that he received improper care and treatment for his wound thereafter. Mr. Shipp alleged that it was three weeks before he received his orthotic shoes. He claimed, had he received them sooner, he would not have developed the ulcer which ultimately caused the amputation of his right foot. Mr. Shipp further alleged that, due to policies and protocols, it took three weeks for Mr. Shipp to be transferred to an appropriate wound care facility, and that the delay ultimately caused the amputation of his right foot.

## GENERAL FACTS NOT IN DISPUTE:

Mr. Shipp did not have his orthotics with him when the county delivered him to SWACCC (Southwest Arkansas Community Correction Center) for intake. He was diabetic with bilateral peripheral neuropathy, with Charcot foot on the right, and prior left great toe amputation due to complication from diabetes/osteomyelitis.

Mr. Shipp was housed at SWACCC from February 1, 2016, to May 11, 2016. Mr. Shipp was released from ADC on August 10, 2016. Mr. Shipp's right foot was amputated on July 31, 2017.

## SUBJECT MATTER ON WHICH EXPERT WILL TESTIFY:

Dr. Stieve has been asked to explain whether CCS follows ADC Medical Operational Policies and Procedures for ACC patient care and how such worked in this case.

Dr. Stieve has been asked to explain the relationship between medical and security and how correctional medical care works.

Dr. Stieve has reviewed CCS records and other records referenced below and has been asked to explain whether the defendant nurses and/or doctors at SWACCC did anything wrong relating to patient care for Mr. Shipp's diabetic foot ulcer at issue in this case.

**SUMMARY OF FACTS AND OPINIONS:**

The Arkansas Board of Corrections contracted with CCS to provide medical care for inmates and residents within the Arkansas Department of Correction (ADC) and Arkansas Community Correction (ACC). CCS followed ADC Operational Policy and Procedure in providing medical care for residents within the ACC. CCS did not have its own separate medical policies and procedures. The main policies which have come into play in this case are OPP 507, the sick call policy, and OPP 517, the off-site referral policy. Residents are to file sick call requests when they want to be seen by medical staff for a medical issue. Medical providers follow the referral process to send patients out for specialty treatment or, in this instance, for wound care. Medical staff followed ADC policy in this case to ensure Mr. Shipp's medical needs were met.

At intake into SWACCC, Mr. Shipp had neuropathy, a degeneration of the nerves which causes numbness or weakness. He also had Charcot neuropathic osteoarthropathy, commonly referred to as Charcot foot. His level of Charcot foot included bone destruction, subluxation, and deformity. The hallmark deformity associated with Charcot foot is midfoot collapse, which he had. Ulcers are a known complication for a diabetic with Charcot foot, even with the best of care. He was predisposed to other complications relating to his diabetes and Charcot foot, particularly considering he was an alcoholic who, prior to conviction, drank a fifth of vodka a day. He had prior amputation of the left great toe, where he had no Charcot foot. His records while in the institution indicate he was insensate in his feet. His hemoglobin A1c level (A1c) upon admission indicate that his blood sugar had been in the 169-170 range in February 2016, and dropped to 148 by June after being in the correctional environment. The improved blood sugars obtained after incarceration suggests to me that prior to coming to prison his diabetes was not optimally controlled.

Medical was not directly involved with the process of Mr. Shipp's shoes not being in his possession at intake. Shoes are generally a custody issue. A resident may wear his own shoes in accordance with custody rules. The resident may ask the warden for permission to wear his outside shoes. The warden may also allow shoes to be shipped to the unit directly from the manufacturer. In this case, property records reflect that Mr. Shipp entered SWACCC with New Balance tennis shoes. Mr. Shipp using New Balance shoes would be better than wearing the standard ACC shoes until his orthotic shoes/inserts came in from his family. Medical could not otherwise control obtaining his special orthotic shoes from his family.

Records reflect that, starting on the date of his admission, he stated that the County did not bring his shoes. The County's failure to allow him to wear his orthotic shoes was not caused by medical. He was instructed to contact the warden about obtaining his orthotic shoes. On February 5, he was instructed to call his family. An email from Ms. Philson (formerly Ms. Turner), the Health Services Administrator (HSA) reveals that he wrote his family February 7 asking for his orthotic shoes. A letter produced by Mr. Shipp indicates that he wrote his mother February 8/9 asking that she send his shoes. He apparently did not receive those orthotic shoes as of February 16; therefore, Dr. Lomax entered an authorization for Mr. Shipp to have his orthotic shoes. Ms. Philson emailed the warden about those orthotic shoes being delivered. Mr. Shipp received his orthotic shoes from

his family by February 18 or 19th. It is unknown why his family did not deliver the shoes sooner.

Per his review of medical records, Mr. Shipp submitted a sick call on February 3, 2016, requesting assessment of his deformed feet and diabetes. That sick call was triaged on February 5 and resulted in him being seen by Nurse Smith the same day. Nurse Smith asked the Unit MD (Dr. Lemdja) for assistance relating to the left foot. Dr. Lemdja was noted to have removed old skin from the left foot and gave verbal orders for antibiotics and daily treatment call. She also instructed to the resident call his family about his orthotic shoes. Nurse Smith issued a temporary elevator pass and noted no open areas to his right foot.

Dr. Lemdja did not make a clinical encounter note on February 5. While it would have been preferable for her to make some type of note, Dr. Stieve has looked at the record and determined that no physician review was required of that particular note. The nurse reflected the MD orders in her notes and they were carried out. The lack of the MD making her own note was insignificant in the treatment of the left foot ulcer, which eventually healed.

Dr. Lemdja performed a health and physical examination of Mr. Shipp on February 9. His right foot was noted as deformed. The record reflects her evaluation, but there was no note of any discussion relating to orthotics. Again, upon report from Mr. Shipp, he had already written his family about sending his orthotic shoes.

CCS was a vendor to ACC. CCS providers would not normally contact ACC over resident issues such as obtaining personal property. If there were a property issue involving orthotics, such would be handled by security (generally a warden) conferring with medical, if needed. If medical became aware of an issue, the HSA would handle the operational issue of consulting with the warden about acquiring orthotic shoes, if deemed necessary by medical. Medical providers are generally isolated and do not discuss medical issues with the warden. Instructing an inmate or resident to call his family for already-existing special shoes was a standard, institution-wide practice as it would be much quicker than going through the molding, manufacturing, fitting, and delivery process. If Mr. Shipp had not had his own orthotics, he would have been sent to orthotics which might have taken up to 60 days to accomplish. Considering Mr. Shipp received his personal orthotics within 18 or 19 days from intake, that was a better outcome. It is unclear why the family did not deliver orthotic shoes to Mr. Shipp sooner. Medical did not prevent such shipping/delivery. Further, medical does not have any control over the communication between Mr. Shipp and his family or Mr. Shipp and the warden. Medical is not responsible for the delay in delivering the orthotic shoes to Mr. Shipp.

There is a sick call process in the ACC which all residents are encouraged to follow during their intake process. Mr. Shipp did not submit one sick call relating to any problem requesting/obtaining his orthotic shoes from his family. He did not submit a sick call asking for orthotic shoes.

Per records maintained by medical, the first request form from Mr. Shipp relating to a need for special orthotic shoes (of which medical was aware) was directed to and received by the warden on Friday, February 12, and forwarded to medical. The HSA, Ms. Philson, received/responded to the

request on Monday, February 15, and instructed him to submit a sick call. He was seen by the physician the next day. He did not submit any requests to medical prior to this Monday, February 15 receipt and review of the Resident Request forwarded by the warden.

Records reflect that Mr. Shipp reported a blister on his right foot on Sunday, February 14, 2016. He was referred to the MD. He was seen by Dr. Lomax on February 16 and she noted the serious nature of the pressure spot on a diabetic patient with Charcot foot. She noted that it was critical for him to offload the pressure points and noted that he either needed his orthotics, or needed to have other accommodations. She issued a script for him to have his orthotics from home.

Records reflect that Dr. Lomax provided excellent care and treatment for Mr. Shipp's feet. HSA Philson then promptly sought permission from the warden for Mr. Shipp to have his shoes when he still had not received them by February 16. Mr. Shipp was allowed to call his family the following day (he had written them before) to request his orthotic shoes. Dr. Stieve understands that both Mr. Shipp and his sister testified that she overnighted the orthotic shoes to him. Dr. Stieve understands that other testimony indicates Mr. Shipp may have received the orthotics on the 18th or 19th. Dr. Stieve considers either date to be a very prompt delivery of his orthotic shoes after Dr. Lomax entered her order. Again, Dr. Stieve is not sure why they were not delivered earlier considering Mr. Shipp had previously asked his family to send them to him. No one in medical, not Dr. Lemdja, nor nurses Smith, Cunningham, or Stoner, prevented the orthotic shoes from being personally delivered or mailed to the unit earlier.

Dr. Lomax ensured that Mr. Shipp received outside wound care treatment which appeared to be good. In the prison context, a consult request system ensures that Off-Site referrals are coordinated with the outside provider and ACC security. That process was fat-tracked in this case. When Mr. Shipp received a cast on March 9 and complained it was rubbing his toe, staff promptly took care of the issue. Dr. Lomax wrote a new consult the following day him to return to the clinic for the cast to be removed. In the interim, on March 10, Dr. Lomax directed Mr. Shipp to be non-weight bearing by using a wheelchair, which he had been issued in February.

Mr. Shipp's commissary records indicate that he regularly purchased carbohydrates and sugary foods which were not a part of his diabetic diet plan. Further, he repeatedly refused to use a wheelchair despite recurrent directions to do so. Because Mr. Shipp was noncompliant with the non-weight bearing recommendations and because he was eating questionable food, he was deviating from the documented recommendations of health care. While he had a right to do so, and while health care is not able to force compliance with recommendations, medical staff had to adjust their treatment of his serious medical condition. Interestingly, from a letter that he wrote home, he expressed his disgust with the nurses for logging every time he did not use a wheelchair. Thus, he was well aware that staff noted his consistent, intentional refusal to comply with medical instructions. He was consistently recorded in mid-March as not using his wheelchair despite instruction. He did not submit any sick calls relating to his wheelchair use or any objection thereto. Considering this was the initial part of his wound treatment, it was in his best medical interest to fully comply with medical instructions. Instead, he continued to walk on the casted foot, continued to cause injury to his toes, and forced early removal of the cast. The wound clinic noted that his ulcer

had "improved just in the 5 days he had the cast on." If he had been compliant, perhaps the wound would have healed better. He had other instances of ignoring instructions to use a wheelchair.

When an ulcer was identified on the right foot, treatment began immediately and he was referred out for advanced treatment as needed. He received standard of care on all fronts for his diabetic ulcers. Dr. Stieve saw nothing that the physicians or nursing staff did wrong as relating to their care and treatment. Specifically, Drs. Lomax and Lemdja and nurses Smith, Stoner, and Cunningham did nothing wrong relating to the care of his diabetic ulcers and Charcot foot.

Mr. Shipp's noncompliance with medical instruction while incarceration was a problem. He went against medical advice with knowledge of the consequences. Once out of prison, his compliance problems continued. His A1c level rose from 6.8 on August 16, 2016, (indicating average blood sugars of 148) to 13.0 on February 17, 2017, (indicating average blood sugars of 326). This indicates poor diabetic control post incarceration. Further, from the record, months after release from incarceration, a pediatrist performed a biopsy of the bone of the foot and Mr. Shipp developed a severe infection in the foot. The following month, the foot was amputated. These facts indicate multiple issues going on with Mr. Shipp, with the diabetes and Charcot foot being the root cause of his amputation.

It is Dr. Stieve's medical opinion that, to a reasonable degree of medical certainty, the medical care provided by medical staff at ACC was appropriate and within the standard of care. There is no medical evidence that the doctors or the nurses were medically negligent or indifferent in their care and treatment of Mr. Shipp. In fact, from all that Dr. Stieve reviewed, they provided excellent care to a patient who was difficult to care for, given his numerous episodes of non-compliance.

Reviewed and approved on this 26th day of March, 2019.

Jeffrey Stieve, M.D., CCHP