UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

CRAIG SHIPP                                                                          PLAINTIFF

v.                                    CASE NO. 4:18-CV-04017-SOH

KEVIN MURPHY, et al.                                                          DEFENDANTS

### PLAINTIFF'S RESPONSE TO MEDICAL DEFENDANTS' STATEMENT OF UNDISPUTED FACTS [DOC. 111]

1. Plaintiff admits that this contains the allegation but does not state the state law claims that are also alleged.

2. Admitted.

3. Admitted.

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted.

8. Denied, as discovery and expert reports have indicated additional violations by Dr. Lemdja. Additionally, under the notice pleading rulings, each and every date is not required to be listed at the pleading stage. Plaintiff further sees that the general descriptions of Dr. Lemdja and Nurse Smith for the date of February 16th, appears to describe the actions of February 5 and, therefore, appears to be a scrivener's error on the date as there is no note from Dr.

Lemdja and Nurse Smith on the 16th.

9. Admit as it relates to liability. Plaintiff would state that the claim after February 16, 2016 extends for damages purposes.

10. Admitted.

11. Admitted.

12. Admitted.

13. Admitted.

14. Admitted.

15. Plaintiff admits that on February 1, 2016 he had a noticeable need for his orthotics. Plaintiff would state that ACC136 (Ex. 1) shows that the shoes containing his orthotics were returned by the SWACCC facility to county.

16. Admitted that Plaintiff entered into the facility with serious medical needs.

17. Plaintiff admits that with any serious chronic disease there is a potential for progression. However, that does not defend the need to appropriately assess and address the condition in order to prevent or reduce further progression.

18. Plaintiff admits that due to his serious medical condition he could not feel the ulcers as they formed, which made it more urgent that he receive his orthotics.

19. Admitted.

20. Admitted that the Defendant agrees that ulcers are a known complication for a diabetic with Charcot foot which was present and observable starting on February 1, 2016.

21. Plaintiff admits that his A1C at intake was 7.3. Plaintiff denies the characterization by Defendant as Correct Care Solutions' Medical Director, Dr. Stieve, testified that a 7.3 is within control of his diabetes. (Ex. 2 - Deposition of Jeffrey Stieve, p. 52:24 to 53:7).

22. Admitted.

23. Denied. A high A1C doesn't necessarily tell you that someone is not making appropriate efforts to control their condition. (Ex. 2, p. 53:8-13).

24. Plaintiff admits that these are the goals that he had in order to help monitor his diabetic condition.

25. Plaintiff admits that his serious medical condition required orthotics to help offload the sores.

26. Plaintiff admits that Correct Care Solutions was notified on February 3, 2016 of his serious medical need.

27. Plaintiff admits that this is what the record indicates. Plaintiff denies that he was told he could call his family. (Ex. 3 - Deposition of Craig Shipp, p. 73:8-10).

28. Admitted.

29. Admitted that the Defendants even based on their own testimony did not have a clear understanding as to how to approve the medical device, including Dr. Lemdja who failed to fill out the appropriate form and even refused to document her encounter entirely on February 5. (Ex. 4 - Email;  Ex. 5 to

        Lemdja's deposition; Ex. 5 - Deposition of Dr. Mimo Lemdja, p. 33:11 to p. 34:25).

30. Plaintiff admits that the elevator pass was the only corrective action taken by Ms. Smith. Plaintiff would state that Correct Care Solutions Medical Director, Dr. Stieve, testified that his condition required offloading, otherwise it violated the standard of care. (Ex. 2, p. 30:1-6).

31. Plaintiff admits that he received evaluations but none of these items corrected the offloading until February 16 when Dr. Lomax observed Plaintiff's condition.

32. Plaintiff admits that this encounter occurred and that Dr. Stieve identified that it violated the standard of care. (Ex. 2, p. 27:20 to p. 30:4).

33. Plaintiff admits that this encounter occurred and that Dr. Stieve identified that it violated the standard of care. (Ex. 2, p. 27:20 to p. 30:4).

34. Plaintiff admits that this encounter occurred and that Dr. Stieve identified that it violated the standard of care. (Ex. 2, p. 27:20 to p. 30:4).

35. Plaintiff admits that he was making all efforts in order to contact his family trying to get the shoes approved and entered into the facility.

36. Plaintiff admits that this encounter occurred and that Dr. Stieve identified that it violated the standard of care. (Ex. 2, p. 27:20 to p. 30:4).

37. Plaintiff admits that he again contacted the warden as medical was not approving his orthotics and the warden, despite 11 days of notice, had not

coordinated this approval either.

38. Plaintiff admits that the 13-day without his orthotics caused a new blister to form.

39. Denied. Ms. Philson did nothing other than instructing him to return to medical, which he had already been to multiple times prior to that date.

40. Plaintiff admits that Dr. Lomax identified that it was "critical that Plaintiff offload the pressure points of his feet" as this was the standard of care already opined by Dr. Stieve. Plaintiff admits that no effort prior to this adequately addressed his serious medical need of his orthotics due to his Charcot foot deformity.

41. Plaintiff admits that this was the first date that he was permitted to call his family to tell them that the shoes were approved.

42. Plaintiff admits that the family sent in his shoes overnight immediately.

43. Plaintiff admits that he was finally issued a wheelchair to offload his feet.

44. Plaintiff admits that Dr. Lomax made the decision to remove his cast due to the pressure causing additional issues.

45. Plaintiff admits that he was not permitted to let others help him push the wheelchair and that the wheelchair caused him pain in his shoulder. This shoulder pain caused a handful of documented events to occur over roughly a 1-week period in March 2016.

46. Plaintiff admits that he was not permitted to let others help him push the

wheelchair and that the wheelchair caused him pain in his shoulder. This shoulder pain caused a handful of documented events to occur over roughly a 1-week period in March 2016.

47. Plaintiff admits that he was not permitted to let others help him push the wheelchair and that the wheelchair caused him pain in his shoulder. This shoulder pain caused a handful of documented events to occur over roughly a 1-week period in March 2016.

48. Plaintiff admits that he was not permitted to let others help him push the wheelchair and that the wheelchair caused him pain in his shoulder. This shoulder pain caused a handful of documented events to occur over roughly a 1-week period in March 2016.

49. Plaintiff admits that he was not permitted to let others help him push the wheelchair and that the wheelchair caused him pain in his shoulder. This shoulder pain caused a handful of documented events to occur over roughly a 1-week period in March 2016.

50. Plaintiff admits that he was not permitted to let others help him push the wheelchair and that the wheelchair caused him pain in his shoulder. This shoulder pain caused a handful of documented events to occur over roughly a 1-week period in March 2016.

51. Plaintiff admits that he was not permitted to let others help him push the wheelchair and that the wheelchair caused him pain in his shoulder. This

shoulder pain caused a handful of documented events to occur over roughly a 1-week period in March 2016.

52. Plaintiff admits that he was not permitted to let others help him push the wheelchair and that the wheelchair caused him pain in his shoulder. This shoulder pain caused a handful of documented events to occur over roughly a 1-week period in March 2016.

53. Plaintiff admits that he was not permitted to let others help him push the wheelchair and that the wheelchair caused him pain in his shoulder. This shoulder pain caused a handful of documented events to occur over roughly a 1-week period in March 2016.

54. Admitted.

55. Plaintiff admits that he was frustrated with the situation.

56. Plaintiff admits that he was not permitted to let others help him push the wheelchair and that the wheelchair caused him pain in his shoulder. This shoulder pain caused a handful of documented events to occur over roughly a 1-week period in March 2016.

57. Plaintiff admits that he was not permitted to let others help him push the wheelchair and that the wheelchair caused him pain in his shoulder. This shoulder pain caused a handful of documented events to occur over roughly a 1-week period in March 2016.

58. Plaintiff admits that the records state this accurately.

59. Admitted.

60. Admitted.

61. Admitted in part and denied in part. Dr. Lomax testified that she is not critical of Mr. Shipp, as he seemed concerned with his feet and seemed like someone who wanted to keep both of his feet. Additionally, she testified Mr. Shipp is a person and based upon his circumstances and past history of substance abuse would lead him to struggle with the situation. (Ex. 6 - Deposition of Dr. Lorene Lomax, p. 17:12 to p. 18:13).

62. Plaintiff admits that treatment was ongoing.

63. Admitted.

64. Admitted.

65. Admitted in part and denied in part. Plaintiff admits that his A1C was at 6.8. Plaintiff would state that below 7 is appropriate. (Ex. 2, p. 52:11 to p. 53:13).

66. Admitted.

67. Admitted.

68. Admitted.

69. Admitted.

70. Admitted.

71. Plaintiff admits the record states this.

72. Admitted.

73. Admitted.

74. Admitted.

75. Admitted.

76. Admitted.

77. Denied. The records states that the walking boot was recommended to stabilize his ankle.

78. Plaintiff admits the record states this.

79. Plaintiff admits the record states this.

80. Admitted.

81. Admitted.

82. Admitted.

83. Admitted.

84. Admitted.

85. Plaintiff admits that he did not provide any opinions on her nursing standard of care. Plaintiff can rely on testimony and statements that a jury can understand that may represent a deliberate indifference.

86. Admitted.

87. Admitted.

88. Admitted.

89. Denied. The individuals in his report are CCS employees.

90. Admitted that the company itself did not do anything wrong, however this has no bearing on *respondeat superior*.

91. Admitted that the company itself did not do anything wrong, however this has no bearing on *respondeat superior*.

92. Denied. See 2nd amended complaint at paragraphs 25, 26, 31, 33, 38, 41, 44, and sections A and D. [Doc. 42].

93. Admitted.

94. Admitted.

95. Admitted, but Plaintiff would state that Dr. Stieve's testimony as previously cited in this Statement of Facts indicates additional violations of the standard of care within the record on this case.

96. Denied.

97. Denied, as Plaintiff does not recall being told to notify his family about his shoes during that visit (Ex. 3, p. 94:20-22) and Plaintiff could not make phone calls during that time period unless approved. (Ex. 3, p. 69:2-5).

98. Denied as there was no authorization to have his custom shoes and inserts ordered by Dr. Lemdja.

99. Denied, she is part of the staff and failed to fill out the appropriate order. (Ex, 5, p. 30:9 to p. 32:13).

100. Denied, see Ex. 7 - Report of Dr. Wright's report, page 21, which details his opinions on Dr. Lemdja. Additionally, see Ex. 2, p. 27:20 to p. 30:4.

101. Admitted.

102. Denied, as this is implicated in his need for orthotics and the delay in

evaluating his foot problems. (Ex. 8 - Deposition of William Wright, p. 21; see also Ex. 2, p. 6).

103. Denied as Doctors cannot predict each and every hypothetical.

104. Denied. See response to 102.

105. Plaintiff admits that this opinion was opined by him and by Dr. Stieve.

106. Denied, as Dr. Stieve opined that there was a violation of the standard of care and that these conditions were observable and known to Dr. Lemdja, which would indicate a deliberate indifference. (Ex. 2, p. 27:20 to p. 30:4).

107. Plaintiff admits that Dr. Smith routinely sees individuals with Charcot foot for both ulcers and amputations.

108. Denied to the extent that it states that they are misstatements, as there is conflicting testimony in the case on whether Crawford brought the shoes or not.

109. Admitted.

110. Admitted.

111. Plaintiff admits that Dr. Smith testified that Plaintiff's pre-existing condition would cause his ulcers' difficulty to heal.

112. Denied. Dr. Smith's testimony is that he "saw several documents like that" but that he struggled to re-find them after reviewing Dr. Peeples' report. (Ex. 9 - Deposition of Dr. Shawn Smith, p. 23-24).

113. Dr. Smith testified that he was unable to find that specific instance.

114. Dr. Smith testified that he could not find those specific records on this part of his additional review after reviewing Peeples' report.

115. Dr. Smith admits that it could have an effect healing but made no testimony that after reviewing those they changed his opinions.

116. Dr. Smith admits that it could have an effect on healing but made no testimony that after reviewing those they changed his opinions.

117. Dr. Smith admits that it could have an effect healing but made no testimony that after reviewing those they changed his opinions.

118. Admit that Dr. Smith cannot speculate on hypothetical changes of the facts of the case.

119. Admitted.

120. Admitted that Dr. Smith cannot speculate as to each and every event that Mr. Shipp ever committed beyond the testimony or records of the case.

121. Admitted that Dr. Smith cannot speculate as to each and every event that Mr. Shipp ever committed beyond the testimony or records of the case.

122. Admitted.

123. Admitted.

124. Admitted.

125. Admitted.

126. Admitted that Dr. Smith evaluated the entire situation and reviewed the records for confirming blood sugar numbers, which he could not find.

127. Admitted that this accurately reflects his testimony but there is no statement that it was not considered as part of his ultimate opinion.

128. Admitted that this accurately reflects his testimony but there is no statement that it was not considered as part of his ultimate opinion.

129. Admitted that this accurately reflects his testimony but there is no statement that it was not considered as part of his ultimate opinion.

130. Admitted that an expert cannot testify as to each and every event that may have happened over an 18-month period and that is not part of the facts of the case. This would be pure speculation as to what may or may not have happened.

131. Denied. Dr. Stieve did not testify that he had the opinion that the non-compliance was the sole cause of his wound not healing.

132. Plaintiff owed no duty to write out to the CCS employees the actions they should have taken, he only owed a duty to notify him of his condition and that he had orthotics already prescribed due to that condition.

## ADDITIONAL FACTS THAT PRECLUDE SUMMARY JUDGMENT

133. Mimo Lemdja's own medical director, Dr. Stieve, testified that she violated the standard of care by not offloading Mr. Shipp's feet regardless of whether they filled out the appropriate form approving his orthotics. (Ex. 2, p. 27:20 to p. 30:4)

134. Dr. Stieve testified that this violation occurred expressly on February 9 and that she had the same information on February 5 which would indicate a

violation of the standard of care on that date as well. (Ex. 2, p. 27:20 to p. 30:4).

135. Dr. Lemdja admits that she did not write any approvals for Mr. Shipp's need for his orthotic shoes. (Ex. 5, p. 30:7-14; p. 31:18 to p. 32:1).

136. Dr. Lemdja did not communicate this need to the HSA director. (Ex. 5, p. 30:15-20).

137. Dr. Lemdja testified that she intended to write an order for bed rest for Mr. Shipp based upon his needs, but no order could be identified at her deposition. (Ex. 5, p. 35:6 to p. 42:22).

138. Dr. Lemdja was willing to misrepresent a note stating "VORB," which means "verbal orders read back," to possibly mean "verbal orders bed rest." (Ex. 5, p. 43:1 to p. 44:17).

139. The forms for specific bed rest orders were not filled out by Dr. Lemdja. (Ex. 5, p. 46:1-24; Ex. 10 - CCS 9 (ex 7 to her depo)

140. Dr. Lemdja intentionally did not write any notes or orders and explained to the nurse that it was because "she didn't want her name in the chart because it was too much of a liability." (Ex. 5, p. 33:1 to p. 34:25; Ex. 8).

141. Nurse Kindall Smith knew on February 5 that Craig Shipp needed his orthotics due to his serious medical need and needed an appropriate order to be filled out. (Ex. 11 - Deposition of Kindall Smith, p. 60:25 to p. 63:10).

142. Nurse Kindall Smith understood that the deformities needed to be offloaded.

(Ex. 11, p. 16:20 to p. 17:24; p. 18:11 to p. 19:3).

143. When Plaintiff's counsel tried to confirm with the HSA for CCS, Lenora Philson, that a nurse can't notify them without a doctor's order, she disagreed with this characterization of her testimony and testified no policy existed. (Ex. 12 - Deposition of Lenora Philson, p. 24:4-13).

144. Warden Arnold testified that he may have spoken to Ms. Philson (formerly Turner) sometime after the first of February about Mr. Shipp's need for the orthotics. (Ex. 13 - Deposition of Steven Arnold, p. 36:13 to p. 37:1; p. 38:21 to p. 39:14).

Respectfully submitted,
WALSH & FRANSEEN

 /s/ Derek S. Franseen
Micky Walsh, OBA No. 9327, *Pro hac vice*
Derek S. Franseen, OBA No. 30557, *Pro hac vice*
200 E. 10th Street Plaza
Edmond, OK 73034
Telephone (405) 843-7600
Facsimile (405) 606-7050
-and-
Ronald W. Metcalf, AR Bar No. 73084
Ronald W. Metcalf, PA
P.O. Box 1844
Ft. Smith, AR 72902
Telephone (479) 783-0239
Facsimile (479) 783-6754
*Counsel for Plaintiff*

## CERTIFICATE OF ELECTRONIC FILING & NOTICE

This is to certify that on this 11^(TH) day of March, 2020, I electronically transmitted this document to the Clerk of the Court using the ECF system for filing, which shall send notification to anyone registered in this case to receive such filings.

          /s/ Derek S. Franseen
          Derek S. Franseen