# Transcript of the Testimony of
## Jeffrey Stieve

**Date:** June 10, 2019

**Case:** Shipp v. Murphy, et al.



Conway Court Reporting
Phone: 5013194807
Email: lydia@conwaycourtreporting.com

Page 5

1   PROCEEDINGS
2   THEREUPON,
3          JEFFREY STIEVE, M.D.,
4       THE WITNESS HEREINBEFORE NAMED, having
5       been first duly cautioned and sworn by me
6       to testify to the truth, the whole truth,
7       and nothing but the truth, testified on his
8       oath as follows, to-wit:
9          EXAMINATION
10  BY MR. FRANSEEN:
11  Q   Could you please state your full name for the record.
12  A   Jeffrey Charles Stieve.
13  Q   And where are you currently employed?
14  A   At Wellpath.
15  Q   It is my understanding that Wellpath is the new name for
16  Correct Care Solutions?
17  A   That's correct.
18  Q   So if I refer to Correct Care Solutions or CCS as far as
19  your current employment and former employment, I am referring
20  to the same entity?
21  A   Correct.
22  Q   How did you become -- what is your position at Wellpath?
23  A   My position is called a regional medical director.
24  Q   And how long have you been in that position?
25  A   It will be five years on July 28th.

Page 6

1   Q   So you started in 2014?
2   A   Correct.
3   Q   Had you worked for any correctional facilities prior to
4   that?
5   A   I was the chief medical -- well, I was hired by the
6   Michigan Department of Corrections as a regional medical
7   director and then promoted a few months later to the chief
8   medical officer. That was roughly -- you might have my CV. I
9   think that was about 2007 or 2008. I worked there until just
10  14 days before I started with Correct Care Solutions.
11  Q   Were you named in any lawsuits during your Michigan
12  employment?
13  A   I was.
14  Q   How many?
15  A   You know, I -- when I say I was named, I think that was
16  inaccurate. I was asked to testify in my capacity as chief
17  medical officer. To the best of my memory -- I guess I should
18  have kept better track of that. There was maybe three or four
19  in the last two years that I've had to give depositions on. I
20  don't believe I've actually been named, because I never gave
21  direct patient care.
22  Q   When you say in the last two years, are you talking about
23  2017 and forward?
24  A   Yes.
25  Q   Did you give any depositions prior to that?

Page 7

1   A   Not that I recall.
2   Q   Were any of the depositions or subject matter of the
3   lawsuits related to your specific medical care?
4   A   No.
5   Q   Have you ever had an adverse medical board action against
6   you?
7   A   Medical board? Yes. In Michigan, many years ago, I was
8   sued for a patient that refused follow up. There were no
9   sanctions or anything like that. The only thing that affected
10  was that I had to go before the Arkansas Medical Board before
11  they would grant me a license. There was a five or ten minute
12  meeting. They approved me to practice in Arkansas.
13  Q   So you were sued related to that instance. What was kind
14  of the general background of that?
15  A   The general background was that I delivered a woman that
16  had never been seen by me before. I was an OBGYN. She had a
17  tear as a result of the delivery to her rectum. She did not
18  come in for any follow up after that. She claimed that there
19  was inadequate repair and got that fixed by a different
20  surgeon, and sued me for the complication that she had.
21  Q   Do you know whether that was resolved or dismissed?
22  A   My carrier -- I was a hospital employee. They settled, I
23  believe, for $12,000 out of court.
24  Q   Any other lawsuits against you?
25  A   Not that I'm aware of.

Page 8

1   Q   Prior to entering the correctional area of practice, was
2   OB your primary specialty?
3   A   It was.
4   Q   And I believe you started your practice in 1994?
5   A   I did.
6   Q   How did you get into the correctional industry?
7   A   After being solo and practicing OBGYN for five years, I
8   was disappointed in my family life. I just happened to see an
9   ad for the correctional position thinking that I could do it
10  until I got my teaching degree and teach high school biology,
11  but I liked it, and I did well at it. So I switched over.
12  Q   And you understand that you are being presented here as an
13  expert?
14  A   Yes.
15  Q   Are you charging for your testimony anything over and
16  above your salary with CCS or Wellpath?
17  A   I'm not charging anything.
18  Q   What is your salary with Wellpath?
19  A   You know, I'm not sure. I think it's about $265,000.
20  Q   How many times have you had to testify on behalf of your
21  roll with Wellpath or CCS?
22  A   Probably about two or three times.
23  Q   And that's in addition to the two or three times with your
24  Michigan position?
25  A   Yes. Excuse me. I guess I need to correct that. I think

Page 25

1   A   I can't say that.
2   Q   She was already on notice that his feet were developing
3   sores as a result of not having his orthotics?
4   A   I can't assume that. He might have had the sores at the
5   jail despite wearing the orthotics. It would surprise me that
6   in the short time between the transfer from the jail to the
7   transfer to the prison that these sores would have developed.
8   It appeared that these were not something that had just
9   developed in a day or so and these were longstanding problems
10  with the patient's feet from what I reviewed.
11  Q   So you reviewed medical records showing that prior to
12  February 1st, he had existing sores on his feet?
13  A   I don't know whether he did or not.
14  Q   Well, you just told me you believe that this shows as a
15  longstanding sore.
16  A   I believe that given this patient's constitution and given
17  this patient's uncontrolled diabetes upon arrival, it would not
18  surprise me if this patient had sores prior to arriving at the
19  prison. I do not have any access to records as to what his
20  feet were like at the time he left the prison. I know that
21  when he got here, he had rather well-developed sores.
22  Q   So it's your testimony that he had sores on both feet
23  prior to February 1st?
24  A   I know that he had charcot foot on the right, and I
25  believe I saw some testimony that that went back into 2011 or

Page 26

1   2012 that this had been a problem. He had an acute problem
2   with a piece of skin hanging from his left foot that Dr. Lemdja
3   addressed. Beyond that, I can't say what his physical
4   condition was.
5   Q   And charcot deformity isn't a sore?
6   A   It's not.
7   Q   It can lead to sores?
8   A   It can.
9   Q   It can lead to sores pretty quickly?
10  A   Charcot foot is a progressive disorder that generally
11  doesn't have a good outcome.
12  Q   It's a serious medical condition?
13  A   It is.
14  Q   Is it something that the CCS staff is trained to
15  recognize?
16  A   It is.
17  Q   What does the intake staff do when a charcot foot
18  deformity comes through the door?
19  A   It depends on how long it's been present and so forth.
20  Generally, they set up a meeting with a provider that can
21  evaluate the problem and address it to the best of their
22  ability.
23  Q   Did anyone, on February 1st, set up that meeting?
24  A   Not that I know of.
25  Q   Should they have?

Page 27

1   A   I don't know what the policy is on whether this inmate was
2   seen according to our policy. Unfortunately, if the inmate
3   wasn't complaining about it, it certainly could have gone days
4   or weeks without being addressed.
5   Q   On the 1st, Mr. Shipp complained about not having his
6   orthotics for his charcot foot; is that correct?
7   A   I believe that's correct.
8   Q   So he not only has the visible condition, but he is also
9   making verbal complaints and testimony to the staff members
10  about this deformity?
11  A   I believe he answered a request for medical evaluation. I
12  believe that the 5th, the triage by the nurse, was the end
13  result of that. In other words, they got him in to see
14  somebody to be evaluated.
15  Q   And so the provider should have evaluated his feet at that
16  time?
17  A   No. That was a nursing triage visit. As a result of the
18  nursing triage visit, an appointment with a provider was set up
19  for the 9th.
20  Q   And on the 9th, what evaluation on the feet was performed?
21  A   Let me review my notes from Dr. Lemdja. It appears that
22  on 2/03/16, Mr. Shipp entered a health service request for
23  deformed feet, charcot joint, and also diabetes.
24  Q   Is that a sufficient sick call?
25  A   Pardon me?

Page 28

1   Q   Is that a sufficient request for sick call?
2   A   I think the policy states that there is supposed to be one
3   issue. I would argue that deformed feet, charcot joint, and
4   diabetes are all related. So, yes, it is.
5   Q   That was enough to put CCS on notice to evaluate the
6   charcot foot deformity in accordance with their policies and
7   procedures?
8   A   Correct. I am looking for a note from Dr. Lemdja. I'm
9   used to looking on the computer here. I believe that -- I am
10  having trouble seeing the date. On 2/09/16, Dr. Lemdja did a
11  physical exam. Her assessment was that it was an intake
12  physical and that the patient had Type 2 diabetes, high blood
13  pressure, high cholesterol, and diabetes with a foot ulcer.
14  The physical exam documents a left foot ulcer with dressing,
15  the wound was cleaned with granulation tissue, and there was a
16  deformity of the right foot. That's it.
17  Q   What medical restrictions were ordered on that date?
18  A   I didn't see any that were ordered.
19  Q   Okay. So on this date, Dr. Lemdja has a clear duty to
20  evaluate the charcot foot deformity?
21  A   I believe, to the best of my memory, that Dr. Lemdja did
22  do that.
23  Q   And what restrictions were ordered to offload his feet
24  during this time period?
25  A   It doesn't appear that she placed any.

Page 29

1  Q  Should she have?
2  A  Well, what she did instead --
3  Q  Tell me whether she should have offloaded the feet at that
4  time?
5  A  She should have done something.
6  Q  Okay. What did she do?
7  A  It appears that she rescheduled the patient to see Dr.
8  Lomax for his charcot foot.
9  Q  Is there anything in Dr. Lemdja's experience that
10 prevented her from ordering any restrictions or providing him
11 with a wheelchair to offload his feet at that time?
12 A  No, there's not.
13 Q  She was trained and qualified in order to provide that
14 type of restriction in order to immediately offload his feet on
15 the 9th?
16 A  I think that physician's have various backgrounds and when
17 somebody knows that something is wrong, but they're not sure
18 what the next step is, we seek help. I think that Dr. Lemdja
19 sought help with Dr. Lomax to evaluate this person's foot
20 deformity. In retrospect, I would have felt that, in defense
21 of Dr. Lemdja, it would have been a much stronger case to say
22 that she put the patient on bed rest and so forth. I did
23 notice earlier that the patient was coming down for treatment
24 for his left foot and was asked to elevate that as much as
25 possible. That fell short of offloading both feet.

Page 30

1  Q  Without you knowing her background, she is a medical
2  doctor. She violated the standard of care by not offloading
3  his feet and writing those restrictions?
4  A  Yes.
5  Q  She had that same knowledge on the 5th; correct?
6  A  She did.
7  Q  And she should have ordered the offloading on that date as
8  well?
9  A  That one I won't agree to, because it was not her patient
10 visit. While I encourage all the providers when they see a
11 patient -- there are two kinds of drive bys. The nurse will
12 come in and say, I need an antibiotic for a boil for example,
13 and the doctor usually asks if they have any allergies, how big
14 is the boil, give them this treatment. They generally don't
15 write a note, because the nurse is going to incorporate that
16 discussion in their note. When they see a patient, and
17 especially when they do a procedure, as limited as it could be,
18 my understanding is that Dr. Lemdja was worried because she was
19 not scheduled for a full evaluation of this patient and she
20 would be putting herself in some sort of medical legal risk to
21 write a partial note as to what she did. I disagree with that,
22 and think that a note should have been written that said, I was
23 called to see this patient for this skin thing. I saw the skin
24 flap, and this is what I did.
25 Q  So you document your procedures?

Page 31

1  A  I think that's the best practice.
2  Q  And that's within the standard of care, to document any
3  procedures, no matter how mild they are?
4  A  Well, you know, healthcare units are busy places.
5  Sometimes corners are cut. I would argue that. I'm not
6  convinced that Dr. Lemdja's lack of documentation in this case
7  resulted in any adverse outcome. I think that just as a
8  standard practice as a physician, we owe it to the rest of the
9  healthcare staff to document what we did.
10 Q  I think federal regulations, on your part, are to document
11 your actions as a medical doctor.
12 A  I will take that as your opinion. I'm not aware of that.
13 Q  As a doctor, are you allowed to choose whether to document
14 your interactions with patients or not?
15 A  I think there are clear instances where you must document.
16 If I do a hysterectomy, I need to document that. Whether I go
17 in and tap on somebody's back or cut off a little skin flap
18 because the nurse isn't allowed to do that, I think that's a
19 gray area. So I don't know the answer to that.
20 Q  Does CCS have a policy that prohibited Dr. Lemdja from
21 performing a more thorough evaluation on the 5th?
22 A  They do not.
23 Q  As a medical doctor, if you are concerned about your
24 patient's well being and concerned about the care of their feet
25 for example and you are brought into a room to evaluate a

Page 32

1  patient, should you go ahead and try to flush out that portion
2  of that patient's issues?
3  A  I think with a drive by when there is a nurse scheduled
4  triage, because of the busyness of the clinic, the providers
5  tend to trust the judgement of the nurse doing the triage. If
6  they say there is a particular instance that they think an
7  intervention is necessary, I think it's not unusual that the
8  focus of that drive by done by the provider would just be on
9  that sole topic.
10 Q  The topic on that date was?
11 A  It was for the left foot specifically, I believe.
12 Q  And during that drive by, she was informed about the need
13 for orthotics?
14 A  Correct.
15 Q  And she knows that that is a prescribed medical device?
16 A  She does. She also knows that if she would have -- I
17 believe it came to her attention that the inmate had orthotic
18 shoes at the jail, but they didn't appear to have made the trip
19 with the inmate. If she would have started that process de
20 novo, it would have taken 30 to 60 days, by policy, to get the
21 patient in to see someone at the foot clinic. I don't know how
22 complicated the orthotics are, but it would have taken a little
23 bit of time after that visit to generate a new orthotic. I
24 think Dr. Lemdja did what was in the patient's best interest
25 and said, If you have bad feet and you have previous orthotics,

Page 49

1  the right leg followed some sort of procedure. I think it was
2  a biopsy done after he left prison that resulted in an
3  infection that precipitated the acute need for the amputation.
4  Q  The biopsy was of the issue of the same sore that
5  initially developed in February 2016 at SWAC?
6  A  Well, I mean, the sore was treated.
7  Q  Did it ever heal over?
8  A  I don't recall.
9  Q  It's the same sore.
10 A  So it's the same sore. The sore was casted and improved.
11 From walking on the cast, the cast needed to be removed. From
12 that point until the time that he was paroled or discharged,
13 I'm unclear as to the time frame.
14 Q  Are you aware you can't provide opinions on matters if you
15 don't know the full extent of the facts?
16 A  Sure.
17 Q  Okay. How many times did he walk on his cast that you are
18 aware of?
19 A  In my review of the record, it seemed that when he would
20 come to pill line, there were instances where nurses would
21 mention that he wasn't in his wheelchair. It was two or more.
22 I don't know specifically.
23 Q  Do you know if there are any reasons, with regard to the
24 layout of the facility, that kept him from sometimes not using
25 his wheelchair?

Page 50

1  A  I'm not aware.
2  Q  Are you aware that the SWAC facility has a policy or
3  procedure preventing other guards or inmates from pushing an
4  inmate's wheelchair?
5  A  I think I am aware of that, yes.
6  Q  Why is that?
7  A  I think it was a Department of Justice ruling a long time
8  ago that inmates can't care for other inmates, but that's all
9  of my knowledge on that.
10 Q  So staff members have to care for inmates?
11 A  Staff members have to -- if an inmate is unable to move
12 their wheelchair themselves and they need to go someplace, I
13 believe that staff would be involved with that. There are
14 inmates that can wheel themselves and choose not to. I don't
15 know whether he was able to move his wheelchair or whether he
16 needed to be pushed.
17 Q  Do you know whether he reported pain in his shoulder as a
18 result of his wheelchair?
19 A  Honestly, that would surprise me. I'm not aware of that.
20 Q  Why would that surprise you?
21 A  Because the overwhelming picture that I got in reviewing
22 his record is that he resisted using the wheelchair.
23 Q  And you saw no mention of reports of left shoulder pain?
24 A  I don't recall that. I'm sorry.
25 Q  Did you see -- did you review his testimony as far as his

Page 51

1  explanations on that?
2  A  I did not.
3  Q  How many times have you visited the Texarkana facility?
4  A  Two or three.
5  Q  Is Dr. Lemdja still a provider at other locations?
6  A  You know, I think she is, but I'm not sure.
7  Q  Have you ever had any discussions with Dr. Lemdja
8  regarding this case?
9  A  I have not. When this case is over and if she's still
10 working with us, I want to talk with her about the
11 documentation issue that's been previously discussed.
12 Q  I assume you probably want to talk to her about the
13 February 9th --
14 A  I want to talk to her about documentation issues when she
15 sees inmates for drive bys.
16 Q  And not the not order issues on February 9th?
17 A  As I testified previously, I believe that correctional
18 providers see such a wide range of medical conditions. For
19 example, as an OBGYN, even though I've done lots of internal
20 medicine training and so forth since I've been doing this job,
21 I'm not comfortable taking a toenail off or putting a
22 dislocated shoulder back, whereas, other providers are. I
23 promise providers when they come on board that if they see
24 something that is beyond their comfort zone, they can refer to
25 somebody else, and they don't have to treat it.

Page 52

1  Q  As we sit here today, you don't know if that is what her
2  decision was?
3  A  Correct.
4  Q  Are you providing any opinions on when this amputation
5  should have occurred?
6  A  Regarding the amputation?
7  Q  Yes.
8  A  All I can say is that I reviewed the record of when the
9  biopsy was done and that it precipitated in an amputation after
10 discharge. That's all I know.
11 Q  Would you agree that an A1C of 6.8 in August of 2016
12 indicates that the purchases from commissary were not
13 significantly affecting his blood sugar levels?
14 A  No. An A1C is a measure of the average of blood sugars
15 over approximately a three-month period. Certainly, we know
16 that acute elevations of blood sugar due to high carbohydrate
17 in foods can cause problems, including circulation problems,
18 even though the average might be within normal limits.
19 Q  You can't use the A1C to base an evaluation off of whether
20 it is controlled or uncontrolled diabetes?
21 A  Most people would think that 6.8 is certainly better than
22 13, but it's not normalized. It's not non diabetic control,
23 which would be optimal.
24 Q  And 7.3, what does that tell you?
25 A  Generally speaking, for somebody like this patient, we

Page 53

 1  would like to see the blood sugar -- the A1C under 7 and
 2  certainly under 8. Generally, we call anything greater than 8
 3  out of control. So he was within control, but it wasn't
 4  optimal.
 5  Q  Okay. So when he arrived, he was within control of his
 6  diabetes?
 7  A  If that's what his blood sugar was when he arrived, yes.
 8  Q  Can the A1C rise above an 8, even if you are following all
 9  the appropriate recommendations?
10  A  Yes.
11  Q  So a high A1C doesn't necessarily tell you that someone
12  isn't doing their efforts to control their condition?
13  A  Correct.
14  Q  Can an infection affect an A1C?
15  A  Infection definitely can affect blood sugars. If the
16  infection lasted long enough, it certainly could affect the
17  A1C.
18  Q  And you testified that you -- it was best to reduce the
19  amputation of an individual -- the area amputated?
20  A  Well, I didn't say that. I think that the folks that do
21  amputations have a protocol to evaluate the whole limb and that
22  includes arterial studies. At any given time, if an amputation
23  is indicated, that protocol tells the amputating physician what
24  the likelihood of good healing would be afterwards. What I
25  said before was that for a patient to continue with their

Page 54

 1  activities of daily living, walking around and so forth, a
 2  below-the-knee amputation results in more affect on the
 3  activities of daily living rather than, for example, the
 4  amputation of a toe.
 5  Q  So you are wanting to preserve those feet and limbs to the
 6  best of your abilities as a provider?
 7  A  Yes. With the caveat that you wouldn't -- the charcot
 8  deformity is a collapse of the mid foot joint in a patient. A
 9  toe or a mid foot amputation is unlikely to remove the charcot
10  problem. An entire foot or below the knee is probably the two
11  actual options for somebody with this problem. That's stated
12  as not an expert in amputations. It's just common sense, I
13  think.
14  Q  And as someone who has treated charcot foot, is it your
15  opinion that you recommend amputation once it develops or is it
16  your opinion to try to manage it and offload it?
17  A  It's complicated, because sometimes it progresses faster
18  than others. I think it is a multiple disciplinary approach in
19  which the provider works with the possible amputation team and
20  circulation team and so forth and talks to the patients. There
21  are some patients that want to resist and knowing that by
22  resisting, they could end up with more being amputated. There
23  are other patients that say, Hey, if this is going to happen,
24  let's do it now before it gets worse.
25  Q  It's a patient's decision?

Page 55

 1  A  It's a combine between the provider, the amputation team,
 2  and the patient. I mean, you don't just tell the patient that
 3  they have to have this or that. You want to know what their
 4  priorities are, I guess.
 5  Q  You indicate that Mr. Shipp's amputation was a blessing?
 6  A  A blessing? Did I say that?
 7  Q  "The amputation for his health status improves function,
 8  avoids expensive chronic wound care, which cannot resolve the
 9  ulcerated charcot foot. It is a blessing, not a harm."
10  A  Well, from the charcot deformity, that's true.
11  Q  I'm sorry. I am reading from Dr. Peeple's report. I'm
12  sorry. I will retract that.
13  A  I didn't think I said that. That's not my usual verbage.
14           MR. FRANSEEN: I will pass the witness.
15                 EXAMINATION
16  BY MS. ODUM:
17  Q  I just have a few. I think y'all were talking about
18  Michigan, so I wanted to clarify as opposed to Arkansas. He
19  specifically asked you if you had any other lawsuits against
20  you. In Arkansas, have inmates filed lawsuits against you as
21  the regional medical director?
22  A  Correct.
23  Q  Okay. And that's numerous; is that also correct?
24  A  Yes, that's very common. The distinction I would make is
25  that -- I think that to date, all of the lawsuits against me

Page 56

 1  have been dismissed.
 2  Q  Okay. And you've never had to go to court, except for one
 3  time?
 4  A  One time with you. I think I was an expert witness or
 5  giving my opinion. I wasn't being sued.
 6  Q  That was the one where the Court called the hearing about
 7  the water; is that correct?
 8  A  That's the one that I recall.
 9  Q  Okay. And that was a post judgement hearing?
10  A  Yeah. I remember they made a judgment and the judge
11  wanted to talk about it again.
12  Q  Okay. And you also stated earlier that staff was trained
13  to recognize charcot foot. Earlier you said that LPNs, it's
14  not their job to make such assessments; is that correct?
15  A  That is correct. LPNs, I believe, in Arkansas, are
16  prohibited from making assessments and labeling this with a
17  diagnosis. I think that's a provider issue. I think that an
18  RN would probably not label it charcot's foot and would assess
19  it as a foot deformity or something.
20  Q  Okay. And there were times where it was CCS policy -- am
21  I correct that CCS follows ADC or ACC policies?
22  A  Right. We can't not follow those policies.
23  Q  So all of the time when you were referring to policies,
24  that's what you were referring to?
25  A  Correct.