

# Transcript of the Testimony of
# **MIMO LEMDJA, M.D.**

# Date: **NOVEMBER 16, 2018**

### Re:   SHIPP VS. CORRECT CARE SOLUTIONS, LLC, ET AL

CONWAY COURT REPORTING, LLC
Phone:501-679-1488
Email:scheduling@conwaycourtreporting.com
Internet: www.conwaycourtreporting.com

Page 30

1    5th when you were informed by Mr. Shipp that he needed his
2    orthotic shoes?
3    A   I told the nurse to write down that he needs his shoes,
4    yes, sir.
5    Q   Can nurses write prescriptions at SWACCC?
6    A   It's not a prescription.
7    Q   Okay.  Can nurses write approvals for medical devices?
8    A   Doctors do it.
9    Q   Right, correct.  So you did not write the approval for a
10   medical device on February 5th; correct?
11   A   I told the patient to get his shoes if he has them.  I
12   told him personally.
13   Q   And that's all you did?
14   A   That's all I did, and the nurse documented.
15   Q   Did you write any other -- or did you communicate this
16   with anyone else other than the nurse?
17   A   The nurse was present, and the patient was present, so the
18   three of us.
19   Q   Okay.  Did you communicate it with anyone else?
20   A   No.
21   Q   Was there any other reason, in your mind, that you didn't
22   want to document this encounter?
23   A   It was documented.
24   Q   Okay.  By the nurse?
25   A   By the nurse.  They usually say, "The doctor orders," so

Page 31

1    that's telling in the record that the doctor gave me permission
2    to -- well, the doctor told the patient to bring this or that,
3    so that if the warden has a question, they will approve of it
4    -- well, they will look at it, "Well, the doctor ordered for
5    the patient to wear those shoes or this device."
6    Q   So CCS staff, based off your instruction to the nurse,
7    should have coordinated the approval of the shoes?
8    A   Well, in this particular case, the patient has to call and
9    get it shipped to the unit.
10   Q   Right.
11   A   Yes.
12   Q   And do you know if CCS staff is telling the patient that
13   he has to get approval to do this?
14   A   No.  I told the patient, not CCS.  I told the patient in
15   front of the nurse to get his shoes shipped to the facility --
16   Q   Right.
17   A   -- so he could wear them.
18   Q   Right.  But you didn't write a note saying that?
19   A   I don't have to write a note, sir.  I told him to.  So
20   what he does, he will get it, and he'll bring it, and then the
21   warden will have to go through the protocol to let him have it.
22   Q   Okay.  So how does this information get to the warden?
23   A   The patient will order; and once the shoes arrive, then
24   the warden will call the floor and ask, "Did you guys okay
25   this?"  "Yes."  That's how it goes.  And then he will have the

Page 32

1    permission to wear his device.
2    Q   Okay.  And that's your understanding of the policy and
3    procedure there?
4    A   That's -- yes, sir.
5              (WHEREUPON, Exhibit 4 was marked for
6              identification and is attached hereto.)
7    Q   Okay.  And here is Exhibit 4.
8    A   Okay.
9    Q   Is that the encounter you were discussing?
10   A   Yes, sir.
11   Q   What did you discuss with Mr. Shipp on the 9th about his
12   shoes?
13   A   We didn't discuss about the shoes on the 9th.
14   Q   Do you know Ms. Turner or Ms. Philson?
15   A   Yes, sir.
16   Q   And they're the same person; correct?
17   A   Yes, sir.
18   Q   Do you have any opinions on Ms. Turner?
19   A   No, sir.
20   Q   Have you ever been written up or reprimanded at SWACCC?
21   A   No.
22   Q   Do you believe Ms. Turner is an honest person?
23   A   Yes, she is.
24             (WHEREUPON, Exhibit 5 was marked for
25             identification and is attached hereto.)

Page 33

1    Q   I'm going to hand you what's been marked as Exhibit 5.
2    Did you review any emails prior to your deposition today?
3    A   Emails?  Tons of emails, yes, sir.
4    Q   Okay.  With regards to this case?
5    A   Yes, sir.
6    Q   Okay.  Do any of the emails stick out in your mind?
7    A   No.
8    Q   Okay.  So none of the emails are critical of your care of
9    Mr. Shipp?
10   A   Not that I can recall.
11   Q   Okay.  I'm going to hand you Exhibit 5 and just give you
12   some time to read through that email.
13   A   Okay.  Yeah, I've seen this.
14   Q   Okay.  Do you agree with that email and what it describes
15   as far as your actions?
16   A   Yeah.
17   Q   Yes?
18   A   Yeah.
19   Q   Is that a yes?
20   A   That's a yes.
21   Q   Okay.  So you agree that you told someone that you refused
22   to document treatment due to it being too much of a liability?
23   A   Well, I said, "I cannot document a visit that I didn't
24   do," so I can't write a note, history, physical, assessment,
25   plan on a patient that I didn't see --

Page 34

1  Q   But you saw Mr. Shipp?
2  A   -- that I didn't do.
3  Q   Okay.
4  A   I didn't take a history, I didn't examine the patient head
5  to toe, I had no assessment and no plan, so I told her, "I
6  can't do it, because I don't do that. That's not medical."
7  You don't document things that you didn't do.
8  Q   That's not what that email describes, does it?
9  A   That's what it does. I told her, "I will not document
10 anything that I didn't do because I didn't do it." I didn't do
11 a visit to document. I only document visits. I can't --
12 Q   And you just pointed to this email and described what it
13 says. I want you to circle on this email -- on this Exhibit 5
14 where it says, "I told her I didn't document because I can't
15 document what I didn't do."
16 A   Huh?
17 Q   Circle on that.
18 A   Oh, I don't -- that's what it means.
19 Q   Okay. So you underlined on here, and I'm quoting this,
20 "She refused to document her interventions because she
21 vocalized that," quote, 'She didn't want her name in the chart
22 because it was too much of a liability,'" end quote. Looking
23 at Exhibit, I believe it's 3, that Physical Assessment 1,
24 maybe, or maybe it's --
25 A   3?

Page 35

1  Q   Yeah. You've got Exhibit 1.
2          MS. ODUM: Are you talking about the 5th?
3          MR. FRANSEEN: It's on the 9th, I believe, the
4      Physical Assessment 1.
5  A   Oh, this one?
6  Q   (By Mr. Franseen) Yes. Is there a place for restrictions
7  on the back?
8  A   I can't see it.
9  Q   Okay. You can't see the title that says, "Restrictions"
10 there?
11 A   Yeah, I can't see -- I think I gave him a -- I gave this
12 patient an elevator pass.
13 Q   Okay. You did on that date?
14 A   Yes.
15 Q   Did you give him any other restrictions?
16 A   I think I approved bed rest on the 5th per the nurse --
17 well, to the nurse.
18 Q   Okay. The top left here under, "Restrictions to be
19 transcribed," did you mark that one?
20 A   But I gave him an elevator pass.
21 Q   Right.
22 A   So I already put the orders in, so I didn't check these,
23 because I already -- the orders were in.
24 Q   Okay. But --
25 A   There is an elevator pass that I put down that I gave him,

Page 36

1  and it's also an order for bed rest.
2  Q   Okay. Where is the order for bed rest?
3  A   They are in the records. In other words, if you look up
4  Ms. Smith's note --
5  Q   She ordered bed rest?
6  A   I told her to order bed rest for him --
7  Q   Okay. Which note was that?
8  A   The first time I saw him.
9  Q   On the 5th?
10 A   On the 5th, I mean, the visit --
11 Q   You ordered bed rest for him on the 5th?
12 A   There is an order -- there was an order for bed rest.
13 Q   Okay. Well, we're --
14 A   I don't have it in my records.
15 Q   -- you have Ms. Smith's note there. Show me -- circle on
16 that note where you ordered bed rest.
17 A   Usually, when we put the orders in, there's a separate
18 order.
19 Q   Right, the doctor -- when the doctor puts the orders in.
20 A   I'm not seeing on February 5th --
21 Q   You're referring to Ms. Smith's notes. Was that October
22 (sic) 5th; correct?
23 A   Yeah. It is an order for bed rest.
24         MR. FRANSEEN: Can we not -- I mean, if you have
25     a document you want her to see --

Page 37

1          MS. ODUM: Right.
2          MR. FRANSEEN: I mean, I don't think you should
3      be --
4          MS. ODUM: Oh, I'm not showing her anything.
5          THE WITNESS: No.
6          MR. FRANSEEN: When she's looking at you going
7      through her --
8          MS. ODUM: See my hair? I can't see her at all
9      when I'm looking sideways at records.
10         THE WITNESS: Yeah.
11 A   But it's an --
12         MS. ODUM: My apologies.
13         MR. FRANSEEN: That's all right.
14 A   -- an order for an elevator pass.
15 Q   That you --
16 A   Yeah, I gave him, uh-huh.
17 Q   Okay. But you didn't document yourself?
18 A   Because I put the orders in.
19 Q   Okay. But can you -- the bed rest you just described, can
20 you show me where that is?
21 A   It's -- I can't see the note, but when I reviewed a note
22 earlier, I saw it. I'm sorry. I can't see it here. I don't
23 have all the records with me. But then if you look right after
24 Ms. Smith's notes, you see the orders that -- it's a computer
25 system. You just have to do the orders separate, and you get

Page 38

1  it on a separate sheet of paper.
2  Q  But on the February 5th one that you referred to, you
3     don't see anything in that one recommending bed rest?
4  A  Ms. Smith's -- let me look for Ms. Smith's note. It's
5     right after this, and it looks like this. It's right after
6     this one, and it looks like this. You can see --
7  Q  That you filled out?
8  A  Like I said, I gave the order to the nurse, so they fill
9     it out. I didn't see the patient. This was just the
10    interaction between me, the patient, and Ms. Smith, who was
11    actually seeing the patient. So just like I told the patient
12    to get the note (sic) from family, she documented that.
13 Q  Right.
14 A  And, again, for bed rest, she documented that, yeah.
15 Q  You're saying the nurse would have filled out that similar
16    form that you're referring to as Exhibit 3 --
17 A  It looks like this. It looks like this one.
18 Q  Okay. And so that note would be signed by the nurse on
19    the very back where --
20 A  And, also, I think the same as another note for my
21    elevator pass that looks just like this.
22 Q  And you've seen that?
23 A  I've seen it.
24 Q  That looks like that document?
25 A  They look pretty similar.

Page 39

1  Q  Is that a document that a physician fills out or a nurse?
2  A  The nurse -- we can give them a verbal order, and they
3     will do just like this. They will fill out like this, yeah.
4     They have --
5  Q  They will fill out that Exhibit 3?
6  A  This is not the elevator pass, but I'm saying it's similar
7     to this.
8  Q  Okay.
9  A  This is me. This is the physician. You have a note
10    similar to this. And I have it upstairs. If you-all want to,
11    I will get it, because I have it.
12       MR. FRANSEEN: Let's take a break -- if you have
13       the documents that you've seen --
14       THE WITNESS: Yes. Let me just go get it in
15       the --
16       MR. FRANSEEN: -- I'll be more than happy to
17       look at those.
18       THE WITNESS: All right. Let me just go get it
19       quick.
20       (WHEREUPON, after a break was taken, the
21       proceedings were resumed as follows, to-wit:)
22 A  That's the bed rest that I was talking about.
23 Q  (By Mr. Franseen) And we're back on the record. Who is
24    supposed to convey this to the SWACCC staff that he is on bed
25    rest?

Page 40

1  A  The patient gets a copy. This is our copy.
2  Q  Okay. Do you know whether Mr. Shipp got a copy of this?
3  A  He had one.
4  Q  Okay. Do you -- how do you know that?
5  A  I don't know, but he's supposed to have one.
6  Q  Okay. Do you know why he was not put on bed rest on
7     February 5th?
8  A  That happened. I can't know whether he wasn't put on bed
9     rest. I wrote an order. And every time you write orders, the
10    patient will have it; and if they are on bed rest and they're
11    going to maybe the supervisor, all they have to do is get the
12    order and show it to them, and they're free. So that's how it
13    works.
14 Q  And I'm going to mark this as Exhibit 6. And you're
15    indicating bed rest based off the asterisks next to these items
16    there?
17       (WHEREUPON, Exhibit 6 was marked for
18       identification and is attached hereto.)
19 A  Yes, sir.
20 Q  Okay. Does that have to be communicated to the SWACCC
21    staff?
22 A  We give the patient a copy.
23 Q  And do you know whether that copy was actually given to
24    the patient?
25 A  They always have a copy. If it's written, they have a

Page 41

1  copy.
2  Q  I'm just asking if you have any personal knowledge of
3     whether Mr. Shipp got that?
4  A  I write this all the time, and I put the orders in all the
5     time, and I give orders to nurses. I've never had any problem,
6     so they always have the copies.
7  Q  And if he was not given a copy of that, would that be
8     inappropriate?
9  A  If he wasn't, absolutely, but I cannot say whether or not
10    he did.
11 Q  Do you know why the bed rest isn't noted in the February
12    5th nurses' note by Nurse Smith?
13 A  I cannot speculate.
14       MS. ODUM: Does she have the note to look at?
15       MR. FRANSEEN: Yes.
16       MS. ODUM: Is that one of these? Which one is
17       that?
18       MR. FRANSEEN: I believe it's Exhibit 3 or --
19       MS. ODUM: 4?
20       MR. FRANSEEN: -- 4 maybe.
21       MS. ODUM: I'm just -- or 6 -- yeah, 4, that's
22       the note he's referring to.
23       THE WITNESS: Okay. Sorry. Yes.
24 A  And, also, my elevator pass was scheduled at five days,
25    elevator pass. It actually says, "Gave the inmate verbal

Page 42

1  instructions regarding medical treatment, and he verbalized
2  understanding."  So she did everything that I --
3  Q  (By Mr. Franseen)  And does it --
4  A  -- I asked her to.
5  Q  -- does it mention bed rest in that note?
6  A  Not specifically.
7  Q  And does it mention any prescription for any wheelchair or
8  crutches?
9  A  I don't see any.  I didn't order a wheelchair.
10 Q  So that's a no?
11 A  No.
12 Q  If the SWACCC facility was continuing to maintain that he
13 follow through with his program as far as having to stand at
14 the meetings, walk to various places, would that be against
15 your bed rest orders?
16 A  It would be, yeah.
17 Q  And if Mr. Shipp was not advised of your bed rest orders,
18 not provided that document, would that be improper?
19 A  I can't really speculate on this one.
20 Q  Okay.  Other than Nurse Smith, did you speak with anyone
21 else on February 5th about Mr. Shipp's care?
22 A  Not to my knowledge.
23         MR. FRANSEEN:  I will pass the witness.
24                 EXAMINATION
25 BY MS. ODUM:

Page 43

1  Q  That Exhibit 4 that's in front of you, right under the
2  elevator pass note -- wait.  Don't mix these in.  Those go with
3  the court reporter.
4  A  Oh, okay.  Sorry.
5  Q  Just set those aside.
6  A  Okay.
7  Q  Now, looking at Exhibit 4, I'm curious, right underneath
8  the area where it says, "Temporary Elevator Pass," it has this
9  "VO."  What does "VO" mean?
10 A  Voice -- I don't know what that is.  It's --
11 Q  Is it voice order?
12 A  Yes.  Yes.  I'm sorry.
13 Q  And then it says, "VORB."  What if that had said, "VOBR"?
14 A  VOBR?
15 Q  If it didn't say, "RB," if those letters were transposed
16 and said, "VOBR"?
17 A  Verbal order -- I don't really understand.
18 Q  Well, what were your verbal orders that day?
19 A  Oh, an elevator pass.
20 Q  And?
21 A  And antibiotics and get device from home -- ask family or
22 write to family to bring device to the facility, and naproxen
23 for the pain, and restrictions.
24 Q  And what about the order you-all just went over, the
25 script?  What was the script for?

Page 44

1  A  For bed rest and elevator -- what was it --
2  Q  Elevator?
3  A  Yeah, elevator pass.
4  Q  Okay.
5  A  Yeah.  Well, it was also instructed him to only go to the
6  dining -- you know, not going to activities, just limited to
7  dining, pill window, shower, so restricted activities.
8  Q  So that keeps him from having to go all over the place?
9  A  Yes, ma'am.
10 Q  So that could mean "Voice Order Bed Rest" if it's not --
11 but you don't know --
12 A  It's possible, but I don't know.
13 Q  Ms. Smith will have to explain that?
14 A  She will have to.  I can't tell you.
15 Q  Okay.
16 A  Yeah.  Maybe that's her initials, but I can't tell you for
17 sure.
18 Q  That's fine.  That's fine.
19    Now, you said something earlier.  You were asked if all
20 encounters have had -- were to be -- you know, have notes.
21 Now, not all -- is every time you look at a patient considered
22 an encounter?
23 A  No, ma'am.
24         MR. FRANSEEN:  Object to form.
25 Q  Okay.  Now, are all notes that you make in a file SOAP

Page 45

1  notes?
2  A  No, ma'am.
3  Q  Okay.  And the email marked as 5, actually, was Doctor --
4  I'm sorry -- was Ms. Turner critical of your patient care, or
5  was she critical of note-taking?
6  A  She was not critical.  This particular conversation
7  happened many, many days after I had seen Mr. Shipp, and she
8  just wanted me to write a note right there, and I couldn't do
9  it because it was not -- it's not right.  You don't write a
10 note on something that you didn't do, so I just --
11 Q  So that was your problem, what you meant by "liability,"
12 if --
13 A  Yes, ma'am.
14 Q  -- if you wrote a note that you examined him and you
15 didn't?
16 A  Yes.  I didn't want to do that, because it's not true.
17 It's fraud.
18 Q  Okay.  And this email is her wording; is that correct?
19 A  That's her.
20 Q  Did she record everything you discussed?
21 A  She didn't.
22 Q  Okay.
23         MS. ODUM:  That's all.
24         MS. MIDDLETON:  I don't have anything.
25             FURTHER EXAMINATION

Page 46

1   BY MR. FRANSEEN:
2   Q   I have one quick little follow-up.  And we can print this
3   out later as Exhibit 7, but just so, if that's okay, it's
4   easier, I'm going to show you what's CCS 9.  Is this a form
5   similar to what Nurse Kindall Smith filled out?
6           (WHEREUPON, Exhibit 7 was marked for
7           identification and is attached hereto.)
8   A   Yes, I think so.
9   Q   Okay.  And so you see, on this form, there's little boxes
10  next to the items; correct?
11  A   Yes.
12  Q   Okay.  This one under Part 3, it says, "Had in
13  possession," the box when it's checked, there's a checkmark in
14  the box; correct?
15  A   Yes.
16  Q   And then the same for "Elevator Pass," there's a checkmark
17  in that box as well when it's filled out; correct?
18  A   Yes.
19  Q   Okay.  And this was filled out by Nadia Brown on February
20  12th, 2016?
21  A   Yes.
22  Q   Okay.  Going back to Exhibit 6, there's no checkmarks in
23  any of those boxes; correct?
24  A   Not this one.
25          MR. FRANSEEN:  No further questions.

Page 47

1           MS. ODUM:  All right.  That's it.
2           (WHEREUPON, the proceedings were concluded in
3           the matter at 9:59 a.m.)
4           (WITNESS EXCUSED)

Page 48

C E R T I F I C A T E

STATE OF ARKANSAS  )
                   )ss
COUNTY OF FAULKNER )

   I, KRISTY L. ROONEY, Certified Court Reporter #529, does hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

   I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

   CONWAY COURT REPORTING - 501.679.1488 or 501.319.4807
              www.conwaycourtreporting.com

Page 49

   WITNESS MY HAND AND SEAL this 4th day of December, 2018.

   _____
   KRISTY L. ROONEY, CCR
   Certified Court Reporter #529