## Page 1

```
              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF ARKANSAS
                    TEXARKANA DIVISION
CRAIG SHIPP                                    PLAINTIFF
            CASE NO. 4:18-CV-04017-SOH
v.

KIMBERLY HOFFMAN, et al.                       DEFENDANTS


       *******************************************

                     ORAL DEPOSITION
                           OF
                      KINDALL SMITH
                     MARCH 29, 2019
                        VOLUME 1

       *******************************************
```

ORAL DEPOSITION OF KINDALL SMITH, produced as a witness at the instance of the PLAINTIFF, CRAIG SHIPP, and duly sworn, was taken in the above-styled and numbered cause on the 29th day of March, 2019, from 9:16 a.m. to 10:47 a.m., before LEICA TURNER, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of Leigh & Associates Court Reporting, 3930 Galleria Oaks Drive, Suite 159, Texarkana, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

**A P P E A R A N C E S**

FOR THE PLAINTIFF CRAIG SHIPP:
  MR. DEREK S. FRANSEEN
      WALSH & FRANSEEN
      200 East 10th Street Plaza
      Edmond, Oklahoma  73034
      Phone:  405.843.7600
      Fax:    405.606.7050
      dfranseen@walshlawok.com

FOR THE MEDICAL DEFENDANTS:
  MS. MICHELLE BANKS ODUM
      HUMPHRIES, ODUM & EUBANKS
      1901 Broadway Street
      Little Rock, Arkansas  72206
      Phone:  501.420.1776
      michelle@humphrieslaw.net

FOR THE ADC DEFENDANTS:
  MS. ROSALYN MIDDLETON
      ASSISTANT ATTORNEY GENERAL
      CIVIL DEPARTMENT
      323 Center Street
      Suite 200
      Little Rock, Arkansas  72201
      Phone:  501.682.8122
      Fax:    501.682.2591
      rosalyn.middleton@arkansasag.gov

ALSO PRESENT:
Ms. Melissa Stoner
Ms. Diane Cunningham

## Page 3

**I N D E X**

WITNESS:  KINDALL SMITH

|  | PAGE |
|---|---|
| Appearances ...................................... | 2 |
| Changes and Signature ............................ | 68 |
| Reporter's Certificates .......................... | 70 |
| Examination by Mr. Franseen ...................... | 4 |
| Examination by Mr. Odum .......................... | 58 |
| Examination by Mr. Franseen ...................... | 60 |
| Examination by Mr. Odum .......................... | 66 |

**E X H I B I T  I N D E X**

| EXHIBIT NO. | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | Medical Records (Bates CCS 536 - CCS 590) | 25 |
| 2 | Arkansas Department of Correction Medical Restrictions/Limitations/ Special Authorization(s) (Bates CCS 792) | 26 |

## Page 4

**P R O C E E D I N G S**

(All parties present have hereby waived the introductory reading by the deposition officer as required by Rule 30(b)(5).)

KINDALL SMITH, having been first duly cautioned and sworn, testified as follows:

**EXAMINATION**

BY MR. FRANSEEN:

Q. Please state your full name.
A. Kindall Nicole Smith.
Q. Have you gone by any other names?
A. Kindall Nicole Hammonds.
Q. How do you spell Hammonds?
A. H-a-m-m-o-n-d-s.
Q. And when did you switch from Hammonds to Smith?
A. 2006.
Q. Were you practicing as a nurse under Hammonds?
A. Yes.
Q. When did you -- just kind of briefly give me your educational background.
A. I graduated high school in 1996; started LVN school in February of 2003 -- no, excuse me, August; and

```
                                                    13
  1      A.   Explain that.
  2      Q.   I assume that CCS -- and I'm going to refer to
  3   that -- those three entities as CCS for purposes of
  4   today.  I assume if you have any issues with either
  5   substandard care or if they're critical of any care that
  6   you provide to a patient, they will write you up or give
  7   you some sort of reprimand, verbal or written; is that
  8   correct?
  9      A.   So are you saying like harm?
 10      Q.   It doesn't necessarily have to be harm, just
 11   something where they're critical of your job performance
 12   as related to a patient.
 13      A.   No.
 14      Q.   Have you ever been written up for any other
 15   reason at CCS?
 16      A.   Attendance.
 17      Q.   Anything else?
 18      A.   Not that I can recall.
 19      Q.   What all correctional facilities have you
 20   worked for with CCS?
 21      A.   Just Southwest Arkansas Community Corrections.
 22      Q.   And sometimes is that also referred to as
 23   SWACC?
 24      A.   Yes.
 25      Q.   What did you review in preparation of this
```

```
                                                    14
  1   deposition?
  2      A.   The records.
  3      Q.   Are you referring --
  4      A.   Medical records.
  5      Q.   Are you referring to Mr. Shipp's records?
  6      A.   Yes.
  7      Q.   I am going to hand you a set of records.
  8   They're Bates stamped as CCS 536 through CCS 590.  Do
  9   you recognize these records?
 10      A.   Yes.
 11      Q.   What are they?
 12      A.   They are his medical records.
 13      Q.   Looking at CCS 536, can you identify what this
 14   encounter note is?
 15      A.   This was his sick call that I seen him on
 16   February 5th.
 17      Q.   Of which year?
 18      A.   2016.
 19      Q.   And would a sick call be the same as a medical
 20   request?
 21      A.   No.
 22      Q.   What's the different procedure for having a
 23   sick call versus a medical request?
 24      A.   A medical request is where they are requesting
 25   a blood pressure check, something that would not pertain
```

```
                                                    15
  1   to a sick call which would be an issue I guess they
  2   would be having that they would need to be seen by a
  3   nurse.
  4      Q.   And so they go to Medical and they're
  5   notifying Medical of an issue that they're having?
  6      A.   Yes.
  7      Q.   Do you believe a sick call is something more
  8   pressing than just a medical request generally?
  9      A.   Yes.
 10      Q.   You think that's an adequate way for the
 11   prisoner to notify Medical of an issue that they're
 12   having?
 13      A.   Is your question through sick call?
 14      Q.   Yes.
 15      A.   Yes.
 16      Q.   It's appropriate for them to either fill out a
 17   medical request or go to sick call and get checked out
 18   there directly?
 19      A.   Not a request.  They would not be seen for a
 20   sick call issue.
 21      Q.   But if they have an issue, they can either
 22   fill out the request or go to sick call?
 23      A.   No.
 24      Q.   So if someone has a medical issue, they can't
 25   fill out a request for it?
```

```
                                                    16
  1      A.   Not if it is something that has to be seen as
  2   a sick call protocol.
  3      Q.   If you are wanting to notify Medical of an
  4   issue while at sick call as far as needing some sort of
  5   medical device, is it appropriate for them to verbally
  6   communicate that to the medical staff?
  7      A.   If it's pertaining to their sick call, yes,
  8   they can make the request at that time.
  9      Q.   Let's just go through this encounter note.
 10   There are different sections here; is that correct?
 11      A.   Yes.
 12      Q.   What is the -- what is the first section?
 13      A.   It's subjective.  It's what they fill out for
 14   their sick call.
 15      Q.   What was his subjective complaint?
 16      A.   His deformed feet and toes due to his Charcot
 17   joint and also diabetes.
 18      Q.   What is the next section?
 19      A.   It's your objective.
 20      Q.   Let's go through this sentence by sentence.
 21   Let's have you read the first sentence.
 22      A.   It says, "'Upon resident taking his shoes off,
 23   his left sock noted to be covered in blood."
 24      Q.   Is that something you observed?
 25      A.   Yes.
```

### Page 17

1  Q.  Is that an issue with someone with diabetes?
2  A.  Yes.
3  Q.  What's the next sentence?
4  A.  "Bilateral feet have deformities noted."
5  Q.  What were the deformities noted?
6  A.  He had the knots from the Charcot foot.
7  Q.  Those were something you observed?
8  A.  Yes.
9  Q.  Next sentence?
10 A.  "Left foot has an open area about the size of a silver dollar with skin only attached by the corner."
12 Q.  When you describe open area, what are you describing?
14 A.  Where the skin is loose, open.
15 Q.  Is it a sore?
16 A.  Yes.
17 Q.  With someone with diabetes, what are the concerns with someone developing a sore on their feet?
19 A.  Infection, not healing.
20 Q.  Do you know what diabetics generally do in order to -- if they have a Charcot joint -- to prevent sores from forming?
23 A.  It would be offloading the pressure of the joint or the -- the deformity.
25 Q.  And what's one of the -- one of the ways they

### Page 18

1  can offload the pressure?
2  A.  His shoes that he said he had; a wheelchair.
3  Q.  The shoes he said he had, what are you talking about?
5  A.  The shoes that he said he was prescribed in the free world for his issue.
7  Q.  The shoes that his family had in their possession at this time?
9  A.  I don't know whose possession they were in at that time.
11 Q.  Read the next sentence, please.
12 A.  "Resident has already had his left great toe removed four to five years ago from infection that went to the bone."
15 Q.  Was that observable by you?
16 A.  Yes.
17 Q.  Next sentence?
18 A.  "Unit MD here.  Skin was removed by MD."
19 Q.  Who was the unit MD?
20 A.  It was Dr. Lomax -- Dr. Lemdja that day.
21 Q.  Why did Dr. Lemdja get involved in this?
22 A.  Because he was a diabetic, his foot was bleeding, and he had an open sore.
24 Q.  Did you notify Dr. Lemdja?
25 A.  Yes.

### Page 19

1  Q.  Were you concerned for Mr. Shipp's foot upon seeing it?
3  A.  Yes.
4  Q.  Did you believe that a doctor should have done an appropriate evaluation and treatment for that foot at that time?
7  A.  I can't answer for her.
8  Q.  Read the next sentence there for me.
9  A.  "The area was cleaned with wound cleanser, TAO," triple antibiotic ointment, "applied, and then covered with 2x2s and roll Kerlix."
12 Q.  Was that performed by you or Dr. Lemdja?
13 A.  By me.
14 Q.  Next sentence?
15 A.  "Resident will return to Medical daily for a PM treatment -- or PM treatment after showers to have dressing changed (sic)."
18 Q.  And did someone prescribe that or is that something you recommended?
20 A.  That was Dr. Lemdja.
21 Q.  Next sentence?
22 A.  "The unit MD gave orders for antibiotics Clindamycin 300 QID times 14 days.  The unit" -- oh.
24 Q.  You can go to the next sentence.
25 A.  "The Unit MD also instructed resident to

### Page 20

1  notify his family of ordering him a pair of shoes to be sent in from the manufactory (sic)."
3  Q.  And next sentence.
4  A.  "His right foot was assessed.  There was no open areas at that time."
6  Q.  Do you know whether the family can send in orthotic shoes without approval?
8  A.  No.
9  Q.  Is that, no, they can't or no --
10 A.  No, they had to be approved.
11 Q.  How are orthotic shoes approved by CCS or the facility here?
13 A.  The doctor sees a need for them.  She can request that.  If he has them, it is requested and it has to go through the warden and he has to approve for any outside items to be brought into the facility.
17 Q.  Is that your understanding as far as the appropriate protocol in February of 2016?
19 A.  Through Medical?
20 Q.  Whatever the -- whatever the resident has to do or the patient has to do at that time in order to receive their prescribed orthotics.
23 A.  It would be facility policy.
24 Q.  How was the warden notified?
25 A.  When the nurse would get the order, she would

Page 57

1  A.  No, not that sticks out.
2  Q.  Were you told why he was not using his
3  wheelchair?
4  A.  No.
5  Q.  Were you told whether the doctor was informed
6  that he was not using his wheelchair?
7  A.  I don't recall.
8  Q.  Are there specific nursing protocols for
9  individuals with diabetic ulcers or sores on their
10 feet?
11 A.  Just treatment call.
12 Q.  Just treatment call?
13 A.  I mean, we would put them on treatment call.
14 Q.  Anything else?
15 A.  If they present signs and symptoms of
16 infections, the doctor would start antibiotics.  Or the
17 doctor, they would be referred to the doctor for a
18 doctor's assessment.
19 Q.  Is that a written-out protocol or is that just
20 part of your training?
21 A.  Per protocol for sick calls.
22 Q.  Is that one specifically for sores or
23 ulcers?
24 A.  Do we have one?
25 Q.  (Moving head up and down).

Page 58

1  A.  No.
2  Q.  Is your LVN license currently active?
3  A.  Yes.
4  Q.  How many times has it been renewed?
5  A.  I would estimate probably seven.  It's every
6  two years.
7  Q.  Has it ever lapsed?
8  A.  Never.
9  Q.  Is there anything regarding Mr. Shipp that you
10 feel is important to tell me concerning any care or
11 treatment at SWACC?
12 A.  No.  I feel that we gave him the best
13 treatment that was appropriate.
14         MR. FRANSEEN:  No further questions.
15         MS. ODUM:  I just have a couple.
16         THE WITNESS:  Okay.
17              EXAMINATION
18 BY MS. ODUM:
19 Q.  Now, back when you first saw Mr. Shipp on the
20 5th of February, 2016, you were asked questions about
21 you ordering the device or you contacting HSA about a
22 device.  As an LVN, did you have authority to order such
23 a device?
24 A.  No.
25         MR. FRANSEEN:  Object to form.

Page 59

1  Q.  As LVN, was that your job?
2  A.  No.
3  Q.  Did you have permission to ask the HSA to get
4  an orthotic device in the unit?
5  A.  Not without a doctor's orders.
6  Q.  So that was really beyond the scope of your
7  job?
8  A.  Yes.
9  Q.  Was there any medical device at the unit to
10 give him on that day --
11 A.  No.
12 Q.  -- for his feet?
13 A.  No.
14 Q.  Okay.  In other words, his orthotic wasn't
15 there?
16 A.  No.
17 Q.  Okay.  And with regard to seeing him on March
18 16th when he was not in his wheelchair -- and you
19 mentioned the shoulder, now, you review -- did you
20 review records prior to today?
21 A.  Yes.
22 Q.  And in the records, did you remember seeing
23 something about his complaint was his shoulder?
24 A.  Yes.
25 Q.  And was there any reference to his shoulder in

Page 60

1  that note that you wrote?
2  A.  No.
3  Q.  Did you consider yourself thorough when you
4  wrote your notes on February 5th?
5  A.  Yes.
6  Q.  And, again, when you saw him for treatment
7  call and you noted there was excess blood, you referred
8  him to the M.D., did you consider that note thorough?
9  A.  Yes.
10 Q.  If he had complained to you about his shoulder
11 on the 16th, would it have been your -- would you have
12 included it in the note?
13 A.  Yes.
14 Q.  So if it's not in the note, what is your
15 thought on the idea of his shoulder complaint?  If you
16 didn't put it in his note, in your note on the 16th, was
17 it something you discussed?
18 A.  I did not discuss it with him.
19 Q.  Okay.
20         MS. ODUM:  Nothing.  I don't have
21 anything.
22         MR. FRANSEEN:  I have a few follow-ups.
23              EXAMINATION
24 BY MR. FRANSEEN:
25 Q.  When you were asked whether it was your job to

```
                                                     61
 1   order the orthotics, the fact that the word "order"
 2   there, does that kind of hinge on whether that's part of
 3   your job?
 4        A.   That is not part of my job to order a medical
 5   device.  That has to be ordered by a physician.
 6        Q.   As an LVN and as your training with SWACC, did
 7   you think Mr. Shipp on February 5th needed his orthotic
 8   ordered?
 9        A.   He and Dr. Lemdja had discussed that and she
10   told him to contact his family to receive his shoes.
11        Q.   But you know the policy for him to receive
12   those is it has to be ordered by Dr. Lemdja and approved
13   by the warden?
14        A.   So he would have had to have wrote his family
15   to see if they would send them and then have it approved
16   by the warden.
17        Q.   But Dr. Lemdja or some doctor there has to
18   order it for it to be approved, correct?
19        A.   Yes.
20        Q.   And on February 5th, it could have been
21   ordered and approved by Dr. Lemdja?
22        A.   Yes.
23        Q.   Did you have any conversation with her
24   regarding whether the orthotic needed to be ordered and
25   documented as being approved?
```

```
                                                     62
 1        A.   I did not speak with her on that.
 2        Q.   Did you leave that just within her general
 3   purview and her decision making?
 4        A.   That was her decisions, yes.
 5        Q.   Did you think to yourself maybe this should be
 6   documented?
 7        A.   I documented that she told him that they had
 8   discussed the shoes and she told him to notify his
 9   family.
10        Q.   Did you think to yourself maybe this needs to
11   be ordered and actually documented as far as being
12   approved?
13        A.   No, because I don't order devices.
14        Q.   And so did you think to yourself maybe I
15   should notify the HSA at that time?
16        A.   I didn't have a doctor's order.
17        Q.   Without a doctor's order, were you sitting
18   there going I wish I had a doctor's order now, that way
19   I could notify HSA so this could get approved?
20             MS. ODUM:  Object to form.
21        A.   If the doctor didn't say I'm going to order
22   him to have his shoes, no, I would not have went to the
23   HSA.
24        Q.   Because your policies and procedures are if
25   the doc doesn't order it, you don't do anything?
```

```
                                                     63
 1        A.   I do not order it.  I do not say that it needs
 2   to be ordered.  That is the physician's call.
 3        Q.   Right.  That's the first step.  The second
 4   step is if it's ordered, you notify HSA?
 5        A.   If the doctor says, yes, I'm going to order
 6   it, then, yes, HSA would be notified.
 7        Q.   So because the first step was not done by
 8   Dr. Lemdja, you did not notify the HSA of the need of an
 9   orthotic being approved?
10        A.   No, because I didn't have an order form.
11        Q.   And on that date, did you think to yourself
12   this should be ordered and the HSA should be notified?
13             MS. ODUM:  Object to form.
14        A.   He was told to order them so -- or to notify
15   his family.
16        Q.   Notifying his family is not ordering and
17   approving the medical device, is it?
18        A.   But he had to have it approved.  His family
19   would send them.
20        Q.   Notifying the family is not ordering and
21   approving the medical device?
22             MS. ODUM:  Object to form.
23        A.   I don't order and approve anything.
24        Q.   Do you know when Dr. Lomax, 11 days later and
25   a second sore had formed on his other foot, whether she
```

```
                                                     64
 1   had the device there in order to approve and order it?
 2        A.   What date was that she seen him?
 3        Q.   February 16th.
 4        A.   And your question is?
 5        Q.   You're telling me that the policy and
 6   procedures is device has to be there before it can be
 7   approved by a doctor, is that your understanding?
 8        A.   The doctor has to write an order for it.
 9        Q.   Right.  So notifying --
10        A.   And then I'm assuming him and Dr. Lomax had
11   talked about them.  I don't know what the conversation
12   was.  And he was told to contact his family and that is
13   what I documented.  That was between him and Dr. Lemdja.
14        Q.   Dr. Lemdja on the 5th?
15        A.   Uh-huh.
16        Q.   Is that a "yes"?
17        A.   Yes.
18        Q.   And do you believe Dr. Lemdja knew that for a
19   medical device to be approved, she has to order it?
20        A.   Yes.
21        Q.   And she did not order it on that date?
22        A.   There's no order, no.
23        Q.   And you knew on that date that in order for
24   those shoes to get approved and come into the facility,
25   a doctor had to order it for you to notify the HSA?
```

16 (Pages 61 to 64)