# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF ARKANSAS
# TEXARKANA DIVISION

CRAIG SHIPP                                                    PLAINTIFF

v.                          CASE NO. 4:18-CV-04017-SOH

KEVIN MURPHY, et al.                                          DEFENDANTS

## PLAINTIFF'S BRIEF IN RESPONSE TO MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. 109]

## INTRODUCTION

Plaintiff has brought claims against these Defendants for their personal involvement in his failure to receive his orthotics or appropriate medical care related to his diabetic Charcot foot condition. Charcot condition is a deformity which requires either orthotics to offload the pressure on the feet or requires offloading by other means, including wheelchair or other device. The Medical Defendants, who were employed by Correct Care Solutions, were responsible under the Constitution to provide appropriate medical care for Mr. Shipp. There is conflicting testimony between the warden, Dr. Lemdja, HSA Director Philson and Nurse Smith as to the appropriate policies. This creates liability for all of the Defendants in the varying scenarios that they each presented. Warden Arnold states it was Medical's duty to approve any and all medical devices without his involvement, which contradicts his actual involvement when the device was finally approved. The Medical Defendants told Mr. Shipp that it was Warden Arnold who was required to approve a medical device before it could come in. Dr. Lemdja was under the impression that the family could simply just send the

orthotics in after a phone call, even though Mr. Shipp could not even make phone calls during this time period. Dr. Lemdja also refused to document or input any orders after encountering Mr. Shipp on February 5 and February 9. Dr. Lemdja's own supervisor, Dr. Stieve, testified that she violated the standard of care by not entering these orders or offloading his feet prior to receiving his orthotics. Warden Arnold testified that HSA Philson was notified on February 1st of Mr. Shipp's condition, however, it is admitted that he states he cannot recall whether or not he actually notified her personally or not. Nurse Smith testified that she could not go to HSA Director Philson despite understanding on February 5 that Mr. Shipp needed his orthotics because Dr. Lemdja failed to fill out an order. She stated this was due to a policy and procedure by Correct Care Solutions that a nurse cannot go to the HSA Director without an order from a physician. HSA Director Philson testified that this policy and procedure was not in place, which contradicts Nurse Smith's statements.

These sets of conflicting testimony have made it difficult to determine who is telling the truth. Because of these differing statements, Plaintiff has been forced to proceed with his claims because a jury could find for one Defendant in one scenario and against another in the alternative scenario. Due to all these policies contradicting each other, the Plaintiff will describe in his brief the differing alternatives which show deliberate indifference by the Defendants in the event the jury agrees with one Defendant over another.

# ARGUMENT AND AUTHORITY

## STANDARD OF REVIEW

Summary judgment is appropriate only when the pleadings, discovery and disclosure materials on file show that there is no dispute to any material fact. F.R.C.P. 56(c). When applying the standard, the court must view the evidence and draw all inferences in favor of the non moving party. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998). That a genuine dispute exists to any predicate facts, the defendant is not entitled to summary judgment. *Plemmons v. Roberts*, 439 F.3d 818, 822 (8th Cir. 2006).

**PROPOSITION I:** **DEFENDANTS' *DAUBERT* MOTION CONTAINED WITHIN THEIR RESPONSE BRIEF REGARDING PLAINTIFF'S EXPERTS, DR. JOSEPH WRIGHT AND DR. SHAWN SMITH, SHOULD BE DENIED AS THEY ARE NOT SUPPORTED BY FEDERAL STANDARDS ALLOWING EXPERT TESTIMONY**.

**A.** **DR. WRIGHT'S OPINION SHOULD BE PERMITTED UNDER THE *DAUBERT* STANDARD AND IS SUPPOSED BY DEFENDANTS' OWN EXPERT, DR. STIEVE**.

Dr. Wright's opinions on Dr. Lemdja should be permitted and establish a breach of standard of care and deliberate indifference by Dr. Lemdja for both her actions on February 5, 2016 and February 9, 2016. Dr. Wright's report stating that she should have appreciated the need for orthotics and offloading on February 15, 2016 will remain in effect until Mr. Shipp received his shoes on February 19, 2016. (Ex. 1 - Report of Dr. Joseph W. Wright). A doctor who should have appreciated the need for the orthotics and offloading on February 5, 2016 would be under the same duty to recognize that need on February 9, 2016. This is

further supported by Dr. Stieve's testimony. Dr. Stieve stated the following:

"Q:     Is that a sufficient request for sick call?

A.      I think the policy states that there is supposed to be one issue. I would argue that deformed feet, Charcot joint, and diabetes are all related. So yes, it is.

Q.      That was enough to put CCS on notice to evaluate the Charcot foot deformity in accordance with their policies and procedures?

A.      Correct. I am looking for a note from Dr. Lemdja. I'm used to looking on the computer here. I believe, that - - I am having trouble seeing the date. On 2/09/16, Dr. Lemdja did a physical exam. Her assessment was that it was an intake physical and that the patient had Type 2 diabetes, high blood pressure, high cholesterol, and diabetes with a foot ulcer. The physical exam documents a left foot ulcer with dressing, the wound was cleaned with granulation tissue, and there was a deformity of the right foot. That's it.

Q.      What medical restrictions were ordered on that date?

A.      I didn't see any that were ordered.

Q.      Okay. So on this date, Dr. Lemdja as a clear duty to evaluate the Charcot foot deformity?

A.      I believe, to the best of my memory, that Dr. Lemdja did do that.

Q.      And what restrictions were ordered to offload his feet during this time period?

A.      It doesn't appear that she placed any.

Q.      Should she have?

A.      Well, what she did instead - -

Q.      Tell me whether she should have offloaded the feet at that time?

4

A.      She should have done something.

Q.      Okay. What did she do?

A.      It appears that she rescheduled the patient to see Dr. Lomax for his Charcot foot.

Q.      Is there anything in Dr. Lemdja's experience that prevented her from ordering any restrictions or providing him with a wheelchair to offload his feet at that time?

A.      No, there's not.

Q.      She was trained and qualified in order to provide that type of restriction in order to immediately offload his feet on the 9th?

A.      I think that physician's (sic) have various backgrounds and when somebody knows that something is wrong, but they're not sure what the next step is, we seek help. I think that Dr. Lemdja sought help with Dr. Lomax to evaluate this person's foot deformity. In retrospect, I would have felt that, in defense of Dr. Lemdja, it would have been a much stronger case to say that she put the patient on bed rest and so forth. I did notice earlier that the patient was coming down for treatment for his left foot and was asked to elevate that as much as possible. That fell short of offloading both feet.

Q.      Without you knowing her background, she is a medical doctor. She violated the standard of care by not offloading his feet and writing those restrictions?

A.      Yes.

Q.      She had that same knowledge on the 5th, correct?

A.      She did." (Ex. 2 - Deposition of Dr. Jeffrey Stieve, p. 28:1 to p. 30:6)."

It is important to note that Dr. Stieve is not only an expert witness who is endorsed by the

Defendants, but he is also a supervisor who will be called by the Plaintiff to provide

testimony on his evaluations of Dr. Lemdja and her interactions with Mr. Shipp in addition to his opinions on whether or not she violated the standard of care. This statement opined by Dr. Stieve at his deposition not only supports Dr. Wright's testimony, but is an independent evaluation by a medical physician that defeats Defendants' Motion for Summary Judgment. The *Daubert* exclusion is meant to weed out unreliable opinions, not opinions that they did not appreciate going into the deposition. Furthermore, Dr. Wright's report is sufficient to put the Defendant on notice of his opinions regarding Dr. Lemdja's standard of care, as there is no magic language that must be contained in the report. His report indicates that he is critical of her actions in February 2016 and he is critical of her not documenting those actions under the appropriate standard of care. These types of actions, willful violations of the standard of care and a deliberate disregard to document her interactions with the inmates to appropriately approve any orthotics and/or offloading, result in deliberate indifference by Dr. Lemdja and are sufficient to establish a deliberate indifference and/or state negligence claim. As such, Dr. Wright's testimony, in combination with and supported by Dr. Stieve's testimony, is sufficient to allow his deposition to be used at trial to support allegations against Dr. Lemdja. Accordingly, any *Daubert* motion against Dr. Wright should be dismissed as there is no claim that his methodology, opinion and/or qualifications are insufficient.

## B. DR. SMITH'S TESTIMONY SHOULD NOT BE EXCLUDED AS HE APPROPRIATELY CONSIDERED THE INFORMATION DISCUSSED AT HIS DEPOSITION AND CAME TO A CONCLUSION THAT THE DEFENSE SIMPLY DOES NOT LIKE.

The Court's role is not to determine whether an expert's opinion is correct; it is an expert witness's methodology, rather than his conclusions, that is the primary concern of Rule 702. *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001). "[E]ven if the judge believes there are better grounds for some alternative conclusion, and that there are some flaws in the scientist's methods, if there are good grounds for the expert's conclusion[,] it should be admitted." *Id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. Thus, "Rule 702 favors admissibility if the testimony will assist the trier of fact, and doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998) (internal citation and quotation omitted). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner*, 259 F.3d at 929-30

Defendants provided no testimony that any other actual events caused the initial wound to form. Dr. Smith was not asked whether the use or non-use of the wheelchair impacted his view on whether the wound would have healed without these events. Defendant cites information based on the actual onset of the damaging event, no case law on the healing of a wound. No direct question about what other items could have possibly caused an event,

just a general statement and no expert can rule out a general hypothetical as that would be impossible to do so. Dr. Smith explained to Defense counsel that he was evaluating the period where he was not provided his orthotics and that the failure to allow them into the facility caused an ulcer to form during this discussion. (Ex. 3 - Deposition of Dr. Shawn Smith, p.58-60)

Defendants cite to an exchange where Dr. Smith states that he took into account that outside factors were considered that affected Mr. Shipp's ability to heal. These factors included his pre-existing conditions of diabetes, Charcot foot deformity and the wound that formed itself. (See Ex. 3, p. 22-23). These are pre-existing conditions and not intervening events as they seem to be argued by the Defendant and, therefore, do not defeat causation or eliminate any damages.

Defendants also seem to imply that Dr. Smith did not review the records about his offloading. He affirmatively states that "I saw several documents like that" when asked about the references to Dr. Peeple's report but that he struggled to locate them again in his subsequent review after seeing Peeple's report. (When handed one example, he testified "I did see this, this specific page where it said "wheelchair for now to offload his foot completely." Yes, I did see that." (Ex. 3, p. 24).

Dr. Smith, when asked about this, stated that those instances of non-compliance did not change his opinion that the initial wound caused by the Defendants actions or inactions did not ever heal. (Ex. 3, p.28: 1- 25). Defendant also presents no testimony where Dr. Smith

stated he failed to exclude anything specifically that would impact his ultimate opinion. This does not rise to the standard that would exclude his opinions as a practicing physician who routinely sees Charcot foot deformities and wounds. Defendant implies Dr. Smith did not excluded items when forming his opinion, however, Dr. Smith specifically testified that

> "I don't think anything he did on those instances that are documented was the major cause for him to have an amputation. Could it have contributed? It's possible, but not likely given everything that they did to try to save his foot." (Ex. 3 - p. 62:7 to 62:11)

This shows he considered and weighed those events as not being the cause of his wound not healing. Under the *Daubert* standard, a Defendant is not entitled to exclude opinions just because they disagree with them, or even if they believe there are better grounds for an alternative conclusion as stated in *Bonner.*

Defendants also point to one instance where Plaintiff's cast was removed due to discomfort. Dr. Smith was asked whether a hypothetical change of the facts in the case could have changed the outcome. In response, he candidly stated he could not speculate on that fact which would have been a different course of treatment and Defendants presented no opinions that the decision to remove the cast was inappropriate, which was initiated by their own physician Dr. Lomax.

Defendants also questioned whether Dr. Smith had information of events outside of the medical records regarding his compliance and non-compliance of offloading. Dr. Smith acknowledged that he saw instances of non-compliance but that he did not have personal knowledge of what happened each and every day. (Ex. 3, p. 36-38). Defendants have not

produced testimony showing other instances beyond the records and it would be inappropriate for Dr. Smith to conclude facts not in the records. Therefore, Defendants have failed to show instances where Dr. Smith's opinions do not match the facts of the case.

Defendants also point to general hypotheticals without any additional supporting testimony that it required Dr. Smith to change his ultimate opinion. Dr. Smith testified that non-compliance can affect healing depending on the non-compliance (and note that nothing presented by Defendants supports that a few instances of non-compliance prevented healing that would have prevented amputation). Dr. Smith also testified that high A1C can be an indicator of non-compliance but Defendants' own physician Dr. Stieve stated A1C can raise even if you are compliant.

> "Q. Can the A1C rise above an 8, even if you are following all the appropriate recommendations?
>
> A. Yes.
>
> Q. So a high A1C doesn't necessarily tell you that someone isn't doing their efforts to control their condition?
>
> A. Correct." Ex. 2, p. 53:8-13).

Looking at this, Defendants failed to appreciate that Dr. Smith looked at other factors beyond just the blood sugar levels, including whether the A1C was an accurate reading, when forming his opinions. (Ex. 3, p. 44-45).

Defendants' criticisms of Dr. Smith do not exclude his testimony as they do not show Dr. Smith did not consider these factors. They were considered and Dr. Smith explained:

"A.    Well, I kind of think the, you know, the horse was already out of the barn.  I mean, once you get the sores in that area in an area that's already, you know, at risk of having breakdown just because of  the deformities, I don't think there was whole lot he could do to make it work because all those doctors worked really hard afterwards to get all the different  things in place that would normally heal an ulcer like that, so I don't think if he would have laid in bed for a year and a half completely non- -- complete non-weightbearing on that leg it would have made a difference in this case.

Q.   Okay.  So –

A.   I don't think anything he did on those instances that are documented was the major cause for him to have an amputation.  Could it have contributed? It's possible, but not likely given everything that they did to try to save his foot." (Ex. 3, p. 61:19 to 62:11).

Furthermore, none of those factors relate to the initial forming of the ulcer, which Defendants presented no information that any other factors would have caused that ulcer to form if he had his orthotics.  Defendants cite cases that explain an expert relies on facts yet continues to point to hypotheticals to support exclusion. These hypotheticals are not facts of the case and should not exclude Dr. Smith.  Furthermore, Dr. Smith did not exclude facts, he considered them as a medical physician and they did not change his opinion.  Dr. Smith, who is qualified as he encounters patients with these ailments regularly, is permitted to provide his opinions.  Accordingly, Defendant has failed to demonstrate that Dr. Smith's opinions should not be permitted in their entirety.

**PROPOSITION II:** **PLAINTIFF HAS SUBMITTED SUFFICIENT INFORMATION THAT THE DEFENDANTS WERE DELIBERATELY INDIFFERENT TO PLAINTIFF'S SERIOUS MEDICAL NEEDS.**

The medical Defendants propose, similar to Warden Arnold, that there was no objective serious medical need or deliberate indifference. However, much of the same evaluations that would apply to lay person as stated in *Langford v. Norris*, 614 F.3d 445 (8th Cir. 2010) also substantiate an objective serious medical need and a deliberate indifference by these Defendants, who would have a greater understanding of the dire medical situation.

It has been well-established that "deliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the 8th Amendment." See *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)(citing *Estelle v. Gamble*, 429 U.S. 97, 107, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). "To show deliberate indifference, plaintiffs must show an objectively serious medical need that the prison officials knew of the need but deliberately disregarded it." *Id*. citing *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005). Individuals can "incur liability....for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices." *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993). In the event a "prisoner needs medical treatment prison officials are under a ***constitutional duty*** to see that it is furnished." *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989)(citing *Estelle*, 429 U.S. at 103, 97 S. Ct. 285). Additionally, "where the duty to furnish treatment is unfulfilled, the mere contracting of services with an independent contractor does

12

not immunize the state from liability for damages in failing to provide a prisoner with the opportunity for such treatment." *Id.* citing *West v. Atkins*, 487 U.S. 42, 55, 108 S. Ct. 2250, 101 L. Ed.2d 40 (1988).

In an 8th Circuit case, a similar set of acts that resulted in a delay by prison officials in addressing an injury with a Charcote foot deformity amounted to deliberate indifference. See *Langford v. Norris*, 614 F.3d 445 (8th Cir. 2010). *Langford* analyzes two sets of a failure to provide care by a prison official. One of the plaintiffs, Langford, determined that he had a serious objective condition related to years of stomach and back pain. The second plaintiff, Hardin, was found to have an even stronger claim for a violation of his constitutional rights due to the severe nature of his claim. Hardin received a lapse in treatment following surgery for his broken ankle that led to, or perhaps "merely exacerbated the effects of, a condition called 'Charcot foot.'" *Id.* The court goes on to state that this condition is objectively serious and it states "what should be uncontroversial given the pernicious effects of Charcot foot, including severe pain and irreversible deformity." *Id.* at 461. The court stated that if the prison official knew that his "serious medical needs were not being adequately treated yet remained indifferent, he may be personally liable." *Id*. citing *Crooks*, 872 F.2d at 804. Based upon this understanding, the court concluded that the lapse in medical care constituted a constitutional violation. *Id.*

The court then addressed whether the prison official had actual knowledge. They determined that documents showed that the official had actual knowledge of at least some

of Langford's medical problems and how problems had been dealt with. The court also showed subjective knowledge for the officials regarding Harden because the documentation confirmed that the inmate described "injury to right ankle and requests to see orthopedic specialist" were sufficient to show an understanding of the need for medical care. In *Langford*, the prison official tried to emphasize that he was not a physician and is not engaged in day-to-day care. The court stated that the official failed to show actual referrals were made and "much less that a proper investigation was eventually conducted." *Id*. at 462. The court went on to state that the prison official "did not insulate himself from liability by passing Langford's and Harden's complaints on to someone else in the prison bureaucracy, or by deferring to his role (if any) in the official grievance procedure." *Id.* at 462 referencing *McKenna v. Wright*, 386 F.3d 432, 438 (2nd Cir. 2004). Based upon this analysis, the 8th Circuit affirmed the district court's order denying qualified immunity to the prison official as it relates to deliberate indifference claims. The same analysis and conclusion applies to Mr. Shipp's claims against these defendants.

A.  **TESTIMONY BY ADVERSE DEFENDANT WARDEN ARNOLD IMPLICATES MS. PHILSON DEMONSTRATED DELIBERATE INDIFFERENCE.** .

Ms. Philson's co-Defendant, Warden Arnold, implicates her as potentially demonstrating deliberate indifference.

"Q    Do you know why Medical was telling him to send requests to you?

A.    I have no idea why Medical was telling him to send requests to me. It's clearly a medical condition.

14

Q.    It's a serious medical condition, isn't it?

A.    It's clearly a medical issue, and it was referred to Medical.

Q.    Is something that can result in an amputation of a foot a serious medical condition?

A.    I think, obviously, that's true.

Q.    And so I want to know, who did you speak with in Medical after this request was sent to you?

A.    I am sure I would have talked to Ms. Turner.

Q.    Okay.  So you talked to Ms. Turner on February 1st or February 2nd –

A.    I can't tell you what date I talked to her.  I'm sure I would have talked to Ms. Turner." (Ex. 4 - Deposition of Steven Arnold, p. 36:3-19)

While it is Plaintiff's position that the facts are more likely than not that Steven Arnold did not speak with Ms. Philson or notify her until he forwarded the second request, without any investigation or further action, to Ms. Philson sometime after February 12, 2016, his testimony is different. He tries to inject, although he cannot say definitively whether he spoke to her, that he would have notified her after the first when he first received the report from Mr. Shipp that he needed his orthotics. Ms. Philson testified that the first time she was notified by Warden Arnold was when she was handed the second Inmate Request Form on February 15, 2016 (Ex. 5 - Deposition of Lenora Philson, p. 41:44 to p. 42:9) and Plaintiff does not disagree that on the 15th, if this was the first time she was notified, then the wound on his right foot would have already formed and the damage would have already been started. However, if the jury believes Warden Arnold that Ms. Philson was notified on the first and

failed to take any action between the first and 15th, then she would be under the same liability as stated in *Lankford*. Based upon this conflicting testimony, Ms. Philson is a proper Defendant if Warden Arnold convinces the jury that she was the one who failed to respond to Mr. Shipp's medical needs. As such, Ms. Philson, if the jury believes Warden Arnold's defense that it was not his fault that the HSA director, who was Ms. Philson (known as Ms. Turner at the time), was deliberately indifferent in conjunction with him.

**PROPOSITION III:** **NURSE SMITH EXERCISED DELIBERATE INDIFFERENCE BECAUSE THERE WAS NO POLICY PREVENTING HER FROM COORDINATING WITH THE HSA ABOUT MR. SHIPP'S NEED FOR ORTHOTICS WHEN DR. LEMDJA FAILED TO FILL OUT THE APPROPRIATE ORDER.**

As I am sure the Court can tell, there is mass confusion among all the Defendants as far as the appropriate policies and procedures that should have been followed when Mr. Shipp made his request for his orthotics due to his Charcot foot deformity. Nurse Smith is no different. She testified that she was prohibited under the Correct Care Solutions' policies and procedures from notifying the HSA of this need unless a doctor filled out an order.

"Q.    But Dr. Lemdja or some doctor there has to order it for it to be approved, correct?

A.    Yes.

Q.    And on February 5th, it could have been ordered and approved by Dr. Lemdja?

A.    Yes.

Q.    Did you have any conversation with her regarding whether the orthotic needed to be ordered and documented as being approved?

16

A.      I did not speak with her on that.

Q.      Did you leave that just within her general purview and her decision making?

A.      That was her decisions, yes.

Q.      Did you think to yourself maybe this should be documented?

A.      I documented that she told him that they had discussed the shoes and she told him to notify his family.

Q.      Did you think to yourself maybe this needs to be ordered and actually documented as far as being approved?

A.      No, because I don't order devices.

Q.      And so did you think to yourself maybe I should notify the HSA at that time?

A.      I didn't have a doctor's order.

Q.      Without a doctor's order, were you sitting there going I wish I had a doctor's order now, that way I could notify HSA so this could get approved?

  MS. ODUM:  Object to form.

A.      If the doctor didn't say I'm going to order him to have his shoes, no, I would not have went to the HSA.

Q.      Because your policies and procedures are if the doc doesn't order it, you don't do anything?

A.      I do not order it.  I do not say that it needs to be ordered.  That is the physician's call.

Q.      Right.  That's the first step.  The second step is if it's ordered, you notify HSA?

A.    If the doctor says, yes, I'm going to order it, then, yes, HSA would be notified.

Q.    So because the first step was not done by Dr. Lemdja, you did not notify the HSA of the need of an orthotic being approved?

A.    No, because I didn't have an order form."

(Ex. 6 - Deposition of Kindall Smith, p. 61:17 to p. 63:10).

Plaintiff can see no reasonable reason this policy or procedure would have been in place. However, assuming her testimony is true and believed by the jury, this would be a policy or procedure that furthered deliberate indifference by Correct Care Solutions employees for not providing Plaintiff his orthotic shoes. Nurse Smith's supervisor, Lenora Philson, provided testimony that contradicts her position:

"Q.    Do you agree that a nurse can't notify you that a resident needs a outside medical device without a doctor filling out such an order?

A.    Can you repeat the question?

Q.    Is there anything regarding the policies and procedures that prohibits a nurse from notifying you that a resident needs an outside medically prescribed device without a doctor's order?

A.    I don't recall anything in the policy about that." (Ex. 5, p. 24:4-13).

If there was no prohibition from her going to the HSA once she knew there was a need for the orthotics, then Nurse Smith would be deliberately indifferent to Craig Shipp's needs as well. Nurse Smith even documented his serious medical need during the encounter on February 5, 2016 and testified that she knew it was concerning after observing his feet. (Ex. 6, p. 14:13 to p. 19:3). This is sufficient testimony to show her personal involvement and her

objective deliberate indifference to Mr. Shipp's care. If a lay person under the *Lankford* analysis can be held liable for their knowledge of Charcot foot deformities, then a nurse should not be able to escape liability when they have a higher level of knowledge. Furthermore, it should be noted that she not only observed an open wound, but also observed the deformity on Mr. Shipp's foot. This, coupled with her supervisor's testimony that there is no policy preventing her from taking action at that time, demonstrates the deliberate indifference by her toward Mr. Shipp. Furthermore, these are conflicting facts that show a question of fact to be determined by the jury. Because the conflicting facts implicate more than one Defendant based upon their defenses, the jury must be able to evaluate these statements before assigning an evaluation of these facts to each individual's claims. Therefore, Nurse Smith's Motion for Summary Judgment should be denied.

**PROPOSITION IV: CCS IMPLEMENTED A POLICY, OR AT LEAST IT WAS A PRACTICE AND CUSTOM BY ITS STAFF, THAT DELAYED MR. SHIPP'S MEDICAL NEEDS.**

CCS did institute a policy and procedure, or at least had a practice and custom, that caused Ms. Smith to not pass along the information of Mr. Shipp's needs in a timely manner. As stated in the previous paragraphs, Ms. Smith did not react because there was a policy or procedure by CCS that prohibited her from notifying the HSA director without a doctor's written orders. There is no justification for having such a policy and procedure in place, and if the jury believes that this policy and procedure was in place, then CCS should be liable for her decision and not Ms. Smith. However, it should also be noted that the Defendant does

not raise an issue with CCS's state law claims and therefore any arguments regarding the state law claims have not been raised in this motion. This would also include claims for *respondeat superior* which would implicate CCS by Dr. Lemdja's actions.

**PROPOSITION V:** **DR. LEMDJA DEMONSTRATED DELIBERATE INDIFFERENCE AND A VIOLATION OF STANDARD OF CARE WHEN SHE FAILED TO APPROPRIATELY APPROVE MR. SHIPP'S ORTHOTICS AND OFFLOAD HIS FEET.**

It cannot be disputed that Dr. Lemdja made a conscious decision to disregard Mr. Shipp's serious medical condition when she encountered him on February 5. On that date, Dr. Lemdja became aware of Mr. Shipp's need for his orthotics and offloading when she was called into the room to evaluate a blister that was already forming on his left foot. Two physicians, Dr. Wright and Dr. Stieve, have found that Dr. Lemdja's knowledge and subsequent inactions during this encounter and the February 9 encounter violated the standard of care. (Ex. 2, p. 28:1 to p. 30:6; Ex. 1; Ex. 7 - Deposition of Dr. Joseph Wright, p. 72-78). Dr. Lemdja was criticized additionally in an email for refusing to document her encounter and is quoted as saying this refusal was due to liability reasons. (Ex. 8 - Ex. 5 to depo; Ex. 9 - Deposition of Dr. Mimo Lemdja, p. 33:11-25). This satisfies both her objective and subjective decision to be deliberately indifferent to Mr. Shipp's needs. Additionally, the violation of standard of care is based on admissible evidence that supports a medical negligence claim against Dr. Lemdja and CCS through *respondeat superior*.

Dr. Lemdja, in an attempt to claim that she documented bed rest for Mr. Shipp which would have adequately offloaded his feet, pointed to Exhibit 6 of her deposition, which does

not mark bed rest or a wheelchair. (Ex. 9, p. 39:23 to p. 42:22; Ex. 10 - lemja dep ex. 6). This exhibit shows that she did not mark the boxes which indicated bed rest or, conversely, that Nurse Smith should have marked those boxes. This, again, is an example that Nurse Smith is liable for her actions if it is to be believed that Dr. Lemdja ordered bed rest on this date, which is clear she did not. (Ex. 9, p. 46:2-24). Nurse Smith confirmed that Dr. Lemdja did not advise her to order bed rest and confirmed that the asterisk next to the bed rest is on every form, and is not indicating that it has been filled out and marked. (Ex. 6, p. 26:1 to p. 27:10).

While it is disturbing that Dr. Lemdja is attempting to testify contrary to the medical records, her testimony shows that she knew she needed to order bed rest is another example that she knew on that date that it violated the standard of care and was a deliberate indifference to Mr. Shipp. This action would have occurred both on February 5 and February 9, as in either scenario she did not order offloading or fill out approval for the medical device. Dr. Stieve testified that as a medical physician she knew she should have ordered these items. (Ex. 2, p. 28:1 to p. 30:6). This standard of care violation and conscious disregard for his medical needs, coupled with Dr. Smith's testimony on causation, meets the elements for Plaintiff's claims. Therefore, the evidence and opinions proffered in this case support both a deliberate indifference and violation of Plaintiff's constitutional rights and demonstrate medical negligence by Dr. Lemdja as well. Even if Plaintiff prevails on his *Daubert* testimony regarding Dr. Wright, Dr. Stieve's testimony defeats Defendants' Motion for Summary Judgment was well.

WHEREFORE, based on the foregoing, Plaintiff would ask that this Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,
WALSH & FRANSEEN

/s/ Derek S. Franseen
Micky Walsh, OBA No. 9327, *Pro hac vice*
Derek S. Franseen, OBA No. 30557, *Pro hac vice*
200 E. 10th Street Plaza
Edmond, OK 73034
Telephone (405) 843-7600
Facsimile (405) 606-7050
-and-
Ronald W. Metcalf, AR Bar No. 73084
Ronald W. Metcalf, PA
P.O. Box 1844
Ft. Smith, AR 72902
Telephone (479) 783-0239
Facsimile (479) 783-6754
*Counsel for Plaintiff*

## CERTIFICATE OF ELECTRONIC FILING & NOTICE

This is to certify that on this 9th day of March, 2020, I electronically transmitted this document to the Clerk of the Court using the ECF system for filing, which shall send notification to anyone registered in this case to receive such filings.

/s/ Derek S. Franseen
Derek S. Franseen