# Joseph William Wright, M.D.

2206 Lockhaven Drive, Colorado Springs, CO 80909
719-494-7073 (cell)
bwright@mollieplummer.com

___

### Regarding:

Craig Shipp
V
Kevin Murphy, et. al.


### Prepared for:

Mr. Derek S. Franseen, Esquire
Attorney at Law
Walsh & Walsh
200 E. 10th Street Plaza
Edmond, OK 74045


### Prepared by:

Joseph William Wright, M.D.
2206 Lockhaven Drive
Colorado Springs, CO 80909

OCTOBER 30, 2018

October 30, 2018

Mr. Derek S. Franseen, Esquire
Attorney at Law
Walsh & Walsh
200 E. 10th Street Plaza
Edmond, OK 74045

Re: Craig Shipp
v
Kevin Murphy, et. al.


Dear Mr. Franseen:

I, Joseph William Wright, M.D., am a licensed physician Board Certified in Otolaryngology – Head and Neck Surgery. For the past eleven years I have practiced in the field of correctional medicine and am certified by the National Commission on Correctional Health Care as a Certified Correctional Healthcare Professional - Physician (CCHP-P).

The CCHP–Physician credential is designed to recognize expertise among physicians practicing in the specialized field of correctional health care.

I have never had my opinions disqualified by any court.

As the previous medical director of the El Paso County Criminal Justice Center in Colorado Springs, Colorado, I am familiar with the standard care for medical practices that currently relate to issues of care and treatment of patients such as Mr. Craig Shipp.

I can fairly evaluate the quality of care that was afforded Mr. Shipp. Attached is a copy of my current curriculum vitae.

I have reviewed the medical records of Craig Shipp supplied by your office. These include the following:

1. Medical chart (1-887)
2. Medication records St. Michael (1-144)
3. Wadley Wound Care medical records (1-68)
4. Defendant Arnold's discovery responses (1-11)
5. Defendant Dr. Lemdja's discovery responses (1-6)
6. Dr. Landja's CV (1-2)
7. Records of grievance and kites (1-41)
8. Contract between ADC and CCS (1-41)
9. CME records for CCS (1-268)

2

10. Employment records CCS (1-1))
11. Staff Roster (1-2)
12. Employee Records Kindall Smith (1-43)
13. Certifications of Dr. Lamdja (1-26)
14. Dr. Lomax CV (1-1)
15. Dr Lomax employment records (1-44)
16. Nursing Protocols (1-42)
17. Employment records Lenora Philson (1-23)
18. CCS Interrogatory responses (1-12)
19. Lomax interrogatory responses (1-6)
20. Kindall Smith interrogatory responses (1-6)
21. Kindall Smith CV (1-2)
22. Deposition of Steven Arnold (1-23)
23. Deposition of Kimberly Hofmann (1-8)
24. Deposition of Mimo Lamdja (1-14)
25. Deposition of Lorene Lomax (1-43)
26. Deposition of Craig Shipp (1-128)
27. Deposition Exhibits of Craig Shipp (1-34)
28. Also I have reviewed current literature related to Mr. Shipp's condition (see Notes section)

It is true to some extent all patient interactions are unique, however there are specific medical practices that a treating physician would be expected to provide to meet the applicable standard of care. I have specifically reviewed these records to determine whether within a reasonable degree of medical certainly that the standard of care was met. The above records disclose the following facts in summary:

## Timeline of Events

### 2/1/16
Patient was admitted to Southwest Arkansas Community Correction Center (ACC) from Crawford County Jail. He was noted to have diabetes with severe peripheral neuropathy. He had orthotics for a Charcot deformity of the right foot, but these were apparently "returned with the officer", presumably to Crawford County Jail and thence to Mr. Shipp's family.

A personal property inventory taken by intake personnel shows "shoes" and two "others" in his possession. Note was made of a pair of "New Balance 9 ½ shoes." He was issued CROC-style shoes, and the New Balance shoes placed in property for holding.

### 2/5/16
An intake nursing physical assessment was performed which showed a left foot ulcer and no ulcers on the right foot. Debridement of the left foot was done by the "unit MD" and

clindamycin was started. The patient was instructed to notify his family to order him a pair of orthotic shoes to be sent in from a manufacturer.

Per Dr. Lemdja's response to plaintiff's interrogatories she states that she debrided some dead skin from Mr. Shipp's left foot on 2/5/16, but that this did not constitute an "official medical encounter." She failed to enter a note in the medical record, and she does not recall when she first became aware that Mr. Shipp did not have his required orthotic shoes nor does she recall any efforts to obtain the shoes.
A nursing note on 2/5/16 states the patient was instructed to notify his family to order a pair of orthotic shoes to be sent directly from a manufacturer. It is not stated who made this recommendation. This is the first mention of the need for orthotics. Orthotics need to be custom fitted to a patient and cannot be obtained in this manner.

## 2/9/16
An intake history and physical was performed. The Charcot deformity was noted and he was authorized to have his own custom shoes and inserts.

## 2/12/16
Mr. Shipp sent a kite requesting special orthotics due to increasing ulcer on the left foot and breakdown of bone in the right foot from Charcot. The kite was answered by instructing him to address the problem in a sick call appointment.

A mental health note on this date states that Mr. Shipp was increasingly concerned that his "feet were getting worse while he waits for all the necessary paperwork to be cleared."

## 2/15/16
A new ulcer was noted on the bottom of the right foot in the nursing notes.

## 2/16/16
A chronic care visit with Dr. Lomax reported diabetes for the past 5-6 years with severe peripheral neuropathy. There had been amputation of the left big toe for osteomyelitis and recurrent ulcer. Charcot deformity of the right foot was noted as was a pressure spot on the bottom of the right foot.

A strong recommendation was made that he use his own custom shoes for the foot deformity and a statement was made that is was "absolutely critical for him to off-load the pressure point on his feet" and that it was "limb threatening for him". "If he gets a severe infection again, he is at high risk for amputation".

There is a statement that he has not had appropriate shoes for three weeks and has developed blisters over pressure points in both feet.

An email was sent to Warden Arnold by Health Services Administrator Turner regarding his medical condition and a request that his orthotic shoes be shipped from his home.

4

**2/17/16**
The warden responded with a request that Mr. Shipp's family send the "special" shoes to his attention and that he would personally inspect them.

**2/19/16**
On or about this date Mr. Shipp received the orthotic shoes from home. No mention is made of an inspection by the warden.

**2/19/16 – 8/10/16**
Events following this date until the date of his parole consisted of multiple visits to the hospital, specialty wound care clinic and local wound care at ACC.

## Conclusions

I have made changes to some of the conclusions in this section based on additional information from the later depositions.

There is confusion in the medical record involving shoes that Mr. Shipp had on admission to ACC on 2/1/16. Upon further review it seems there were two pairs of shoes involved. The first shoes were a pair of New Balance shoes with orthotics that he had worn in Crawford County. These were not allowed in the ACC facility and were returned through Crawford County to the patient's family.

The second dispatch is or CROC-style shoes that were issued to Mr. Shipp by ACC to wear in the facility.

Mr. Shipp received his orthotic shoes after an approximate three-week delay. After that he received appropriate care conforming to community standards for his symptoms of diabetic foot ulcers.

There was no medical or security reason to not allow the orthotics to be admitted on 2/1/16 for Mr. Shipp's use. As documented in the medical record, his clinical condition deteriorated rapidly when denied the orthotics.

Warden Arnold stated in his answer to plaintiff's interrogatories that "Per policy, all decisions regarding medical needs, including prescription items, were to be made by the medical contractor.". Yet the sequence of events indicates that the warden's input was sought as a matter of course.

In his interrogatory responses Warden Arnold also states the he "forwarded Mr. Shipp's request for orthotics to the medical provider since it involved prescription orthotics. I requested permission to allow Mr. Shipp to have the shoes and that was granted…" From the records it

seems clear that the medical staff requested the shoes on 2/9/16, but they were not delivered. Again, it seems that the warden's permission was needed. It is not stated whose "permission" Warden Arnold sought.

It is unusual to have the warden of a correctional facility involved in the approval of medical devices. A more usual sequence of events is to have the intake security personnel notify medical staff of the device and, if approved by security, to immediately furnish the device to the patient. Perhaps medical staff would want to first see the patient to determine needs, but other than that short delay, an approval that the device poses no security threat to the facility is all the administrative input required.

There was error on the part of the intake staff in not allowing his orthotics to be admitted to the facility on 2/1/16. Likewise, there is no mention of informing the medical unit that the orthotics had accompanied the patient from Crawford County.

Dr. Lemdja should have appreciated the need for his orthotics on 2/5/18 and should have documented the need in the medical record. There was delay by the medical staff in the evaluation of Mr. Shipp's foot problems until 2/9/16 and after that another ten days until the orthotics were received.

In her deposition Dr Lemdja stated that you should not write something in the medical record without doing all the steps of a formal SOAP evaluation. This is incorrect. Any information of medical significance should be noted in the chart. She indicated that the debridement of a wound was a"pretty big procedure", and it is certainly pertinent medical information that should have been recorded in the medical chart.

Her intentional omission of this event would have the effect of masking the seriousness of the situation from her colleagues who depend on the medical record for continuity of care.

There was confusion as to who was responsible for obtaining the orthotics. The warden stated in interrogatories that the medical contractor was responsible while also requesting that the shoes be sent to him. The medical staff felt that they needed the warden's permission to get the orthotics. This breakdown in the chain of command led to more delay.

It is my professional opinion based on a reasonable degree of medical certainly that Mr. Shipp's medical condition significantly deteriorated as a proximate result of being denied the use of his orthotic shoes in a timely fashion.

Sincerely yours,

*Joseph William Wright, M.D.*

Joseph William Wright, M.D.

**Notes**

Rogers LC, Frykberg RG, Armstrong DG, Boulton AJ, Edmonds M, Van GH, Hartemann A, Game F, Jeffcoate W, Jirkovska A, Jude E, Morbach S, Morrison WB, Pinzur M, Pitocco D, Sanders L, Wukich DK, Uccioli L, *The Charcot Foot in Diabetes*, Diabetes Care. 2011 Sep;34(9):2123-9.


Petrova NL, Edmonds ME, *Medical management of Charcot arthropathy.*, Diabetes Obes Metab. 2013 Mar;15(3):193-7. Epub 2012 Sep 20.


Wukich DK, Sadoskas D, Vaudreuil NJ, Fourman M, *Comparison of Diabetic Charcot Patients With and Without Foot Wounds.*, AU Foot Ankle Int. 2017;38(2):140. Epub 2016 Oct 24.

Raspovic KM, Wukich DK, *Self-reported quality of life in patients with diabetes: a comparison of patients with and without Charcot neuroarthropathy.*, Foot Ankle Int. 2014 Mar;35(3):195-200. Epub 2013 Dec 18.


Hordon LD, *Diabetic Neuropathic Arthropathy,* UpToDate (www.Uptodate.com), 2019

# Curriculum Vitae

# Joseph William Wright, M.D.

| | |
|---|---|
| Overview | Dr. Wright trained in neuro-otology at Indiana University Medical Center in Indianapolis, Indiana. He practiced that discipline in Indianapolis from 1974 to 2002 when he retired for four years.<br><br>He resumed practice in Colorado Springs, Colorado in 2006 before changing careers into correctional medicine with the Colorado Department of Corrections. He practiced general medicine in Colorado prisons and jails from 2007 to the present.<br><br>He has served as medical director of several correctional facilities. He recently retired as the medical director of the El Paso County Criminal Justice Center, a facility of 1500 inmates in Colorado Springs. |
| Address | 2206 Lockhaven Drive<br>Colorado Springs, CO 80909 |
| Phone | Cell: (719) 494-7073 |
| Email | bwright@mollieplummer.com |
| Undergraduate Education | University of Michigan<br>Ann Arbor, MI<br>B.S. Zoology 1962-65 |
| Medical School | University of Michigan<br>Ann Arbor, MI<br>M.D. 1965-1969 |
| Internship | Rotating Internship<br>Blodgett Memorial Hospital<br>Grand Rapids, MI 1969-70 |
| Surgical Residency | Tampa General Hospital<br>Tampa, FL 1970-71 |
| Otolaryngology Residency | Indiana University Hospitals<br>Indianapolis, IN 1971-74 |

| | |
|---|---|
| Work Experience | 1) Private Practice of Otology & Neuro-Otology<br>   Ear and Balance Institute, Indianapolis, IN 1974 - 2002<br><br>2) Retirement West Palm Beach, FL 2002 - 2006<br><br>3) Colorado Hearing and Balance Clinic – Otology & Neuro-Otology<br>   Colorado Springs, CO 2006 - 2007<br><br>4) Colorado Department of Corrections – General Medical Practice<br>   Colorado Springs, CO 2007 - 2016<br><br>5) Cheyenne Mountain Reentry Center – Medical Director and General Medical Practice, Colorado Springs, CO 2009 - 2016<br><br>6) El Paso County Criminal Justice Center – Medical Director and General Medical Practice, Colorado Springs, CO 2014 – 2018<br><br>7) Medical Expert records review, depositions, and trial testimony 2018 - present |
| Board Certification | American Academy of Otolaryngology – Head and Neck Surgery 1974 |
| Academic Associations | Assistant Professor, Department of Otolaryngology - Indiana University Medical Center, Indianapolis, IN 1974 - 2002 |
| Professional Organizations: | - American Correctional Association<br>- National Institute of Corrections<br>- American Jail Association<br>- National Commission on Correctional Health Care<br>   ◦ Accredited CCHP-P<br>- American Society of Addiction Medicine<br>   ◦ Certified in suboxone opioid treatment |
| Medical License | State of Colorado # 45073 |
| DEA | FW0077734, FX0077734 |
| NPI | 1144310343 |
| Languages | English and Spanish |
| Revision Date | August 14, 2018 |

# Expert Witness Retention Contract

1. **Parties.** This contract is made between Joseph William Wright, M.D. ("Expert") and the Law Firm of Walsh & Walsh PLLC ("Client") regarding the underlying legal matter of orthotic shoes for an Arkansas prisoner.

2. **Retention.** The parties agree that Expert will only become retained by Client once this contract has been mutually executed and Client has paid the initial non-refundable retention retainer specified in paragraph 4.b. Expert has no duties to Client until such time.

3. **Expert's Fees and Expenses.** The parties agree that the fee for all time Expert spends on the case will be compensated at a rate of $250/hour. It is agreed that this specifically includes (but is not limited to) research, conferences, consultations with Client, reviewing documents, organizing documents, analysis, testing, responding to discovery requests, report writing, testifying, investigating, reading and signing deposition transcripts, local portal-to-portal travel, waiting time, preparing exhibits, preparing demonstrative aids, and preparation time for testifying at deposition, trial, hearing, arbitration or other venues. Expert's time will be tracked and invoiced to the nearest 0.1 of an hour. For in-person local work a minimum of two hours is charged. Travel time is $75/hour, from portal to portal with a one-hour minimum travel charge. In lieu of the above hourly rate, duties that reasonably require overnight travel will be billed at the flat rate of $2,000/day on site. In any and all events, Client will be responsible for all reasonable out of pocket expenses including, but not limited to travel, testing, research, copying, storage of evidence or documents, etc.

4. **Payment Terms.**

    a. All payments are to be made to:

    **Joseph William Wright, M.D.**
    **2206 Lockhaven Drive**
    **Colorado Springs, CO 80909**

    b. The *non-refundable* retention retainer amount is $2,000. Expert will invoice against this retainer. This non-refundable retainer amount is the

minimum fee due Expert and is earned upon receipt. The retainer will be replenished for requested services if less than $500 remains.

c. Expert agrees to invoice client no less frequently than monthly.

d. All invoices will be paid within 30 days - or sooner if so specified in this Contract.

e. Overdue invoices will accrue interest at a rate of 1.5% per month.

f. Fees for any time Expert is asked to reserve for testifying (at trial, hearing, deposition, arbitration or other venue) and preparation for said testimony must be paid in advance and in full 5 (five) business days prior to the time reserved for the scheduled testimony. Expert is under no contractual obligation to reserve the time or appear to testify and provide opinions unless Expert has received this payment in full at least 5 (five) business days prior to the time reserved for the scheduled testimony.

g. Client is responsible for collecting any and all deposition fees owed by other lawyers or parties. In the event Expert's deposition fees are reduced by court order, Client shall still pay Expert Expert's full fee specified in paragraph 3.

h. Expert will invoice Client upon completion of Expert's report(s). All fees must be paid in full before a report is released to Client, other parties or anyone else. Expert is under no duty to release a report until Expert has been paid in full for all work performed to date.

i. Expert will invoice Client before scheduled testimony for any outstanding fees and expenses for work performed to date. All such fees must be paid in full before Expert testifies. Expert is under no contractual duty to appear to testify and provide opinions until Expert has been paid in full for all outstanding services performed and expenses incurred on behalf of Client.

5. **Fees for Late Notice Cancellation or Rescheduling of Testimony.**

a. Client understands that Expert will suffer damages from late notice cancellation or rescheduling of Expert's testimony and that since the precise amount of these damages would be difficult to determine, Expert

shall instead be entitled to the cancellation and rescheduling fees specified in paragraphs 5.c and 5.d.

   b. The fees specified in paragraph 4.f. are 100% refundable to Client in the event Expert's scheduled testimony is cancelled or rescheduled with notice to Expert of 3 (three) or more business days.

   c. In the event Expert's scheduled testimony is cancelled or rescheduled with 1 (one) or 2 (two) business days' notice, Expert may retain a cancellation fee of 50 % the amount from paragraph 4. f. The remaining amount will at Client's option be applied to future testimony or refunded to Client.

   d. In the event of same day cancellation or rescheduling of Expert's Testimony or if Expert's testimony is completed in less time than was reserved pursuant to paragraph 4. f., Expert may retain 100% of the amount specified in paragraph 4.f.

   e. In the event of any cancellation or rescheduling of testimony, Client shall be responsible for all non-refundable out of pocket travel expenses incurred by Expert such as airline tickets and hotel rooms.

6. **Duties of Client.** The Client's duties specifically include, but are not limited to:

   a. Abiding by the applicable rules of professional conduct for attorneys.

   b. Making all payments as specified in Paragraphs 4 and 5 under the terms as specified in Paragraphs 4 and 5.

   c. Providing Expert with copies of or access to all non-privileged, arguably relevant documents, evidence and other materials in the underlying legal matter.

   d. Notifying Expert of all parties and attorneys in the case so that Expert can check for conflicts of interest.

   e. Where circumstances reasonably allow, providing Expert with prompt notice of any *Daubert* motions, *Frye* motions, motions in limine, or other pre-trial motions made by other parties or persons to restrict, exclude or in any way limit Expert's testimony or Expert's participation in the underlying legal matter.

    **f.** Obtaining Expert's advance approval (for accuracy) of the relevant portions of any and all answers to interrogatories, motions, expert designations or other documents which summarize Expert's qualifications, methodology, opinion(s) and/or anticipated testimony.

    **g.** Being available as reasonably requested to meet with Expert prior to anticipated testimony.

    **h.** Promptly notifying Expert of when and where Expert may be requested to appear to testify.

    **i.** Promptly notifying Expert of any issues related to paragraph 8.b. to which Client is or becomes aware of.

    **j.** Promptly notifying Expert of the settlement or final adjudication of the underlying legal matter.

7. **Duties of Expert.** The Expert's duties are:

    **a.** To truthfully represent Expert's credentials.

    **b.** To formulate with honesty and due care and truthfully express Expert's opinion(s) in those areas (and only those areas) where Expert feels qualified to render an opinion and where Client has requested an opinion. Client agrees that Expert's opinion(s) are not preordained, might be contrary to Client's position, and are subject to modification as a result of new or additional information.

    **c.** To cease work on the underlying legal matter and promptly inform Client whenever Expert has accrued unpaid fees and expenses totaling more than $1,000. In this event, Expert shall not perform further work on the underlying legal matter until approval is given by Client.

    **d.** Expert is under no duty to provide and express opinions if Expert is given time deadlines or cost-based or other restrictions by Client that would not reasonably allow Expert to in good faith formulate and express his opinions with reasonable care.

    **e.** Subject to paragraph 7.d., to prepare a written report if Client requests one.

    **f.** Subject to paragraph 7.d. and to circumstances beyond the Expert's control, to meet all reasonable deadlines requested by Client.

g. To retain and preserve (during this engagement) all evidence provided to Expert from the underlying legal matter unless Client gives written permission for destructive testing or the like.
   h. To be available on reasonable notice to testify.
   i. To be available on reasonable notice to consult with Client. Expert's cellular number is 719-494-7073.
   j. To work exclusively with Client in the underlying legal matter unless the parties mutually agree in writing otherwise.
   k. Upon receipt from Client of the list of attorneys and parties specified in paragraph 6.d., to within 30 days check for conflicts of interest with due care and within the same 30 day period to notify Client of any conflicts of interest discovered that preclude Expert's further involvement in the underlying legal matter.
8. **Expert's Right of Withdrawal From Case.** Expert shall have the absolute right to withdraw, without any liability, from the case if Client violates any of the duties specified in paragraph 6 above or if:
   a. Expert discovers a conflict of interest which precludes Expert's further involvement in the underlying legal matter.
   b. Expert discovers that because of legal restrictions Expert's involvement or testimony in the case could reasonably be deemed to be practicing Expert's profession without a license.
9. **Withdrawal.** Notice of withdrawal under Paragraph 8 shall be in writing from Expert to Client. In the event of withdrawal, the parties agree that Client remains fully liable for all accrued but unpaid fees, expenses, and interest.
10. **Termination.** This contract shall be terminated upon written notice to Expert from Client at any time, by Expert's withdrawal pursuant to paragraph 8, at such time as Client is no longer involved in the underlying legal matter, or upon the settlement or final adjudication of the underlying legal matter. In the event of termination Client is still responsible for all sums owed Expert.
11. **Document/Evidence Retention.** Expert shall have no duty to retain any documents, reports, evidence, transcripts, exhibits, e-mails, electronic files or

other materials from the underlying legal matter for more than 30 (thirty) days following the termination of this agreement. Expert shall return (at Client's expense) all records and evidence in the underlying legal matter to Client if a written request to do so is received by Expert within the 30 (thirty) days following the termination of this agreement.

12. **Airline Flights.** All airline flights taken by Expert shall be direct, non-stop, coach class where possible.

13. **Disputes.** Any controversy, claim or dispute arising out of or relating to this Contract, shall be resolved through binding arbitration conducted in accordance with the rules of the American Arbitration Association in the State in which the Expert is domiciled. The law of the State in which the Expert is domiciled will be the governing law. The arbitration award will be enforceable in any state or federal court. In any arbitration or court proceeding, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs. In addition, Client shall be responsible for payment of attorneys' fees and expenses associated with the Expert's efforts to collect monies owed under the terms of this Contract.

14. **Miscellaneous.** Each party agrees that it may not assign its interest, rights or duties under this Contract to any other person or entity without the other party's prior approval. (Expert is under no duty to work for successor law firms on the underlying legal matter.) The performance of this contract by either party is subject to acts of God, death, disability, government authority, disaster or other emergencies, any of which make it illegal or impossible to carry out the agreement. It is provided that this contract may be terminated for any one or more of such reasons by written notice from one party to the other without liability. If either party agrees to waive its right to enforce any term of this contract, it does not waive its right to enforce any other terms of this contract. This written contract represents the entire understanding between the Expert and Client. The individual signing this contract on behalf of Client represents and warrants that he/she is duly authorized to bind Client.

| EXPERT, by | CLIENT, by |
|---|---|
| _____ | _____ |
| Signature | Signature |
| J. William Wright, M.D. | _____ |
| Print Name | Print Name |
| Date: 09/17/2018 | Date: _____ |