## Page 1

```
             UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF ARKANSAS
                  TEXARKANA DIVISION
CRAIG SHIPP                              PLAINTIFF
         CASE NO. 4:18-CV-04017-SOH
v.

KIMBERLY HOFFMAN, et al.                 DEFENDANTS


         *******************************************

                     ORAL DEPOSITION
                            OF
                      LENORA PHILSON
                      MARCH 29, 2019
                        VOLUME 1

         *******************************************
```

ORAL DEPOSITION OF LENORA PHILSON, produced as a witness at the instance of the PLAINTIFF, CRAIG SHIPP, and duly sworn, was taken in the above-styled and numbered cause on the 29th day of March, 2019, from 12:58 p.m. to 1:59 p.m., before LEICA TURNER, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of Leigh & Associates Court Reporting, 3930 Galleria Oaks Drive, Suite 159, Texarkana, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

### A P P E A R A N C E S

FOR THE PLAINTIFF CRAIG SHIPP:
    MR. DEREK S. FRANSEEN
        WALSH & FRANSEEN
        200 East 10th Street Plaza
        Edmond, Oklahoma  73034
        Phone:  405.843.7600
        Fax:    405.606.7050
        dfranseen@walshlawok.com

FOR THE MEDICAL DEFENDANTS:
    MS. MICHELLE BANKS ODUM
        HUMPHRIES, ODUM & EUBANKS
        1901 Broadway Street
        Little Rock, Arkansas  72206
        Phone:  501.420.1776
        michelle@humphrieslaw.net

FOR THE ADC DEFENDANTS:

    MS. ROSALYN MIDDLETON
        ASSISTANT ATTORNEY GENERAL
        CIVIL DEPARTMENT
        323 Center Street
        Suite 200
        Little Rock, Arkansas  72201
        Phone:  501.682.8122
        Fax:    501.682.2591
        rosalyn.middleton@arkansasag.gov

## Page 3

### I N D E X

WITNESS:  LENORA PHILSON

|  | PAGE |
|---|---|
| Appearances ........................................ | 2 |
| Changes and Signature ........................... | 46 |
| Reporter's Certificates ........................ | 48 |
| Examination by Mr. Franseen ..................... | 5 |
| Examination by Ms. Odum ......................... | 41 |
| Examination by Mr. Franseen ..................... | 44 |

## Page 4

### E X H I B I T   I N D E X

| EXHIBIT NO. | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | Email, 2/16/16, from Lenora Turner to Stephen Arnold, Subj: Resident Craig Shipp (Bates CCS-Requests Complaints Other 0018) | 18 |
| 2 | Medical Restrictions/Limitations/ Special Authorization(s) (Bates CCS 788) | 18 |
| 3 | Email between Jeffrey Stieve and Lenora Turner and Kim Hofmann Re: Resident Craig Ship (Bates CCS-Requests Complaints Other 0024 - 0025) | 29 |
| 4 | Email String between Lenora Turner and Stephen Arnold, 2/16/16, Re: Resident Craig Shipp (Bates CCS-Requests Complaints Other 0019) | 32 |
| 5 | Request Form (Bates CCS-Requests Complaints Other 0026) | 44 |

**Page 21**

Q. The warden says refer to Medical and says he sent it to Medical and you received that document. What are you supposed to do with that?

A. Okay. That's a conversation I would have with the warden.

Q. Okay. What kind of conversation would you have?

A. Okay. First of all, I would have to look into the record to see exactly what was going on as far as the shoes and what the doctor had documented. So I know that I would go in first of all and look at the record and see exactly is there a medical necessity, what the doctor had said about the shoes, about the foot, if the documentation is there. And no matter what the documentation says, I'm still going to follow back up with the warden on that request because that's something we did routinely is follow back up. Any time he gives me something, there was always close follow-up.

Q. How would you follow up?

A. It all depends. I mean, sometimes I will talk to him, I'd go to his office quite a bit, I would e-mail, I would call, sometimes he would come to my office.

Q. So you would agree before February 16, 2016, you had not notified Mr. Warden that Mr. Shipp needed

**Page 22**

orthotic shoes?

A. I'm not agreeing to that. I just said I can't recall.

Q. You don't have any memory of doing that?

A. I don't recall.

Q. Do you recall looking at Mr. Shipp's records prior to February 16, 2016?

A. Looking at his records?

Q. To see whether he needed orthotic shoes, whether they were approved or not?

A. Prior to February 16th?

Q. Yes.

A. I don't remember, sorry.

Q. On Exhibit 2 there, is that the document that would be filled out by a doctor approving a medical device?

A. It appears to be.

Q. So that would have to be filled out by a doctor in order for a medical device to be approved to come into the facility by Medical and the warden?

A. It looks like that is one form.

Q. And so in order for a resident to get their medical prescribed device, that document had to be filled out, you would have to be notified, and the warden would have to approve it?

**Page 23**

A. Sounds pretty accurate.

Q. Is there anything prohibiting a doctor from filling out that type of form prior to an intake physical if they have an encounter with the resident?

A. I can't answer that. That would be up to the physician.

Q. Why is it up to the physician whether they can fill out a form or not?

A. That would be their discretion.

Q. So it's at their discretion so there's nothing prohibiting them from using their discretion in filling out that form approving a device if it's brought to their attention?

A. I wouldn't think so.

Q. You wouldn't want a policy in place that prohibits them from using their discretion, would you?

A. I don't make the policies.

Q. But as an administrator there, you want to have policies in place that are in the best interest of the residents regarding their healthcare?

A. Well, the policies are in place and that's what we do, follow the policy.

Q. So is there a policy that you're aware of that prohibits a doctor from exercising their discretion in filling out that form during an encounter once they're

**Page 24**

aware that a resident does not have their medically prescribed device?

A. I'm not aware of any policies.

Q. Do you agree that a nurse can't notify you that a resident needs a outside medical device without a doctor filling out such an order?

A. Can you repeat that question?

Q. Is there anything regarding the policies and procedures that prohibits a nurse from notifying you that a resident needs an outside medically prescribed device without a doctor's order?

A. I don't recall anything in the policy about that.

Q. Do you know whether the nursing staff follows such a policy in February 2016 in that manner?

A. Follows such a policy about what? I'm sorry.

Q. About not notifying the health service administrator until the doctor fills out an order.

A. Your question was is there anything in the policy?

Q. Do you know whether the nursing staff would have followed that policy, that they would wait until a doctor filled out an order before they notified the HSA regarding the need for an outside device to be approved?

**41**

1  I'm not -- I would have to say no. I'm not critical
2  about any of the care. I would have to say no to that.
3  I'm not critical of any of it.
4  　　　　MR. FRANSEEN: I'll pass the witness.
5  　　　　MS. ODUM: I just have a couple of
6  questions.
7  　　　　　　　　EXAMINATION
8  BY MS. ODUM:
9  　Q.　I'm not sure if you understood something he
10 was asking you and I want to make sure we verify it.
11 　A.　Okay.
12 　Q.　When he was asking you questions about
13 requests that come down, I think he was intending the
14 inmate request form.
15 　A.　Okay.
16 　Q.　So do you remember receiving any inmate
17 request forms either from Mr. Shipp or from Warden
18 Arnold?
19 　A.　Yes.
20 　Q.　Or did you see any?
21 　A.　Yes, I did.
22 　Q.　Okay. Now, I'm trying to remember his
23 questions. Do you remember the warden forwarding any
24 requests to you?
25 　A.　Yes.

**42**

1  　Q.　Okay. Do you remember when the first time was
2  that you received an inmate request from your review of
3  the records?
4  　A.　I believe the first date was on 2/12. I
5  received one that was scratched through from Warden
6  Arnold and it was sent to me.
7  　Q.　Okay. And did you -- is that the one that you
8  received on the 15th?
9  　A.　Yes.
10 　Q.　Okay. Now, is it your -- what is your normal
11 routine if you receive an inmate request form that's
12 completed by an inmate?
13 　A.　Then I would go ahead and address that. I go
14 ahead and address whatever the concern is, you know, I
15 just address that, whether it's in the form of -- I
16 mean, if it's something that I can just go ahead and
17 answer, sometimes I'll call the resident up to my office
18 and address it. If it's -- you know, it just depends on
19 what the concern is and, you know, I'll just go ahead
20 and I'll copy it and then go ahead and send it back to
21 that resident. And that's what the normal procedure is,
22 you just address it and get it back to them.
23 　Q.　So if you receive a request --
24 　A.　No, I was just saying -- as far as the policy
25 for resident requests, there's no set amount of time to

**43**

1  get the resident request back. The policy doesn't state
2  a specific amount of time. But I set it my goal to get
3  it back to them just as soon as -- you know, within a
4  reasonable amount of time. I always try to answer mine
5  within at least about a week, just depending on how many
6  I get in, within a few days to a week, just, like I
7  said, just depending on how many I have.
8  　Q.　Okay. So if you receive one, you respond to
9  it and you sign it?
10 　A.　I do.
11 　Q.　Okay. All right. I just felt like there was
12 some confusion.
13 　A.　Yes.
14 　Q.　And I think he was talking about the form and
15 so I wanted to cover that.
16 　A.　I'm glad you clarified it because I didn't
17 understand.
18 　Q.　Okay. Now, do you have anything to do with
19 inmates making phone calls?
20 　A.　No, ma'am.
21 　Q.　Do you have anything to do with processing
22 incoming mail?
23 　A.　No.
24 　　　　MS. ODUM: That's all.
25 　　　　　　　　EXAMINATION

**44**

1  BY MR. FRANSEEN:
2  　Q.　So the warden received a request from an
3  inmate before the one that you said you received on the
4  15th?
5  　A.　I can't be so sure of the date unless I saw
6  it. Could I see it?
7  　　　　MS. ODUM: The one we were just talking
8  about.
9  　A.　Yes, yes.
10 　　　　(Exhibit No. 5 marked)
11 　Q.　I'll mark this as Exhibit 5, CCS-Requests
12 Complaints Other 0026. I'm not sure if this is the one
13 you were talking about because you weren't sure. You
14 were sure when you answered her questions.
15 　　　　MS. ODUM: I didn't bring one. I'm
16 sorry.
17 　A.　That's okay. It is the one time I'm talking
18 about.
19 　Q.　So if there was one prior to this, you weren't
20 shown it?
21 　A.　I'm sorry, if there was one prior -- what did
22 you say?
23 　Q.　If there was a request sent to the warden
24 prior to this one, you weren't shown it?
25 　A.　I wasn't showing it?