Transcript of the Testimony of

# WILLIAM WRIGHT, M.D.
June 7, 2019

<u>Craig Shipp</u>
v
<u>Correct Care Solutions, LLC, et al.</u>

## Sundae A. Stoa, FCRR, RPR

*Sundae A. Stoa, FCRR, RPR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



CELEBRATING 20 YEARS
Of Court Reporting In Colorado
Hansen & Company, Inc.
*Serving Colorado's Legal Community*

Page 69

1  EXAMINATION
2  BY MS. MIDDLETON:
3  Q. Dr. Wright, can you hear me okay?
4  A. Yes, ma'am.
5  Can you hear me all right?
6  Q. Okay. Yes, I can.
7  I just kind of want you to explain -- I hear
8  you say something about it's the chain of command. Is
9  that what I'm hearing you had a problem with?
10  A. Yeah, I have a problem with that.
11  Q. Okay. Is it -- do you have a problem with
12  them involving the warden in this decision?
13  Is that what you're saying?
14  A. Well, the thing that seemed peculiar was that
15  the warden would be involved in this in any case.
16  He seemed to feel that he needed to have the
17  shoes sent to him, for instance, while that was really
18  not an appropriate thing to do.
19  Certainly, security would be involved in
20  checking the shoes when they got there. That's not the
21  warden's job, but it seemed like everybody in medical
22  had the impression that they couldn't really do
23  anything until the warden said it was okay.
24  Q. But then, did I hear you say that if the
25  shoes had something metal on them, that's a possible

Page 70

1  security problem?
2  A. Yes, that's a possible security problem.
3  Q. Okay. I also heard you say earlier that to
4  treat his Charcot foot he would need to offload the
5  weight.
6  Is it on both feet or just the foot in
7  particular that had the Charcot foot?
8  A. The foot that was affected by the Charcot
9  deformity.
10  Q. Okay. So his orthotic shoes -- I'm not sure
11  if I'm the right person to ask you this question, but
12  I'm going to ask you this anyway:
13  So were the shoes, the orthotic shoes, are
14  they offloading the weight on that left foot that had
15  the Charcot foot or both feet?
16  A. Well, they are distributing the weight more
17  evenly over the surface of the foot. In Charcot
18  deformity, the bones of the foot collapse basically,
19  and you often have a bone that's protruding under the
20  skin, which would certainly ulcerate if you put weight
21  on it for any length of time.
22  And then you'd also have osteomyelitis, and
23  so forth. So that's it, you don't want to have weight
24  concentrated on one area of the foot.
25  Q. And he had the Charcot foot in the left foot;

Page 71

1  is that correct?
2  A. No, ma'am.
3  Q. No?
4  A. No, ma'am. It's the right foot.
5  Q. When he was admitted, he had the Charcot foot
6  in the left foot or was it in the right?
7  A. No. He had an ulcer on the left foot, and no
8  Charcot deformity on that side.
9  Q. Okay. Again, can you just, in your own
10  words, tell me what it is you're saying that Warden
11  Arnold did not do right.
12  A. I think that Mr. Arnold should have been
13  clear that this was a medical decision, and that he
14  acted that way.
15  He said several times that this is a medical
16  type of problem; and yet, he kept injecting himself
17  into it. I think everybody in medical is convinced
18  that they had to clear things with the warden before
19  they could do anything.
20  MS. MIDDLETON: Hold on for just a second
21  here.
22  Okay. I think that's all I have right now.
23  MS. ODUM: All right.
24  MR. FRANSEEN: Okay. I do have some
25  questions.

Page 72

1  EXAMINATION
2  BY MR. FRANSEEN:
3  Q. When we talk about the testimony of Mr. Shipp
4  and his sister on the chain of command of the
5  shoes -- chain of custody of the shoes, is it common
6  for a prisoner who has had property taken from them to
7  be able to watch where that property went that entire
8  time?
9  A. No.
10  Q. If the intake note indicates that a Crawford
11  County officer brought the shoes and they were returned
12  with him, could that be something that happened outside
13  of the observations of Mr. Shipp?
14  A. Yes. Mr. Shipp would not be aware of that.
15  Q. And if the officer then returned back to
16  Crawford County and the sister was then notified to
17  come pick up them, does that fit within that intake
18  note that the shoes were returned to Crawford County by
19  the SWACCC?
20  A. Yes.
21  Q. And, I guess, regardless of whether Crawford
22  County said, Hey, we're going to keep these shoes, or
23  whether SWACCC said, No, those can't come in right now,
24  the warden was notified on the 1st that Mr. Shipp
25  needed his shoes?

Page 73

1  A. Yes.
2  Q. The warden didn't notify the H.S.A. on the
3  1st to get these shoes approved by medical?
4  A. No.
5  Q. Mr. Shipp notified the intake nurse -- the
6  C.C.S. employee intake nurse on the 1st about the need
7  for his shoes?
8  A. I'm sorry?
9  Q. On the 1st, Mr. Shipp notified the intake
10 nurse who is an employee of C.C.S. about the need for
11 the shoes?
12 A. Yes.
13 Q. Did that employee of C.C.S. notify the H.S.A.
14 director?
15 A. No.
16 Q. Did that nurse notify any medical
17 providers -- doctors?
18 A. No.
19 Q. Are they critical of whether Mr. Shipp
20 submitted daily medical sick calls -- is that kind of
21 your impression based on the questioning?
22 A. My impression was that Mr. Shipp talked to
23 the nurses on a frequent basis, but did not submit
24 written kites on a regular basis.
25 Q. Whether you submit to medical in person or

Page 74

1  through a written record, should it change the standard
2  of care that the nurse or the doctor -- how they treat
3  the known issues with that inmate?
4  A. No.
5  Q. Dr. Lemdja on the 5th knew about Mr. Shipp's
6  need for his orthotic shoes?
7  A. Yes.
8  Q. Did she write any orders that sufficiently
9  offloaded his feet?
10 A. She didn't write -- let's see.
11    Everything in the record was from the nurse's
12 note that was working with Dr. Lemdja. She prescribed
13 the antibiotic, but there was no effort to obtain
14 orthotic shoes.
15 Q. In your opinion, would padding be sufficient
16 to offload Mr. Shipp's Charcot condition?
17 A. No.
18 Q. What should she have done if he could not
19 have the orthotics that day until the time period that
20 he needed his orthotics?
21 A. Well, you can offload the -- the foot by, for
22 instance, using a crutch and keeping that foot up off
23 the ground.
24    You could use a wheelchair. That's usually
25 the thing that you would be interested in, in this

Page 75

1  case, to keep the weight off that foot.
2  Q. And by failing to offload the foot, was that
3  a violation of the standard of care for Dr. Lemdja?
4  A. Yes.
5  Q. Did Dr. Lemdja notify the H.S.A.?
6  A. No.
7  Q. In fact, did Dr. Lemdja refuse to document
8  her encounter due to the liability according to an
9  email?
10 A. That's correct.
11 Q. C.C.S. should have trained their employees
12 when a medical device is needed for an inmate to notify
13 the H.S.A. or warden?
14 A. The proper procedure would be to notify the
15 physician or nurse practitioner at first, and not just
16 the nurses. And they would take the issue to the
17 H.S.A. right away.
18 Q. And that didn't occur in this instance, did
19 it?
20 A. No.
21 Q. Same question on the 9th for Dr. Lemdja: Did
22 she notify the H.S.A.?
23 A. No.
24 Q. Did she provide any sufficient offloading for
25 Mr. Shipp?

Page 76

1  A. No.
2  Q. The warden testified that he received phone
3  calls from Mr. Shipp's family.
4     Did he provide any testimony that he told the
5  family, Here is the H.S.A. person you need to call,
6  this is their name, this is their number?
7  A. No.
8  Q. Would that have been the appropriate step for
9  him if that's what he believed needed to occur on that
10 date?
11 A. I believe that would be the appropriate
12 thing, yes.
13 Q. Same question for when Mr. Shipp wrote him on
14 the 1st about the need for his orthotics: Should he
15 have notified the H.S.A. about getting this approved?
16 A. Yes.
17 Q. Was there anything preventing the warden or
18 the H.S.A. from contacting a doctor and asking them
19 directly on the 1st, when they knew about this need,
20 should this be approved or not?
21    MS. ODUM: Object to form.
22 A. That would typically be a function of the
23 H.S.A. The H.S.A. has the job of administrating the
24 medical clinic.
25    The warden is involved with administering the

Page 77

1  entire prison or jail, so the warden could certainly
2  pass it along, but it's really not his job to do that.
3  If he's concerned about something maybe being neglected
4  in his facility, he would certainly notify the H.S.A.
5  right away.
6      Q. (BY MR. FRANSEEN) If a request comes to him
7  about a medical device, is it his duty to notify the
8  H.S.A.?
9      A. Yes.
10     Q. On the 12th, there was a note that says:
11 Feet were getting worse while he awaits for all the
12 necessary paperwork to be cleared?
13     A. Yes.
14     Q. Is that the paperwork that Dr. Lomax was the
15 first person to initiate on the 16th?
16     A. That's correct.
17     Q. And that is fifteen days after Mr. Shipp gets
18 into the facility and notifies both medical and the
19 warden that he does not have his orthotics?
20     A. Yes.
21     Q. During that time period, he not only develops
22 sores on his left foot, which was evaluated on the 5th,
23 but also develops sores on his right foot?
24     A. Yes, he had at that time.
25     Q. Is it your opinion that had the facility

Page 78

1  either properly offloaded his foot -- feet on the 1st,
2  or provided the appropriate documentation that they
3  required on the 1st, that these sores would not have
4  formed?
5      A. You certainly can't predict that something is
6  or isn't going to happen medically, but by not doing
7  it, you're pretty much tipping the scales towards him
8  developing an ulcer in a deformed foot and the
9  complications that go along with that.
10     Q. Within a degree of medical certainty, is that
11 what happened in this case?
12     A. Yes.
13        MR. FRANSEEN: I'll pass the witness.
14        MS. ODUM: Do you have any follow-up?
15        MS. MIDDLETON: Yeah, I do.
16        MS. ODUM: Okay.
17             EXAMINATION
18 BY MS. MIDDLETON:
19     Q. I heard you say on the 1st that the warden
20 should -- when he received the request from Mr. Shipp
21 that he should have sent it to the H.S.A.
22        Is that correct?
23     A. On the 1st? Let me see.
24        Well, I don't know if I have it in here --
25 the intake note.

Page 79

1        The intake note would have --
2     Q. No, it's not an intake, it's in his request.
3  He sent an inmate request to the warden on February 1st
4  right when he -- right after intake.
5        And I thought I heard you say that he should
6  have sent that to the H.S.A.?
7     A. Well, that would be the person to send it to,
8  but -- let's see.
9        Is this on the 1st? Yes.
10       MS. MIDDLETON: Michelle, do you have a copy
11 of that? I thought you put that into evidence.
12       MS. ODUM: I put the -- we referenced the
13 February 12th one.
14       MR. FRANSEEN: I provided him with a copy of
15 the one on the 1st.
16       MS. MIDDLETON: Okay.
17    A. Yes, that's correct.
18    Q. (BY MS. MIDDLETON) Okay. So you say he
19 erred by telling Shipp to go to medical?
20    A. No, ma'am. He erred by not doing anything to
21 take care of this.
22    Q. Well, did he not refer Mr. Shipp that he
23 needed to see medical?
24    A. I don't know that.
25    Q. Look at the bottom of that request. What's

Page 80

1  the response?
2     A. He noted: Go see medical.
3     Q. Okay. So you're saying that was the wrong
4  response?
5     A. No, that's not the wrong response.
6        The wrong response is to be aware of this
7  problem in the first place and not be sure that -- you
8  need to be sure that the procedure was -- that things
9  were progressing, rather than everybody just saying, Oh
10 my God, he's got a Charcot foot, we ought to do
11 something about that. But apparently, nobody did.
12    Q. So you understand that Mr. Arnold does not
13 have any medical experience, correct?
14    A. That's true.
15    Q. So he is to second guess his medical staff?
16    A. No, ma'am.
17       MS. MIDDLETON: Michelle, that's all I have.
18       MS. ODUM: I don't have any more.
19            EXAMINATION
20 BY MR. FRANSEEN:
21    Q. In addition to telling Mr. Shipp to go to
22 medical, should he have notified the H.S.A. on the 1st?
23    A. I believe so.
24    Q. Because that's how -- ultimately, someone in
25 administration has to approve this without it coming