IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

CRAIG SHIPP                                                                                    PLAINTIFF

v.                              Case No. 4:18-cv-4017

STEVEN ARNOLD;[1] DR.
MIMO LEMDJA; LENORA
TURNER; KINDALL SMITH;
and CORRECT CARE SOLUTIONS, LLC                                                DEFENDANTS

## MEMORANDUM OPINION

Before the Court is Separate Defendant Steven Arnold's ("Arnold") Motion for Summary Judgment. (ECF No. 105). Plaintiff Craig Shipp has responded. (ECF No. 120). Arnold has replied. (ECF No. 126). The Court finds the matter ripe for consideration. For the reasons discussed below, the motion will be granted.

## I. BACKGROUND

In 2012, Plaintiff, a diabetic, was diagnosed with Charcot foot in his right foot, a progressive disorder that can cause bones to break down.[2] Prior to his incarceration, Plaintiff used a pair of prescription orthotic shoes to manage his Charcot foot.

On January 11, 2016, Plaintiff was sentenced by the Circuit Court of Crawford County, Arkansas, to two years of incarceration. Plaintiff's sentence also required him to participate in the Modified Therapeutic Community Program at the Arkansas Community Correction, Southwest

---

[1] Plaintiff's complaint and briefing of the instant motion spells Separate Defendant Arnold's first name as "Steven." Separate Defendant Arnold's briefing of the instant motion spells his first name as "Stephen." For consistency's sake, this memorandum opinion will spell his first name as "Steven," as it is spelled in Plaintiff's complaint.

[2] The parties sometimes refer to Plaintiff's condition as "Charcot joint." However, as far as the Court can tell, the terms interchangeably refer to the same condition. The Court will refer to the condition throughout this memorandum opinion as "Charcot foot."

Arkansas Community Correction Center ("SWACCC") in Texarkana, Arkansas. On January 31, 2016, Plaintiff reported to the Crawford County Jail. During intake there, his personal belongings—including his special prescription orthotic shoes—were confiscated. Plaintiff was provided a standard-issue jumpsuit and "Croc-type" sandals to wear. Crawford County Jail staff later gave Plaintiff's possessions to his sister to take home.

On February 1, 2016, Plaintiff was transported to the SWACCC. During the SWACCC's intake procedure, he was provided a standard-issue jumpsuit and "Croc-type" sandals to wear. A nurse from the SWACCC's medical staff evaluated him, and he told her that he was diabetic and needed special prescription orthotic shoes that were taken from him at the Crawford County Jail. (ECF No. 105-9, p. 1).[3] The nurse stated that she would include that information in her notes and told Plaintiff to send a written request to Arnold, the SWACCC's warden, regarding his shoes. Later that day, Plaintiff sent a one-sentence written request to Arnold, requesting "orthotic diabetic shoes for Charcot joint." (ECF No. 105-3). Arnold responded in writing the next day, stating that Plaintiff would need to "go see medical" if he needed special shoes.

At the SWACCC, an inmate's request for a medical device must be evaluated by a doctor at the unit. If the doctor determines that the device is medically necessary, the medical unit will obtain the device either through an offsite consult process or, if the inmate already owns the device and obtaining that device would be faster, by having the inmate's family deliver the device to the SWACCC. (ECF No. 105-8, p. 12, 13). If the latter approach is taken, medical staff notify the SWACCC's Health Service Administrator, Defendant Lenora Turner ("Turner"), who would then contact security and Arnold for consideration of any security threat the outside device might pose.

On February 3, 2016, Plaintiff submitted a sick-call request, complaining of deformed feet

---

[3] All citations to specific pages within record filings are to the bates number generated by the CM/ECF system.

and toes caused by his Charcot foot and diabetes. Defendant Kindall Smith ("Smith"), a nurse at the SWACCC, saw Plaintiff at sick call on February 5, 2016. She observed an open wound on his left foot, with the skin attached only at the corner, but did not observe any open wounds on his right foot. Smith asked Defendant Mimo Lemdja ("Dr. Lemdja"), a doctor at the SWACCC, to examine Plaintiff's left foot. Dr. Lemdja removed the piece of skin from Plaintiff's left foot and instructed him to contact his family about ordering him a pair of orthotic shoes to be sent to the SWACCC from the manufacturer. Nothing in Plaintiff's medical notes indicates that Dr. Lemdja or Smith documented a determination that orthotic shoes were medically necessary for Plaintiff, nor did they notify Turner or Arnold of the availability of Plaintiff's personal orthotic shoes.

Between February 2 and February 9, 2016, Plaintiff was seen seven times by a member of medical staff for various reasons, including checking his blood pressure, a request for a special diet, and follow-up care and dressing for the wound on his left foot. (ECF No. 105-9, pp. 1-8). On February 9, 2016, Dr. Lemdja saw Plaintiff for an intake physical. The parties dispute whether Plaintiff asked Dr. Lemdja for his orthotic shoes during this meeting, but Plaintiff's medical file does not contain any reference to orthotic shoes during this encounter. (ECF No. 105-9, p. 8).

At some point, Plaintiff spoke with Arnold in person and mentioned that he still needed his orthotic shoes. Arnold again told Plaintiff that he would need to speak with medical. On February 12, 2016, Plaintiff submitted a second written request to Arnold, stating that he had an open wound on his left foot and Charcot foot, causing his bones to break down. (ECF No. 105-3, p. 2). Plaintiff's request also reiterated his need for special orthotics. That same day, Arnold referred the request to the medical staff. Turner responded to the request in writing on February 15, 2016, stating that the request for orthotics "must be addressed in a sick call due to it has [sic] to be evaluated for medical necessity by the doctor." *Id.*

On February 14, 2016, a nurse observed a blister on Plaintiff's right foot and referred him to be seen by one of the SWACCC's doctors. On February 16, 2016, Dr. Lenore Lomax[4] saw Plaintiff for a chronic care visit and observed blisters on both of his feet and Charcot foot on his right foot. Dr. Lomax noted that it was critical for Plaintiff to offload the pressure points on his feet because the issue was limb threatening. (ECF No. 105-9, p. 14). Dr. Lomax found that Plaintiff required orthotic shoes and alerted Turner about the need. (ECF No. 105-13, p. 12). That same day, Turner emailed Arnold to inform him that Dr. Lomax was requesting permission for Plaintiff's orthotic shoes to be shipped from his home to the SWACCC. Three minutes later, Arnold emailed his boss to request approval, and nine minutes after that, Arnold obtained permission. Minutes later, Arnold instructed Turner to have Plaintiff's family send his orthotic shoes to the facility.

Several hours later, Plaintiff was allowed to call his sister to give her instructions for sending his shoes to the SWACCC. Three days later, on February 19, 2016, Plaintiff's orthotic shoes arrived at the SWACCC and were given to him. After receiving his shoes, Plaintiff experienced additional problems with his feet and, on May 11, 2016, he was admitted to the University of Arkansas for Medical Sciences for a heavy debridement of his right foot. On May 17, 2016, he was discharged to the Arkansas Division of Correction, Ouachita River Unit in Malvern, Arkansas, where he remained until his release from incarceration on August 10, 2016. On July 31, 2017, Plaintiff underwent a below-the-knee amputation of his right leg.

On January 31, 2018, Plaintiff filed this case pursuant to 42 U.S.C. § 1983. He amended his complaint on March 26, 2018, and again on November 8, 2018. In relevant part, Plaintiff sues Arnold in his individual capacity, contending that the delay in approving his request for his orthotic

---

[4] Dr. Lomax was originally included as a defendant to this action, but Plaintiff later voluntarily dismissed his claims against her.

4

shoes, taken in conjunction with the SWACCC's inadequate medical care, resulted in wounds developing on his right foot that required its ultimate amputation. Plaintiff alleges that Arnold's actions constituted deliberate indifference to his serious medical needs and cruel and unusual punishment, in violation of the Eighth Amendment.[5]

On February 9, 2020, Arnold filed the instant motion, contending that there is no genuine dispute of material fact and that he is entitled to summary judgment. Specifically, Arnold contends that he is entitled to qualified immunity. Plaintiff opposes the motion.

## II. STANDARD

The standard for summary judgment is well established. A party may seek summary judgment on a claim, a defense, or "part of [a] claim or defense." Fed. R. Civ. P. 56(a). When a party moves for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Krenik v. Cnty. of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995). This is a "threshold inquiry of . . . whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they reasonably may be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material only when its resolution affects the outcome of the case. *Id.* at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252.

In deciding a motion for summary judgment, the Court must consider all the evidence and all reasonable inferences that arise from the evidence in a light most favorable to the nonmoving party. *Nitsche v. CEO of Osage Valley Elec. Co-Op*, 446 F.3d 841, 845 (8th Cir. 2006). The

---

[5] Plaintiff also asserts a state-law negligence claim against certain Defendants. Plaintiff does not assert a negligence claim against Arnold.

moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

Qualified immunity "is an immunity from suit rather than a mere defense to liability[;] . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Thus, the summary judgment stage, "qualified immunity cases are somewhat unique in that the court should [not] deny summary judgment any time a material issue of fact remains on the [constitutional violation] claim [because to do so] could undermine the goal of qualified immunity." *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012) (alterations in original). Rather, "the court must take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party as long as those facts are not so blatantly contradicted by the record . . . that no reasonable jury could believe [them]." *Id.* at 1161-62 (alteration in original) (internal quotation marks omitted).

### III. DISCUSSION

As a preliminary matter, the Court must address Plaintiff's statement of disputed facts. Then the Court will take up the merits of the instant motion.

#### A. Plaintiff's Statement of Disputed Facts

The Court will begin by discussing Plaintiff's statement of disputed facts filed in response to Arnold's statement of undisputed facts. The Court may deem a movant's asserted fact as undisputed if it is not properly controverted by the other party pursuant to Rule 56(c). Fed. R. Civ. 56(e); *see also* Local Rule 56.1(c) (providing that a movant's asserted facts will be deemed admitted if they are not controverted by the nonmovant's own statement of disputed material facts).

A party asserting a genuine dispute of material fact must do so by either citing to materials in the record or by showing that the cited materials do not establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1).

Although Plaintiff complies with Rule 56 in denying several of Arnold's asserted facts, on other occasions Plaintiff "admits" Arnold's asserted facts while rephrasing the assertions in ways that are ostensibly more advantageous to Plaintiff.[6] Most of these "admissions" are neither accompanied by citations to record evidence nor a statement of how Arnold's cited materials fail to establish the absence or presence of a genuine dispute of fact. This practice does not comply with Rule 56 and Local Rule 56.1. *See Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996) (stating that a district court is not required to "speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim"). Consequently, Arnold's assertions of fact are deemed admitted to the extent that Plaintiff attempts to admit or otherwise rephrase them using this practice. *Spence v. Union Pac. R.R. Co.*, No. 3:17-cv-3074-TLB, 2019 WL 1281244, at *1 (W.D. Ark. Mar. 20, 2019) (deeming admitted the summary judgment movant's asserted facts when the nonmovant failed to controvert them as required by Local Rule 56.1).

### B. Summary Judgment

Arnold contends that he is entitled to qualified immunity on Plaintiff's claims against him because he did not violate Plaintiff's constitutional rights. Plaintiff disagrees.

---

[6] For example, Arnold's eighteenth asserted fact reads, "[o]n February 2, 2016, Warden Arnold responded to Plaintiff's request. In his response, he informed Plaintiff that if he needed special shoes he would need to go see the unit's medical staff." (ECF No. 107, p. 3). Plaintiff's statement of disputed facts responds to that particular assertion, "[a]dmitted that Warden Arnold made no other efforts to notify medical or coordinate and approve Plaintiff's request after being informed." (ECF No. 121, p. 2).

A federal cause of action exists for the deprivation, under color of state law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. To state a claim under section 1983, a plaintiff must allege that a defendant acted under color of state law and that they violated a right secured by the Constitution. *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999). A defendant may be sued under section 1983 in his individual capacity, official capacity, or both. *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998). Plaintiff sues Arnold only in his individual capacity.

The affirmative defense of qualified immunity shields government officials from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether a defendant is entitled to qualified immunity is ordinarily a question of law to be decided by the trial court. *J.H.H. v. O'Hara*, 878 F.2d 240, 243 (8th Cir. 1989), *cert. denied*, 493 U.S. 1072 (1990).

Determining whether a defendant is entitled to qualified immunity requires a two-pronged inquiry. *Jones*, 675 F.3d at 1161. The Court must determine whether the facts demonstrate a deprivation of a constitutional right. *Id.* (citing *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010)). The Court must also decide whether the implicated right was clearly established at the time of the deprivation. *Id.* The Court may begin with either prong and may conclude the analysis if either prong is not met. *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017). Arnold focuses primarily on the first prong, so the Court will start there.

### 1. Deprivation of a Constitutional Right

The Court begins its qualified immunity inquiry by considering whether the record establishes that Arnold violated Plaintiff's Eighth Amendment rights.

Plaintiff contends that Arnold was deliberately indifferent to his serious medical needs and subjected him to cruel and unusual punishment, both in violation of the Eighth Amendment. The Eighth Amendment's prohibition of cruel and unusual punishment forbids deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012). Thus, to prevail on his Eighth Amendment claims, Plaintiff must prove that Arnold acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The deliberate-indifference standard includes "both an objective and a subjective component: '[Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (alterations in original). To show that he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011). Arnold does not dispute that Plaintiff's Charcot foot was a serious medical need, so the only remaining question is whether Arnold was aware of and deliberately disregarded that medical need.

To satisfy the subjective prong of deliberate indifference, "it is not enough that a reasonable official should have known of the risk." *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000). Rather, Plaintiff must show that Arnold actually knew of the risk and deliberately disregarded it. *Id.* "This knowledge is subject to proof by all the usual ways, including inferences based on the obviousness of the risk." *Id.* However, "even if an official knows of a risk, he is not liable for a subsequent injury if he responded reasonably to the known risk." *Id.* When evaluating whether Arnold unreasonably disregarded a risk, the Court considers "his actions in light of the information

9

he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position." *Id.* at 419.

Plaintiff "must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citation omitted). Deliberate indifference may be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted). However, the "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. Cnty. of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009). The objective seriousness of delay in treatment must be measured by reference to the effect of delay, which must be shown by verifying medical evidence in the record. *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005). *But see Schaub*, 638 F.3d at 919 (stating that submission of verifying medical evidence is unnecessary where the need for medical attention would have been obvious to a layperson).

Arnold argues there is no evidence that, prior to February 16, 2016, he was aware of the existence of a substantial risk of serious harm to Plaintiff's health, or of facts from which he could draw that inference. Arnold states that when Plaintiff asked him prior to February 16 for orthotics to treat his Charcot foot, Arnold, a layperson with no medical training, did not know what Charcot foot was or the risk it posed. Thus, Arnold contends that nothing in the record supports a finding that he knew of—or could have drawn the inference of—a substantial risk of harm to Plaintiff's health and that he disregarded the same. Arnold also argues that, as a non-healthcare professional,

he was under no duty to independently assess or second guess the medical opinions of the SWACCC's medical staff.

Plaintiff disagrees and asserts that his written requests for orthotics, submitted to Arnold on February 1 and 12, 2016, made Arnold aware of his Charcot foot condition and that, if left untreated, it could cause the bones in his foot to break down. Plaintiff also argues that Arnold understood that his needs were medical needs and that Arnold knew that a medical condition that could require amputation is a serious medical condition. Plaintiff argues that, despite this knowledge, Arnold took no action other than referring Plaintiff to medical, even when it became apparent that medical was not resolving the issue. Thus, Plaintiff contends that Arnold was deliberately indifferent to his serious medical needs.

Plaintiff's February 1, 2016 written request for orthotics reads in its entirety: "Orthotic diabetic shoes for Charcot joint." (ECF No. 105-3, p. 1). The undisputed evidence establishes that Arnold is a layperson with no medical training and the Court is unconvinced that the February 1, 2016 request contained enough information to allow Arnold to know or draw the inference that there was a substantial risk of serious harm to Plaintiff's health. Plaintiff implies that Arnold knew or should have known at this point that Plaintiff's health was in jeopardy because Arnold's father is a diabetic. (ECF No. 122, p. 6). This suggestion is purely speculative and is unsupported by any record evidence showing that Arnold's father ever had Charcot foot or that his diabetic condition would give Arnold reason to know what Charcot foot is and/or the risk it presents. To the contrary, Arnold's deposition testimony demonstrates an unfamiliarity with Charcot foot and that he did not know what orthotic shoes were.[7] (ECF No. 105-4, p. 15). Accordingly, the Court

---

[7] Plaintiff contends that Arnold testified that he understood Charcot foot is a serious medical condition that can result in amputation. (ECF No. 122, p. 7). However, the record evidence does not bear out this statement. Arnold testified that he did not know what Charcot foot is. Counsel later asked if a condition that can result in limb amputation is a serious medical condition, and Arnold answered yes. (ECF No. 122, p. 16). The Court does not believe that this

11

finds that the summary judgment evidence does not establish that the February 1, 2016 written request for orthotics gave Arnold the knowledge or ability to infer that Plaintiff's Charcot foot presented a substantial risk of serious harm to his health.

Plaintiff's February 12, 2016 request for orthotics is a different story. It reads: "Open wound on left foot. And Charcot joint on left foot causing bones to break down. Need special orthotics." (ECF No. 105-3, p. 2). The Court believes this is sufficient to give Arnold enough information to know or infer that Plaintiff's Charcot foot presented a substantial risk of serious harm to his health. The question now becomes whether Arnold responded reasonably.

Arnold argues that his response was objectively reasonable under the circumstances. He states that, for each of Plaintiff's requests for orthotics prior to February 16, 2016, he told Plaintiff to speak with medical staff about the issue. Arnold contends that the undisputed facts show that SWACCC inmates can only obtain medical devices if a unit doctor deems the device medically necessary and, if needed, once the medical staff seeks Arnold's approval of the device for security purposes. Arnold contends that no unit doctor communicated to him that Plaintiff's orthotic shoes were medically necessary until February 16, 2016, at which point Arnold immediately facilitated the request and got the orthotic shoes to Plaintiff within three days.

Plaintiff disagrees, arguing that Arnold cannot stand behind his referral of Plaintiff's requests to medical as a bar to liability. Plaintiff states that there was no written order from a SWACCC doctor affirmatively stating that Plaintiff did not need orthotics. Without citing to authority, Plaintiff argues that Arnold's actions were unreasonable because he should have investigated the matter further, particularly after Plaintiff made repeated requests for orthotics and

---

question and answer establishes that Plaintiff understood the severity of Charcot foot prior to February 12, 2016. The question was posed in the abstract rather than related directly to Charcot foot and, in any event, Arnold's affirmative answer does not establish that he knew the danger posed by Charcot foot prior to February 12, 2016.

it became clear that medical was not resolving his problem.

The Court disagrees with Plaintiff. "'Prison officials lacking medical expertise are entitled to rely on the opinions of medical staff' with regard to a prisoner's health care needs." *Anderson v. United States*, No. CIV. 11-1486 DWF/LIB, 2013 WL 1173948, at *12 (D. Minn. Jan. 25, 2013) (quoting *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011)), *report and recommendation adopted*, No. CIV. 11-1486 DWF/LIB, 2013 WL 1173901 (D. Minn. Mar. 20, 2013), *aff'd*, 564 F. App'x. 865 (8th Cir. 2014). In the context of the Eighth Amendment, prison officials acting in an administrative capacity "cannot substitute their judgment for a medical professional's prescription" and "cannot be liable for the medical staff's diagnostic decisions." *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002). In other words, prison officials do not have a "constitutional duty to independently assess, and second-guess, the medical opinions of a prison's medical staff." *Anderson*, 2013 WL 1173948, at *12.

Plaintiff contends that Arnold showed deliberate indifference by not taking action to acquire the orthotics after being informed on several occasions that Plaintiff did not have his orthotics.[8] The Court is unpersuaded. The case Plaintiff relies on for this argument, *Langford v. Norris*, is distinguishable from the case at bar. In that case, the Eighth Circuit affirmed a district court's denial of qualified immunity to a prison medical services administrator who received grievances and letters from a prisoner complaining of worsening Charcot foot over the course of roughly eight months and took no action beyond referring the issue to medical staff. *Langford v. Norris*, 614 F.3d 445, 465 (8th Cir. 2010). The Eighth Circuit reasoned that the prison

---

[8] Plaintiff provides no authority for his proposition that Arnold was obliged to act because SWACCC medical staff never explicitly found that the orthotics were not medically necessary. In the absence of any such authority, the Court finds that this argument runs contrary to the existing caselaw in this circuit establishing that prison officials have no constitutional duty to independently assess the medical opinions of prison medical staff. *Anderson*, 2013 WL 1173948, at *12.

administrator was aware of the specifics of the prisoner's Charcot foot and a reasonable administrator would have known that ignoring the prisoner's repeated complaints about receiving inadequate medical care would violate the Eighth Amendment rights. *Id.* at 461-62.

*Langford* is inapposite because Plaintiff, "by contrast, did not languish for years without proper medical care." *Hamner v. Burls*, 937 F.3d 1171, 1178 (8th Cir. 2019), *as amended* (Nov. 26, 2019). The evidence in this case shows that, from the time Plaintiff entered the SWACCC, he went without his orthotics for fifteen days before staff began the process of acquiring the shoes, and that Plaintiff notified Arnold of his need for orthotics on three occasions during that time.

It is undisputed that Arnold had no medical experience or medical training. It is further undisputed that, in the SWACCC, the first step of a prisoner obtaining a medical device involves a unit doctor finding that the device is medically necessary. Thus, Plaintiff could not obtain his orthotic shoes until a doctor deemed them medically necessary. Plaintiff has produced no evidence that Arnold could somehow bypass this requirement and order medical staff to acquire Plaintiff's orthotics.

Considering Arnold's "actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position," *Gregoire*, 236 F.3d at 419, the Court finds based on the summary judgment record that Arnold's actions were reasonable. Each time Plaintiff asked him for orthotics, Arnold referred Plaintiff to medical because a unit doctor had to make the initial determination that Plaintiff's orthotics were medically necessary before he could obtain them. "A reasonable prison official, aware of the alleged gaps in [Plaintiff's] treatment, could have understood the Eighth Amendment to allow administrators an opportunity to fix problems that arise in a prison's health care system by responding to grievances and taking corrective actions."

*Hamner*, 937 F.3d at 1178. Arnold did just that, as he referred Plaintiff's February 12, 2016 request to Turner, the SWACCC's Health Service Administrator, for further action. For whatever reason, the "medically necessary" determination was not made and conveyed to Arnold until February 16, 2016, fifteen days after Plaintiff's arrival at the SWACCC. That same day, Arnold began the process of acquiring the orthotics and Plaintiff had them in his possession three days later.

An argument could be made that Arnold's actions were negligent. His terse responses to Plaintiff to "talk to medical" about the orthotic shoes did little to help Plaintiff understand what needed to be done. Perhaps Arnold could have made it clearer to Plaintiff that, to receive his orthotic shoes, he needed to obtain a determination from a unit doctor that the shoes were medically necessary.[9] However, Plaintiff has not asserted a negligence claim against Arnold, and negligence is not deliberate indifference. *Popoalii*, 512 F.3d at 499. The only question before the Court is whether Arnold was deliberately indifferent. Viewing the record in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court concludes that Arnold was not deliberately indifferent to his serious medical needs. Consequently, Arnold did not deprive Plaintiff of his Eighth Amendment rights.

### 2. Clearly Established Right

The second prong of the qualified immunity analysis is whether Plaintiff's implicated right was clearly established at the time of the deprivation. *Jones*, 675 F.3d at 1161. In light of the Court's finding that Arnold was not deliberately indifferent to Plaintiff's serious medical needs, it is unnecessary to address this prong. *Kulkay*, 847 F.3d at 642.

---

[9] In fairness, Arnold referred Plaintiff's February 12, 2016 request to Turner—the SWACCC's Health Service Administrator—who responded to Plaintiff in writing that his request must be addressed during sick call because it had to be evaluated for medical necessity by the doctor. (ECF No. 105-3, p. 2). However, it does not appear that Plaintiff received Turner's response until February 15, 2016 at the earliest, one day before Dr. Lomax determined that his orthotic shoes were medically necessary.

### 3. Conclusion

In sum, Plaintiff has not established that Arnold violated his Eighth Amendment rights. Because the summary judgment record shows that Arnold was not deliberately indifferent to Plaintiff's serious medical needs, Arnold is entitled to qualified immunity.

### III.  CONCLUSION

For the above-stated reasons, the Court finds that Separate Defendant Steven Arnold's Motion for Summary Judgment (ECF No. 105) should be and hereby is **GRANTED**. Plaintiff's claims against Separate Defendant Arnold are hereby **DISMISSED WITH PREJUDICE**. A judgment of even date shall issue.

**IT IS SO ORDERED**, this 15th day of July, 2020.

/s/ Susan O. Hickey
Susan O. Hickey
Chief United States District Judge