IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

CRAIG SHIPP                                                                                      PLAINTIFF

v.                                          Case No. 4:18-cv-4017

STEVEN ARNOLD;
DR. MIMO LEMDJA; LENORA
TURNER;[1] KINDALL SMITH;
and CORRECT CARE SOLUTIONS, LLC                                          DEFENDANTS

## MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment (ECF No. 109) filed by Separate

Defendants Dr. Mimo Lemdja; Lenora Turner; Kindall Smith; and Correct Care Solutions, LLC

(collectively, the "Medical Defendants").  Plaintiff Craig Shipp has responded.  (ECF No. 123).

The Medical Defendants have replied.  (ECF No. 129).  The Court finds the matter ripe for

consideration.  For the reasons discussed below, the motion will be granted.

## I.  BACKGROUND

In 2012, Plaintiff, a diabetic, was diagnosed with Charcot foot in his right foot, a

progressive disorder that can cause bones to break down.[2]  Prior to his incarceration, Plaintiff used

a pair of prescription orthotic shoes to manage his Charcot foot.

On January 11, 2016, Plaintiff was sentenced by the Circuit Court of Crawford County,

Arkansas, to two years of incarceration.  Plaintiff's sentence also required him to participate in the

Modified Therapeutic Community Program at the Arkansas Community Correction, Southwest

---

[1] The briefing of the instant motion indicates that Defendant Turner's last name is now Philson.  However, Plaintiff's complaint names her as "Lenora Turner," so the Court will use that name when referring to her.

[2] The parties sometimes refer to Plaintiff's condition as "Charcot joint."  However, as far as the Court can tell, the terms "Charcot joint" and "Charcot foot" interchangeably refer to the same condition.  The Court will refer to the condition throughout this memorandum opinion as "Charcot foot."

Arkansas Community Correction Center ("SWACCC") in Texarkana, Arkansas.  On January 31, 2016, Plaintiff reported to the Crawford County Jail.  During intake there, his personal belongings—including his special prescription orthotic shoes—were confiscated.  Crawford County Jail staff later gave Plaintiff's possessions to his sister to take home.

On February 1, 2016, Plaintiff was transported to the SWACCC.  During the SWACCC's intake procedure, a nurse evaluated him, and he told her that he was diabetic and needed his special prescription orthotic shoes.  (ECF No. 111-1, p. 1).[3]  The nurse stated that she would include that information in her notes and told Plaintiff to send a written request to Defendant Steven Arnold,[4] the SWACCC's warden, regarding his shoes.  Later that day, Plaintiff did so, and Arnold responded that Plaintiff needed to speak with medical staff about the request.

At the SWACCC, an inmate's request for a medical device must be evaluated for medical necessity by a unit doctor.  If the doctor determines that the device is necessary, the medical unit will obtain the device either through an offsite consult process or, if the inmate already owns the device and obtaining that device would be faster, by having the inmate's family deliver the device to the SWACCC.  If the latter approach is taken, medical staff notify the SWACCC's Health Service Administrator, Defendant Lenora Turner ("Turner"), who would then contact security and Arnold for consideration of any security threat the outside device might pose.

On February 3, 2016, Plaintiff submitted a sick-call request, complaining of deformed feet and toes caused by his Charcot foot and diabetes.  Defendant Kindall Smith ("Smith"), a nurse at the SWACCC, saw Plaintiff at sick call on February 5, 2016.  She observed an open wound on his left foot, with the skin attached only at the corner, but did not observe any open wounds on his

---

[3] All citations to specific pages within record filings are to the bates number generated by the CM/ECF system.

[4] Defendant Arnold was a defendant to this case and separately moved for summary judgment, which the Court granted for the reasons set out in a separate memorandum opinion.

right foot.  Smith asked Defendant Dr. Mimo Lemdja ("Dr. Lemdja"), a unit doctor at the SWACCC, to examine Plaintiff's left foot.  Dr. Lemdja removed the piece of skin from Plaintiff's left foot and instructed him to contact his family about ordering him a pair of orthotic shoes to be sent to the SWACCC from the manufacturer.  Plaintiff's medical notes do not indicate that Dr. Lemdja or Smith documented that orthotic shoes were medically necessary for Plaintiff at that time, nor did they notify Turner or Arnold of the availability of Plaintiff's personal orthotic shoes.

Between February 2 and February 9, 2016, Plaintiff was seen seven times by a member of medical staff for various reasons, including follow-up care and dressing for the wound on his left foot.  (ECF No. 111-1, pp. 1-9).  On February 9, 2016, Dr. Lemdja saw Plaintiff for an intake physical. Dr. Lemdja noted, *inter alia*, Plaintiff's history of diabetes and that his right foot was deformed.  She ordered lab work, the continuation of ongoing therapy, and for Plaintiff to follow up with the SWACCC's chronic care physician.  Plaintiff's medical notes for this encounter do not contain any reference to orthotic shoes.

On February 12, 2016, Plaintiff submitted a written request to Arnold, stating that he had an open wound on his left foot and Charcot foot, causing his bones to break down.  (ECF No. 111-10, p. 1).  Plaintiff's request also stated his need for special orthotic shoes.  That same day, Arnold referred the request to the medical staff.  On February 15, 2016, Turner received the request and responded to Plaintiff in writing, stating that his request for orthotic shoes "must be addressed in a sick call due to it has [sic] to be evaluated for medical necessity by the doctor." *Id.*

On February 14, 2016, a nurse observed a blister on Plaintiff's right foot and referred him to be seen by one of the SWACCC's doctors.  On February 16, 2016, Dr. Lenore Lomax[5] saw Plaintiff for a chronic care visit and observed blisters on both of his feet and Charcot foot on his

---

[5] Dr. Lomax was originally included as a defendant to this action, but Plaintiff later voluntarily dismissed his claims against her.

right foot.  Dr. Lomax wrote that it was critical for Plaintiff to offload the pressure points on his feet because the issue was limb threatening.  (ECF No. 105-9, p. 14).  Among other things, Dr. Lomax noted Plaintiff's need for custom orthotic shoes for his Charcot foot.  (ECF No. 111-1, p. 17).  Dr. Lomax alerted Turner of Plaintiff's need for orthotic shoes, and after an exchange of emails between Turner and Arnold, Arnold instructed Turner to have Plaintiff's family send his orthotic shoes to the facility.

Several hours later, Plaintiff was allowed to call his sister to give her instructions for sending his shoes to the SWACCC.  Three days later, on February 19, 2016, Plaintiff's orthotic shoes arrived at the SWACCC and were given to him.  After receiving his shoes, Plaintiff experienced additional problems with his feet, and on May 11, 2016, he was admitted to the University of Arkansas for Medical Sciences for a heavy debridement of his right foot.  On May 17, 2016, he was discharged to the Arkansas Division of Correction, Ouachita River Unit in Malvern, Arkansas, where he remained until his release from incarceration on August 10, 2016.  On July 31, 2017, Plaintiff underwent a below-the-knee amputation of his right leg.

On January 31, 2018, Plaintiff filed this case pursuant to 42 U.S.C. § 1983.  He amended his complaint on March 26, 2018, and again on November 8, 2018.  In relevant part, he alleges that the Medical Defendants' delay in approving his request for his orthotic shoes, taken in conjunction with the inadequate medical care he received, resulted in wounds developing on his right foot that required its ultimate amputation.  Plaintiff asserts that the Medical Defendants' actions constituted deliberate indifference to his serious medical needs and cruel and unusual punishment, in violation of the Eighth Amendment.  He also contends that the Medical Defendants were negligent under Arkansas law.

On February 10, 2020, the Medical Defendants filed the instant motion, contending that there is no genuine dispute of material fact and that they are entitled to summary judgment.

Plaintiff opposes the motion.

## II.  STANDARD

The standard for summary judgment is well established.  A party may seek summary judgment on a claim, a defense, or "part of [a] claim or defense."  Fed. R. Civ. P. 56(a).  When a party moves for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Krenik v. Cnty. of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995).  This is a "threshold inquiry of . . . whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they reasonably may be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A fact is material only when its resolution affects the outcome of the case.  *Id.* at 248.  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  *Id.* at 252.

In deciding a motion for summary judgment, the Court must consider all the evidence and all reasonable inferences that arise from the evidence in a light most favorable to the nonmoving party.  *Nitsche v. CEO of Osage Valley Elec. Co-Op*, 446 F.3d 841, 845 (8th Cir. 2006).  The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.

## III.  DISCUSSION

As a preliminary matter, the Court must address Plaintiff's statement of disputed facts.  Then the Court must address the Medical Defendants' requests to exclude some of Plaintiff's expert opinions.  Afterwards, the Court will take up the merits of the instant motion.

### A. Plaintiff's Statement of Disputed Facts

The Court will begin by discussing Plaintiff's statement of disputed facts filed in response to the Medical Defendants' statement of undisputed facts.  The Court may deem a movant's asserted fact as undisputed if it is not properly controverted by the other party pursuant to Rule 56(c).  Fed. R. Civ. 56(e); *see also* Local Rule 56.1(c) (providing that a movant's asserted facts will be deemed admitted if they are not controverted by the nonmovant's own statement of disputed material facts).  A party asserting a genuine dispute of material fact must do so by either citing to materials in the record or by showing that the cited materials do not establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).

Although Plaintiff complies with Rule 56 in denying several of the Medical Defendants' asserted facts, on other occasions Plaintiff "admits" the Medical Defendants' asserted facts while rephrasing the assertions in ways that are ostensibly more advantageous to Plaintiff.[6]  Most of these "admissions" are neither accompanied by citations to record evidence nor a statement of how the Medical Defendants' cited materials fail to establish the absence or presence of a genuine dispute of fact.  This practice does not comply with Rule 56 and Local Rule 56.1.  *See Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996) (stating that a district court is not required to "speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim").  Consequently, the Medical Defendants' assertions of fact are deemed admitted to the extent that Plaintiff attempts to admit or otherwise rephrase them using this practice.  *Spence v. Union Pac. R.R. Co.*, No. 3:17-cv-3074-TLB, 2019 WL 1281244, at *1 (W.D. Ark. Mar. 20,

---

[6] For example, the Medical Defendants' thirty-first asserted fact reads, "Plaintiff received daily treatment call for the wound on his left foot."  (ECF No. 111, p. 6).  Plaintiff's statement of disputed facts responds to that particular assertion, "Plaintiff admits that he received evaluations but none of these items corrected the offloading until February 16 when Dr. Lomax observed Plaintiff's condition."  (ECF No. 124, p. 4).

2019) (deeming admitted the summary judgment movant's asserted facts when the nonmovant failed to controvert them as required by Local Rule 56.1).

### B. The Medical Defendants' Requests for Exclusion of Expert Opinions

The Medical Defendants' brief in support of their summary judgment motion asks the Court to exclude the expert opinions of two of Plaintiff's expert witnesses:  Dr. William Wright and Dr. Shawn Smith.  The Medical Defendants contends that some of Dr. Wright's opinions should be excluded because they were disclosed to Defendants for the first time after the expert disclosure deadline.  The Medical Defendants also argue that all of Dr. Smith's opinions should be excluded under *Daubert*[7] because they are unreliable.  Plaintiff argues that these experts' opinions should not be excluded.

The Court need not address either challenged expert because the exclusion requests are not properly put before the Court for consideration.  Federal Rule of Civil Procedure 7 "is a general rule that applies to all motions."  *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 793 (8th Cir. 2003).  Rule 7 requires that a request for a court order must be made by motion, which shall:  (1) be in writing, unless made during a hearing or a trial, (2) state with particularity the grounds for seeking the order, and (3) state the relief sought.  Fed. R. Civ. P. 7(b).  A request for court action, made in briefing papers or other non-motion documents, is procedurally deficient and not properly presented to the Court for consideration.  *See Ivers v. CMFG Life Ins. Co.*, No. CV 15-1577 (WMW/BRT), 2016 WL 5796919, at *8 (D. Minn. Aug. 12, 2016) (stating that a request made in a reply brief does not constitute a motion); *see also Fitzgerald v. Zakheim & LaVrar, P.A.*, 90 F. Supp. 3d 867, 873 n.3 (D. Minn. 2015) (declining, without analysis, a request for court action that was made in a response brief opposing a motion).

---

[7] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591-93 (1993).

The exclusion requests are made only in the Medical Defendants' memorandum brief filed in support of their summary judgment motion.  Because the exclusion requests are not made in a formal written motion, the Court finds that they are procedurally deficient.  Consequently, the Court declines to consider them at this time.  If the Medical Defendants are inclined to move for exclusion of expert opinions, they must do so by separately filing a *Daubert* motion or a motion in limine.

### C. Summary Judgment

Plaintiff contends that the Medical Defendants were deliberately indifferent to his serious needs in violation of the Eighth Amendment, and that they were negligent under Arkansas state law.  The Court will begin with Plaintiff's deliberate indifference claims and, if necessary, will then reach the negligence claims.

#### 1. Deliberate Indifference

Plaintiff contends that the Medical Defendants were deliberately indifferent to his serious medical needs and subjected him to cruel and unusual punishment, both in violation of the Eighth Amendment.  The Court will provide the relevant authority governing these claims and then will separately address the various Medical Defendants.

The Eighth Amendment's prohibition of cruel and unusual punishment forbids deliberate indifference to prisoners' serious medical needs.  *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012).  Thus, to prevail on his Eighth Amendment claims, Plaintiff must prove that the Medical Defendants acted with deliberate indifference to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The deliberate-indifference standard includes "both an objective and a subjective component: '[Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"

8

*Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (alterations in original).  To show that he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011).  The Medical Defendants do not dispute that Plaintiff's Charcot foot was a serious medical need, so the only remaining question is whether they were aware of and deliberately disregarded that need.

To satisfy the subjective prong of deliberate indifference, Plaintiff "must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation."  *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citation omitted).  Medical malpractice is also not deliberate indifference.  *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).  "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct."  *Popoalii*, 512 F.3d at 499.  An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment."  *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010).  This requires a showing that the medical staffer's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care."  *Dulany*, 132 F.3d at 1240-41.  Furthermore, the objective seriousness of a delay in treatment must be measured by reference to the effect of delay, which must be shown by verifying medical evidence in the record.  *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005).

With that authoritative framework in mind, the Court will now address Plaintiff's deliberate indifference claim against each of the Medical Defendants.

### a. Dr. Lemdja

Plaintiff's primary argument against Dr. Lemdja is that, from February 5, 2016 onward, she knew of his Charcot foot and his attendant need for orthotic shoes, yet she took no action to procure the shoes for him.  He argues that she failed to offload his feet when she saw him on February 5 or 9, 2016, and that she knew at that time that he had Charcot foot and what could happen if it went untreated.  The Medical Defendants argue that there is no evidence that Dr. Lemdja was deliberately indifferent.

The Court finds no genuine dispute of material fact regarding whether Dr. Lemdja was deliberately indifferent to Plaintiff's serious medical needs.  Absent from the record is any evidence that Dr. Lemdja's treatment of Plaintiff was "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care."  *Dulany*, 132 F.3d at 1241.  Plaintiff does not argue that she refused to examine his foot, as the evidence shows that she examined his feet on February 5, 2016, when Smith called her over to Plaintiff's sick call, and again on February 9, 2016, when she performed his intake physical examination.  Thus, Plaintiff's claim is that Dr. Lemdja's medical decisions on those dates were constitutionally deficient in that she should have been more cognizant of his Charcot foot condition, ordered offloading of his feet, and written an order allowing him to have orthotic shoes.

The case Plaintiff primarily relies on for this argument, *Langford v. Norris*, is distinguishable from the case at bar.  In that case, the Eighth Circuit affirmed a district court's denial of qualified immunity to a prison medical services administrator who, over the course of roughly eight months, received grievances and letters from a prisoner complaining of worsening Charcot foot and took no action beyond referring the issue to medical staff.  *Langford v. Norris*, 614 F.3d 445, 465 (8th Cir. 2010).  The Eighth Circuit reasoned that the prison administrator was aware of the specifics of the prisoner's Charcot foot and a reasonable administrator would have

known that ignoring the prisoner's repeated complaints about receiving inadequate medical care would violate the Eighth Amendment rights. *Id.* at 461-62.

*Langford* is inapposite because Plaintiff, "by contrast, did not languish for years without proper medical care." *Hamner v. Burls*, 937 F.3d 1171, 1178 (8th Cir. 2019), *as amended* (Nov. 26, 2019). The evidence in this case shows that, from the time Plaintiff entered the SWACCC, he went without his orthotic shoes for fifteen days before staff began the process of acquiring the shoes, and that Plaintiff notified Dr. Lemdja of his need for orthotic shoes on one, or perhaps two, occasions during that time. For the reasons discussed in this section, the Court is not convinced that Dr. Lemdja's knowledge of Plaintiff's need for orthotic shoes, coupled with the amount of time where he went without orthotic shoes, evidences her deliberate indifference to his serious medical needs.

The evidence shows that Dr. Lemdja intended on February 5, 2016, to allow Plaintiff to have his orthotic shoes. She told him that day to call his family and have them send his orthotic shoes to the facility. However, Plaintiff could not do so because Dr. Lemdja did not write an order for the shoes and communicate that to Turner. That same day, Dr. Lemdja also instructed Smith to give Plaintiff an elevator pass so he would not have to climb stairs, and Smith did so. Dr. Lemdja also saw Plaintiff on February 9, 2016 for a physical exam, where she noted his right-foot deformity, prescribed various medications, and referred him to be seen in a follow-up visit by a chronic care doctor. (ECF No. 111-1, p. 9). Plaintiff points to the testimony of two experts, Dr. Wright and Dr. Jeffrey Stieve, who each opine that Dr. Lemdja's treatment of Plaintiff on February 5 and 9, 2016, violated the medical standard of care because she should have recognized Plaintiff's Charcot foot and ordered offloading of his feet. Even so, this potentially establishes medical malpractice or negligence, not deliberate indifference. *See Fourte v. Faulkner Cnty., Ark.*, 746 F.3d 384, 389 (8th Cir. 2014) ("At best, [the evidence] show[s] that [the medical officials] should

have known they were committing malpractice—but medical malpractice is not deliberate indifference.").

Plaintiff has not shown that Dr. Lemdja refused to treat him or that she intentionally provided him substandard treatment with the goal of harming him.  Therefore, the Court must conclude that Dr. Lemdja was not deliberately indifferent to Plaintiff's serious medical needs.  Plaintiff's section 1983 claim against her should be dismissed.

### b. Turner

Plaintiff contends that summary judgment should not be granted to Turner, the SWACCC's health services administrator, because there is a question of fact regarding whether she was aware of Plaintiff's Charcot's foot on February 1 or 2, 2016.  Plaintiff contends that Arnold testified that he believes he spoke to Turner about Plaintiff's orthotic shoes after Plaintiff submitted his February 1, 2016 written request for orthotic shoes to Arnold.  Plaintiff contends that, if the jury believes that testimony, then Turner knew of Plaintiff's need for orthotic shoes in early February 2016 and did nothing to facilitate that need, which shows her deliberate indifference.[8]

The Medical Defendants disagree, arguing that the summary judgment record shows only that Arnold spoke with Turner about Plaintiff's orthotic shoes on February 16, 2016, the same day Plaintiff's shoes were approved for entry into the SWACCC.  Absent any evidence indicating otherwise, the Medical Defendants argue that nothing creates a genuine dispute of material fact as to whether Turner was deliberately indifferent.

The Court agrees with the Medical Defendants.  The summary judgment record shows that,

---

[8] Plaintiff's complaint also alleges that Turner promulgated policies, procedures, or customs that led to the delay of his treatment, thereby violating his constitutional rights.  The Medical Defendants argue that Plaintiff has no evidence of this.  Plaintiff does not address that argument in his response brief, nor does he provide evidence that Turner has the power to set policies for Correct Care Solutions, LLC, or that she indeed did so.  Thus, the Court assumes that Plaintiff has abandoned and waived that allegation.  *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").

on February 1, 2016, Plaintiff submitted a written request to Arnold for orthotic shoes. Arnold responded in writing the next day. Then on February 12, 2016, Plaintiff submitted a second written request to Arnold for orthotic shoes. That same day, Arnold forwarded the request to the medical unit for a response. On February 15, 2016, Turner received the written request and responded to it, indicating that Plaintiff needed to submit a sick call because the orthotic shoes he wanted had to be evaluated for medical necessity by a doctor. On February 16, 2016, after Dr. Lomax examined Plaintiff and determined that he needed orthotic shoes, she informed Turner of the need and Turner immediately began corresponding with Arnold to procure the shoes. Plaintiff's shoes were approved that same day and he had the shoes in his possession three days later.

Arnold testified at his deposition that he thought he might have spoken with Turner sometime after he received Plaintiff's February 1, 2016 written request for orthotic shoes, but he did not know for sure whether he did or, if so, on what date. (ECF No. 124-13, pp. 2-3). The record shows that Arnold forwarded Plaintiff's second written request to Turner on February 12, 2016, and that she received in on February 15, 2016. There is no evidence showing that Arnold communicated with Turner about Plaintiff's orthotic shoes before February 15, 2016.

Plaintiff appears to concede that Turner was not deliberately indifferent if she learned about his medical needs for the first time on February 15, 2016, as the damage to his right foot had already occurred by that point. Plaintiff's expert, Dr. Wright, seems to agree with this assessment, testifying that Turner would not be at fault if she was informed "late" that there was a problem with Plaintiff's foot. (ECF No. 111-2, p. 9). Dr. Wright's expert report does not opine that Turner did anything wrong. *See generally id.* at 17-21.

The Court does not believe that there is a genuine dispute of material fact on this issue. There is no evidence that Turner learned of Plaintiff's medical needs before February 15, 2016. Even if the Court assumes *arguendo* that Turner was informed of Plaintiff's needs sometime in

13

early February 2016, there is no summary judgment evidence showing that she deliberately disregarded those needs.  Nothing in the record indicates that Turner is a doctor capable of determining medical necessity, or that she would be able to otherwise circumvent the SWACCC's requirement that a doctor must determine a prisoner's medical device to be medically necessary before the device can be procured.  Moreover, Plaintiff's reliance on *Langford* to place culpability on Turner is unpersuasive for the same reasons discussed above for Dr. Lemdja.  The summary judgment record does not establish that Turner was deliberately indifferent to Plaintiff's serious medical needs.  Plaintiff's section 1983 claim against her should be dismissed.

### c. Smith

Plaintiff contends that a question of fact exists as to whether Smith was deliberately indifferent to his serious medical needs.  He argues that Smith has testified that, after she saw Plaintiff on February 5, 2016 and became aware of his Charcot foot, a Correct Care Solutions, LLC policy provided that she could not speak with Turner about obtaining Plaintiff's orthotic shoes because she did not have a doctor's order for them.  Plaintiff contends that Turner testified that there was no policy to prevent nurses from communicating with her absent a doctor's note. Thus, Plaintiff argues that if the jury believes Turner's testimony, it necessary follows that Smith was deliberately indifferent for not discussing the matter with Turner.

The Medical Defendants argue that there is no evidence showing that Smith was deliberately indifferent.  They state that Smith never testified that a policy prevented her from discussing Plaintiff's orthotic shoes with Turner, but rather, she did not do so because she was not a doctor and it was not within her authority to order medical devices for inmates.  They argue that Plaintiff has produced no evidence that Smith did anything wrong and that Plaintiff's own expert on correctional and medical care, Dr. Wright, testified that Smith acted properly on February 5, 2016.

The Court agrees with the Medical Defendants. There is no evidence in the record showing that Smith acted with deliberate indifference. She saw Plaintiff at sick call on February 5, 2016, noted the wounds on his left foot and his Charcot foot, and provided treatment for the open wounds. She also asked Dr. Lemdja to examine Plaintiff's left foot, and during that exchange, Dr. Lemdja indicated to Plaintiff that he should call his family regarding his orthotic shoes. No order was written that day for orthotic shoes.

The Court does not believe there is a question of fact regarding whether a policy prevented Smith from contacting Turner. Smith does not testify that any policy or custom of Correct Care Solutions, LLC prevented her from going over Dr. Lemdja's head and discussing orthotic shoes with Turner without a doctor's note. Rather, she testified that she was a nurse and did not have the authority to order medical devices, so she would not have discussed a medical device with Turner if a doctor had not ordered it. Smith clearly believed that Dr. Lemdja's oral instruction to Plaintiff to call his family about his shoes was not a "doctor's order" that orthotic shoes were medically necessary, given that she did not take that instruction to Turner to facilitate the procurement of the shoes.

Like Dr. Lemdja, Smith's actions could arguably constitute negligence or medical malpractice if enough evidence bears it out.[9] Even if so, though, that does not rise to the level of deliberate indifference. *Popoalii*, 512 F.3d at 499; *Dulany*, 132 F.3d at 1239. Smith did not refuse to treat Plaintiff, nor is it apparent from the record that her conduct evidences intentional maltreatment. Smith treated Plaintiff for the wounds on his left foot and asked Dr. Lemdja to look at his feet. Perhaps Smith could have had a follow-up conversation with Dr. Lemdja after she told

---

[9] However, it is dubious whether there is sufficient evidence for that, given that the only expert testimony Plaintiff points to concerning Smith is Dr. Wright's expert report and deposition testimony. Dr. Wright did not opine that Smith did anything wrong and expressly stated that he believed she acted properly on February 5, 2016.

Plaintiff to call his family about orthotic shoes and told her that, if she intended to order orthotic shoes for him, she needed to write an order for it. However, this possibility would go to negligence, not deliberate indifference. Despite Smith's testimony that Plaintiff's foot concerned her,[10] given that she was a nurse, it was reasonable for her to defer to the doctor's chosen course of action and not pursue the matter further, which is what she testified she did. *See Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000) (providing that "even if an official knows of a risk, she is not liable for a subsequent injury if she responded reasonably to the known risk").

Plaintiff suggests that Smith's knowledge of his Charcot foot and her subsequent inaction in procuring orthotic shoes for him shows her deliberate indifference. The Court disagrees. There is no evidence showing that Smith acted with the necessary intent to constitute deliberate indifference to his serious needs. Plaintiff's argument otherwise is purely speculative. Based on the present record, the Court must find that no genuine issue of material fact exists on this issue and that Smith was not deliberately indifferent. Plaintiff's section 1983 claim against her should be dismissed.

### d. Correct Care Solutions, LLC

Plaintiff alleges that Defendant Correct Care Solutions, LLC—the medical contractor at the SWACCC—is liable for the unconstitutional actions of its employees under the theory of *respondeat superior* and because it instituted policies, procedures, and protocols that caused the violation of his constitutional rights. The Medical Defendants argue that Correct Care Solutions cannot be held liable under section 1983 solely based on *respondeat superior* and that there is no evidence that it established any unconstitutional policy or custom.[11]

---

[10] It is unclear exactly which foot she meant, as she did not specify. The line of questioning immediately preceding that statement concerned Plaintiff's left foot, which was not the foot with Charcot foot. (ECF No. 124-11, p. 3).

[11] It is unclear whether Plaintiff is also proceeding against Smith in her official capacity. He names her in his complaint as "Nurse Kendall [sic] Smith, Individually and Employee of Correct Care Solutions, LLC." (ECF No. 42, p. 1). If

For purposes of 42 U.S.C. § 1983, "it is well established that a municipality [or a contracting corporate entity] cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). Thus, to maintain a section 1983 claim against Correct Care Solutions, Plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006) (discussing a section 1983 claim against a prison medical provider); *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993) ("[A] corporation acting under color of state law will only be held liable under section 1983 for its own unconstitutional policies.").

To establish the existence of an unconstitutional policy, Plaintiff must point to "a deliberate choice of a guiding principle or procedure made by the [corporate officer] who has final authority regarding such matters." *Mettler v. Whiteledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). "A . . . custom involves a pattern of persistent and widespread . . . practices which become so permanent and well settled as to have the effect and force of law." *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007) (cleaned up). To establish the existence of a custom, Plaintiff must demonstrate:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the . . . entity's employees;
>
> 2) Deliberate indifference to or tacit authorization of such conduct by the . . . entity's policymaking officials after notice to the officials of that misconduct; and
>
> 3) That plaintiff was injured by acts pursuant to the . . . entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

---

this is meant to name Smith in both her individual and official capacities, the official capacity claim against her is functionally the same as directly suing Correct Care Solutions, LLC, and the same analysis governs both. *See Cannady v. Cradduck*, No. 5:16-cv-5039-TLB, 2016 WL 4432704, *1-2 (W.D. Ark. Aug. 18, 2016) (finding that official capacity claims against employees of a third party medical provider are treated as claims against the company because the county contracted with the company to provide healthcare to county prisoners).

*Id.* at 828.  Under this standard, "multiple incidents involving a single plaintiff could establish a custom if some evidence indicates that the incidents occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials."  *Id.*

Plaintiff has not offered evidence that Correct Care Solutions created and maintained a policy of denying orthotic shoes to inmates with diabetes and Charcot foot.  He argues Correct Care Solutions may have had a policy in place that prevented nurses from notifying a healthcare services administrator about an inmate's need for a medical device without a doctor's order, which caused Smith to not inform Turner about Plaintiff's orthotic shoes despite having knowledge of it.  However, there is no evidence indicating that Correct Care Solutions had such a policy.  The only policy reflected in the record is that of SWACCC, providing that if a doctor finds a device medically necessary, the warden would then be asked to approve the outside device's entry into the facility.  (ECF No. 125-6, p. 3).  The evidence shows that doctors in the SWACCC had authority to order the use of medical devices.  Nurses like Smith did not have the power to order medical devices for inmates, nor does it appear that nurses had the ability to go over the head of a doctor and request a device for an inmate.  The Court is unconvinced that there is any evidence of an unconstitutional policy of Correct Care Solutions.

There is also no evidence of an unconstitutional custom.  Like the above, Plaintiff argues that Smith's failure to contact Turner about Plaintiff's need for orthotic shoes from February 5 through February 16, 2016, shows that Correct Care Solutions maintained a custom that prevented inmates from receiving their medical devices.  However, Plaintiff has not shown a continuing, widespread, persistent pattern of unconstitutional misconduct by Correct Care Solutions' employees.  As relevant to this motion, Smith saw Plaintiff three times, on February 5, 7, and 11, 2016.  These contacts, and her failure to go to Turner to approve Plaintiff's orthotic shoes for

18

roughly ten days afterwards, does not establish that the conduct was continuing, widespread, and persistent.  Plaintiff has also failed to show that Correct Care Solutions had notice of, and was deliberately indifferent to, the conduct.  Consequently, Plaintiff has not shown that Correct Care Solutions maintained a custom that violated his constitutional rights.

Accordingly, the Court finds that Plaintiff has not demonstrated that Correct Care Solutions had an unconstitutional policy or custom that caused a deprivation of Plaintiff's constitutional rights.  Correct Care Solutions was not deliberately indifferent to his serious medical needs, and Plaintiff's section 1983 claim against it should be dismissed.

### 2. Negligence

Plaintiff has also asserted negligence claims against each of the Medical Defendants.  The Court will not reach those claims for the following reasons.

As discussed above, the Medical Defendants are entitled to summary judgment on Plaintiff's federal claims against them.  Those claims will be dismissed with prejudice.  The Court has also determined in a separate memorandum opinion that Steven Arnold is entitled to summary judgment on Plaintiff's federal claims against him.  Consequently, no federal claims remain in this case.  The only remaining claims are Plaintiff's state-law claims, which are before the Court based on supplemental jurisdiction.

A court may decline to exercise supplemental jurisdiction over state claims if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  In other words, the Court maintains discretion to either dismiss or remand the state claims, or allow them to proceed in federal court.  *Lindsey v. Dillard's, Inc.*, 306 F.3d 596, 599 (8th Cir. 2002).

To be clear, this Court certainly has the power to exercise jurisdiction over Plaintiff's remaining state claims even though the federal claims have all been resolved.  *Osborn v. Haley*, 549 U.S. 225, 245 (2007).  However, the question becomes whether the Court should exercise that

power.  When determining whether to exercise supplemental jurisdiction, the Court must consider

various factors such as judicial economy, convenience, fairness, and comity.  *See Carnegie-Mellon*

*Univ. v. Cohill*, 484 U.S. 343, 357 (1988); *Quinn v. Ocwen Fed. Bank FSB*, 470 F.3d 1240, 1249

(8th Cir. 2006) (per curiam).  In the Eighth Circuit, the preference is for a district court to decline

to exercise supplemental jurisdiction when all federal claims have been eliminated before trial.

*Williams v. Hobbs*, 658 F.3d 842, 853 (8th Cir. 2011); *Johnson v. City of Shorewood, Minn.*, 360

F.3d 810, 819 (8th Cir. 2004) ("'[I]n the usual case in which all federal-law claims are eliminated

before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will

point toward declining to exercise jurisdiction over the remaining state-law claims.'") (quoting

*Cohill*, 484 U.S. at 350 n.7).

This preference is rooted in a desire to avoid encroaching upon a state court's jurisdiction

over matters of state law.  *See Curtis v. Sears, Roebuck & Co*., 754 F.2d 781, 786-87 (8th Cir.

1985) (explaining that exercising jurisdiction over purely state law claims is disfavored and noting

that "if the federal court goes ahead and tries the state-law claim, it will conduct a full-blown trial

and enter judgment on a claim over which it could not constitutionally have been given

independent jurisdiction").  In addressing issues of supplemental jurisdiction, the Supreme Court

has stated that "[n]eedless decisions of state law should be avoided both as a matter of comity and

to promote justice between the parties, by procuring for them a surer-footed reading of applicable

law."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Gregoire*, 236

F.3d at 420 (stressing "the need to exercise judicial restraint and avoid state law issues wherever

possible").

Under these circumstances, the Court finds that it would be inappropriate to exercise

supplemental jurisdiction over Plaintiff's remaining state-law claims.  *See Curtis*, 754 F.2d at 785

(stating that exercising supplemental jurisdiction is likely improper when dealing with state-law

claims that could have been asserted on their own without raising any theory of recovery under federal law).  Because the Court has dismissed Plaintiff's federal claims, it declines to exercise supplemental jurisdiction over his remaining state-law claims.  Plaintiff's negligence claims against the Medical Defendants will be dismissed without prejudice.[12]

### III.  CONCLUSION

For the above-stated reasons, the Court finds that the Medical Defendants' Motion for Summary Judgment (ECF No. 109) should be and hereby is **GRANTED**.  Plaintiff's claims of deliberate indifference against the Medical Defendants are hereby **DISMISSED WITH PREJUDICE**.  Plaintiff's state-law claims of negligence against the Medical Defendants are hereby **DISMISSED WITHOUT PREJUDICE**.  A judgment of even date shall issue.

**IT IS SO ORDERED**, this 15th day of July, 2020.

/s/ Susan O. Hickey
Susan O. Hickey
Chief United States District Judge

---

[12] "It should be noted that if [Plaintiff chooses] to refile [his] tort claims in state court, it appears that the Arkansas 'savings statute' protects [him] from any statute of limitations issue."  *Sitzes v. City of W. Memphis, Ark.*, No. 3:08-cv-0026-WRW, 2009 WL 9072639, at *4 n.34 (E.D. Ark. Apr. 10, 2009) (citing Ark. Code Ann. § 16-56-126; *Carton v. Mo. Pac. R.R. Co.*, 295 Ark. 126 (1988), *aff'd*, 606 F.3d 461 (8th Cir. 2010)).